ROBBINS LLP
Brian J. Robbins (190624)
Craig W. Smith (164886)
Shane P. Sanders (237146)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
          csmith@robbinsllp.com
          ssanders@robbinsllp.com

WEISS LAW LLP
Joel E. Elkins (256020)
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
E-mail: jelkins@weisslawllp.com

David C. Katz (admitted *pro hac vice*)
Mark D. Smilow (*pro hac* to be filed)
Joshua Rubin (*pro hac* to be filed)
1500 Broadway, 16th Floor
New York, NY 10036
E-mail: dkatz@weisslawllp.com
          msmilow@weisslawllp.com
          jrubin@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE INC. STOCKHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Lead Case No. 4:19-cv-05153-YGR<br><br>**NOTICE OF MOTION, UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: April 16, 2024<br>Time: 2:00 p.m.<br>Courtroom: 1 - 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED AND RELIEF SOUGHT ................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 2

I.     INTRODUCTION .................................................................................................... 2

II.    OVERVIEW OF THE LITIGATION ...................................................................... 5

     A.    Plaintiffs' Allegations ................................................................................ 5

     B.    Procedural Background .............................................................................. 8

          1.    The Federal Action ......................................................................... 8

          2.    The California Action ..................................................................... 10

          3.    The Litigation Demand ................................................................. 11

     C.    Settlement Negotiations ........................................................................... 11

III.   TERMS OF THE SETTLEMENT ........................................................................ 12

IV.   LEGAL STANDARDS ........................................................................................ 14

V.    THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL ................. 15

     A.    The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations .......... 15

     B.    The Settlement Is Well Within the Range of Possible Approval ........................ 18

     C.    The Risks and Expenses of Protracted Litigation Support Settlement ................. 22

VI.   THE PROPOSED NOTICE SATISFIES RULE 23.1 AND AFFORDS DUE PROCESS ....................................................................................................... 24

VII.  PROPOSED SCHEDULE OF EVENTS ............................................................... 25

VIII. CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*Arace v. Thompson*,
   2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ................................................................ 24

*Arnaud van der Gracht de Rommerswael v. Auerbach*,
   2019 WL 7753447 (C.D. Cal. Jan. 7, 2019) .................................................................. 15

*Athan v. United States Steel Corp.*,
   523 F. Supp. 3d 960 (E.D. Mich. 2021) ......................................................................... 24

*Brooks v. Am. Exp. Indus., Inc.*,
   1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977) .............................................. 17

*Churchill Vill., LLC v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ......................................................................................... 24

*Clark v. Ecolab Inc.*,
   2010 WL 1948198 (S.D.N.Y. May 11, 2010) ................................................................ 16

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ....................................................................................... 14

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................................ 18, 20, 22

*Copeland v. Lane*,
   2013 WL 1899741 (N.D. Cal. May 6, 2013) ................................................................. 22

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ............................................................................................ 17

*Four in One Co. v. S.K. Foods, L.P.*,
   2014 WL 4078232 (E.D. Cal. Aug. 14, 2014) ............................................................... 23

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................. 14, 18

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,
   2010 WL 4027632 (S.D. Cal. Oct. 14, 2010) ................................................................ 18

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ....................................................................................................... 15

*In re Am. Cap. S'holder Derivative Litig.*,
   2013 WL 3322294 (D. Md. June 26, 2013) ................................................................... 25

*In re AOL Time Warner S'holder Derivative Litig.*,
  2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) .................................................. 24

*In re Apple Computer, Inc. Derivative Litig.*,
  2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ........................................... 18, 19

*In re Apple Inc. Device Performance Litig.*,
  2021 U.S. Dist. LEXIS 50550 (N.D. Cal. Mar. 17, 2021) ............................... 17

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................... 15

*In re Chickie's & Pete's Wage & Hour Litig.*,
  2014 WL 911718 (E.D. Pa. Mar. 7, 2014) ...................................................... 18

*In re Emerson Radio S'holder Derivative Litig.*,
  2011 WL 1135006 (Del. Ch. Mar. 28, 2011) ................................................. 20

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
  1992 U.S. Dist. LEXIS 14337 (C.D. Cal. June 10, 1992) ................................. 16

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
  726 F.2d 1075 (6th Cir. 1985) ..................................................................... 24

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
  716 F. App'x 603 (9th Cir. 2017) ................................................................ 18

*In re Intel Corp. Derivative Litig.*,
  2010 WL 2955178 (D. Del. July 22, 2010) ..................................................... 23

*In re Lloyd's Am. Tr. Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ............................................... 23

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................... 15

*In re NVIDIA Corp. Derivative Litig*,
  2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009) ............................... 18

*In re NVIDIA Corp. Derivative Litig.*,
  2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................................................ 14

*In re OSI Sys. Derivative Litig.*,
  2017 WL 5642304 (C.D. Cal. May 2, 2017) ................................................... 23

*In re OSI Sys., Inc. Derivative Litig.*,
  2017 U.S. Dist. LEXIS 221033 (C.D. Cal. May 2, 2017) ................................. 18

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) ........................................................ 14, 16, 22, 23

*In re Pfizer Inc. S'holder Derivative Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011) ................................................................. 19

*In re Pinterest Derivative Litig.*,
    2022 WL 484961 (N.D. Cal. Feb 16, 2022) ...................................................... 18

*In re PMC-Sierra, Inc. Derivative Litig.*,
    2010 U.S. Dist. LEXIS 5818 (N.D. Cal. Jan. 26, 2010) ................................. 24

*In re Wells Fargo & Co. Shareholder Derivative Litig.*,
    2019 WL 13020734 (N.D. Cal. May 14, 2019) ............................................... 14

*In re Xoma Corp. Sec. Litig.*,
    1992 U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ............................... 14

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) ...................................................................... 15

*Johnson v. Hui*,
    752 F. Supp. 909 (N.D. Cal. 1990) .................................................................. 22

*Kamen v. Kemper Fin. Servs. Inc.*,
    500 U.S. 90 (1991) ........................................................................................... 22

*Lewis v. Anderson*,
    692 F.2d 1267 (9th Cir. 1982) .................................................................. 19, 22

*Lloyd v. Gupta*,
    2016 WL 3951652 (N.D. Cal. July 22, 2016) ................................................. 15

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ............................................................... 18, 23, 24

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ......................................................................................... 18

*Officers for Just. v. Civil Serv. Comm'n of S.F.*,
    688 F.2d 615 (9th Cir. 1982) .................................................................... 14, 22

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ............................................................................ 15

*Satchell v. Fed. Express Corp.*,
    2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ................................................. 18

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ................................................................................. 22

*True v. Am. Honda Motor Co., Inc.*,
    2009 WL 838284 (C.D. Cal. Mar. 25, 2009) ............................................ 14, 15

*U.S. v. McInnes*,
    556 F.2d 436 (9th Cir. 1977) ................................................................ 14

*Villanueva v. Morpho Detection, Inc.*,
    2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) ................................... 15

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) ............................................................. 17, 22

**STATUTES, RULES & OTHER AUTHORITIES**

Cal. Corp. Code §800(b)(2) ......................................................................... 22

Federal Rule of Civil Procedure 23.1 ......................................................... 22

MANUAL FOR COMPLEX LITIGATION §21.632 (4th ed. 2004) .................. 14, 15

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 16, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Yvonne Gonzalez Rogers, Courtroom 1, 1301 Clay Street, Oakland, CA 94612, plaintiffs Terrence Zehrer, Andrew Fine, Tammy Federman SEP/IRA, The Rosenfeld Family Foundation, and John Votto (collectively, the "Federal Plaintiffs") will and hereby do move the Court for an order: (1) preliminarily approving the proposed Settlement,[1] which will resolve the above-captioned consolidated shareholder derivative action (the "Federal Action") brought on behalf of Apple Inc. ("Apple" or "Company"), a related derivative action pending in the Superior Court of the State of California captioned, *In re Apple Inc. Stockholder Derivative Litigation*, Lead Case No. 19CV355213 (Cal. Super. Ct., Santa Clara Cnty.) (the "California Action" and together with the Federal Action, the "Actions"), and a shareholder litigation demand (the "Demand"); (2) approving the proposed form and manner of notice to Current Apple Shareholders; and (3) scheduling the Settlement Fairness Hearing to determine whether to approve the proposed Settlement and the agreed-upon Fee and Expense Amount and Service Awards to Plaintiffs (the "Motion").   The Motion is based on the following Memorandum of Points and Authorities, the Stipulation and exhibits thereto, the Lead Counsel Declaration, the previous filings and orders in this action, and such additional evidence or argument as the Court may require.

