ROBBINS LLP
Brian J. Robbins (190624)
Craig W. Smith (164886)
Shane P. Sanders (237146)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
         csmith@robbinsllp.com
         ssanders@robbinsllp.com

WEISS LAW LLP
Joel E. Elkins (256020)
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
E-mail: jelkins@weisslawllp.com

David C. Katz (admitted *pro hac vice*)
Mark D. Smilow (*pro hac* to be filed)
Joshua Rubin (*pro hac* to be filed)
1500 Broadway, 16th Floor
New York, NY 10036
E-mail: dkatz@weisslawllp.com
         msmilow@weisslawllp.com
         jrubin@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE INC. STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No. 4:19-cv-05153-YGR |
| | **NOTICE OF MOTION, MOTION FOR FINAL APPROVAL OF SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND EXPENSES, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| This Document Relates to: | |
| ALL ACTIONS | Date: July 16, 2024 |
| | Time: 2:00 p.m. |
| | Courtroom: 1 - 4th Floor |
| | Judge: Honorable Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED AND RELIEF SOUGHT ....................................2

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................2

I.     INTRODUCTION ................................................................................2

II.    THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT
NEGOTIATIONS, AND SETTLEMENT CONSIDERATION ...........................5

III.   GOVERNING LEGAL STANDARDS..................................................................5

IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ...........................6

     A.    The Settlement Merits the Presumption of Fairness .................................6

     B.    Plaintiffs' Counsel's Settlement Recommendation Is Well-Informed....................8

     C.    The Settlement's Substantial Benefits Support Final Approval ............................9

     D.    The Substantial Risks, Expense, Complexity, and Likely Duration of Further
Litigation Support the Settlement ....................................14

     E.    The Board's Decision to Approve the Settlement Warrants Deference.................17

V.    THE AGREED FEE AND EXPENSE AMOUNT SHOULD BE APPROVED .............18

     A.    The Parties' Agreement Is the Product of Arm's-Length Negotiations.................18

     B.    The Agreed Fee and Expense Amount Is Reasonable in Relation to the Value of
the Settlement Benefit...................................................20

     C.    A Lodestar Cross-Check Supports the Agreed Fee and Expense Amount...........23

     D.    The Proposed Service Awards to Each Plaintiff Are Reasonable .......................25

VI.   CONCLUSION....................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anselmo v. W. Paces Hotel Grp., LLC*,
   2012 WL 5868887 (D.S.C. Nov. 19, 2012)................................................22

*Arnaud van der Gracht de Rommerswael v. Auerbach*,
   2019 WL 7753447 (C.D. Cal. Jan. 7, 2019) ..............................................7

*Athan v. United States Steel Corp.*,
   523 F. Supp. 3d 960 (E.D. Mich. 2021).....................................................17

*Berkey Photo, Inc. v. Eastman Kodak Co*.,
   603 F.2d 263 (2d Cir. 1979)........................................................................17

*Brooks v. Am. Exp. Indus., Inc.*,
   1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977)..........................17

*Buccellato v. AT&T Operations, Inc.*,
   2011 WL 3348055 (N.D. Cal. June 30, 2011) ...........................................24

*Bushansky v. Kawas*,
   2024 U.S. Dist. LEXIS 81444 (W.D. Wash. May 3, 2024).........................6

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949).....................................................................................24

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005).................................................. *passim*

*Copeland v. Lane*,
   2013 WL 1899741 (N.D. Cal. May 6, 2013) ..............................................15

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)............................................................................7

*Desaigoudar v. Meyercord*,
   108 Cal. App. 4th 173 (2003) ......................................................................16

*Dupler v. Costco Wholesale Corp.*,
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ........................................................19

*Four in One Co. v. S.K. Foods, L.P.*,
   2014 U.S. Dist. LEXIS 113084 (E.D. Cal. Aug. 13, 2014)........................16

*Garner v. State Farm Mut. Auto. Ins. Co*.,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .............................................8

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)......................................................................................18

*Ingram v. Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001).................................................................19

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*,
62 B.R. 723 (S.D.N.Y. 1986).......................................................................22

*In re AOL Time Warner, Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)................................................18

*In re AOL Time Warner S'holder Derivative Litig.*,
2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006).......................................10, 17

*In re AOL Time Warner S'holder Derivative Litig.*,
2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)...........................................20, 23

*In re Apollo Grp., Inc. Sec. Litig.*,
2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd and remanded*, 2010 WL 5927988
(9th Cir. June 23, 2010) ..............................................................................17

*In re Apple Comput., Inc. Derivative Litig.*,
2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ..........................................9, 18, 19, 20

*In re Ashanti Goldfields Sec. Litig.*,
2005 WL 3050284 (E.D.N.Y. Nov. 15, 2005)............................................22

*In re Atmel Corp. Derivative Litig.*,
2010 WL 9525643 (N.D. Cal. Mar. 31, 2010)............................................20

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)..........................................................19

*In re Caremark Int'l. Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996)......................................................................15

*In re Cedant Corp. Derivative Action Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ..............................................................25

*In re Citigroup Inc. Bond Litig.*,
296 F.R.D. 147 (S.D.N.Y. 2013)..................................................................18

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) .......................................................................18

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
248 F.R.D. 483 (E.D. Mich. 2008) .........................................................18, 22

*In re Emerson Radio S'holder Derivative Litig.*,
    2011 WL 1135006 (Del. Ch. Mar. 28, 2011)...........................................................12

*In re F5 Networks, Inc. Derivative Litig.*,
    2011 WL 13195985 (W.D. Wash. Jan. 6, 2011).....................................................23

*In re Fab Universal Corp. S'holder Derivative Litig.*,
    148 F. Supp. 3d 277 (S.D.N.Y. 2015)......................................................................24

*In re Genworth Fin. Sec. Litig.*,
    210 F. Supp. 3d 837 (E.D. Va. 2016) .......................................................................25

*In re Google Inc. S'holder Derivative Litig.*,
    2015 WL 12990195 (N.D. Cal. Jan. 21, 2015).........................................................21

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) (en banc) ................................................................5, 22

*In re Intel Corp. Derivative Litig.*,
    2010 WL 2955178 (D. Del. July 22, 2010) ..............................................................17

*In re Lloyd's Am. Tr. Fund Litig.*,
    2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).......................................................16

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ..............................................................................25

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ......................................................................................8

*In re Microstrategy, Inc.*,
    172 F. Supp. 2d 778 (E.D. Va. 2001) ......................................................................23

*In re MRV Commc'ns Inc. Derivative Litig.*,
    2013 WL 2897874 (C.D. Cal. June 6, 2013) ..........................................................6, 8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................................25

*In re NVIDIA Corp. Derivative Litig.*,
    2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)............................................................5

*In re NVIDIA Corp. Derivative Litig.*,
    2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009)......................................6, 7

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ..............................................................18, 20

*In re Oracle Sec. Litig.*,
    852 F. Supp. 1437 (N.D. Cal. 1994) .........................................................................21

*In re OSI Sys., Inc. Derivative Litig.*,
   2017 WL 5642304 (C.D. Cal. May 2, 2017) ........................................................ *passim*

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ................................................................................. 15

*In re Pfizer Inc., S'holder Derivative Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011) ............................................................ 10, 21

*In re Rambus Inc. Derivative Litig.*,
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ....................................................... 21

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) .......................... 16

*In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................ 25

*In re Xoma Corp. Sec. Litig.*,
   1992 U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ...................................... 6

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*,
   489 U.S. 87 (1989) ............................................................................................... 20

*Johnson v. Hui*,
   752 F. Supp. 909 (N.D. Cal. 1990) ..................................................................... 15

*Kamen v. Kemper Fin. Servs. Inc.*,
   500 U.S. 90 (1991) .......................................................................................... 15, 24

*Kanter v. Reed*,
   92 Cal. App. 5th 191 (2023) ................................................................................ 15

*Lambrecht v. Taurel*,
   2010 U.S. Dist. LEXIS 75633 (S.D. Ind. June 8, 2010) ...................................... 22

*Lewis v. Anderson*,
   692 F.2d 1267 (9th Cir. 1982) ............................................................................... 9

*Lunsford v. Woodforest Nat'l Bank*,
   2014 WL 12740375 (N.D. Ga. May 19, 2014) .................................................... 17