---

[1] Unless otherwise noted, all capitalized terms have the same definition as set forth in the Stipulation and Agreement of Compromise, Settlement, and Release dated February 8, 2024 (the "Stipulation" or "Stip."), which is attached as Exhibit 1 to the Joint Declaration of Craig W. Smith and David C. Katz in Support of Unopposed Motion for Preliminary Approval of Settlement (the "Lead Counsel Declaration" or "Lead Counsel Decl.").

**STATEMENT OF ISSUES TO BE DECIDED AND RELIEF SOUGHT**

1.      Whether the Court should preliminarily approve the Settlement based on a finding that its terms fall within the range of possible approval as fair, reasonable, and adequate.

2.      Whether the Court should approve the proposed form and manner of notice of the Settlement to Current Apple Shareholders as meeting due process standards.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Plaintiffs are pleased to present the Settlement for preliminary approval.  If approved, the Settlement will resolve consolidated shareholder derivative actions pending in two jurisdictions and a related shareholder litigation demand.  Stip., ¶¶13, 24.

The Settlement is the product of hard-fought, arm's-length negotiations conducted over more than a year by experienced well-informed counsel with the assistance of Hon. Layn Phillips (Ret.), of Phillips ADR Enterprises (the "Mediator"), a former federal judge with extensive experience mediating complex shareholder disputes, who also successfully mediated the resolution of the related consumer class action captioned, *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.) (the "Consumer Class Action").  The substantive consideration for the Settlement takes the form of policy, corporate governance, and oversight reforms designed to prevent recurrence of the same or similar alleged misconduct and corporate injury, and to help restore and maintain investor and customer confidence in Apple's commitment to address expeditiously, fairly, and transparently product performance issues as they arise (the "Enhancements").  Stip., ¶2; *see also id*., Ex. A.  While Defendants deny any wrongdoing,[2] the Parties agree that the Enhancements confer substantial benefits upon Apple and its shareholders, the value of which falls well within the range that might be approved as fair, reasonable and adequate, particularly in light of the significant costs, risks, delay, and management distraction that would be

---

[2] Defendants have denied, and continue to deny, that they committed, or aided and abetted in the commission of, any violation of law or duty or engaged in any wrongful acts whatsoever, including specifically those alleged in the Actions, and expressly maintain that they have complied with their statutory, fiduciary, and other legal duties, and that at all relevant times they acted in good faith and in a manner they reasonably believed to be in the best interests of Apple and its shareholders.

entailed in any attempt to secure a superior recovery through further litigation.  Stip., ¶2.  The Parties, and Apple's Board of Directors (the "Board"), agree that the Settlement serves the Company's and its shareholders' best interests and should be preliminarily approved.  *Id*.

Plaintiffs allege that certain officers and directors of Apple (the "Individual Defendants") breached fiduciary duties owed to the Company and its shareholders by causing or permitting Apple to respond to increasing reports of iPhone shutdowns by secretly disseminating power management instructions in iOS updates that slowed CPU and GPU clock rates on a range of iPhone functions, without customers' knowledge or consent, in violation of domestic and international consumer protection laws and regulations.  Plaintiffs contend that by failing to acknowledge widespread reports of iPhone shutdowns, and later minimizing the issue in public statements, while secretly distributing performance degrading software, the Individual Defendants exposed Apple to a series of domestic and international regulatory actions, consumer class actions, and securities class actions, and damaged customer loyalty during the critical transition to the next generation of iPhones, ceding market share to increasingly competitive Android-based products. Defendants deny the allegations and vigorously dispute the claims asserted in the Actions.

Pursuant to the Settlement, Apple will adopt, implement, and maintain for at least four years a suite of policy commitments and related corporate governance and oversight enhancements designed to address and prevent similar alleged misconduct and corporate injury, including, *inter alia*: (i) enhanced risk oversight regimes and response protocols governing the identification, assessment, escalation, and response to risks arising from product performance, manufacturing defects, and safety issues, and enhanced monitoring of management's responses to product regulatory compliance risks; (ii) enhancements to the duties and responsibilities of the Chief Compliance Officer ("CCO"), including, *inter alia*, responsibility for (a) overseeing the development, implementation, and execution of the enhanced monitoring and response protocols to ensure that relevant business teams timely develop, implement and disclose action plans designed to address and resolve or mitigate business, compliance, financial and/or reputational risks arising from product field performance and related customer experience issues, (b) escalating potentially significant or material risks and proposed remedial responses for direct oversight by the Board's

Risk Oversight Committee, and (c) reviewing iOS update release notes addressing Performance Management (as defined by the Stipulation) to ensure accurate, timely, and transparent disclosure of the key components of such updates; (iii) extension and expansion to future product generations of the expired Customer Transparency Commitments Apple had entered into with several states' attorneys general detailing Apple's disclosure obligations relating to lithium-ion batteries, unexpected shutdowns, Performance Management, iOS updates that materially change product Performance Management, and battery service options available to consumers when battery performance becomes significantly degraded, and related Board oversight mechanisms; and (iv) enhancements to the duties of the Disclosure Committee requiring its co-Chairs to review transcripts of earning conferences with analysts and investors to evaluate whether to recommend corrections, clarifications, further disclosures or explanations, or other actions. *See* Stip., Ex. A.

The Enhancements directly and comprehensively address the alleged lapses in governance, monitoring, internal controls, oversight, and disclosure that Plaintiffs contend permitted the alleged wrongdoing and corporate injury to occur, significantly reducing the likelihood of recurrence and laying the foundation necessary to restore and maintain consumer confidence in the iPhone brand and investor confidence in the integrity of Apple's corporate disclosures.  The Board, including each of its independent, non-employee directors (and the members of the Demand Evaluation Committee), advised by outside counsel for the Company, has unanimously approved a resolution reflecting the Board's determination that the Enhancements confer substantial benefits upon Apple and its shareholders, that the Settlement and each of its terms are fair and reasonable, and that the Settlement serves the best interests of the Company and its shareholders.  Stip. at 10.[3]

At the preliminary approval stage, the Court need only determine that the proposed Settlement falls within a range that might be found fair, reasonable, and adequate, such that notice

---

[3] After reaching agreement on the substantive consideration for the Settlement, with the Mediator's assistance the Parties separately negotiated and reached agreement on a reasonable award of $6,000,000 in attorneys' fees and expenses to Plaintiffs' Counsel, commensurate with the value of the Settlement recovery (the "Fee and Expense Amount"), subject to the Court's approval.  Stip., ¶17.  The Court is not asked to evaluate the agreed Fee and Expense Amount at the preliminary approval stage; that question is generally reserved for final settlement approval proceedings.

may be provided to Current Apple Shareholders and the Settlement Fairness Hearing scheduled for consideration of final settlement approval.  The Settlement plainly meets this standard.  The Settlement guarantees substantial benefits that will confer significant economic value over the course of many years, and is fair and reasonable, particularly balanced against the enormous costs, risks, delay, and disruption that would be entailed in continued litigation against corporate fiduciaries in pursuit of the vanishingly low probability that a materially better result might be achieved.  Moreover, the Settlement process was fair and not collusive.  The Settlement is the product of two in-person mediation sessions and additional months of hard-fought negotiations among sophisticated parties, each represented by experienced, well-informed counsel, facilitated by a respected neutral familiar with the relevant law and the particular subject matter.  The proposed form and manner of notice and the schedule for consideration of final approval meet applicable standards, as they inform Current Apple Shareholders of the Settlement's essential terms and afford a fair opportunity for comment and objection.