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ...................................................................... 5, 10, 15

*Malchman v. Davis*,
   761 F.2d 893 (2d Cir. 1985), *abrogated by Amchem Prods., Inc. v. Windsor*, 521
   U.S. 591 (1997) .................................................................................................... 20

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)................................................................9, 10, 20, 21

*Officers for Just. v. Civ. Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ...................................................5, 6, 7, 17

*Ramey v. Cincinnati Enquirer, Inc.*,
   508 F.2d 1188 (6th Cir. 1974) ................................................................21

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ....................................................................7

*Sauby v. City of Fargo*,
   2009 WL 2168942 (D.N.D. July 16, 2009) ............................................25

*Shapiro v. JPMorgan Chase & Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................19

*Spiegel v. Buntrock*,
   571 A.2d 767 (Del. 1990) .......................................................................15

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ....................................................18

*Surowitz v. Hilton Hotels Corp.*,
   383 U.S. 363 (1966)................................................................................24

*U.S. v. McInnes*,
   556 F.2d 436 (9th Cir. 1977) ....................................................................5

*Unite Nat'l Ret. Fund v. Watts*,
   2005 WL 2877899 (D.N.J. Oct. 28, 2005)..................................10, 21, 22

*Unitrin, Inc. v. Am. Gen. Corp.*,
   651 A.2d 1361 (Del. 1995) .....................................................................17

*Velez v. Novartis Pharms. Corp.*,
   2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ........................................24

*Villanueva v. Morpho Detection, Inc.*,
   2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) ..........................................7

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ....................................................22, 23, 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)......................................................................24

*Zapata Corp. v. Maldonado*,
   430 A.2d 779 (Del. 1981) ..................................................................15, 18

**STATUTES, RULES & OTHER AUTHORITIES**

California Corporations Code
    § 800(b)(2) ........................................................................................................15
    § 204(a)(10) .....................................................................................................16

Federal Rules of Civil Procedure
    Rule 23.1 ..................................................................................................4, 6, 15

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 16, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Yvonne Gonzalez Rogers, Courtroom 1, 1301 Clay Street, Oakland, CA 94612, plaintiffs Terrence Zehrer, Andrew Fine, Tammy Federman SEP/IRA, The Rosenfeld Family Foundation, and John Votto (collectively, the "Federal Plaintiffs") will and hereby do move the Court for entry of the Judgment[1] granting final approval of the proposed Settlement, which will resolve the above-captioned consolidated shareholder derivative action (the "Federal Action") brought on behalf of Apple Inc. ("Apple" or "Company"), a related derivative action pending in the Superior Court of the State of California captioned *In re Apple Inc. Stockholder Derivative Litigation*, Lead Case No. 19CV355213 (Cal. Super. Ct., Santa Clara Cnty.) (the "California Action") (collectively, the "Actions"), and a shareholder litigation demand (the "Demand"), pursuant to the Stipulation dated April 29, 2024; and approving the agreed Fee and Expense Amount to be paid to Plaintiffs' Counsel and the Service Awards to Plaintiffs to be drawn therefrom (the "Motion").   The Motion is based on the following Memorandum of Points and Authorities; Stipulation and all exhibits thereto; Joint Declaration of Craig W. Smith and David C. Katz in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees And Expenses ("Lead Counsel Decl."); Declaration of Craig W. Smith on Behalf of Robbins LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Smith Decl."); Declaration of David C. Katz on Behalf of WeissLaw LLP in Support of Plaintiffs' Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Katz Decl."); Declaration of Daniella Quitt on Behalf of Glancy Prongy & Murray LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Quitt Decl."); Declaration of John C. Herman on Behalf of Herman Jones LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Herman Decl."); Declaration of Kevin Lane Keller in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Keller Decl."); Declaration of the Honorable Layn R. Phillips in Support of Motion for Final Approval

---

[1] Unless otherwise noted, all capitalized terms have the same definition as set forth in the Amended Stipulation and Agreement of Compromise, Settlement, and Release dated April 29, 2024 (the "Stipulation" or "Stip.") filed with the Court on April 30, 2024 (ECF No. 82-1).

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND AWARD OF
ATTORNEYS' FEES AND EXPENSES
LEAD CASE NO. 4:19-CV-05153-YGR                                                                    1

of Settlement and Award of Attorneys' Fees and Expenses ("Phillips Decl."); and previous filings and orders in this action, and such additional evidence or argument as the Court may require.

### STATEMENT OF ISSUES TO BE DECIDED AND RELIEF SOUGHT

1.    Whether the Court should approve the Settlement as fair, reasonable, and adequate and enter the Judgment substantially in the form annexed as Exhibit C to the Stipulation.

2.    Whether the Court should approve the agreed Fee and Expense Amount to be paid to Plaintiffs' Counsel as fair and reasonable, and the nominal Service Awards to be drawn therefrom.

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs respectfully present for approval the Settlement of claims asserted in shareholder derivative actions brought on behalf of nominal defendant Apple.  The Actions arise from performance management problems that caused Apple iPhones with aging batteries to shut down unexpectedly (hereinafter, the "PMP").  Plaintiffs claim that certain officers and directors of Apple (the "Individual Defendants") breached fiduciary duties to the Company by causing or permitting Apple to respond to complaints about unexpected iPhone shutdowns with iOS operating system updates that slowed CPU and GPU clock rates on a range of iPhone functions, without customers' knowledge or consent, in violation of domestic and international laws and regulations.  Apple faced regulatory actions, consumer and securities class actions, as a result, and the Apple and iPhone brands suffered serious and lasting damage, reducing sales and ceding market share to competing products.  Defendants deny the allegations and vigorously dispute the claims.[2]

The Settlement commits Apple's Board of Directors (the "Board") to adopt, implement, and maintain for a minimum of four years policy commitments and related corporate governance, internal controls, and oversight enhancements (the "Enhancements") designed to improve Apple's response to future product performance issues and substantially reduce the probability that Apple and its shareholders

---

[2] To be clear, Defendants have denied, and continue to deny, that they committed, or aided and abetted in the commission of, any violation of law or duty or engaged in any wrongful acts whatsoever, including specifically those alleged in the Actions, and expressly maintain that they have complied with their statutory, fiduciary, and other legal duties, and at all relevant times acted in good faith and in a manner they reasonably believed to be in the best interests of Apple and its shareholders.

will suffer the consequences of a similar brand crisis going forward.  In addition to loss prevention, Professor Kevin Lane Keller, the E. B. Osborn Professor of Marketing at the Tuck School of Business at Dartmouth College, explains in his accompanying declaration that the Enhancements provide the credible institutional response consumers demand following a brand crisis of this nature.  The Enhancements will contribute significantly to Apple's efforts to rebuild consumer trust in the iPhone brand promise and Apple brand values, and will help to restore and maintain the full power of the Apple brand in the marketplace ("brand equity").  Professor Keller confirms Plaintiffs' assessment that, while the Enhancements' economic value cannot be estimated with mathematical precision, the combined economic value of the Enhancements' prophylactic and brand equity effects will range into the hundreds of millions of dollars.

The Settlement benefits' probable range of economic value far outweighs the speculative prospect that further litigation might produce a one-time monetary award of substantially greater value, particularly when discounted by the enormous costs, disruption, and delay such litigation would entail, and the substantial risk that further litigation would sacrifice the Settlement benefit and produce no recovery.  Accordingly, Plaintiffs respectfully submit that the Settlement is substantively fair, reasonable, and adequate, and merits final approval.

The Settlement was reached in a fair process, warranting the presumption of fairness and reasonableness courts afford compromises reached in non-collusive negotiations among sophisticated parties represented by experienced and informed counsel.  The Settlement is the product of months of hard-fought negotiations conducted by lawyers with decades of shareholder litigation experience and a firm grip on the facts.  The Parties did not address the question of attorneys' fees until after they had reached agreement upon the substantive Settlement consideration.  The negotiations were facilitated by Hon. Layn Phillips (Ret.), an exceedingly experienced and skilled mediator with an unusually deep knowledge of the relevant facts and law, based upon his successful mediation of the settlement reached in the consumer class actions.  Judge Phillips confirms the negotiations were substantive, difficult, and conducted at arm's-length, without a hint of collusion.