Accordingly, the Court should enter the [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Settlement Notice (Exhibit B to the Stipulation, and separately submitted concurrently herewith) granting preliminary approval, authorizing the dissemination of Notice, and scheduling the Settlement Fairness Hearing.

## II.    OVERVIEW OF THE LITIGATION

### A.    Plaintiffs' Allegations

Apple, a California corporation with its principal executive offices in Cupertino, California, designs, manufactures, and markets mobile communication and media devices and personal computers, and sells a variety of related software, services, accessories, and third-party digital content and applications.  ¶¶21, 55.[4]  The iPhone has served as Apple's flagship product since its release in 2007, accounting for nearly two-thirds of the Company's net sales in 2017.  ¶57.  Apple's

---

[4] Unless otherwise noted, all references to "¶__" or "¶¶__" are to the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Indemnification and Contribution filed by plaintiff Terrence Zehrer in the Federal Action on August 19, 2019.  ECF No. 1.

"iOS" mobile operating system drives the iPhone.  *Id*.  Apple regularly improves the functionality, security, and performance of the iPhone and the Company's other mobile devices through iOS updates, which play a critical role in ensuring competitive performance and customer loyalty.  ¶60.

Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Apple and its shareholders by causing or permitting the Company to first deny and then to minimize widespread iPhone shutdowns caused by aging batteries, while secretly distributing performance degrading power management software through iOS updates, in violation of consumer protection laws and regulations in the U.S. and abroad.  ¶69.

In 2016, older model iPhones began shutting down in response to the demands of iOS enhancements due to the declining performance of aging batteries.  ¶¶3, 61.  Apple responded to early reports of problems by denying that the problems were significant or widespread.  In January 2017, after internal assessments confirmed that a significant number of iPhones were impacted by declining battery performance, Apple secretly introduced software in iOS updates designed to "throttle" CPU and GPU clock rates, dramatically slowing the performance of older iPhone models, without owners' knowledge or consent.  ¶¶3, 62.  Because Apple did not tell iPhone owners that a $79 battery replacement would restore their phones' performance, many iPhone users replaced their older models, purchasing newer, more expensive next-generation iPhones in the mistaken belief that their older phones lacked sufficient processing power to keep pace with the demands of the new functions and applications.  ¶¶3, 63.

Despite the "fix" provided in the iOS update, declining battery performance continued to cause problems, and increasing numbers of users reported that their iPhones were operating more slowly.  ¶¶60-63.  In late 2017, independent investigators reported that the Apple iOS updates issued earlier in the year strongly correlated with the dramatically declining performance of older iPhone models.  On December 20, 2017, Apple admitted that neither the shutdowns nor the slowing performance was due to product obsolescence, but were due to aging batteries and to iOS updates that contained performance management routines designed to slow the execution of certain operations in older model iPhones.  ¶¶4-5, 64-67.  Apple's credibility and the iPhone brand were damaged, leaving Apple little choice but to over-correct to try to regain customer trust.  On

December 28, 2017, Apple announced a program that would permit customers to purchase replacement batteries for $29, a $50 discount.  ¶¶5, 68.

Plaintiffs further allege that between August 2017 and January 2019, Defendants caused or permitted Apple to make a series of misleading statements touting strong iPhone demand, while concealing that this demand was driven in material part by Apple's undisclosed performance throttling of older model iPhones, which had induced customers to replace older iPhones with newer generation iPhones sooner.  ¶¶11, 77-103.  Once the truth about the actual cause of older iPhone shutdowns and slower performance was revealed, material numbers of customers who might have opted to upgrade to the new generation iPhones opted instead to keep their old iPhones and to purchase the discounted replacement battery, while others opted to switch to competing products, negatively impacting sales and revenue.  *Id.*

On January 2, 2019, Apple issued a press release disclosing declining iPhone sales.  ¶105.  The Company reduced iPhone revenue guidance to $84 billion from the range of between $89 billion and $93 billion the Company had forecasted to investors just eight weeks before, marking the first time in fifteen years that Apple would fail to meet its revenue guidance.  *Id.*  Apple representatives attributed this decline to macroeconomic downtrends (primarily in China) and lower than expected rates of iPhone upgrades to newer models, admitting that the lower iPhone upgrade rates were due in part to customers' decisions to take advantage of Apple's belated discount Battery Replacement Program.  ¶¶105-06.  Estimates of lost revenues ranged into the billions of dollars.[5]

In addition to lost revenues, the cost of the discounted battery program, and serious damage to Apple's credibility and iPhone brand, Plaintiffs contend the Individual Defendants' alleged misconduct exposed the Company to: (i) domestic consumer class actions (*e.g.*, *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.) and *In re Apple OS Cases*, JCCP No. 4976 (Cal. Super. Ct., S.F. Cnty.) (the "Consumer Actions")); (ii) securities class actions (*e.g.*, consolidated in *In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR ("Federal

---

[5] *See, e.g.*, Matt Swider, *Apple's iPhone sales shortfall could cost it $9 billion in revenue*, techradar, Jan. 2, 2019, https://www.techradar.com/news/apple-iphone-revenue-shortfall-2019.

Securities Action")); (iii) class actions and regulatory actions in a variety of foreign jurisdictions, including Canada, France, Italy, and the UK;[6] and (iv) domestic regulatory actions.  ¶¶112-16.  In November 2020, Apple entered into a Consent Judgment with the Attorneys General of 34 U.S. states, including the District of Columbia, pursuant to which Apple agreed to pay $113 million and to adopt certain commitments to inform consumers about iPhone battery performance for a limited period.  On March 17, 2021, U.S. District Judge Edward J. Davila granted final approval of the settlement of the Consumer Actions, providing a non-reversionary minimum of $310 million and a maximum of $500 million to the settlement class.  *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.), ECF No. 608.

### B.      Procedural Background

#### 1.      The Federal Action

On August 19, 2019, plaintiff Terrence Zehrer filed a stockholder derivative complaint on behalf of Apple asserting claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution ("*Zehrer* Action").  ECF No. 1.  Three related shareholder derivative complaints were later filed asserting substantially similar claims arising out of the same facts and circumstances as the *Zehrer* Action: (i) *Fine, et al. v. Cook, et al.*, Case No. 4:19-cv-05863-YGR ("*Fine* Action") (filed September 20, 2019); (ii) *Bankhalter v. Cook, et al.*, Case No. 4:19-cv-05881-YGR ("*Bankhalter* Action") (filed September 20, 2019); and (iii) *Votto v. Cook, et al.*, Case No. 4:19-cv-08246-YGR ("*Votto* Action") (filed December 18, 2019).