The Parties reached agreement upon the award of $6 million in fees and expenses to be paid to Plaintiffs' Counsel, subject to court approval, in consideration for their efforts and risks assumed in securing the Settlement benefit through months of arm's-length negotiations facilitated by Judge Phillips. Judge Phillips confirms the negotiations were substantive, hard fought, and properly focused on the factors identified in applicable case law, including the value of the recovery and fee awards approved in comparable cases.  Accordingly, the agreed Fee and Expense Amount merits the substantial deference generally afforded negotiated awards, and the Court need only determine that the agreed amount falls within a reasonable range.  The $6 million agreed amount represents a small fraction of the Settlement's probable range of economic value, and is in line with awards approved in comparable derivative settlements.  A lodestar cross-check confirms the agreed amount will not confer a windfall relative to Plaintiffs' Counsels' efforts.  The nominal $5,000 Service Awards proposed for each Plaintiff properly recognize their indispensable role in securing the Settlement benefit for Apple and its shareholders, and will be drawn from any fees awarded to Plaintiffs' Counsel, preserving the value of the recovery. Accordingly, Plaintiffs respectfully submit that the Fee and Expense Amount and Service Awards are fair and reasonable and should be approved.

In the sound exercise of its business judgment, Apple's Board, including each of its independent, non-employee directors and the members of the Demand Evaluation Committee (the "DEC") appointed to investigate the Demand, advised by experienced in-house and outside counsel, unanimously determined that the Enhancements confer substantial benefits, and that the Settlement, including the Fee and Expense Amount, is fair, reasonable, and adequate, and serves the best interests of Apple and its shareholders.

Apple disseminated the Notice in the manner approved by the Court as meeting Rule 23.1 and due process standards.  To date, no objections have been filed or received by counsel, indicating strong support for the Settlement among Apple's tens of thousands of shareholders, including dozens of the world's largest financial institutions.

For these reasons, Plaintiffs respectfully submit that the Settlement should be approved in all respects, and the proposed Judgment entered by the Court.

## II. THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT NEGOTIATIONS, AND SETTLEMENT CONSIDERATION

A detailed summary of the allegations and procedural history, Plaintiffs' Counsel's investigation and litigation efforts, the Settlement negotiations, and the Settlement consideration is set forth in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (ECF No. 70) and the accompanying joint declaration of Craig W. Smith and David C. Katz (ECF No. 71), as well as the Lead Counsel Declaration submitted herewith.  To avoid repeating matters previously presented, Plaintiffs incorporate those filings by reference, and respectfully refer the Court to them for detailed descriptions of: (i) the allegations (ECF No. 70 at 3, 5-8; Stip. at 2-3); (ii) the procedural history (ECF No. 70 at 8-11; Stip.at 2-7); (iii) Plaintiffs' Counsel's investigation and litigation efforts (ECF No. 70 at 16-17; ECF No. 71, ¶4); (iv) the settlement negotiations (ECF No. 70 at 11; ECF No. 71, ¶4); and (v) the substantive Settlement consideration (ECF No. 70 at 12-14; Stip. at 16).  In support of final approval, Plaintiffs provide the declaration of Professor Keller, which provides a thorough and detailed explanation of how the Enhancements' various components will operate to strengthen Apple's brand governance and improve its response to product performance issues, prevent future losses, and restore and maintain brand equity.  *See* Keller Decl., *passim*.

## III. GOVERNING LEGAL STANDARDS

The Court's evaluation of the Settlement should be guided by the "'strong judicial policy that favors settlements'" in complex cases.  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015));[3] *Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 635 (9th Cir. 1982) ("settlement process [is] favored in the law"); *U.S. v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) (noting "overriding public interest in settling and quieting litigation").  "Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'"  *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *see In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("Because shareholder derivative actions are 'notoriously difficult and unpredictable ... settlements are

---

[3] Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.

favored.'") (omission in original); *In re Xoma Corp. Sec. Litig.*, 1992 U.S. Dist. LEXIS 10502, at *3-4 (N.D. Cal. July 10, 1992) ("The law favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").

In preliminarily approving the Settlement, the Court found the Settlement fell within the range that might be finally approved as fair, reasonable and adequate.  ECF No. 81 at 3, 5.  At the final approval stage, the Court's substantive assessment of the Settlement is governed by similar considerations.  "Within the Ninth Circuit, the 'proper legal standard' to apply under Rule 23.1(c) is whether the settlement is fair, reasonable, and adequate to the nominal defendant, *i.e.*, the entity in which the derivative plaintiffs are shareholders." *Bushansky v. Kawas*, 2024 U.S. Dist. LEXIS 81444, at * 3 (W.D. Wash. May 3, 2024) (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995)); *see also In re MRV Commc'ns Inc. Derivative Litig.*, 2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013).  The relevant factors include: (1) the strength of the claims; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the value of the settlement benefit; (4) the stage of the proceedings; (5) the experience and views of counsel; and (6) the reaction of the stockholders.  *In re NVIDIA Corp. Derivative Litig.*, 2009 U.S. Dist. LEXIS 24973, at *8-9 (N.D. Cal. Mar. 18, 2009) (quoting *Officers for Just.*, 688 F.2d at 625); *MRV Commc'ns*, 2013 WL 2897874, at *2.  "[These] factors are not exclusive, and one factor may deserve more weight than the others depending on the circumstances.  In some instances, 'one factor alone may prove determinative in finding sufficient grounds for court approval.'"  *MRV Commc'ns*, 2013 WL 2897874, at *2.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.    The Settlement Merits the Presumption of Fairness

In evaluating the Settlement, the Court is not called upon "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Just.*, 688 F.2d at 625.  In exercising its discretion, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties … must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or

overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id.*

Courts "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Settlements achieved through extensive arm's-length negotiations conducted by experienced, well-informed counsel enjoy a "presumption of fairness." *Villanueva v. Morpho Detection, Inc.*, 2015 WL 4760464, at *6 (N.D. Cal. Aug. 12, 2015); *Arnaud van der Gracht de Rommerswael v. Auerbach*, 2019 WL 7753447, at *3 (C.D. Cal. Jan. 7, 2019) ("strong presumption of fairness" attaches to settlement that "was the product of arms-length negotiations between experienced and well-informed counsel").

The Settlement is the result of many months of hard-fought, arm's-length negotiations among experienced, well-informed counsel following their substantial investigation of the claims, defenses and remedial measures, with the assistance of a highly regarded neutral. Plaintiffs' Counsel include nationally recognized leaders in shareholder litigation. *See* Lead Counsel Decl., ¶46; Smith Decl., Ex. 2 (Robbins LLP firm resume); Katz Decl., Ex. 2 (WeissLaw LLP firm resume); Quitt Decl., Ex. 2 (Glancy Prongay & Murray LLP firm resume); Herman Decl., Ex. 2 (Herman Jones LLP firm resume). Their recommendation in favor of the Settlement is well-informed both by facts gathered and evaluated in their investigation, and the crucible of an extended and rigorous mediation process, which tested the relative strength of the claims, theories of liability, estimates of damages, and the available defenses. *See* Phillips Decl., *passim*; ECF No. 71, ¶4; *see also* section V.A., *infra*. Apple, the Individual Defendants, and Apple's Board, including its DEC, were represented by preeminent corporate defense counsel.

Judge Phillips confirms the arm's-length nature of the settlement negotiations, and his participation eliminates any concerns about collusion. *NVIDIA*, 2009 U.S. Dist. LEXIS 24973, at *10-11 (approving settlement where "the parties engaged in significant negotiations, including at least four formal mediation sessions, and the parties were assisted by an experienced mediator in reaching the Settlement," which "weighs considerably against any inference of a collusive settlement."); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement … helps to ensure that the proceedings were free of collusion"). Accordingly, the Settlement merits a strong presumption of fairness

1  and reasonableness.  *Garner v. State Farm Mut. Auto. Ins. Co*., 2010 WL 1687832, at *13 (N.D. Cal.

2  Apr. 22, 2010) (where "a settlement is the product of arms-length negotiations conducted by capable and

3  experienced counsel, the court begins its analysis with a presumption that the settlement is fair and

4  reasonable").