On March 6, 2020, the Federal Plaintiffs and Defendants filed a stipulation to consolidate the *Zehrer* Action, *Fine* Action, *Bankhalter* Action, and *Votto* Action and to set a schedule for

---

[6] *See* T. Tomm, *Apple to pay $113 million to settle state investigation into iPhone "battergate"*, The Washington Post, Nov. 18, 2020, https://www.washingtonpost.com/technology/2020/11/18/apple-fine-battery/; P. Foran, *Apple to pay Canadians $14.4M in proposed class-action settlement. Here's how much you could get*, CTV News, Jan. 12, 2024, https://toronto.ctvnews.ca/apple-to-pay-canadians-14-4m-in-proposed-class-action-settlement-here-s-how-much-you-could-get1.6722319#:~:text=Following%20a%20scandal%20involving%20its,a%20proposed%20class%2Daction%20settlement; D. Deahi, Apple and Samsung fined in Italy for slowing down their phones, The Verge, Oct. 24, 2018; P. Cohen, *UK tribunal gives $2B iPhone battery lawsuit the go-ahead*, ai, Nov. 1, 2023, https://appleinsider.com/articles/23/11/01/uk-tribunal-gives-2b-iphone-battery-lawsuit-the-go-ahead.

---

1   motions for the appointment of lead counsel.  ECF No. 19.  On March 11, 2020, the Court entered

2   an order consolidating the *Zehrer* Action, *Fine* Action, *Bankhalter* Action, and *Votto* Action (thus

3   forming the Federal Action).  ECF No. 20.

4          On April 14, 2020, plaintiffs Zehrer, Fine, Federman, and the Rosenfeld Family Foundation

5   filed a motion to appoint Robbins LLP and Weiss Law LLP as co-lead counsel for all derivative

6   plaintiffs in the Federal Action.  ECF No. 23.  That same day, plaintiff Bankhalter filed a motion to

7   appoint Pritzker Levine LLP and Gainey McKenna & Egleston as interim co-lead counsel.  ECF

8   No. 21.  On June 29, 2020, following briefing on the competing lead counsel motions, the Court

9   appointed Robbins LLP and Weiss Law LLP as Plaintiffs' Co-Lead Counsel.  ECF No. 39.  Plaintiff

10  Bankhalter filed a motion for voluntary dismissal of the *Bankhalter* Action, which the Court granted.

11  ECF Nos. 40-41.

12         On August 11, 2020, the Federal Plaintiffs and Defendants filed a stipulation and proposed

13  order to stay the Federal Action pending resolution of the motion to dismiss the Federal Securities

14  Action.  ECF No. 42.  On August 18, 2020, the Court granted this stipulation.  ECF No. 43.

15         On January 21, 2021, following the partial denial of the motion to dismiss the Federal

16  Securities Action, the parties to the Federal Action filed a stipulation and proposed order to continue

17  the stay of the Federal Action until thirty days after the close of fact discovery in the Federal

18  Securities Action.  ECF No. 46.  On January 25, 2021, the Court granted this stipulation.  ECF No.

19  47.  The parties to the Federal Action sought subsequent extensions of the stay, all of which were

20  granted.  ECF Nos. 48-53.

21         On March 20, 2023, after meeting and conferring on a proposed schedule for further

22  proceedings, the parties to the Federal Action filed a stipulation and proposed order to set a schedule

23  for the Federal Plaintiffs to file a consolidated complaint or designate one of the existing complaints

24  in the action as the operative consolidated complaint before any briefing took place on motions

25  raising substantive issues concerning the Federal Plaintiffs' claims pursuant to Federal Rule of Civil

26  Procedure 23.1.  ECF No. 56.  On March 27, 2023, the Court granted this stipulation.  ECF No. 57.

27         On May 19, 2023, the parties to the Federal Action filed a stipulation extending the Federal

28  Plaintiffs' time to file their consolidated complaint due to their ongoing investigation of related

1   matters, which the Court granted.  ECF Nos. 58-59.

2       On October 5, 2023, the parties to the Federal Action filed a stipulation to advise the Court

3   that the parties had executed a memorandum of understanding to settle the litigation and were in the

4   process of negotiating and finalizing a settlement agreement.  ECF No. 63.

5       On January 19, 2024, the Court set a compliance deadline for March 8, 2024, requiring the

6   parties to file by March 1, 2024 either: (i) a motion for preliminary approval of the settlement; or

7   (ii) a joint statement explaining the parties' noncompliance.  ECF No. 69.

8                   **2.       The California Action**

9       On September 17, 2019, Tim Himstreet ("Himstreet") filed a derivative action in Superior

10  Court of the State of California, County of Santa Clara (the "California Court") captioned *Himstreet*

11  *v. Cook, et al.*, Case No. 19CV355213 ("*Himstreet* Action"), alleging, *inter alia*, breaches of

12  fiduciary duty by Defendants arising out of the same facts and circumstances as the Federal Action.

13  Stip. at 6.

14      On September 30, 2019, the parties to the *Himstreet* Action filed a stipulation and proposed

15  order to stay the action on terms similar to those in the Federal Action, which the California Court

16  granted on October 1, 2019.  *Id.*  This stay was subsequently extended on similar terms as those in

17  the Federal Action.  *Id.*

18      On August 17, 2020, plaintiff Steven Hill (together with Himstreet, the "California

19  Plaintiffs") filed a derivative action in California Court captioned *Hill v. Cook, et al.*, Case No.

20  20CV369387 ("*Hill* Action") alleging, *inter alia*, breaches of fiduciary duty by Defendants arising

21  out of the same facts and circumstances as the Federal Action.  *Id.*

22      On November 16, 2020, the California Court entered an order consolidating the *Himstreet*

23  Action and *Hill* Action (hereinafter, the "California Action") and continuing the Case Management

24  Conferences in the respective actions.  The California Action was stayed until February 1, 2023.

25  Stip. at 6-7.

26      On March 24, 2023, the parties to the California Action filed a stipulation setting a schedule

27  for the filing of a consolidated complaint and briefing on Apple's anticipated demurrer, which the

28  court granted.  Stip. at 7.  On May 19, 2023, the parties to the California Action filed a 28-day

1    extension of these deadlines, which the court granted.

2                    **3.      The Litigation Demand**

3         On November 13, 2018, Apple shareholders Augustin Sacks and Gerard Bernales made the

4    Demand on Apple's Board, demanding that the Board investigate claims arising from the same facts

5    and circumstances.  Stip. at 7.  On December 9, 2018, the Board formed an advisory Demand

6    Evaluation Committee to review and investigate the allegations, with the advice of independent

7    counsel, and to report to the Board concerning its conclusions and recommendations.  *Id.*

8         **C.      Settlement Negotiations**

9         The Settlement is the product of extensive negotiations, including multiple mediation

10   sessions before the Hon. Layn Phillips (Ret.) of Phillips ADR (the "Mediator"), a nationally

11   renowned mediator with extensive experience mediating complex shareholder disputes, who was

12   also uniquely familiar with the facts, having successfully mediated the resolution of the Consumer

13   Actions.  Stip. at 7-8.

14        On January 28, 2022, Plaintiffs submitted a mediation statement, made a settlement demand

15   on Defendants, and requested certain documents.  *Id.*  The parties dedicated significant time and

16   resources to the mediation and to subsequent settlement discussions.  In addition to its outside

17   counsel, Apple sent several in-house lawyers with relevant knowledge to engage directly in the

18   mediation process.  *Id.*

19        On January 31, 2022, the Parties held their first mediation session.  Stip. at 7.  The Parties

20   were unable to reach an agreement resolving the litigation during this session, but agreed to continue

21   their discussions under the aegis of the Mediator.  Stip. at 8.