5      **B.     Plaintiffs' Counsel's Settlement Recommendation Is Well-Informed**

6          The stage of the proceedings and amount of discovery factor focuses on whether Plaintiffs were

7  in a position to make a reasonably informed decision about whether and on what terms to settle; formal

8  discovery is not required.  *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 459 (9th Cir. 2000) ("'formal

9  discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information

10 to make an informed decision about settlement.'"); *MRV Commc'ns*, 2013 WL 2897874, at *4.  Plaintiffs'

11 Counsel were well-informed going into the Settlement negotiations, and they learned more during the

12 months of substantive settlement exchanges with Apple's representatives and defense counsel regarding

13 the facts; the relative strength of the claims and defenses; the quantum of provable damages; the state of

14 Apple's corporate governance and internal controls; and myriad other matters bearing on the prospects

15 for further litigation and the range of available remedies.

16         Plaintiffs' Counsel in two jurisdictions completed substantial pre- and post-filing investigations,

17 including the review of a trove of domestic and international media, analyst and regulatory reports,

18 Apple's public filings, the deluge of reporting and analysis published by independent experts regarding

19 the PMP, and the voluminous pleadings in the consumer class actions and the Federal Securities Action,

20 which were supplemented by substantive information exchanges during mediation sessions and in the

21 months of negotiations that followed.  Stip. at 8; ECF No. 71, ¶4.  As Judge Philips confirms, Plaintiffs'

22 Counsel's extensive investigation and analytic work was evident in their mediation briefs and settlement

23 demand, in their performance throughout the months-long mediation process, and in the results.  Phillips

24 Decl., ¶¶18-20.

25         As a result, Plaintiffs' Counsel had a clear understanding of the potential risks and rewards of

26 pursuing further litigation; how Apple's and its shareholders' interests would be impacted across the broad

27 range of possible litigation scenarios and outcomes; and the remedial measures that would be necessary

28

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND AWARD OF
ATTORNEYS' FEES AND EXPENSES
LEAD CASE NO. 4:19-CV-05153-YGR                                                          8

to: (i) ensure the Company will not suffer the consequences of similar alleged mishandling of future product performance issues; and (ii) restore Apple's credibility with its customers, whose loyalty keys the Company's performance and ability to maximize long-term shareholder value. ECF No. 70 at 11, 16-17; Keller Decl., ¶6. In sum, Plaintiffs' Counsel's determination that the economic value of the benefits guaranteed by the Settlement far outweigh the value of any probable risk-adjusted monetary recovery that might be secured through further litigation is well-informed.

### C. The Settlement's Substantial Benefits Support Final Approval

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re OSI Sys., Inc. Derivative Litig.*, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017); *see also In re Apple Comput., Inc. Derivative Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008).

The Settlement guarantees Apple and its shareholders the benefits of a comprehensive set of policy, governance, internal controls, and oversight enhancements designed to address the specific alleged policy, decision-making, and oversight lapses that allowed Apple to respond to the iPhone shutdown problem in ways that jeopardized customer loyalty and resulted in significant legal-regulatory exposure in domestic and international markets. The Enhancements will substantially reduce the likelihood that the Company will suffer the potential losses that could attend similar alleged mishandling of future product performance issue and related brand challenges, and lay the foundation necessary for restoring customer trust and strengthening Apple's brand equity. Stip., Ex. A; ECF No. 70 at 19-21; *see also* Keller Decl., ¶¶121-22. The Enhancements confer real and substantial economic value upon Apple and its shareholders that almost certainly exceeds the probable range of recovery at trial, particularly when discounted for the enormous risk, costs, delays, and disruption further litigation in pursuit of such a recovery would entail.

"[A] corporation may receive a 'substantial benefit' from a derivative suit … regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *Lewis v.*

*Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (citing *Fletcher v. A. J. Indus., Inc.*, 266 Cal. App. 2d 313, 324 (1968) (approving settlement predicated upon non-pecuniary benefit)).

Although difficult to quantify in precise monetary terms, courts widely recognize the substantial economic value of corporate governance reforms tailored to address the oversight and controls lapses that led to or permitted the alleged wrongdoing.  *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (benefit of prophylaxis can be "substantial enough to merit approval").  Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors." *Cohn*, 375 F. Supp. 2d at 853; *see also Mills*, 396 U.S. at 396 (substantial benefit conferred where the relief "accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest"); *In re Pfizer Inc., S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement providing for "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2, *5 (D.N.J. Oct. 28, 2005) (approving settlement designed "to prevent future harm") ("the great benefit conferred … as a result of the new corporate governance principles provided for in the settlement agreement ... will serve to prevent and protect [the nominal defendant] from the reoccurrence of certain alleged wrongdoings").

In fact, in many circumstances, the economic value of strong prophylactic reforms far outweighs any likely monetary recovery.  *See Maher*, 714 F.2d at 461 ("the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor"); *Cohn*, 375 F. Supp. 2d at 853 (corporate governance reforms "achieved independently of any monetary benefits … are even more worthwhile").  That certainly is the case, here.  Based on his substantial experience and exhaustive review of the relevant academic and business literature, Professor Keller confirms Plaintiffs' conclusion that the Enhancements

will deliver real, lasting, and substantial economic value far greater than any likely monetary award that might be obtained through further litigation.

**First**, "the Enhancements' strong brand governance polices, decision-making and oversight regime will substantially reduce the probability that Apple will suffer the consequences of another mishandled brand crisis" with even more serious immediate costs and long-term damage to Apple's brand equity.[4]  Keller Decl., ¶115.

As Professor Keller explains, "[f]irm policies and procedures designed to facilitate a timely, transparent, and effective response to major brand challenges, internal controls designed to ensure those policies and procedures are followed when it counts most, and strong escalation and oversight protocols to ensure sound, fully-informed decision-making, is critical to prevent (where possible) brand challenges from becoming brand crises, and to limit the damage to brand equity." *Id.*., ¶112.  The Enhancements' transparency and risk oversight policies and procedures go to the heart of Apple's alleged mishandling of the iPhone shutdown problem that led to the brand crisis—namely, Apple's alleged lack of speed, lack of transparency, and perceived abuse of its customers' trust that routine iOS updates would only be used to enhance, not degrade, iPhone performance.  *Id.*, ¶¶82-87, 116-20.  How the essential elements of the Enhancements' four major components will operate to achieve this result is detailed and explained in Plaintiffs' motion in support of preliminary approval (ECF 70 at 19-21), and explicated in further detail by Professor Keller.  Keller Decl., ¶¶123-49.  Suffice it to say here, "[b]ased on [his] academic work and decades of experience advising dozens of leading brands," Professor Keller concludes that "the Enhancements are well-designed to address the policy, decision-making and oversight lapses Plaintiffs contend lay at the root of Apple's decision to respond to the iPhone shutdown issues in ways that jeopardized customer loyalty to its most important product.… [I]mplementation and

---

[4] "The concept of 'brand equity' is used to summarize the power of brands … [and] 'consists of the marketing effects uniquely attributable to a brand. … [B]rand equity explains why different outcomes result from the marketing of a branded product or service than if it were not branded.'"  Keller Decl., ¶36.  "Brands can motivate customers or potential customers to purchase a product or service and to pay a price premium for it.…  As a result of these dynamics, strong brands can confer significant competitive advantages over existing competitors and potential market entrants."  *Id.*, ¶35.  "Marketing academics and practitioners understand that brands can be extremely valuable, and, once established, may comprise a substantial share of a firm's overall value."  *Id.*, ¶36.

1   maintenance of the Enhancements for the four-year agreed term will confer real and substantial economic

2   value by significantly reducing the chances that Apple will suffer the potentially catastrophic losses that

3   would attend similar mishandling of future brand challenges."  *Id.*, ¶121.

4       While the value of preventing future missteps cannot be determined with precision, even

5   aggressively discounting the likelihood of recurrence absent the Enhancements and the Enhancements'

6   effectiveness in preventing recurrence, the alleged magnitude of the harm Apple suffered in the wake of

7   the PMP, which Professor Keller concurs includes nearly half a billion dollars in immediate legal-

8   regulatory costs and billions in lost sales and long-term brand equity-related losses (*id.*, ¶¶82-106); the

9   inevitability of future product performance issues that will require effective brand management responses

10  (*id.*, ¶116); and the probability that Apple would suffer far greater immediate and long-term loss in the

11  event of a future brand crisis (*id.*, ¶104), the prophylactic value of the Enhancements, standing alone,

12  likely ranges into the hundreds of millions of dollars.  *Id.*, ¶¶82-149.  *See, e.g.*, *In re Emerson Radio*

13  *S'holder Derivative Litig.*, 2011 WL 1135006, at *3-7 (Del. Ch. Mar. 28, 2011) (in approving derivative

14  settlement, quantifying benefit of therapeutics intended to prevent recurrence of misconduct by

15  multiplying damages flowing from original misconduct by estimated risk of recurrence but-for new

16  governance reforms).