22        On April 6, 2023, the Parties engaged in their second formal mediation session.  *Id.*  The

23   Parties discussed at length and in detail the complex facts and circumstances and their implications

24   for the claims and defenses, both indirectly through the Mediator and directly in joint sessions

25   attended by counsel for the Parties, percipient witnesses, and the relevant insurers.  *Id.*  During the

26   joint sessions, the Company provided detailed confidential information regarding the technical and

27   practical considerations that drove its decision-making with respect to the iOS performance updates.

28   *Id.*  The Parties debated their competing views of the essential facts, legal claims and defenses, and

the broad range of possible litigation outcomes.  The Parties also discussed a range of remedial options, and were able to agree on a set of principles and target areas for corporate governance enhancements to flesh out through further negotiations.  *Id.*

The Parties were unable to reach an agreement during the April 2023 in-person mediation, but continued negotiating.  *Id.*  Over the course of many months, the Parties exchanged written proposals and counter proposals, guided by the Mediator.  *Id.*  Ultimately, the Parties reached an agreement in principle on the material substantive consideration for the Settlement.  *Id.*

On August 9, 2023, the Parties executed a written memorandum of understanding outlining the essential terms and conditions for the release of all claims asserted in the Actions in consideration for Apple's agreement to adopt, implement, and maintain the Enhancements set forth in Exhibit A to the Stipulation of Settlement.  *Id.*

After the Parties reached an agreement in principle on the material substantive terms of the Settlement, the Parties commenced negotiations facilitated by the Mediator regarding a reasonable award of attorneys' fees and expenses to Plaintiffs' Counsel in consideration for the substantial benefits conferred upon Apple and its shareholders by the Settlement.  The Parties agree that, subject to the Court' approval, Apple shall pay or cause to be paid attorneys' fees and expenses to Plaintiffs' Counsel in the agreed amount of $6,000,000, from which Plaintiffs will each receive $5,000 Service Awards, subject to the Court's approval.  Stip. at 8-9 & ¶¶17, 23.

Thereafter, the settling Parties negotiated and finalized the formal operative terms of the Settlement set forth in the Stipulation.

## III.     TERMS OF THE SETTLEMENT

The Settlement commits the Board to the adoption, implementation, and/or maintenance of the Enhancements for at least four (4) years.  Stip., Ex. A.  The Enhancements are designed to prevent alleged lapses in Board and management oversight of risks related to the Company's products, and to ensure the Apple lives up to its brand commitments and communicates clear and accurate information to customers and shareholders.  In sum, Apple shall:

- Amend the Charter for its Risk Oversight Committee to specifically require the review and discussion of material regulatory compliance issues relating to the Company's products, including the risks in relation to product performance and

manufacturing defect and safety, and management's monitoring efforts, analysis, and response to potential product regulatory compliance risks.

- Add the Chief Compliance Officer ("CCO") as a member of the Risk Oversight Committee and require the CCO to report to the Audit and Finance Committee concerning emerging and ongoing risks discussed or presented at Risk Oversight Committee meetings.

- Ensure that all data (including in-store and third-party repair data, social media and other sources) bearing upon Performance Management will be actively and regularly monitored, compiled, and made available to leaders on the business teams responsible for product lines, who will evaluate, and, as appropriate, address or escalate for further review and oversight, real-time trends and issues.

- Implement a formal protocol to be facilitated and supervised by the CCO for the report, evaluation, recommendation, and escalation of potential product regulatory compliance risks, and procedures ensuring that important information is communicated to the relevant persons at the Company prior to remedial action and related disclosures, and enhanced reporting and oversight of responses to material compliance risks to ensure timely, effective and transparent remedial action.[7]

- Require the CCO (i) to review related iPhone release notes in advance of the release of an iOS update involving changes to Performance Management in order to ensure accurate, timely, and transparent disclosures of such changes; and (ii) to work with the appropriate business team leaders to ensure that Apple's website appropriately identifies and describes the key components of such release notes relating to Performance Management.

- Maintain easily accessible and prominent webpages that contain clear and conspicuous information about lithium-ion batteries, unexpected shutdowns, and Performance Management; notify consumers of any material change to Performance Management due to an iOS update, provide information about battery health in the iPhone user interface; and inform consumers of the option to service the iPhone battery once performance has become significantly degraded.

- Require training and education of consumer-facing staff in these matters to provide a "front-line" resource for consumers and maximize transparency and responsiveness when product-related issues arise.

---

[7] These provisions include, (i) the evaluation by the leaders on the business teams of any reports to consider whether further evaluation, escalation, and decision-making is required; (ii) the preparation of written reports reflecting these evaluations and dissemination to the CCO and Chief Operations Officer ("COO"); (iii) coordination between the COO and the relevant business teams to develop and implement and action plan to address or mitigate the relevant risks; (iv) preparation of escalation reports setting out the proposed remedial responses by the business teams in conjunction with the CCO and timely presentation of the reports to the Risk Oversight Committee, and, as appropriate, senior executives; and (v) a review and evaluation of the proposed remedial response by the Risk Oversight Committee and further recommendation on improvements to the response.

- Require the General Counsel to report to the Audit and Finance Committee on any material compliance issues.

- Require that Apple adopt and implement a written policy requiring the co-Chairs of the Disclosure Committee to review transcripts of each earnings call and make appropriate recommendations with respect to correction, clarification, further disclosure and explanation, or other actions.

## IV.   LEGAL STANDARDS

Federal Rule of Civil Procedure 23.1(c) provides that "[a] derivative action may be settled ... only with the court's approval." "[S]trong judicial policy … favors settlements" in complex cases, especially derivative actions.  *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *see In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Officers for Just. v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 635 (9th Cir. 1982) ("settlement process [is] favored in the law"); *U.S. v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("there is an overriding public interest in settling and quieting litigation"); *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 2019 WL 13020734, at *3 (N.D. Cal. May 14, 2019); *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("Because shareholder derivative actions are 'notoriously difficult and unpredictable ... settlements are favored.'") (omission in original); *In re Xoma Corp. Sec. Litig.*, 1992 U.S. Dist. LEXIS 10502, at *3-4 (N.D. Cal. July 10, 1992) ("The law favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").[8]

In a derivative action, settlement approval "generally proceeds in two stages"—preliminary approval followed by a final fairness hearing. *True v. Am. Honda Motor Co., Inc.*, 2009 WL 838284, at *3 (C.D. Cal. Mar. 25, 2009) (citing MANUAL FOR COMPLEX LITIGATION (hereinafter "MANUAL") §21.632 (4th ed. 2004)).   At the preliminary approval stage, the court's evaluation of proposed settlement terms is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Just.*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).  The

---

[8] Here, as throughout, citations and footnotes are omitted unless noted.

1   Court need only determine "whether a proposed settlement is 'within the range of possible approval'"

2   as fair, reasonable and adequate "and that notice should be sent to" shareholders.  *True*, 2009 WL

3   838284, at *3 (citing MANUAL §21.632).  Courts look to "'whether the settlement is the result of

4   arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the

5   shareholder class [here, Apple's interests], and whether the substantive terms of the settlement are

6   in the interests of [the company] and its shareholders relative to the likely rewards of litigation.'"