17      **Second**, the Enhancements' rigorous customer-oriented brand management policies, combined

18  with strengthened monitoring, reporting, escalation, and oversight procedures and governance, will

19  significantly improve corporate decision-making, not just in responding to brand challenges, but across

20  the broad range of brand management decisions that are necessary to preserve and increase the brand

21  equity that is central to Apple's enterprise value.  Keller Decl., ¶¶69-81.

22      As Professor Keller observes, "there is broad recognition among management academics and

23  business leaders that effective brand management requires strong brand management policies, internal

24  controls, decision-making procedures, and oversight, as much as well-funded and properly focused

25  external brand activities, like advertising, marketing and promotions.  This principle is so broadly

26  accepted, in fact, that it is now part of the core curriculum taught in business schools."  *Id.*, ¶107.  Even

27  companies with preeminent brands must "develop a brand equity management system that will maximize

28

long-term brand equity" or suffer serious economic consequences.  *Id*., ¶108.  Doing so requires "managers [to] clearly define organizational responsibilities and processes with respect to the brand."  *Id*.  In addition, "[a]ll firms must operate with the expectation that they will confront unexpected brand challenges or crises that must be addressed quickly and managed effectively to protect brand equity.… 'Careful preparation and a well-managed crisis management program are [] critical[.]'"  *Id*.  In short, strong brand governance produces better brand management and a more valuable and resilient brand.  Apple's strengthened customer-centric policies requiring timely and transparent responses to complaints or field performance issues and clear explanations of iOS contents, combined with enhanced monitoring, reporting, information flows, decision-making processes, and rigorous oversight, will ensure transparency and produce better brand management decisions, preserving and strengthening Apple brand equity.  *Id*., ¶124 ("the Settlement's enhanced risk oversight regime is exemplary in this regard").

**Third**, the Enhancements will be recognized as a credible and effective corporate remedial response to the PMP, and contribute significantly to Apple's efforts to re-build trust in the brand promise and in Apple's commitment to brand values, strengthening brand equity.  As Professor Keller explains:

> Although harder to measure, the longer lasting impacts of tarnished brand equity and the severe disruption in loyalty are no less certain and potentially far more serious.  While Apple continues to out-perform on the basis of its superior product offerings, the Batterygate episode has undoubtedly made customer loyalty more brittle.  The Apple brand will be less resilient in the face of similar product problems and other brand pressures, and it is far more vulnerable to a brand crisis should Apple fail to mount an effective response to future problems. …

> As significant as these short term [legal-regulatory] costs were to Apple's income statement and balance sheet, the long-term consequences for customer behavior, brand equity, and enterprise value are likely to be far greater, even if more difficult to measure and quantify. The Batterygate crisis tarnished Apple's brand in fundamental ways.… [T]his less positive brand image and diminished brand equity will have lingering effects, including diminished marketing effectiveness and efficiency.… Apple will be required to make greater investments in re-building its brand image for many years, but it can expect the marginal impact of each dollar spent on these efforts to be smaller than before the crisis.… Even assuming a "small" marginal diminishment in percentage terms, in the context of Apple's multi-billion dollar annual marketing budget, the probable annual economic impacts would range into at least the hundreds of millions of dollars.

*Id.*, ¶¶88, 101-03.

The Enhancements confer substantial additional economic value by providing the credible institutional response necessary to restore and to maintain customer trust.  As Professor Keller observes:

Adopting a strong set of principles and implementing them through a strong governance framework provides structural assurances that the company will properly and transparently manage future branding discrepancies in a way that will effectively bring diverging products back into alignment with the brand promise. Such measures have powerful signaling effects that help to re-build the credibility of the brand promise and the firm's commitment to brand values—essential elements in increasing brand equity and making it more resilient to the expected and unexpected challenges that will arise over the life of the brand. Conversely, failure to implement credible institutional remedies in the wake of a brand crisis not only leaves residual doubts unaddressed, but can itself become reason to doubt the credibility of the firm's commitment to the brand promise and brand values.

*Id.*, ¶113.

The Enhancements credibly demonstrate Apple's commitment "to change internally to ensure that its response to future problems is consistent with the brand promise and brand values." *Id.*, ¶151. "The Enhancements accomplish this through a combination of concrete policy commitments; monitoring, escalation, and decision-making protocols and controls; and correlative management- and Board-level oversight regimes … a substantive, thoughtful, and credible institutional response to the missteps of the Batterygate episode." *Id.*, ¶152.

Professor Keller concludes that "in the context of Apple's business, the combined economic value of substantially reduced risks of future loss and brand equity damage, the institutional reforms' contributions to re-building and maintaining brand credibility, and the market effects of lower perceived brand-related risks of investing in Apple[5] will almost certainly range into the hundreds of millions of dollars." *Id.*, ¶154.

### D. The Substantial Risks, Expense, Complexity, and Likely Duration of Further Litigation Support the Settlement

In assessing the Settlement, the Court "must balance the benefits accorded to [the company] and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation." *Cohn*, 375 F. Supp. 2d at 855. For reasons familiar to the Court, the probability that Plaintiffs might secure a monetary recovery of decisively greater value than the

---

[5] Institutional investors recognize the value of strong governance and are prepared to pay significant premiums for it. *See* ECF 70 at 21. *See also McKinsey & Company Investor Opinion Survey,* McKinsey & Company (June 2000) (three-quarters of investors cite board practices as at least as important as financial performance, and, all else being equal, would pay average premium of 18% for securities issued by well-governed company) (Lead Counsel Decl., Ex. 14).

Enhancements is vanishingly low, particularly when discounted by the substantial costs, disruption, and delay involved, and the enormous risk that further litigation would result in no recovery.

Courts recognize that "derivative lawsuits are rarely successful[,]" and "[t]he odds of winning [a] derivative lawsuit [a]re extremely small." *Pac. Enters.*, 47 F.3d at 378; *see also Maher*, 714 F.2d at 455 (derivative litigation "notoriously difficult and unpredictable").

The challenges begin at the pleading stage.  The demand futility requirement is satisfied only under "'extraordinary conditions.'"  *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991).  The challenges confronting Plaintiffs are especially daunting.  This case does not involve allegations of direct conflicts of interest or self-dealing.  Plaintiffs allege a so-called *Caremark* claim predicated on allegations that a majority of Apple's directors consciously disregarded their duty of oversight—a claim widely recognized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see Kanter v. Reed*, 92 Cal. App. 5th 191, 206-09 (2023) (adopting *Caremark* standard for director oversight liability).  Plaintiffs would have to demonstrate the futility of making a demand on Apple's super-majority independent Board through particularized facts demonstrating that most face a substantial likelihood of liability for utterly failing to exercise oversight.  *See* Fed. R. Civ. P. 23.1; Cal. Corp. Code § 800(b)(2).  Notwithstanding Plaintiffs' confidence in their claims, the complexity of the technological and business considerations at issue will allow Defendants to assert a number of plausible business reasons for their decisions other than conscious disregard of duty.[6]

Even were Plaintiffs to prevail at the pleading stage, the Board could appoint "an independent committee composed of disinterested board members" tasked with investigating and determining whether to permit plaintiffs to pursue the claims or to "act for the corporation to move to dismiss [the] derivative litigation."  *Johnson v. Hui*, 752 F. Supp. 909, 913-14 (N.D. Cal. 1990); *accord Zapata Corp. v.*

---

[6] The Demand faces even greater challenges.  Demands concede a board's independence and disinterestedness; only the decision-making process in responding is in issue, not the decision's merits; and a decision to "reject[] the demand is entitled to the presumption of the business judgment rule." *Copeland v. Lane*, 2013 WL 1899741, at *7 (N.D. Cal. May 6, 2013); *see also Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990) (directors presumed to have "acted on an informed basis, in good faith and in the honest belief that [refusal] was in the best interests of the company").