7   *Lloyd v. Gupta*, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016).  Where "the proposed settlement

8   appears to be the product of serious, informed, non-collusive negotiations, has no obvious

9   deficiencies, ... and falls within the range of possible approval, preliminary approval is granted."  *In*

10  *re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

11  **V.      THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL**

12      **A.      The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations**

13          Settlements achieved through extensive arm's-length negotiations conducted by

14  experienced, well-informed counsel enjoy a "presumption of fairness."  *Villanueva v. Morpho*

15  *Detection, Inc.*, 2015 WL 4760464, at *6 (N.D. Cal. Aug. 12, 2015); *see Arnaud van der Gracht de*

16  *Rommerswael v. Auerbach*, 2019 WL 7753447, at *3 (C.D. Cal. Jan. 7, 2019) ("strong presumption

17  of fairness" attached to settlement that "was the product of arms-length negotiations between

18  experienced and well-informed counsel"); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th

19  Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

20  resolution").[9]  Significant weight is accorded the parties' belief that the litigation should be settled

21  on the proposed terms, since "[p]arties represented by competent counsel are better positioned than

22

23  _____

24  [9] *See also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000) ("If … the Settlement is the product of arm's length negotiations conducted by experienced

25  counsel knowledgeable in complex ... litigation, the Settlement will enjoy a presumption of fairness.").  While the Court need not address the agreed Fee and Expense Amount until final approval, it bears mention that courts afford similar deference to arm's-length fee negotiations.  *See,*

26  *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (negotiated fees strongly preferred) ("[a]

27  request for attorney's fees should not result in a second major litigation"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (where no evidence of collusion and no detriment to the

28  parties, "the Court should give substantial weight to a negotiated fee amount").

1   courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Pac.*
2   *Enters.*, 47 F.3d at 378; *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992
3   U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992) (counsel's view that settlement served best
4   interests of class compelling factor favoring approval); *Clark v. Ecolab Inc.*, 2010 WL 1948198, at
5   *4 (S.D.N.Y. May 11, 2010) ("'Absent fraud or collusion, [courts] should be hesitant to substitute
6   [their] judgment, for that of the parties who negotiated the settlement.'") (alterations original).

7        Here, the Settlement was negotiated by parties with a firm understanding of the strengths
8   and weaknesses of the claims and defenses, and was reached after many months of hard-fought
9   negotiations, including two in-person mediation sessions attended by counsel for each party, as well
10  as several Apple in-house lawyers with direct knowledge of the relevant corporate operations and
11  decision-making.  Stip., ¶28.  Each of the settling Parties was represented by zealous and able
12  counsel with extensive experience in complex derivative litigation and who were fully informed
13  regarding the facts and the law applicable to the core claims and defenses.

14       Plaintiffs' Counsel conducted extensive research and investigation into the Defendants'
15  alleged misconduct and the corresponding alleged damages to Apple, including, *inter alia*: (i)
16  research and analysis in support of inspection demands pursuant to Cal. Corp. Code § 1601; (ii)
17  review and analysis of non-public corporate books and records produced by Apple during the
18  litigation, as well as Apple's public filings with the U.S. Securities and Exchange Commission
19  ("SEC"), press releases, announcements, transcripts of investor conference calls, and news articles;
20  (iii) review and analysis of the results of the investigations conducted by regulators, states attorneys
21  general, consumer litigants, securities litigants, and business, securities, and information technology
22  analysts, available in court filings, regulatory filings, press releases, website postings, and blogs;
23  (iv) thorough research and analysis of the applicable law governing the claims and potential defenses
24  in connection with the preparation of the initial complaints, drafts of the amended consolidated
25  complaints, mediation statements, and subsequent written and verbal mediation exchanges; (v)
26  research and analysis regarding remedial commitments negotiated in the related regulatory and
27  private actions, Apple's corporate governance and oversight policies and practices, the corporate
28  governance and brand management best practices of peer corporations, and relevant internal policies

provided by Apple during the course of settlement negotiations; (vi) additional legal and factual research conducted in connection with preparing responses to Defendants' mediation statement and anticipated arguments in the lead up to the two in-person mediation sessions, and over the course of the subsequent mediation exchanges; (vii) research, analysis, and calculation of the broad range of out-of-pocket damages and development of sources and models for estimating lost sales and revenues; (viii) review and analysis of information provided by Apple during the course of the mediation; and (ix) extensive pre- and post-mediation settlement discussions with the Mediator and counsel for Defendants.  Lead Counsel Decl., ¶4.  As a result, Plaintiffs' Counsel and their clients were well-positioned to negotiate effectively and to make fully informed decisions about the strengths and weaknesses of the claims and defenses, the available remedial alternatives, the likely costs, risks and duration of continued litigation, and the ultimate terms and conditions upon which they agreed to settle.

The Board, including each of its independent, non-employee directors as well as the members of the Demand Evaluation Committee, has determined that the Settlement is in the best interests of Apple and Current Apple Shareholders, and unanimously approved the Settlement.  Stip. at 10.  The Board's decision warrants substantial deference.  *See Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("[T]he decision of the [] board to approve this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity."); *see generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

Moreover, the negotiations were structured to eliminate potential conflicts of interest and to ensure fairness.  Apple was represented by experienced counsel at every phase of negotiations facilitated by an experienced private mediator familiar with the relevant law and the specific subject matter, and attorneys' fees were not addressed until the Parties had reached agreement upon the substantive consideration for the Settlement.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement ... helps to ensure that the proceedings were free of collusion"); *In re Apple Inc. Device Performance Litig.*, 2021 U.S. Dist. LEXIS 50550, at *44 (N.D. Cal. Mar. 17, 2021) ("extensive arm's-length negotiations between experienced counsel, including several in-person mediation sessions and additional negotiations facilitated by" mediator rules out collusion);

1  *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010 WL 4027632, at *2 (S.D. Cal. Oct. 14,

2  2010) ("negotiations for several months ... and the active involvement of the mediator ... weighs

3  considerably in favor of concluding this is not a collusive settlement"); *Satchell v. Fed. Express*

4  *Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced mediator

5  ... confirms that the settlement is non-collusive"); *In re Chickie's & Pete's Wage & Hour Litig.*,

6  2014 WL 911718, at *4 (E.D. Pa. Mar. 7, 2014) (no collusion where "the amount of attorneys' fees

7  could not have affected the amount of [p]laintiffs' recovery").

8  **B.      The Settlement Is Well Within the Range of Possible Approval**

9        In deciding whether to approve the settlement of a derivative action, "[t]he principal factor

10  to be considered ... is the extent of the benefit to be derived from the proposed settlement by the

11  corporation, the real party in interest." *In re Pinterest Derivative Litig.*, 2022 WL 484961, at *3

12  (N.D. Cal. Feb 16, 2022) (citing *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784,

13  at *2 (N.D. Cal. Nov. 5, 2008)); *In re OSI Sys., Inc. Derivative Litig.*, 2017 U.S. Dist. LEXIS

14  221033, at *5-6 (C.D. Cal. May 2, 2017).  Courts may weigh a variety of other factors, including:

15  "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further

16  litigation, the amount offered in settlement, the stage of the proceedings, the experience and views

17  of counsel, and the reaction of class members to the proposed settlement." *In re Hewlett-Packard*

18  *Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017); *Hanlon*, 150 F.3d at 1026.

19        Courts have long "recognized that corporate governance reforms such as those achieved here

20  provide valuable benefits to public companies." *In re NVIDIA Corp. Derivative Litig*, 2009 U.S.

21  Dist. LEXIS 24973, at *11-12 (N.D. Cal. Mar. 18, 2009); *see also Mills v. Elec. Auto-Lite Co.*, 396

22  U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ...

23  regardless of whether the benefit is pecuniary in nature.").  In fact, "the effects of the suit on the

24  functioning of the corporation may have a substantially greater economic impact on it, both long-

25  and short-term, than the dollar amount of any likely judgment in its favor." *Maher v. Zapata Corp.*,

26  714 F.2d 436, 461 (5th Cir. 1983); *see also Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005)

27  ("Courts have recognized that corporate governance reforms ... provide valuable benefits to public

28  companies.").  Courts routinely approve settlements where corporate governance reforms are

designed effectively to prevent the same or similar alleged wrongdoing that precipitated the litigation.  *See, e.g.*, *Apple Comput*, 2008 WL 4820784, at *2; *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (finding corporate governance reforms "sufficiently beneficial" to warrant settlement approval and fee award); *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement where therapeutics "significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company").