*Maldonado*, 430 A.2d 779, 786 (Del. 1981).  In addition to compounding delay, expense, and complexity, the decision of such a committee to terminate litigation is protected by the business judgment presumption, and the odds of defeating a motion to terminate are low.  *See, e.g.*, *OSI Sys.*, 2017 WL 5642304, at *3.

Defeating a special litigation committee motion to dismiss would permit Plaintiffs to move on to the merits phase, but would not improve their chances of success.  Plaintiffs would have to build a circumstantial case for liability based upon a mountain of complex business and financial records, and secure evidence sufficient to overcome motions for summary judgment predicated on the business judgment presumption that directors act on an informed basis and in good faith.  *See, e.g.*, *Desaigoudar v. Meyercord*, 108 Cal. App. 4th 173, 183 (2003); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).  Plaintiffs would confront the exculpatory provision of Article V of Apple's Restated Articles of Incorporation adopted pursuant to Section 204(a)(10) of the California Corporations Code, which forecloses monetary damages absent proof of disloyalty, bad faith, intentional misconduct, receipt of an improper personal benefit, or a knowing violation of law.  Pursuing the necessary discovery would be an enormously complex, costly and years-long undertaking.  After documents are gathered and analyzed, dozens of percipient witnesses would have to be deposed concerning exceedingly complex facts.  Expert reports would have to be prepared and expert depositions taken.

When and if the case reached trial, Plaintiffs would have to present their case primarily through the testimony of hostile percipient witnesses, some of whom may be unavailable or unable to recall critical information.  Plaintiffs would have to prove damages in a battle of experts.  The trier of fact could react to the evidence in unpredictable and unfavorable ways.  *See, e.g.*, *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such complex expert testimony is highly unpredictable."); *Four in One Co. v. S.K. Foods, L.P.*, 2014 U.S. Dist. LEXIS 113084, at *36-37 (E.D. Cal. Aug. 13, 2014) (noting "risks of continuing to litigate the action include determining damages, which is an 'expert-intensive uncertain process[] often involving

conflicting testimony,' and the possibility a jury could find either no damages or a fraction of the damages contended.").

Even victory at trial would afford no guarantee of a meaningful recovery.  Plaintiffs would have to defend any favorable judgment through post-trial motions and appeals, and then seek to enforce it. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731, at *1 (D. Ariz. Aug. 4, 2008), *rev'd and remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for shareholders of $277 million); *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

Weighed against these and other risks, including the very real risk of no recovery after years of litigation, the Settlement's guaranteed benefits far outweigh the speculative potential for a one-time monetary recovery of decisively greater value.  *See Officers for Just.*, 688 F.2d at 625; *In re Intel Corp. Derivative Litig.*, 2010 WL 2955178, at *2 (D. Del. July 22, 2010) (governance benefits "outweigh the speculative potential of any monetary payment from the relevant insurance policies"); *AOL Time Warner*, 2006 WL 2572114, at *5 (settlement ensures prophylaxis following corporate injury and permits management to restore full attention to business); *Athan v. United States Steel Corp.*, 523 F. Supp. 3d 960, 967-68 (E.D. Mich. 2021) (settlement "fair and reasonable … in relation to the potential risks and uncertain recovery").

### E.     The Board's Decision to Approve the Settlement Warrants Deference

The Board, including each of its independent, non-employee directors, as well as the members of the DEC, advised by experienced in-house and outside counsel, unanimously approved the Settlement as serving the best interests of Apple and its shareholders.  Stip. at 10, 16.  The Board's reasonable exercise of business judgment merits deference.  *See, e.g.*, *Lunsford v. Woodforest Nat'l Bank*, 2014 WL 12740375, at *4 (N.D. Ga. May 19, 2014) (in evaluating settlement, "the Court 'will not substitute its business judgment for that of the parties'") (citing *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982)); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness"); *Brooks v. Am. Exp. Indus., Inc*., 1977 U.S. Dist.

1   LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) (board decision to approve settlement "is a business

2   judgement with presumptive validity").  *See generally Zapata*, 430 A.2d at 782.

3        **F.    The Absence of Shareholder Objections Confirms the Settlement Is Sound**

4        To date, no objection has been filed and counsel are unaware of any objections to the Settlement.

5   Lead Counsel Decl., ¶69.   This factor strongly favors approval, particularly given the dozens of

6   institutions that hold substantial positions in Apple stock.  *See In re Citigroup Inc. Bond Litig.*, 296 F.R.D.

7   147, 156 (S.D.N.Y. 2013) (shareholder reaction supports settlement where "not one of the objections or

8   requests for exclusion was submitted by an institutional investor"); *In re AOL Time Warner, Inc.*, 2006

9   WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) ("*AOL Time Warner II*") ("small number of objections ...

10  strongly favor[s] the Settlement" where "not a single institutional Class Member objected to the

11  Settlement").[7]

12  **V.    THE AGREED FEE AND EXPENSE AMOUNT SHOULD BE APPROVED**

13       **A.    The Parties' Agreement Is the Product of Arm's-Length Negotiations**

14       "A request for attorney's fees should not result in a second major litigation.  Ideally ... litigants

15  will settle the amount of a fee."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).   Given the Parties'

16  negotiated agreement on the Fee and Expense Amount, the Court is not required to fashion a fee and

17  expense award; the Court need only determine whether the agreed award falls within the range of

18  reasonableness.  *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors best

19  understood by negotiating parties should determine quantum of attorneys' fees); *Apple Comput.*, 2008

20  WL 4820784, at *3 ("A court should refrain from substituting its own value for a properly bargained—

21  for agreement.").  Where, as here, the fee negotiations were conducted at arm's-length and there is no

22  evidence of collusion, courts accord "substantial deference" to the parties' agreement.  *Cohn*, 375 F. Supp.

23

24  ─────────────────────
[7] The deadline for filing objections to the Settlement is July 2, 2024. Plaintiffs will address any objections
that may be received (if any) in their reply papers, to be filed on July 9, 2024.  Even if a handful of

25  objections are presented, this factor would weigh in favor of approval. *See, e.g.*, *In re Omnivision Techs.,
Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (three objections out of tens of thousands of

26  shareholders "raises a strong presumption that the terms of a proposed class settlement action are
favorable to the class members"); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d

27  254, 258 (S.D.N.Y. 2003) ("It has repeatedly been held that 'one indication of the fairness of a settlement
is the lack of or small number of objections.'"); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,

28  248 F.R.D. 483, 498-99 (E.D. Mich. 2008) (small number of objections indicate settlement's adequacy).

2d at 861; *see OSI Sys.*, 2017 WL 5642304, at *5 ("The parties' separately-negotiated attorneys' fees arrangement warrants significant deference."); *Apple Comput.*, 2008 WL 4820784, at *3 (similar); *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (substantial deference accorded to negotiated fee agreement); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount").

The Parties agree that "the Enhancements confer substantial benefits upon Apple and its shareholders" and warrant the award of the $6 million Fee and Expense Amount to Plaintiffs' Counsel. Stip., ¶¶2, 17.  This agreement was reached following extensive arm's-length negotiations between sophisticated parties represented by experienced and well-informed counsel.  *See* Phillips Decl., ¶¶15-20; Lead Counsel Decl., ¶71.  The negotiations were facilitated by an experienced and reputable mediator. The fee negotiations began only after the Parties had reached agreement on the substantive Settlement consideration, eliminating any possibility of collusion.  Phillips Decl., ¶15; *see Apple Comput.*, 2008 WL 4820784, at *3 (finding that "evidence that the proposed award of attorneys' fees was negotiated separately from the" settlement consideration suggested a lack of collusion and warranted deference to the parties' agreement); *Shapiro*, 2014 WL 1224666, at *25 ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 244 (E.D.N.Y. 2010) ("the fact that the parties did not negotiate the issue of attorneys' fees until after deciding on the benefit to the class … weighs in favor of the reasonableness of the fees").  The negotiations were substantive and focused on the relevant factors identified in applicable case law, including the award amount in relation to the value of the Settlement benefit and fee awards approved in comparable cases.  Phillips Decl., ¶¶15-20.