The Enhancements directly address the claims asserted in the Actions and confer substantial benefits upon Apple and Current Apple Shareholders.  *See* Section III, *supra*.

The Enhancements addressing risk oversight—*e.g.*, enhanced duties and responsibilities of the Risk Oversight Committee and the CCO, and improved oversight concerning data bearing upon Performance Management and potential product regulatory risks—will help ensure that risks like those at issue in the Actions are elevated to the appropriate personnel, assessed carefully and properly, and escalated to the Company's executive officers and Board (or relevant Board subcommittee).  This will (among other things) help maintain brand loyalty from Apple's customers, increase investor confidence by making clear that the Company will take swift and decisive action in the face of crises, and help prevent a recurrence of the alleged failures at issue here.  In addition, the improvements to Apple's risk oversight, and disclosure governance framework, processes and procedures will benefit Apple and its shareholders by clearly signaling the Company's commitment to the value and reliability of its brand, mitigating risk, increasing customer loyalty and satisfaction, building value for the Apple brand overall and helping to avoid a recurrence of the issues in this Action and the damages associated therewith.

The Enhancements to the Company's oversight of iOS update transparency—*e.g.*, requiring the CCO to review related iPhone release notes in advance of the release of an iOS update involving changes to Performance Management and to work with the appropriate business team leaders to ensure that Apple's website appropriately identifies and describes key components relating to Performance Management—will help prevent future, similar alleged misconduct and to rebuild

customer trust through improved transparency and protect the Company from negative impacts of crises it may confront in the future.

The Enhancements expanding the Company's previously expired customer transparency commitments—*e.g.*, enhanced transparency concerning information about Performance Management and battery health and servicing; required training and education of consumer-facing staff; and the requirement that the General Counsel report to the Audit and Finance Committee on material compliance issues—will help ensure Apple can respond swiftly to any concerns, and avoid large-scale risks to customer loyalty through timely, effective remedial action and communication.

Finally, the adoption of a written policy requiring the co-Chairs of the Disclosure Committee to review transcripts of management's earnings calls with financial analysts and investors and make appropriate recommendations for any corrections, clarifications, or further actions will help ensure that statements made by Apple's executives and/or directors in earnings conference calls are truthful, complete, and accurate, and, if necessary, are promptly corrected.

Apple has agreed to maintain the Enhancements for a minimum of four years, sufficient time to ensure that they become embedded in the Company's practices and corporate culture, with continuing benefits even after the expiration of the four-year commitment term.  *See Cohn*, 375 F. Supp. 2d at 850 (three-year commitment to reforms will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

The economic value of the Enhancements is real and substantial.  Operating together, the various components of this comprehensive remedial package will make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors."  *Id.* at 853.  While the value of preventing future alleged missteps cannot be determined with precision, the damages and reputational injuries Apple would suffer if faced again with regulatory, consumer and/or securities fraud actions arising from similar conduct, let alone lost sales and revenues and further damage to iPhone brand loyalty, suggests that even an aggressively discounted probable economic value ranges into the hundreds of millions of dollars.  *See, e.g.*, *In re Emerson Radio S'holder Derivative Litig.*, 2011 WL 1135006, at *6 (Del. Ch. Mar. 28, 2011) (estimating economic value of therapeutics

intended to prevent recurrence of misconduct by multiplying damages flowing from original misconduct by estimated risk of recurrence but-for new governance reforms).

More rigorous and effective oversight will improve decision-making and execution of key corporate strategies and help to restore and to maintain brand loyalty.  The value of avoiding the substantial economic costs of lost customer loyalty alone are enormous.  Ensuring swift and fair responses to customer concerns is essential to restoring and preserving the value of the Apple and iPhone brands.  Having a documented, established, and robust means to respond to customer concerns in a timely and transparent manner will help to ensure that customers continue to engage with Apple and install the iOS updates that enhance their enjoyment of the design advantages of Apple's products, and do not migrate to competing products.[10]

Finally, the Enhancements confer additional economic value by laying the foundation necessary to restore and preserve investor confidence in the effectiveness of Apple management and in the accuracy and integrity of Apple's public disclosures, particularly in connection with matters implicating brand value and loyalty, the essential bases of Apple's competitive advantage.  Strong governance and improved decision-making processes in the management of enterprise-level risks arising in core operations and reliable disclosures correlate with long-term value creation, for which investors will pay substantial premiums.[11]

---

[10] *See* Lead Counsel Decl., Ex. 2 (A.V. Muthukrishnan and Amitava Chattopadhyay, "Just Give Me Another Chance: The Strategies for Brand Recovery from a Bad First Impression," Journal of Marketing Research, Vol. XLIV (May 2007), 334–345 at 335); Ex. 3 (Ahluwalia, Rohini, Robert E. Burnkrant, and H. Rao Unnava. "Consumer Response to Negative Publicity: The Moderating Role of Commitment."  Journal of Marketing Research, Vol. XXXVII (May 2000), 203-214).

[11] *See* Lead Counsel Decl., Ex. 4 (P. Gompers, J. Ishii & A. Metrick, Corporate Governance and Equity Prices, Quarterly Journal of Economics, Vol. 118, No. 1, pp. 107-155, February 2003); *id.*, Ex. 5 (Brown, L. D., Ph.D., & Caylor, M. L., The Correlation between Corporate Governance and Company Performance, Institutional Shareholder Services (2004)); *id*., Ex. 6 (V. Cunant, M. Gina & M. Guadalupe, The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value, Journal of Finance, American Finance Association, Vol. 67(5), pp. 1943-1977 (Oct. 2012)).Ex. 7 (Lucian A. Bebchuk, Assaf Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009) ("There is now widespread [acceptance] that adequate investor protection can substantially affect []the value of public firms and their performance[.]")); *id.*, Ex. 8 (Robert Adamson, Corporate Governance, Risk Management and Corporate Social Responsibility in Emerging Markets: A Symbiotic Relationship, Corporate Governance & Risk Management Blog,

**C.**     **The Risks and Expenses of Protracted Litigation Support Settlement**

In evaluating the settlement benefit, courts recognize the limited utility of speculation about the possibility that further litigation might yield a materially better result.  "[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Just.* 688 F.2d at 624.  Here, the Settlement's guarantee of benefits with substantial long-term economic value far outweighs the vanishingly low probability that meaningfully superior benefits might be achieve through further litigation, particularly in light of the substantial costs, delays, and management distractions continued litigation would entail, and the substantial risk that further litigation would forfeit the Settlement's benefits and result in no recovery whatsoever.

Although Plaintiffs believe the derivative claims are meritorious, the risks of continued prosecution of the Action are substantial.  "[T]he odds of winning [a] derivative lawsuit [a]re extremely small." *Pac. Enters.*, 47 F.3d at 378; *Cohn*, 375 F. Supp. 2d at 852; *Lewis*, 59 F.R.D. at 528.  The risks begin at the pleadings stage, where demand futility must be pled with particularity as to a majority of Apple's directors, a super-majority of whom are independent, non-employee directors.  *See* Cal. Corp. Code § 800(b)(2); *see also* Fed. R. Civ. P. 23.1.  The demand futility requirement is satisfied only under "'extraordinary conditions[.]'" *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991)).[12]

Even if Plaintiffs succeed in pleading demand futility, the Board "'may appoint a special litigation committee'" tasked with investigating and determining whether to permit plaintiffs to prosecute the claims or to terminate the litigation.  *Johnson v. Hui*, 752 F. Supp. 909, 913-14 (N.D. Cal. 1990); *accord Zapata*, 430 A.2d at 786 ("We do not think that the interest taint of the board

---

Simon Fraser University, Beedie School of Business (Mar. 22, 2011) ("Investors, particularly large institutional investors, are … focused on corporate governance[.]… Paying attention to corporate governance issues is becoming an important part of investment decisions[.]")).