Based on his vast experience mediating hundreds of derivative settlements, Judge Phillips concluded that the award he proposed to bridge the gap in the Parties' respective positions and ultimately accepted by the Parties "is consistent with fee and expense awards approved in reasonably comparable derivative settlements … and … is fair and reasonable in relation to the substantial value of the Settlement

1   benefit, the quality of Plaintiffs' Counsel's advocacy, and the substantial contingency risks they assumed

2   in investing the considerable time and effort required to secure the Settlement." *Id.*, ¶20.

3       In the absence of red flags suggesting collusion, an extreme imbalance in negotiating power, or

4   indications that the agreed amount would confer an unreasonable windfall, the Parties' agreement merits

5   substantial deference. *See Apple Comput.*, 2008 WL 4820784, at *3 (participation of a mediator and

6   "multiple counsel from different firms suggests a lack of collusion"); *In re AOL Time Warner S'holder*

7   *Derivative Litig.*, 2010 WL 363113, at *24 (S.D.N.Y. Feb. 1, 2010) ("*AOL Time Warner III*") ("mediator's

8   involvement ... helps to ensure that the proceedings were free of collusion") (quoting *D'Amato*, 236 F.3d

9   at 85); *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), *abrogated by Amchem Prods., Inc. v. Windsor*,

10  521 U.S. 591 (1997) (courts should hesitate to interfere in fee arrangements between settling parties in

11  stockholder actions); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("[i]n

12  cases of this kind, we encourage counsel … to utilize their best efforts to … arrive at a settlement as to

13  attorney's fees"), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).

14      **B.    The Agreed Fee and Expense Amount Is Reasonable in Relation to the Value of the**
15              **Settlement Benefit**

16      "'The principal factor to be considered in determining the fairness of a settlement concluding a

17  shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by

18  the corporation, the real party in interest.'" *In re Atmel Corp. Derivative Litig.*, 2010 WL 9525643, at

19  *12 (N.D. Cal. Mar. 31, 2010) (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978)); *see*

20  *Omnivision*, 559 F. Supp. 2d at 1046 ("The overall result and benefit to the class from the litigation is the

21  most critical factor in granting a fee award.").

22      Under the substantial benefit doctrine, counsel who prosecute a shareholder derivative action that

23  results in substantial benefits are entitled to fees and expenses in reasonable proportion to the value of

24  the benefits, and taking into account contingency risks. *Mills*, 396 U.S. at 394-96 ("[A] corporation may

25  receive a 'substantial benefit … justifying an award of counsel fees, regardless of whether the benefit is

26  pecuniary in nature.… [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and

27  furnish a benefit to all shareholders[.]"). Courts recognize that a settlement providing for "a significantly

28

improved institutional structure for detecting and rectifying the types of wrongdoing that have … caused extensive harm to the company …  provide[s] considerable corporate benefits." *Pfizer*, 780 F. Supp. 2d at 342 (awarding $22 million fee).  *See In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) ("Following *Mills*, courts consistently have approved attorneys' fees and expenses in shareholder actions where plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief"); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445-50 (N.D. Cal. 1994) (changes in governance likely to produce economic benefits or cost avoidance are "'fund creating actions'" meriting fee and expense award) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989)); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194 (6th Cir. 1974) ("services performed by plaintiffs' attorneys justify an award of fees, even though no fund had been brought into court and even though it may be impossible to assign an exact monetary value to the benefit"); *see also In re Google Inc. S'holder Derivative Litig.*, 2015 WL 12990195, at *1-2 (N.D. Cal. Jan. 21, 2015) (awarding $9.9 million fee in settlement exclusively involving corporate governance enhancements); *Unite Nat'l*, 2005 WL 2877899, at *5 (awarding $9.2 million fee based on "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement").

While it may not be possible to estimate the Enhancements' precise economic value, this does not mean that estimates as to their probable range of economic value are speculative.  Based on his deep knowledge of the academic literature and decades of consulting for some of the world's most valuable brands, Professor Keller concludes "with confidence" that by "ensuring that the Apple brand is properly monitored and managed to avoid such financially disastrous brand crises, the Enhancements are likely to confer economic value ranging into the hundreds of millions of dollars, if not more, and orders of magnitude greater than the $6 million Fee and Expense Amount Apple has agreed Plaintiffs' Counsel should receive in consideration for their efforts in securing the Enhancements through the Settlement." Keller Decl., ¶7; *see id.*, ¶154 ("[I]n the context of Apple's business, the combined economic value of substantially reduced risks of future loss and brand equity damage, the institutional reforms' contributions to re-building and maintaining brand credibility, and the market effects of lower perceived brand-related risks of investing in Apple will almost certainly range into the hundreds of millions of dollars.").

1   Accordingly, the agreed Fee and Expense Amount is fair and reasonable in relation to the value of the

2   Settlement benefit.[8]

3        In evaluating whether the agreed amount is reasonable, courts also consider awards in cases of

4   comparable magnitude and complexity.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049-50 (9th Cir.

5   2002).  The Fee and Expense Amount agreed upon by the Parties here is in line with awards approved in

6   corporate governance-based derivative settlements of comparable magnitude and complexity, and similar

7   recoveries.  *See, e.g.*, *In re Alphabet Inc. Shareholder Deriv. Litig.*, Lead Case No. 19CV341522, slip op.

8   (Cal. Super. Ct., Santa Clara Cnty. Nov. 30, 2020), and *Irving Firemen's Relief and Ret. Fund v. Page*,

9   C.A. No. 2019-0355-SG, Transcript (Del. Ch. Dec, 23, 2020) (combined $40.3 million in attorneys' fees)

10  (Lead Counsel Decl., Exs. 2-4); *In re Altria Group, Inc. Derivative Litig.*, No. 3:20-cv-00772-DJN, slip

11  op. (E.D. Va. Feb. 20, 2023) ($15 million in attorneys' fees) (Lead Counsel Decl., Ex. 17); *In re Google

12  Inc. S'holder Derivative Litig.*, No. 4:11cv-04248-PJH, slip op. (N.D. Cal. Jan. 21, 2015) ($9.9 million in

13  attorneys' fees) (Lead Counsel Decl., Exs. 5-6); *In re Motorola, Inc., Derivative Litig.*, No. 07CH23297,

14  slip op. (Ill. Cir. Ct.-Cook Cty. Nov. 29, 2012) ($9.5 million in attorneys' fees) (Lead Counsel Decl., Ex.

15  7); *Unite Nat'l*, 2005 WL 2877899, at *5 ($9.2 million in attorneys' fees); *Lambrecht v. Taurel*, 2010 U.S.

16  Dist. LEXIS 75633 (S.D. Ind. June 8, 2010) ($8.75 million in attorneys' fees); *Wolfson v. Spiegel*, Case

17  No. BC720152, slip op. (Cal. Super. Ct.–Los Angeles Cnty. Jan. 12, 2021) ($7.5 million in attorneys'

18  fees) (Lead Counsel Decl., Exs. 8-6); *In re: Lifelock, Inc. Derivative Litig.*, No. CV2015-054087, slip op.

19  (Ariz. Super. Ct.-Maricopa Cnty. Sept. 8, 2016) ($6 million in attorneys' fees) (Lead Counsel Decl., Exs.

20  10-11); *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC, slip op.

21

---

22  [8] Plaintiffs' success in securing the Settlement's substantial benefits without complete merits discovery
    and a trial is not grounds to disregard the value of the recovery or to reduce an agreed fee that constitutes
23  a small fraction of the economic value conferred.  To the contrary, courts reward counsel who efficiently
    and effectively resolve actions brought for the benefit of corporations and spare them the costs and
24  distraction of burdensome litigation. *See, e.g.*, *Anselmo v. W. Paces Hotel Grp., LLC*, 2012 WL 5868887,
    at *4 (D.S.C. Nov. 19, 2012) (considering skill and experience in relevant field); *Delphi*, 248 F.R.D. at
25  504 ("The ability of Co-Lead Counsel to negotiate a favorable settlement in the face of formidable legal
    opposition further evidences the reasonableness of the fee award requested."); *In re Ashanti Goldfields
26  Sec. Litig.*, 2005 WL 3050284, at *4 (E.D.N.Y. Nov. 15, 2005) ("The 'quality of representation' factor is
    designed to reward 'particularly resourceful' legal work that 'secures a substantial benefit ... with a
27  minimum of time invested.'") (omission in original); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*,
    62 B.R. 723, 737 (S.D.N.Y. 1986) (same).