[12] The Demand faces an even tougher hurdle, because a board that "reject[s] the demand is entitled to the presumption of the business judgment rule." *Copeland v. Lane*, 2013 WL 1899741, at *7 (N.D. Cal. May 6, 2013); *accord Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990) (where demand is made, only the decision-making process is in issue, not the merits of the decision, and courts presume the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members … [that may] properly act for the corporation to move to dismiss derivative litigation[.]").  *See, e.g.*, *In re OSI Sys. Derivative Litig.*, 2017 WL 5642304, at *3 (C.D. Cal. May 2, 2017).

If Plaintiffs defeat the recommendation of a Special Litigation Committee, the challenges remain daunting, including, *inter alia*, (i) building a circumstantial case for liability based upon thousands of complex business and financial documents; (ii) proving actual damages in a battle of the experts;[13] (iii) overcoming motions for summary adjudication; (iv) securing a favorable judgment at trial through circumstantial evidence comprised of complex corporate documents and the testimony of predominantly hostile percipient witnesses and contested expert testimony; (v) maintaining that judgment through post-trial motions and appeals; and (vi) enforcing any judgment as might be obtained.  These challenges are amplified in shareholder derivative litigation, making it "notoriously difficult and unpredictable[,]" *Maher*, 714 F.2d at 455, and rendering the litigation option dubious, at best.  *Pac. Enters.*, 47 F.3d at 378 ("derivative lawsuits are rarely successful").  The pre-trial discovery required to overcome these challenges would be exceedingly costly, complex, and time-consuming, encompassing an enormous volume of documents, depositions of myriad fact witnesses, and preparation of expert reports and expert depositions.

The Settlement eliminates the risks, costs, delays, and disruption that further litigation would entail, including the very real risk that it would yield no recovery at all.  Weighed against these risks and costs, the Settlement's guarantee of substantial benefits far outweighs the speculative potential for a one-time monetary recovery of decisively greater value.  Accordingly, the Settlement falls within the range of reasonableness and should be preliminarily approved.  *See In re Intel Corp.*

---

[13] Proving damages is particularly difficult. *Four in One Co. v. S.K. Foods, L.P.*, 2014 WL 4078232, at *13 (E.D. Cal. Aug. 14, 2014) ("risks of continuing to litigate the action include determining damages, … an 'expert-intensive uncertain process[] often involving conflicting testimony,' and the possibility a jury could find either no damages or a fraction of the damages contended") (alteration in original); *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable.").

*Derivative Litig.*, 2010 WL 2955178, at *2 (D. Del. July 22, 2010) (governance benefits "outweigh the speculative potential of any monetary payment from the relevant insurance policies"); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *5 (S.D.N.Y. Sept. 6, 2006) (settlement ensures prophylaxis following corporate injury and permits management to restore full attention to business); *Athan v. United States Steel Corp.*, 523 F. Supp. 3d 960, 967-68 (E.D. Mich. 2021) (settlement "fair and reasonable … in relation to the potential risk and uncertain recovery").

## VI.   THE PROPOSED NOTICE SATISFIES RULE 23.1 AND AFFORDS DUE PROCESS

Rule 23.1(c) accords "'wide discretion to the District Court as to the form and content of the notice[.]'" *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1985); *Maher*, 714 F.2d at 450-51.  The Stipulation provides that within ten (10) business days after the Court enters the Preliminary Approval Order, Apple shall cause: (i) the posting of a copy of the Long Form Notice, substantially in the form attached to the Stipulation as Exhibit B-1, and the Stipulation on the Investor Relations page of the Company's website; (ii) the filing with the SEC of the Long Form Notice and Stipulation as exhibits to a Form 8-K, subject to any modifications the Court may require; and (iii) the publication of the Summary Notice, substantially in the form attached to the Stipulation as Exhibit B-2, in *Investor's Business Daily* ("*IBD*") and issuance of a press release with the Summary Notice on GlobeNewswire.  The Summary Notice will provide a link to the Company's Investor Relations web page where the Long Form Notice and the Stipulation may be viewed.  Stip., ¶9.  The Notice describes in plain English: (i) the terms and conditions of the Settlement; (ii) the facts and considerations that led the settling Parties to conclude that the proposed Settlement is fair, reasonable, adequate; (iii) the procedure for objecting; and (iv) the date, place, and time of the Settlement Fairness Hearing.  Stip., Exs. B-1 & B-2.  This form and manner of notice follows established practice long held to satisfy Rule 23.1(c) and due process standards.[14]

---

[14] *See Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"); *In re PMC-Sierra, Inc. Derivative Litig.*, 2010 U.S. Dist. LEXIS 5818, at *4 (N.D. Cal. Jan. 26, 2010) (approving notice by publication in *IBD* and posted on company's website); *Arace v. Thompson*, 2011 WL 3627716, at *1-2 (S.D.N.Y. Aug. 17, 2011) (finding notice published in *IBD* adequate to place absent shareholders

## VII.  PROPOSED SCHEDULE OF EVENTS

As part of the Preliminary Approval Order, Plaintiffs propose the following schedule:

| | |
|---|---|
| Long-Form Notice and Stipulation attached to Form 8-K filed with the SEC and posted on Apple's website, and Summary Notice published in *IBD* and in a press release on GlobeNewswire | Within 10 business days after entry of the Preliminary Approval Order |
| Deadline to file any motions for final approval | At least 21 calendar days before the Settlement Fairness Hearing |
| Deadline for Current Apple Shareholders to object | At least 14 calendar days before the Settlement Fairness Hearing |
| Deadline for filing any replies and responses to any shareholder objections | At least 7 calendar days before the Settlement Fairness Hearing |
| Settlement Fairness Hearing | At least 45 calendar days after entry of the Preliminary Approval Order |

This schedule tracks those generally approved in derivative actions and affords shareholders ample opportunity to be heard. *See, e.g.*, *In re Finisar Corp. Derivative Litig.*, No. C-06-07660-RMW-HRL, slip op. (N.D. Cal. Aug. 15, 2013) (Lead Counsel Decl., Ex. 9); *In re Extreme Networks, Inc. S'holder Derivative Litig.*, No. C-07-02268-RMW, slip op. (N.D. Cal. May 4, 2011) (Lead Counsel Decl., Ex. 10).

## VIII.  CONCLUSION

Plaintiffs respectfully submit that the Court should preliminarily approve the Settlement, schedule the Settlement Fairness Hearing, and authorize the dissemination of notice to shareholders.

DATED:  March 1, 2024

**ROBBINS LLP**

*/s/ Craig W. Smith*
Craig W. Smith
Brian J. Robbins
Shane P. Sanders
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990

---

on constructive notice of the settlement); *In re Am. Cap. S'holder Derivative Litig.*, 2013 WL 3322294, at *7 (D. Md. June 26, 2013) (approving notice via publication in *IBD*).

1

Facsimile: (619) 525-3991
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

**WEISS LAW LLP**
Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
jelkins@weisslawllp.com

David C. Katz (admitted p*ro hac vice*)
Mark D. Smilow (*pro hac vice* to be filed)
Joshua Rubin (*pro hac vice* to be filed)
1500 Broadway, 16th Floor
New York, NY 10036
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
dkatz@weisslawllp.com
msmilow@weisslawllp.com
jrubin@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*