28

(Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014) ($5.25 million in attorneys' fees) (Lead Counsel Decl., Exs. 12-13); *In re F5 Networks, Inc. Derivative Litig.*, 2011 WL 13195985, at *1 (W.D. Wash. Jan. 6, 2011) ($5 million fee in attorneys' fees).

Accordingly, the Fee and Expense Amount negotiated by Apple with the assistance of counsel and approved by the Board plainly falls within a reasonable range, and there is no basis to second-guess the Board's reasonable exercise of business judgment.[9]

**C.   A Lodestar Cross-Check Supports the Agreed Fee and Expense Amount**

A "lodestar" cross-check confirms the reasonableness of the agreed Fee and Expense Amount. *See Vizcaino*, 290 F.3d at 1051-52 (approving lodestar "cross-check" on percentage-of-recovery award, and noting "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases"); *OSI Sys.*, 2017 WL 5642304, at *5 (evaluating lodestar as cross-check on agreed derivative fee award).  Agreed fee amounts that result in lodestar multiples falling with the range deemed reasonable in contingency fee representative actions do not confer an unreasonable windfall relative to counsel's efforts and contingency risk, and are generally found reasonable.  *See, e.g., Vizcaino*, 290 F.3d at Appendix & n.6; *see also Cohn*, 375 F. Supp. 2d at 862.[10]

---

[9] The Board's approval of the Fee and Expense Amount merits special consideration.  Unlike in class actions, where the diverging interests of class counsel and absent class members at the fee stage warrant close judicial scrutiny, as in most derivative actions, Apple, the Settlement beneficiary, and its D&O insurers, participated in the fee negotiations, were represented by experienced counsel free of any conflict, and had every incentive to negotiate the lowest reasonable fee and expense amount.  *See, e.g., In re Google Inc. S'holder Derivative Litig.*, Case No. 4:11-cv-04248-PJH, Tr. of Fairness Hearing at 11:21-12:6 (N.D. Cal. Jan. 21, 2015) (in evaluating agreed fee in derivative action, "the Court's responsibility is a little different than in your typical class action given the determination by the corporate entity that the amount is satisfactory") (Lead Counsel Decl., Ex. 15); *In re comScore S'holder Derivative Litig.*, CA No. 1:16-cv-09855-JGK, Tr. of Final Approval Hearing at 20:15-21:12 (S.D.N.Y. June 7, 2018) (approving fee agreement endorsed by disinterested directors) (Lead Counsel Decl., Ex. 16).

[10] Public policy strongly supports the award of reasonable multipliers on lodestar where plaintiffs' counsel proceeding on a wholly contingent fee basis secure substantial benefits in representative litigation.  *See Cohn*, 375 F. Supp. 2d at 863, 865-66 ("[I]t is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.... [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained.  The attorney's fees awarded should reflect this goal."); *AOL Time Warner III*, 2010 WL 363113, at *23 (fee award should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis"); *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001) (similar).  *See generally Kamen*, 500 U.S. at 95 ("[T]he purpose of the derivative action was to place in the hands of the individual shareholder a

The details of each firm's lodestar and hourly rates through April 30, 2024, and charts showing the time devoted to particular task categories, is included in Exhibit 1 to each of the Smith, Katz, Quitt, and Herman declarations.  Lead Counsel's declaration sums the data for all Plaintiffs' Counsel who filed actions.  Lead Counsel Decl., ¶¶79-82 & Ex. 1.[11]  After subtracting Plaintiffs' Counsel's collective expenses of $160,104.59, the net fee amount is $5,839,895.41, resulting in an implied multiple of 1.93 on Plaintiffs' Counsel's lodestar—well within the range deemed reasonable in this Circuit and elsewhere. *See, e.g.*, *Vizcaino*, 290 F.3d at Appendix & n.6 (collecting cases and finding average approved lodestar multiplier of 3.28); *Buccellato v. AT&T Operations, Inc.*, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (collecting cases approving multipliers from 4.3 to 9.3 and approving 4.3 lodestar multiplier); *see also Cohn*, 375 F. Supp. 2d at 862 (approving 2.9 multiplier, noting that "[i]n shareholder litigation, courts typically apply a multiplier of 3 to 5"); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (affirming multiplier of 3.5); *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *23 (S.D.N.Y. Nov. 30, 2010) (multiplier of 2.4 "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit") (collecting cases approving multipliers from 2.09 to 5.5); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving 3.97

---

means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"); *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966) (derivative suits play "important role in protecting shareholders of corporations from the designing schemes and wiles of insiders"); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) (derivative action is "the chief regulator of corporate management ... without it there would be little practical check on [management] abuses"); *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 284 (S.D.N.Y. 2015) (private enforcement of shareholders' rights "is clearly in the interest of the public, the markets, and the economy").

[11] Plaintiffs' Counsel's lodestar was calculated by multiplying the number of hours that were reasonable and necessary to litigate the case by the current hourly rates charged for each attorney and professional support staff.  The methods used by each firm to determine hourly rates are set forth in the accompanying declarations.  Each firm's hourly rates have consistently been approved as the foundation for lodestar cross-checks in derivative settlements.  *See* Smith Decl., Ex. 1; Katz Decl., Ex. 1; Quitt Decl., Ex. 1; Herman Decl., Ex. 1.  As set forth in counsels' declarations, the hours reported were spent on tasks necessary to effectively prosecute the case and secure the Settlement.  The tasks performed were reasonably necessary to advance the goals of the litigation.  Work was organized to avoid to the degree possible unnecessary duplication of effort, and to ensure that lawyers and staff were assigned tasks appropriate to their respective experience levels.  Lead Counsel Decl., ¶¶79-82.  In computing Plaintiffs' Counsel's lodestar, Plaintiffs' Counsel excluded all time spent after April 30, 2024 (the date on which the Court accepted the filing of the Amended Stipulation of Settlement) to ensure that no time devoted to recovering attorneys' fees was included.  Time recorded by timekeepers who billed less than five hours to the matter was excluded.  Smith Decl., ¶3; Katz Decl., ¶3; Quitt Decl., ¶3; Herman Decl., ¶3.

multiplier, noting multipliers between 3 and 4.5 are common); *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2-3 times lodestar multipliers.").

### D.     The Proposed Service Awards to Each Plaintiff Are Reasonable

In recognition of Plaintiffs' essential role in securing the Settlement's substantial benefits for Apple and its shareholders, Plaintiffs' Counsel respectfully request that the Court approve a service award of $5,000 for each, to be paid from the Fee and Expense Amount.  Stip., ¶23.  Public policy supports nominal service awards in this range.  *See OSI Sys.*, 2017 WL 5642304, at *5 (finding "'[n]amed plaintiffs ... eligible for reasonable incentive payments'" of $5,000, noting "'incentive payment[s] to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.'"); *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D. July 16, 2009) (approving $5,000 and $10,000 service awards not "to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action"); *In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving total of $100,000 in service awards to eight plaintiffs) ("if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150-51 (S.D.N.Y. 2010) (approving $15,000 service awards to address leadership's risks and burdens); *In re Cedant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving $25,000 service award in recognition of plaintiffs' public service).

## VI.     CONCLUSION

Plaintiffs respectfully submit that the Settlement, including the agreed Fee and Expense Amount and the Service Awards to be paid therefrom, is fair, reasonable and adequate, and merits final approval.

DATED: June 25, 2024                                **ROBBINS LLP**

                                                    */s/ Craig W. Smith*
                                                    Craig W. Smith
                                                    Brian J. Robbins
                                                    Shane P. Sanders
                                                    5060 Shoreham Place, Suite 300
                                                    San Diego, CA 92122

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

**WEISS LAW LLP**
Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
jelkins@weisslawllp.com

David C. Katz (admitted p*ro hac vice*)
Mark D. Smilow (*pro hac vice* to be filed)
Joshua Rubin (*pro hac vice* to be filed)
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
dkatz@weisslawllp.com
msmilow@weisslawllp.com
jrubin@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*