1    ROBBINS LLP
     Brian J. Robbins (190624)
2    Craig W. Smith (164886)
     Shane P. Sanders (237146)
3    5060 Shoreham Place, Suite 300
     San Diego, CA 92122
4    Telephone: (619) 525-3990
     Facsimile: (619) 525-3991
5    E-mail: brobbins@robbinsllp.com
             csmith@robbinsllp.com
6            ssanders@robbinsllp.com

7    WEISS LAW LLP
     Joel E. Elkins (256020)
8    9107 Wilshire Blvd., Suite 450
     Beverly Hills, CA 90210
9    Telephone: (310) 208-2800
     Facsimile: (310) 209-2348
10   E-mail: jelkins@weisslawllp.com

11   David C. Katz (admitted *pro hac vice*)
     Mark D. Smilow (*pro hac* to be filed)
12   Joshua Rubin (*pro hac* to be filed)
     1500 Broadway, 16th Floor
13   New York, NY 10036
     E-mail: dkatz@weisslawllp.com
14           msmilow@weisslawllp.com
             jrubin@weisslawllp.com
15
     *Co-Lead Counsel for Plaintiffs*
16

17                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
18                           OAKLAND DIVISION

19   IN RE APPLE INC. STOCKHOLDER          Lead Case No. 4:19-cv-05153-YGR
     DERIVATIVE LITIGATION
20                                         **JOINT DECLARATION OF CRAIG W.
21                                         SMITH AND DAVID C. KATZ IN
                                           SUPPORT OF MOTION FOR FINAL
22   This Document Relates to:            APPROVAL OF SETTLEMENT AND
                                           AWARD OF ATTORNEYS' FEES AND
             ALL ACTIONS                   EXPENSES**
23
24                                         Date: July 16 2024
                                           Time: 2:00 p.m.
25                                         Courtroom: 1 - 4th Floor
                                           Judge: Hon. Yvonne Gonzalez Rogers
26
27
28
     JOINT DECLARATION OF CRAIG W. SMITH AND DAVID C. KATZ IN SUPPORT OF
     MOTION FOR FINAL APPROVAL OF SETTLEMENT
     Case No. 4:19-cv-05153-YGR

Craig W. Smith and David C. Katz declare as follows:

1. I, Craig W. Smith, am a partner at the law firm of Robbins LLP. I am duly licensed to practice law in the State of California and admitted to practice before this Court.

2. I, David C. Katz, am a principal at the law firm of Weiss Law LLP. I am duly licensed to practice law in the State of New York and am admitted to practice *pro hac vice* before this Court.

3. Robbins LLP and Weiss Law LLP serve as co-lead counsel for plaintiffs Terrence Zehrer, Andrew Fine, Tammy Federman SEP/IRA, The Rosenfeld Family Foundation, and John Votto in the above-captioned shareholder derivative action. We submit this declaration in support of the Plaintiffs' Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses (the "Motion"). Apart from matters we include to retain context, we confine our statements to matters that may require substantiation beyond the facts, allegations, contentions, and inferences that are evident in the public record of the litigation and public disclosures by or concerning Apple. We have personal knowledge of the matters stated herein and, should we be called upon, we could and would testify competently thereto.

4. The purpose of this Declaration is to set forth the background and procedural history of the Derivative Actions, the negotiations that led to the Settlement, and the results achieved.[1] This Declaration also sets forth certain facts pertinent to the agreed Fee and Expense Amount.

## I. INTRODUCTION AND OVERVIEW

5. The Actions arise from performance management problems that caused Apple iPhones with aging batteries to shut down unexpectedly (hereinafter, the "PMP"). Plaintiffs claim that certain officers and directors of Apple (the "Individual Defendants") breached fiduciary duties to the Company by causing or permitting Apple to respond to complaints about unexpected iPhone shutdowns with iOS operating system updates that slowed CPU and GPU clock rates on a range of iPhone functions, without customers' knowledge or consent, in violation of domestic and international laws and regulations. Apple faced regulatory actions, consumer and securities class actions, as a result, and the Apple and

---

[1] Unless otherwise noted, all capitalized terms have the same definition as set forth in the Amended Stipulation and Agreement of Compromise, Settlement, and Release dated April 29, 2024 (the "Stipulation" or "Stip.") filed with the Court on April 30, 2024 (ECF No. 82-1).

iPhone brands suffered serious and lasting damage, reducing sales and ceding market share to competing products.

6. The Settlement commits Apple's Board of Directors (the "Board") to adopt, implement, and maintain for a minimum of four years policy commitments and related corporate governance, internal controls, and oversight enhancements (the "Enhancements") designed to improve Apple's response to future product performance issues, and substantially reduce the probability that Apple and its shareholders will suffer the consequences of a similar brand crisis going forward. In addition to loss prevention, Professor Kevin Lane Keller, the E. B. Osborn Professor of Marketing at the Tuck School of Business at Dartmouth College, explains in his declaration (filed concurrently with Plaintiffs' Motion) that the Enhancements provide the credible institutional response consumers demand following a brand crisis of this nature. The Enhancements will contribute significantly to Apple's efforts to rebuild consumer trust in the iPhone brand promise and Apple brand values, and will help to restore and maintain the full power of the Apple brand in the marketplace ("brand equity"). Professor Keller confirms Plaintiffs' assessment that, while the Enhancements' economic value cannot be estimated with mathematical precision, the combined economic value of the Enhancements' prophylactic and brand equity effects will range into the hundreds of millions of dollars.

7. Based upon Plaintiffs' Counsel's research, investigation, and experience, and as confirmed by Professor Keller, we conclude that the Settlement benefits' probable range of economic value far outweighs the speculative prospect that further litigation might produce a one-time monetary award of substantially greater value, particularly when discounted by the enormous costs, disruption, and delay such litigation would entail, and the substantial risk that further litigation would sacrifice the Settlement benefit and produce no recovery.

8. The Settlement was reached in a fair process, warranting the presumption of fairness and reasonableness courts afford compromises reached in non-collusive negotiations among sophisticated parties represented by experienced and informed counsel. The Settlement is the product of months of hard-fought negotiations conducted by lawyers with decades of shareholder litigation experience and a firm grip on the facts. The Parties did not address the question of attorneys' fees until after they had reached agreement upon the substantive Settlement consideration. The negotiations were facilitated by

Hon. Layn Phillips (Ret.), an exceedingly experienced and skilled mediator with an unusually deep knowledge of the relevant facts and law, based upon his successful mediation of the settlement reached in the consumer class actions. Judge Phillips confirms the negotiations were substantive, difficult, and conducted at arm's-length, without a hint of collusion.

9. The Parties reached agreement upon the award of $6 million in fees and expenses to be paid to Plaintiffs' Counsel, subject to court approval, in consideration for their efforts and risks assumed in securing the Settlement benefit through months of arm's-length negotiations facilitated by Judge Phillips. The negotiations were substantive, hard fought, and properly focused on the factors identified in applicable case law, including the value of the recovery and fee awards approved in comparable cases, as Judge Phillips confirms in his declaration. For the reasons, discussed in our brief and confirmed by Professor Keller, we believe the $6 million agreed amount represents a small fraction of the Settlement's probable range of economic value. As discussed in greater detail below, (i) the $6 million agreed amount is in line with awards approved in comparable derivative settlements; (ii) a lodestar cross-check confirms the agreed amount will not confer a windfall relative to Plaintiffs' Counsels' efforts; and (iii) the nominal $5,000 Service Awards proposed for each Plaintiff properly recognize their indispensable role in securing the Settlement benefit for Apple and its shareholders, and will be drawn from any fees awarded to Plaintiffs' Counsel, preserving the value of the recovery.

10. In the sound exercise of its business judgment, Apple's Board, including each of its independent, non-employee directors and the members of the Demand Evaluation Committee (the "DEC") appointed to investigate the Demand, advised by outside counsel for the Company, unanimously determined that the Enhancements confer substantial benefits, and that the Settlement, including the Fee and Expense Amount, is fair, reasonable, and adequate, and serves the best interests of Apple and its shareholders.

11. Apple disseminated the Notice in the manner approved by the Court as meeting Rule 23.1 and due process standards. To date, no objections have been filed or received by counsel, indicating strong support for the Settlement among Apple's tens of thousands of shareholders, including dozens of the world's largest and most sophisticated financial institutions.

## II. SUMMARY OF ALLEGATIONS, PROCEDURAL HISTORY, AND SETTLEMENT NEGOTIATIONS

### A. Plaintiffs' Allegations

12. Apple, a California corporation with its principal executive offices in Cupertino, California, designs, manufactures, and markets mobile communication and media devices and personal computers, and sells a variety of related software, services, accessories, and third-party digital content and applications. ¶¶21, 55.[2] The iPhone has served as Apple's flagship product since its release in 2007, accounting for nearly two-thirds of the Company's net sales in 2017. ¶57. Apple's "iOS" mobile operating system drives the iPhone. *Id*. Apple regularly improves the functionality, security, and performance of the iPhone and the Company's other mobile devices through iOS updates, which play a critical role in ensuring competitive performance and customer loyalty. ¶60.

13. Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Apple and its shareholders by causing or permitting the Company to first deny and then to minimize widespread iPhone shutdowns caused by aging batteries, while secretly distributing performance degrading power management software through iOS updates, in violation of consumer protection laws and regulations in the U.S. and abroad. ¶69.

14. In 2016, older model iPhones began shutting down in response to the demands of iOS enhancements due to the declining performance of aging batteries. ¶¶3, 61. Apple responded to early reports of problems by denying that the problems were significant or widespread. In January 2017, after internal assessments confirmed that a significant number of iPhones were impacted by declining battery performance, Apple secretly introduced software in iOS updates designed to "throttle" CPU and GPU clock rates, dramatically slowing the performance of older iPhone models, without owners' knowledge or consent. ¶¶3, 62. Because Apple did not tell iPhone owners that a $79 battery replacement would restore their phones' performance, many iPhone users replaced their older models, purchasing newer,

---

[2] Unless otherwise noted, all references to "¶__" or "¶¶__" are to the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Indemnification and Contribution filed by plaintiff Terrence Zehrer in the Federal Action on August 19, 2019. ECF No. 1.

more expensive next-generation iPhones in the mistaken belief that their older phones lacked sufficient processing power to keep pace with the demands of the new functions and applications. ¶¶3, 63.

15. Despite the "fix" provided in the iOS update, declining battery performance continued to cause problems, and increasing numbers of users reported that their iPhones were operating more slowly. ¶¶60-63. In late 2017, independent investigators reported that the Apple iOS updates issued earlier in the year strongly correlated with the dramatically declining performance of older iPhone models. On December 20, 2017, Apple admitted that neither the shutdowns nor the slowing performance was due to product obsolescence, but were due to aging batteries and to iOS updates that contained performance management routines designed to slow the execution of certain operations in older model iPhones. ¶¶4-5, 64-67. Apple's credibility and the iPhone brand were damaged, leaving Apple little choice but to over-correct to try to regain customer trust. On December 28, 2017, Apple announced a program that would permit customers to purchase replacement batteries for $29, a $50 discount. ¶¶5, 68.

16. Plaintiffs further allege that between August 2017 and January 2019, Defendants caused or permitted Apple to make a series of misleading statements touting strong iPhone demand, while concealing that this demand was driven in material part by Apple's undisclosed performance throttling of older model iPhones, which had induced customers to replace older iPhones with newer generation iPhones sooner. ¶¶11, 77-103. Once the truth about the actual cause of older iPhone shutdowns and slower performance was revealed, material numbers of customers who might have opted to upgrade to the new generation iPhones opted instead to keep their old iPhones and to purchase the discounted replacement battery, while others opted to switch to competing products, negatively impacting sales and revenue. *Id*.

17. On January 2, 2019, Apple issued a press release disclosing declining iPhone sales. ¶105. The Company reduced iPhone revenue guidance to $84 billion from the range of between $89 billion and $93 billion the Company had forecasted to investors just eight weeks before, marking the first time in fifteen years that Apple would fail to meet its revenue guidance. *Id*. Apple representatives attributed this decline to macroeconomic downtrends (primarily in China) and lower than expected rates of iPhone upgrades to newer models, admitting that the lower iPhone upgrade rates were due in part to customers'

decisions to take advantage of Apple's belated discount Battery Replacement Program.  ¶¶105-06.
Estimates of lost revenues ranged into the billions of dollars.[3]

18.     In addition to lost revenues, the cost of the discounted battery program, and serious damage to Apple's credibility and iPhone brand, Plaintiffs contend the Individual Defendants' alleged misconduct exposed the Company to: (i) domestic consumer class actions (*e.g.*, *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.) and *In re Apple OS Cases*, JCCP No. 4976 (Cal. Super. Ct., S.F. Cnty.) (the "Consumer Actions")); (ii) securities class action (*e.g.*, consolidated in *In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR (N.D. Cal.) ("Federal Securities Action")); (iii) class actions and regulatory actions in a variety of foreign jurisdictions, including Canada, France, Italy, and the UK;[4] and (iv) domestic regulatory actions.  ¶¶112-16.  In November 2020, Apple entered into a Consent Judgment with the Attorneys General of 34 U.S. states, including the District of Columbia, pursuant to which Apple agreed to pay $113 million and to adopt certain commitments to inform consumers about iPhone battery performance for a limited period.  On March 17, 2021, U.S. District Judge Edward J. Davila granted final approval of the settlement of the Consumer Actions, providing a non-reversionary minimum of $310 million and a maximum of $500 million to the settlement class.  *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.), ECF No. 608.

---

[3] *See, e.g.*, Matt Swider, *Apple's iPhone sales shortfall could cost it $9 billion in revenue*, techradar, Jan. 2, 2019, https://www.techradar.com/news/apple-iphone-revenue-shortfall-2019.

[4] *See* T. Tomm, *Apple to pay $113 million to settle state investigation into iPhone "battergate"*, The Washington Post, Nov. 18, 2020, https://www.washingtonpost.com/technology/2020/11/18/apple-fine-battery/; P. Foran, *Apple to pay Canadians $14.4M in proposed class-action settlement. Here's how much you could get*, CTV News, Jan. 12, 2024, https://toronto.ctvnews.ca/apple-to-pay-canadians-14-4m-in-proposed-class-action-settlement-here-s-how-much-you-could-get1.6722319#:~:text=Following%20a%20scandal%20involving%20its,a%20proposed%20class%2Daction%20settlement; D. Deahi, Apple and Samsung fined in Italy for slowing down their phones, The Verge, Oct. 24, 2018; P. Cohen, *UK tribunal gives $2B iPhone battery lawsuit the go-ahead*, ai, Nov. 1, 2023, https://appleinsider.com/articles/23/11/01/uk-tribunal-gives-2b-iphone-battery-lawsuit-the-go-ahead.

### B.    Procedural Background

#### 1.    The Federal Action

19.    On August 19, 2019, plaintiff Terrence Zehrer filed a stockholder derivative complaint on behalf of Apple asserting claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution ("*Zehrer* Action").    ECF No. 1.    Three related shareholder derivative complaints were later filed asserting substantially similar claims arising out of the same facts and circumstances as the *Zehrer* Action: (i) *Fine, et al. v. Cook, et al.*, Case No. 4:19-cv-05863-YGR ("*Fine* Action") (filed September 20, 2019); (ii) *Bankhalter v. Cook, et al.*, Case No. 4:19-cv-05881-YGR ("*Bankhalter* Action") (filed September 20, 2019); and (iii) *Votto v. Cook, et al.*, Case No. 4:19-cv-08246-YGR ("*Votto* Action") (filed December 18, 2019).

20.    On March 6, 2020, the Federal Plaintiffs and Defendants filed a stipulation to consolidate the *Zehrer* Action, *Fine* Action, *Bankhalter* Action, and *Votto* Action and to set a schedule for motions for the appointment of lead counsel.    ECF No. 19.    On March 11, 2020, the Court entered an order consolidating the *Zehrer* Action, *Fine* Action, *Bankhalter* Action, and *Votto* Action (thus forming the Federal Action).    ECF No. 20.

21.    On April 14, 2020, plaintiffs Zehrer, Fine, Federman, and the Rosenfeld Family Foundation filed a motion to appoint Robbins LLP and Weiss Law LLP as co-lead counsel for all derivative plaintiffs in the Federal Action.    ECF No. 23.    That same day, plaintiff Bankhalter filed a motion to appoint Pritzker Levine LLP and Gainey McKenna & Egleston as interim co-lead counsel.    ECF No. 21.    On June 29, 2020, following briefing on the competing lead counsel motions, the Court appointed Robbins LLP and Weiss Law LLP as Plaintiffs' Co-Lead Counsel.    ECF No. 39.    Plaintiff Bankhalter filed a motion for voluntary dismissal of the *Bankhalter* Action, which the Court granted. ECF Nos. 40-41.

22.    On August 11, 2020, the Federal Plaintiffs and Defendants filed a stipulation and proposed order to stay the Federal Action pending resolution of the motion to dismiss the Federal Securities Action. ECF No. 42.    On August 18, 2020, the Court granted this stipulation.    ECF No. 43.

23.    On January 21, 2021, following the partial denial of the motion to dismiss the Federal Securities Action, the parties to the Federal Action filed a stipulation and proposed order to continue the

JOINT DECLARATION OF CRAIG W. SMITH AND DAVID C. KATZ IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 4:19-cv-05153-YGR                                                                                    7

stay of the Federal Action until thirty days after the close of fact discovery in the Federal Securities Action. ECF No. 46. On January 25, 2021, the Court granted this stipulation. ECF No. 47. The parties to the Federal Action sought subsequent extensions of the stay, all of which were granted. ECF Nos. 48-53.

24. On March 20, 2023, after meeting and conferring on a proposed schedule for further proceedings, the parties to the Federal Action filed a stipulation and proposed order to set a schedule for the Federal Plaintiffs to file a consolidated complaint or designate one of the existing complaints in the action as the operative consolidated complaint before any briefing took place on motions raising substantive issues concerning the Federal Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 23.1. ECF No. 56. On March 27, 2023, the Court granted this stipulation. ECF No. 57.

25. On May 19, 2023, the parties to the Federal Action filed a stipulation extending the Federal Plaintiffs' time to file their consolidated complaint due to their ongoing investigation of related matters, which the Court granted. ECF Nos. 58-59.

26. On October 5, 2023, the parties to the Federal Action filed a stipulation to advise the Court that the parties had executed a memorandum of understanding to settle the litigation and were in the process of negotiating and finalizing a settlement agreement. ECF No. 63.

27. On January 19, 2024, the Court set a compliance deadline for March 8, 2024, requiring the parties to file by March 1, 2024 either: (i) a motion for preliminary approval of the settlement; or (ii) a joint statement explaining the parties' noncompliance. ECF No. 69.

### 2. The California Action

28. On September 17, 2019, Tim Himstreet ("Himstreet") filed a derivative action in Superior Court of the State of California, County of Santa Clara (the "California Court") captioned *Himstreet v. Cook, et al.*, Case No. 19CV355213 ("*Himstreet* Action"), alleging, *inter alia*, breaches of fiduciary duty by Defendants arising out of the same facts and circumstances as the Federal Action. Stip. at 6.

29. On September 30, 2019, the parties to the *Himstreet* Action filed a stipulation and proposed order to stay the action on terms similar to those in the Federal Action, which the California Court granted on October 1, 2019. *Id.* This stay was subsequently extended on similar terms as those in the Federal Action. *Id.*

30.     On August 17, 2020, plaintiff Steven Hill (together with Himstreet, the "California Plaintiffs") filed a derivative action in California Court captioned *Hill v. Cook, et al.*, Case No. 20CV369387 ("*Hill* Action") alleging, *inter alia*, breaches of fiduciary duty by Defendants arising out of the same facts and circumstances as the Federal Action. *Id.*

31.     On November 16, 2020, the California Court entered an order consolidating the *Himstreet* Action and *Hill* Action (hereinafter, the "California Action") and continuing the case management conferences in the respective actions. The California Action was stayed until February 1, 2023. Stip. at 6-7.

32.     On March 24, 2023, the parties to the California Action filed a stipulation setting a schedule for the filing of a consolidated complaint and briefing on Apple's anticipated demurrer, which the court granted. Stip. at 7. On May 19, 2023, the parties to the California Action filed a 28-day extension of these deadlines, which the court granted.

### 3.     The Litigation Demand

33.     On November 13, 2018, Apple shareholders Augustin Sacks and Gerard Bernales made the Demand on Apple's Board, demanding that the Board investigate claims arising from the same facts and circumstances. Stip. at 7. On December 9, 2018, the Board formed an advisory DEC to review and investigate the allegations, with the advice of independent counsel, and to report to the Board concerning its conclusions and recommendations. *Id.*

### C.     Settlement Negotiations

34.     The Settlement is the product of extensive negotiations, including multiple mediation sessions before the Hon. Layn Phillips (Ret.) of Phillips ADR (the "Mediator"), a nationally renowned mediator with extensive experience mediating complex shareholder disputes, who was also uniquely familiar with the facts, having successfully mediated the resolution of the Consumer Actions. Stip. at 7-8.

35.     On January 28, 2022, Plaintiffs submitted a mediation statement, made a settlement demand on Defendants, and requested certain documents. *Id.* The parties dedicated significant time and resources to the mediation and to subsequent settlement discussions. *Id.* In addition to its outside counsel,

Apple sent several in-house lawyers with relevant knowledge to engage directly in the mediation process. *Id.*

36.     On January 31, 2022, the Parties held their first mediation session. Stip. at 7. The Parties were unable to reach an agreement resolving the litigation during this session, but agreed to continue their discussions under the aegis of the Mediator. Stip. at 8.

37.     On April 6, 2023, the Parties engaged in their second formal mediation session. *Id.* The Parties discussed at length and in detail the complex facts and circumstances and their implications for the claims and defenses, both indirectly through the Mediator and directly in joint sessions attended by counsel for the Parties, percipient witnesses, and the relevant insurers. *Id.* During the joint sessions, the Company provided detailed confidential information regarding the technical and practical considerations that drove its decision-making with respect to the iOS performance updates. *Id.* The Parties debated their competing views of the essential facts, legal claims and defenses, and the broad range of possible litigation outcomes. *Id.* The Parties also discussed a range of remedial options, and were able to agree on a set of principles and target areas for corporate governance enhancements to flesh out through further negotiations. *Id.*

38.     The Parties were unable to reach an agreement during the April 2023 in-person mediation, but continued negotiating. *Id.* Over the course of many months, the Parties exchanged written proposals and counter proposals, guided by the Mediator. *Id.* Ultimately, the Parties reached an agreement in principle on the material substantive consideration for the Settlement. *Id.*

39.     On August 9, 2023, the Parties executed a written memorandum of understanding outlining the essential terms and conditions for the release of all claims asserted in the Actions in consideration for Apple's agreement to adopt, implement, and maintain the Enhancements set forth in Exhibit A to the Stipulation of Settlement. *Id.*

40.     After the Parties reached an agreement in principle on the material substantive terms of the Settlement, the Parties commenced negotiations facilitated by the Mediator regarding a reasonable award of attorneys' fees and expenses to Plaintiffs' Counsel in consideration for the substantial benefits conferred upon Apple and its shareholders by the Settlement. Stip. at 8-9. The Parties agree that, subject to the Court's approval, Apple shall pay or cause to be paid attorneys' fees and expenses to Plaintiffs'

Counsel in the agreed amount of $6,000,000, from which Plaintiffs will each receive $5,000 Service Awards, subject to the Court's approval. *Id.*; ¶¶17, 23.

41.    Thereafter, the settling Parties negotiated and finalized the formal operative terms of the Settlement set forth in the Stipulation.

**D.    Preliminary Approval and Notice to Apple Shareholders**

42.    On April 23, 2024, the Court granted preliminary approval of the Settlement and approved the proposed notice program, finding that it satisfied Rule 23.1 and due process standards. ECF No. 81. On April 30, 2024, the Court entered an order granting the Parties' Stipulation Regarding Amended Stipulation of Settlement and Exhibits Thereto. ECF No. 83. Apple timely disseminated the Notice in accordance with the Court's Preliminary Approval Order. ECF No. 84. To date, no objections have been received from Current Apple Shareholders.

**III.    SETTLEMENT CONSIDERATION**

43.    The Settlement commits the Board to the adoption, implementation, and/or maintenance of the Enhancements for at least four (4) years. Stip., Ex. A. The Enhancements are designed to prevent alleged lapses in Board and management oversight of risks related to the Company's products, and to ensure the Apple lives up to its brand commitments and communicates clear and accurate information to customers and shareholders.

44.    In sum, Apple shall:

- Amend the Charter for its Risk Oversight Committee to specifically require the review and discussion of material regulatory compliance issues relating to the Company's products, including the risks in relation to product performance and manufacturing defect and safety, and management's monitoring efforts, analysis, and response to potential product regulatory compliance risks.

- Add the Chief Compliance Officer ("CCO") as a member of the Risk Oversight Committee and require the CCO to report to the Audit and Finance Committee concerning emerging and ongoing risks discussed or presented at Risk Oversight Committee meetings.

- Ensure that all data (including in-store and third-party repair data, social media and other sources) bearing upon Performance Management will be actively and regularly monitored, compiled, and made available to leaders on the business teams responsible for product lines, who will evaluate, and, as appropriate, address or escalate for further review and oversight, real-time trends and issues.

- Implement a formal protocol to be facilitated and supervised by the CCO for the report, evaluation, recommendation, and escalation of potential product regulatory compliance

risks, and procedures ensuring that important information is communicated to the relevant persons at the Company prior to remedial action and related disclosures, and enhanced reporting and oversight of responses to material compliance risks to ensure timely, effective and transparent remedial action.[5]

- Require the CCO (i) to review related iPhone release notes in advance of the release of an iOS update involving changes to Performance Management in order to ensure accurate, timely, and transparent disclosures of such changes; and (ii) to work with the appropriate business team leaders to ensure that Apple's website appropriately identifies and describes the key components of such release notes relating to Performance Management.

- Maintain easily accessible and prominent webpages that contain clear and conspicuous information about lithium-ion batteries, unexpected shutdowns, and Performance Management; notify consumers of any material change to Performance Management due to an iOS update, provide information about battery health in the iPhone user interface; and inform consumers of the option to service the iPhone battery once performance has become significantly degraded.

- Require training and education of consumer-facing staff in these matters to provide a "front-line" resource for consumers and maximize transparency and responsiveness when product-related issues arise.

- Require the General Counsel to report to the Audit and Finance Committee on any material compliance issues.

- Require that Apple adopt and implement a written policy requiring the co-Chairs of the Disclosure Committee to review transcripts of each earnings call and make appropriate recommendations with respect to correction, clarification, further disclosure and explanation, or other actions.

45. To avoid unnecessary repetition, we respectfully refer the Court to paragraphs 116-149 of Professor Keller's declaration for a detailed explanation of the how the provisions of each of the Enhancement's four areas will operate in concert to address and remedy the alleged lapses that led Apple to mishandle its response to the iPhone performance management problems.

---

[5] These provisions include, (i) the evaluation by the leaders on the business teams of any reports to consider whether further evaluation, escalation, and decision-making is required; (ii) the preparation of written reports reflecting these evaluations and dissemination to the CCO and Chief Operations Officer ("COO"); (iii) coordination between the COO and the relevant business teams to develop and implement and action plan to address or mitigate the relevant risks; (iv) preparation of escalation reports setting out the proposed remedial responses by the business teams in conjunction with the CCO and timely presentation of the reports to the Risk Oversight Committee, and, as appropriate, senior executives; and (v) a review and evaluation of the proposed remedial response by the Risk Oversight Committee and further recommendation on improvements to the response.

# IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

## A.   The Settlement Is the Product of Extensive Arm's-Length Negotiations, Overseen by an Experienced Mediator

46.   The Settlement is the result of many months of hard-fought, arm's-length negotiations among experienced, well-informed counsel following their substantial investigation of the claims, defenses and remedial measures, with the assistance of a highly regarded neutral.  Plaintiffs' Counsel include nationally recognized leaders in shareholder litigation.  *See* Declaration of Craig W. Smith on Behalf of Robbins LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees And Expenses ("Smith Declaration" or "Smith Decl."), Ex. 1 (Robbins LLP firm resume); Declaration of David C. Katz on Behalf of Weiss Law in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees And Expenses ("Katz Declaration" or "Katz Decl."), Ex. 1 (WeissLaw LLP firm resume); Declaration of Daniella Quitt on Behalf of Glancy Prongay & Murray LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees And Expenses ("Quitt Declaration" or "Quitt Decl."), Ex. 1 (Glancy Prongay & Murray LLP firm resume); Declaration of John C. Herman on Behalf of Herman Jones LLP in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees And Expenses ("Herman Declaration" or "Herman Decl."), Ex. 1 (Herman Jones LLP firm resume) (filed concurrently herewith).  Their recommendation in favor of the Settlement is well-informed both by facts gathered and evaluated in their investigation, and the crucible of an extended and rigorous mediation process, which tested the relative strength of the claims, theories of liability, estimates of damages, and the available defenses.  Apple, the Individual Defendants, and the DEC were represented by preeminent corporate defense counsel.

47.   Judge Phillips confirms the arm's-length nature of the settlement negotiations, and his participation eliminates any concerns about collusion.  Accordingly, the Settlement merits a strong presumption of fairness and reasonableness.

## B.   Plaintiffs' Counsel's Settlement Recommendation Is Well-Informed

48.   Plaintiffs' Counsel were well-informed going into the Settlement negotiations, and they learned more during the months of substantive settlement exchanges with Apple's representatives and defense counsel regarding the facts; the relative strength of the claims and defenses; the quantum of

provable damages; the state of Apple's corporate governance and internal controls; and myriad other matters bearing on the prospects for further litigation and the range of available remedies.

49. Plaintiffs' Counsel in two jurisdictions completed substantial pre- and post-filing investigations, including the review of a trove of domestic and international media, analyst and regulatory reports, Apple's public filings, the deluge of reporting and analysis published by independent experts regarding the PMP, and the voluminous pleadings in the consumer class actions and the Federal Securities Action, which were supplemented by substantive information exchanges during mediation sessions and in the months of negotiations that followed. Stip. at 8; ECF No. 71, ¶4.

50. In particular, Plaintiffs' Counsel's research and investigation into the Defendants' alleged misconduct and the corresponding alleged damages to Apple, included, *inter alia*: (i) research and analysis in support of inspection demands pursuant to Cal. Corp. Code § 1601; (ii) review and analysis of non-public corporate books and records produced by Apple during the litigation, as well as Apple's public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, announcements, transcripts of investor conference calls, and news articles; (iii) review and analysis of the results of the investigations conducted by regulators, states attorneys general, consumer litigants, securities litigants, and business, securities, and information technology analysts, available in court filings, regulatory filings, press releases, website postings, and blogs; (iv) thorough research and analysis of the applicable law governing the claims and potential defenses in connection with the preparation of the initial complaints, drafts of the amended consolidated complaints, mediation statements, and subsequent written and verbal mediation exchanges; (v) research and analysis regarding remedial commitments negotiated in the related regulatory and private actions, Apple's corporate governance and oversight policies and practices, the corporate governance and brand management best practices of peer corporations, and relevant internal policies provided by Apple during the course of settlement negotiations; (vi) additional legal and factual research conducted in connection with preparing responses to Defendants' mediation statement and anticipated arguments in the lead up to the two in-person mediation sessions, and over the course of the subsequent mediation exchanges; (vii) research, analysis, and calculation of the broad range of out-of-pocket damages and development of sources and models for estimating lost sales and revenues; (viii) review and analysis of materials provided by Apple during the

1  course of the mediation; and (ix) extensive pre- and post-mediation settlement discussions with the

2  Mediator and counsel for Defendants.

3       51.    Judge Philips confirms that Plaintiffs' Counsel's extensive investigation and analytic work

4  were evident in their mediation briefs and settlement demand, in their performance throughout the

5  months-long mediation process, and in the results. *See* Declaration of Layn R. Phillips in Support of

6  Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Phillips Decl."),

7  ¶¶18-20 (filed concurrently herewith).

8       52.    As a result, when the agreement in principle was reached on the material substantive terms

9  of the Settlement, Plaintiffs' Counsel had a clear understanding of the potential risks and rewards of

10 pursuing further litigation; how Apple's and its shareholders' interests would be impacted across the broad

11 range of possible litigation scenarios and outcomes; and the remedial measures that would be necessary

12 to: (i) ensure the Company will not suffer the consequences of similar mishandling of future product

13 performance issues; and (ii) restore Apple's credibility with its customers, whose loyalty keys the

14 Company's performance and ability to maximize long-term shareholder value. ECF No. 70 at 11, 16-17.

15 In sum, Plaintiffs' Counsel's determination that the economic value of the benefits guaranteed by the

16 Settlement far outweigh the value of any probable risk-adjusted monetary recovery that might be secured

17 through further litigation is well-informed.

18     **C.    The Settlement Confers Substantial Benefits on Apple and Its Shareholders**

19     53.    The Settlement guarantees Apple and its shareholders the benefits of a comprehensive set

20 of policy, governance, internal controls, and oversight enhancements designed to address the specific

21 policy, decision-making, and oversight lapses they allege allowed Apple to respond to the iPhone

22 shutdown problem in ways that jeopardized customer loyalty and resulted in significant legal-regulatory

23 exposure in domestic and international markets.   The Enhancements will substantially reduce the

24 likelihood that the Company will suffer the potentially catastrophic losses that would attend similar

25 mishandling of future product performance issue and related brand challenges, and lay the foundation

26 necessary for restoring customer trust and strengthening Apple's brand equity. Stip., Ex. A; ECF No. 70

27 at 19-21. The Enhancements confer real and substantial economic value upon Apple and its shareholders

28

that almost certainly exceeds the probable range of recovery at trial, particularly when discounted for the enormous risk, costs, delays, and disruption further litigation in pursuit of such a recovery would entail.

54. For the reasons set forth in detail in his declaration, Professor Keller confirms Plaintiffs' conclusion that the Enhancements will deliver real, lasting, and substantial economic value far greater than any likely monetary award that might be obtained through further litigation. In sum:

55. **First,** "the Enhancements' strong brand governance polices, decision-making and oversight regime will substantially reduce the probability that Apple will suffer the consequences of another mishandled brand crisis" with even more serious immediate costs and long-term damage to Apple's brand equity.[6]  *See* Keller Decl. ¶115. The Enhancements' transparency and risk oversight policies and procedures go to the heart of Apple's alleged mishandling of the iPhone shutdown problem that led to the brand crisis—namely, Apple's alleged lack of speed, lack of transparency, and perceived abuse of its customers' trust that routine iOS updates would only be used to enhance, not degrade, iPhone performance.  *Id.*, ¶¶82-87, 116-20. How the essential elements of the Enhancements' four major components will operate to achieve this result is detailed and explained in Plaintiffs' motion in support of preliminary approval (ECF 70 at 19-21), and explicated in further detail by Professor Keller. Keller Decl., ¶¶123-49.

56. While the value of preventing future missteps cannot be determined with precision, even aggressively discounting the likelihood of recurrence absent the Enhancements and the Enhancements' effectiveness in preventing recurrence, the magnitude of the harm Apple suffered in the wake of the PMP, which Professor Keller concurs includes nearly half a billion dollars in immediate legal-regulatory costs and billions in lost sales and long-term brand equity-related losses (*id.*, ¶¶82-106); the inevitability of

---

[6] "The concept of 'brand equity' is used to summarize the power of brands … [and] 'consists of the marketing effects uniquely attributable to a brand…. [B]rand equity explains why different outcomes result from the marketing of a branded product or service than if it were not branded.'" Declaration of Kevin Lane Keller in Support of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Keller Decl."), ¶36 (filed concurrently herewith). "Brands can motivate customers or potential customers to purchase a product or service and to pay a price premium for it…. As a result of these dynamics, strong brands can confer significant competitive advantages over existing competitors and potential market entrants." *Id.*, ¶35. "Marketing academics and practitioners understand that brands can be extremely valuable, and, once established, may comprise a substantial share of a firm's overall value." *Id.*, ¶36.

future product performance issues that will require effective brand management responses (*id.*, ¶116); and the probability that Apple would suffer far greater immediate and long-term loss in the event of a future brand crisis (*id.*, ¶104), the prophylactic value of the Enhancements, standing alone, likely ranges into the hundreds of millions of dollars. *Id.*, ¶¶82-149.

57.     **Second,** the Enhancements' rigorous customer-oriented brand management policies, combined with strengthened monitoring, reporting, escalation, and oversight procedures and governance will significantly improve corporate decision-making, not just in responding to brand challenges, but across the broad range of brand management decisions that are necessary to preserve and increase the brand equity that is central to Apple's enterprise value. ¶¶69-81.

58.     As Professor Keller observes, "there is broad recognition among management academics and business leaders that effective brand management requires strong brand management policies, internal controls, decision-making procedures, and oversight, as much as well-funded and properly focused external brand activities, like advertising, marketing and promotions. *Id.*, ¶107. This principle is so broadly accepted, in fact, that it is now part of the core curriculum taught in business schools." *Id.* In short, strong brand governance produces better brand management and a more valuable and resilient brand. Apple's strengthened customer-centric policies requiring timely and transparent responses to complaints or field performance issues and clear explanations of iOS contents, combined with enhanced monitoring, reporting, information flows, decision-making processes, and rigorous oversight, will ensure transparency and produce better brand management decisions, preserving and strengthening Apple brand equity. *Id.*, ¶124 ("the Settlement's enhanced risk oversight regime is exemplary in this regard").

59.     **Third**, the Enhancements will be recognized as a credible and effective corporate remedial response to the PMP, and contribute significantly to Apple's efforts to re-build trust in the brand promise and in Apple's commitment to brand values, strengthening brand equity. The Enhancements confer substantial additional economic value by providing the credible institutional response necessary to restore and to maintain customer trust. As Professor Keller observes:

> Adopting a strong set of principles and implementing them through a strong governance framework provides structural assurances that the company will properly and transparently manage future branding discrepancies in a way that will effectively bring diverging products back into alignment with the brand promise. Such measures have powerful signaling effects that help to re-build the credibility of the brand promise and the

firm's commitment to brand values—essential elements in increasing brand equity and making it more resilient to the expected and unexpected challenges that will arise over the life of the brand. Conversely, failure to implement credible institutional remedies in the wake of a brand crisis not only leaves residual doubts unaddressed, but can itself become reason to doubt the credibility of the firm's commitment to the brand promise and brand values.

*Id.*, ¶113.

60. The Enhancements credibly demonstrate Apple's commitment "to change internally to ensure that its response to future problems is consistent with the brand promise and brand values" (*id.*, ¶151) "through a combination of concrete policy commitments; monitoring, escalation, and decision-making protocols and controls; and correlative management- and Board-level oversight regimes … a substantive, thoughtful, and credible institutional response to the missteps of the Batterygate episode." *Id.*, ¶152. Professor Keller concludes that "in the context of Apple's business, the combined economic value of substantially reduced risks of future loss and brand equity damage, the institutional reforms' contributions to re-building and maintaining brand credibility, and the market effects of lower perceived brand-related risks of investing in Apple will almost certainly range into the hundreds of millions of dollars." *Id.*, ¶154.

**D.    The Substantial Risks, Expense, Complexity, and Likely Duration of Further Litigation Support the Settlement**

61. Our research, analysis, experience, exchanges with defense counsel, as well as with Apple's representatives and Judge Phillips, and consultations with experts in the relevant fields lead us to conclude that the probability that Plaintiffs might secure a monetary recovery of decisively greater value than the Enhancements is vanishingly low, particularly when discounted by the substantial costs, disruption, and delay involved, and the enormous risk that further litigation would result in no recovery.

62. It is exceedingly difficult for shareholder plaintiffs to succeed in prosecuting shareholder derivative actions. The challenges begin at the pleading stage. The demand futility requirement is satisfied only under extraordinary conditions. The challenges confronting Plaintiffs in the present matter are especially daunting. This case does not involve allegations of direct conflicts of interest or self-dealing. Plaintiffs allege a so-called *Caremark* claim predicated on allegations that a majority of Apple's directors consciously disregarded their duty of oversight—a claim widely recognized as "possibly the

most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see Kanter v. Reed*, 92 Cal. App. 5th 191, 206-09 (2023) (adopting *Caremark* standard for director oversight liability).[7]  Plaintiffs would have to demonstrate the futility of making a demand on Apple's super-majority independent Board through particularized facts demonstrating that most face a substantial likelihood of liability for utterly failing to exercise oversight.  *See* Fed. R. Civ. P. 23.1; Cal. Corp. Code § 800(b)(2).  Notwithstanding Plaintiffs' confidence in their claims, the complexity of the technological and business considerations at issue would allow Defendants to assert a number of plausible business reasons for their decisions other than conscious disregard of duty.  The Demand faces even greater challenges.

63.     Even were Plaintiffs to prevail at the pleading stage, the Board could appoint an independent committee composed of disinterested board members ("special litigation committee") tasked with investigating and determining whether to permit plaintiffs to pursue the claims or to move to terminate the litigation.  In addition to compounding delay, expense, and complexity, the decision of such a committee to terminate litigation is protected by the business judgment presumption, and the odds of defeating a motion to terminate are low.

64.     Defeating a special litigation committee motion to dismiss would permit Plaintiffs to move on to the merits phase, but would not improve their chances of success.  Plaintiffs would have to build a circumstantial case for liability based upon a mountain of complex business and financial records, and secure evidence sufficient to overcome motions for summary judgment predicated on the business judgment presumption that directors act on an informed basis and in good faith.  Plaintiffs would confront the exculpatory provision of Article V of Apple's Restated Articles of Incorporation adopted pursuant to Section 204(a)(10) of the California Corporations Code, which forecloses monetary damages absent proof of disloyalty, bad faith, intentional misconduct, receipt of an improper personal benefit, or a knowing violation of law.  Pursuing the necessary discovery would be an enormously complex, costly and years-long undertaking.  After documents are gathered and analyzed, dozens of percipient witnesses

---

[7] Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.

1    would have to be deposed concerning exceedingly complex facts.  Expert reports would have to be
2    prepared and expert depositions taken.

3          65.    When and if the case reached trial, Plaintiffs would have to present their case primarily
4    through the testimony of hostile percipient witnesses, some of whom may be unavailable or unable to
5    recall critical information.  Plaintiffs would have to prove damages in a battle of experts.  The trier of fact
6    could react to the evidence in unpredictable and unfavorable ways.

7          66.    Even victory at trial would afford no guarantee of a meaningful recovery.  Plaintiffs would
8    have to defend any favorable judgment through post-trial motions and appeals, where numerous verdicts
9    in shareholder actions have been vacated or modified over the years, and then seek to enforce it.

10         67.    Weighed against these and other risks, including the very real risk of no recovery after
11   years of litigation, the Settlement's guaranteed benefits far outweigh the speculative potential for a one-
12   time monetary recovery of decisively greater value.

13         **E.     The Board's Decision to Approve the Settlement Warrants Deference**

14         68.    The Board, including each of its independent, non-employee directors, as well as the
15   members of the DEC, advised by experienced in-house and outside counsel, unanimously approved the
16   Settlement as serving the best interests of Apple and its shareholders.  Stip. at 10, 16.  The Board's
17   reasonable exercise of business judgment merits deference.

18         **F.     The Absence of Shareholder Objections Confirms the Settlement Is Sound**

19         69.    To date, no objection has been filed and counsel are unaware of any objections to the
20   Settlement.  This strongly favors approval, particularly given the dozens of institutions that hold
21   substantial positions in Apple stock.

22   **V.    THE AGREED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE**

23         **A.     The Parties' Agreement Is the Product of Arm's-Length Negotiations**

24         70.    Given the Parties' negotiated agreement on the Fee and Expense Amount, the Court need
25   only determine whether the agreed amount falls within the range of reasonableness.  Where, as here, the
26   fee negotiations were conducted at arm's-length and there is no evidence of collusion or that the agreed
27   Fee and Expense Amount would confer an unreasonable windfall, we respectfully submit that the Parties'
28   agreement should be afforded substantial deference.

71.     The Parties agree that "the Enhancements confer substantial benefits upon Apple and its shareholders" and warrant the $6 million Fee and Expense Amount to Plaintiffs' Counsel. Stip., ¶¶2, 17. This agreement was reached following extensive arm's-length negotiations between sophisticated parties represented by experienced and well-informed counsel. *See* ¶¶34-41, *supra*; Phillips Decl., ¶¶15-20. The negotiations were facilitated by the Judge Phillips, an experienced and reputable mediator. The fee negotiations began only after the Parties had reached agreement on the substantive Settlement consideration, eliminating any possibility of collusion. *See also* Phillips Decl., ¶15. The negotiations were substantive and focused on the relevant factors identified in applicable case law, including the award amount in relation to the value of the Settlement benefit and fee awards approved in comparable cases. *See also id.*, ¶¶15-20.

72.     Based on his vast experience mediating hundreds of derivative settlements, Judge Phillips confirms the Parties' agreement that the amount he proposed to bridge the gap in the Parties' respective positions and ultimately accepted by the Parties "is consistent with fee and expense awards approved in reasonably comparable derivative settlements … and … is fair and reasonable in relation to the substantial value of the Settlement benefit, the quality of Plaintiffs' Counsel's advocacy, and the substantial contingency risks they assumed in investing the considerable time and effort required to secure the Settlement." *Id.*, ¶20.

73.     We respectfully submit that, in the absence of red flags suggesting collusion, an extreme imbalance in negotiating power, or indications that the agreed amount would confer an unreasonable windfall, the Parties' agreement merits substantial deference.

**B.      The Agreed Fee and Expense Amount Is Reasonable in Relation to the Value of the Settlement Benefit**

74.     While it may not be possible to estimate the Enhancements' precise economic value, this does not mean that estimates as to their probable range of economic value are speculative. Based on his deep knowledge of the academic literature and decades of consulting for some of the world's most valuable brands, Professor Keller confirms "with confidence" our conclusion that by "ensuring that the Apple brand is properly monitored and managed to avoid such financially disastrous brand crises, the Enhancements are likely to confer economic value ranging into the hundreds of millions of dollars, if not

more, and orders of magnitude greater than the $6 million Fee and Expense Amount Apple has agreed Plaintiffs' Counsel should receive in consideration for their efforts in securing the Enhancements through the Settlement."  Keller Decl., ¶7; *see id.*, ¶154 ("[I]n the context of Apple's business, the combined economic value of substantially reduced risks of future loss and brand equity damage, the institutional reforms' contributions to re-building and maintaining brand credibility, and the market effects of lower perceived brand-related risks of investing in Apple will almost certainly range into the hundreds of millions of dollars.").  Accordingly, the agreed Fee and Expense Amount is fair and reasonable in relation to the value of the Settlement benefit.

75.    The Fee and Expense Amount agreed upon by the Parties here is in line with awards approved in corporate governance-based derivative settlements of comparable magnitude and complexity, and similar recoveries.  *See, e.g.*, *In re Alphabet Inc. Shareholder Deriv. Litig.*, Lead Case No. 19CV341522, slip op. (Cal. Super. Ct., Santa Clara Cnty. Nov. 30, 2020), and *Irving Firemen's Relief and Ret. Fund v. Page*, C.A. No. 2019-0355-SG, Transcript (Del. Ch. Dec, 23, 2020) (combined $40.3 million in attorneys' fees) (Exs. 2-4); *In re Altria Group, Inc. Derivative Litig.*, No. 3:20-cv-00772-DJN, slip op. (E.D. Va. Feb. 20, 2023) ($15 million in attorneys' fees) (Ex. 18); *In re Google Inc. S'holder Derivative Litig.*, No. 4:11cv-04248-PJH, slip op. (N.D. Cal. Jan. 21, 2015) ($9.9 million in attorneys' fees) (Exs. 5-6); *In re Motorola, Inc., Derivative Litig.*, No. 07CH23297, slip op. (Ill. Cir. Ct.-Cook Cty. Nov. 29, 2012) ($9.5 million in attorneys' fees) (Ex. 7); *Unite Nat'l*, 2005 WL 2877899, at *5 ($9.2 million in attorneys' fees); *Lambrecht v. Taurel*, 2010 U.S. Dist. LEXIS 75633 (S.D. Ind. June 8, 2010) ($8.75 million in attorneys' fees); *Wolfson v. Spiegel*, Case No. BC720152, slip op. (Cal. Super. Ct.–Los Angeles Cnty. Jan. 12, 2021) ($7.5 million in attorneys' fees) (Exs. 8-9); *In re: Lifelock, Inc. Derivative Litig.*, No. CV2015-054087, slip op. (Ariz. Super. Ct.-Maricopa Cnty. Sept. 8, 2016) ($6 million in attorneys' fees) (Exs. 10-11); *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC, slip op. (Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014) ($5.25 million in attorneys' fees) (Exs. 12-13); *In re F5 Networks, Inc. Derivative Litig.*, 2011 WL 13195985, at *1 (W.D. Wash. Jan. 6, 2011) ($5 million fee in attorneys' fees).

76.    Robbins LLP, Weiss Law LLP, or both, played leading roles in a number of these cases, including *Altria Group*, *Google, Motorola*, *Wolfson*, *Lifelock*, *Alphatec*, and *F5 Networks*.

77.     The Board's approval of the Fee and Expense Amount merits special consideration. Unlike in class actions, where the diverging interests of class counsel and absent class members at the fee stage warrant close judicial scrutiny, as in most derivative actions, Apple, the Settlement beneficiary, and its D&O insurers, participated in the fee negotiations, were represented by experienced counsel free of any conflict, and had every incentive to negotiate the lowest reasonable fee and expense amount.

78.     Based on these considerations, we respectfully submit that the Fee and Expense Amount negotiated by Apple with the assistance of counsel and approved by the Board plainly falls within a reasonable range, and there is no basis to second-guess the Board's reasonable exercise of business judgment.

### C.     Plaintiffs' Counsel Devoted Significant Time and Expense to the Derivative Matters

79.     As set forth in the chart below and Plaintiffs' Counsel's respective declarations (Smith Decl., Katz Decl., Quitt Decl., Herman Decl.), collectively, Plaintiffs' Counsel devoted a total of 3,675.70 hours to the Derivative Actions, for total lodestar of $3,019,990.25. This time was spent on tasks that led directly to the recovery and, as we explain below, constitutes a conservative tally of billable hours devoted to the matter.

| PLAINTIFFS' COUNSEL - TOTAL HOURS & LODESTAR | | | | |
|---|---|---|---|---|
| **Federal Action** | **Hours** | **Lodestar** | **Multiplier** | **Expenses** |
| Robbins LLP | 1,826.50 | $1,303,066.25 | | $48,208.04 |
| Weiss Law | 924.90 | $916,272 | | $34,557.54 |
| **California Action** | | | | |
| Glancy Prongay & Murray LLP | 578.30 | $498,675 | | $42,406.92 |
| Herman Jones LLP | 346 | $301,977 | | $34,932.09 |
| **TOTAL** | **3,675.70** | **$3,019,990.25** | | **$160,104.59** |

80.     Attached hereto as Exhibit 1 is a task chart showing the total hours, rates, and lodestar for each firm organized by task category (e.g., complaint drafting, factual research, contested leadership motion work, settlement demands, mediations, settlement negotiations). This information was compiled from information supplied in the individual firm task charts attached as Exhibit 1 to the Smith Declaration, the Katz Declaration, the Quitt Declaration, and the Herman Declaration.

81.     Plaintiffs' Counsel also collectively incurred total expenses of $160,104.59. *See* Smith Decl., Katz Decl., Quitt Decl., Herman Decl.

---

JOINT DECLARATION OF CRAIG W. SMITH AND DAVID C. KATZ IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 4:19-cv-05153-YGR                                                          23

82.     A lodestar cross-check on the agreed Fee and Expense Amount is unnecessary here because, as shown above, the agreed Fee and Expense Amount plainly would not confer a windfall. Regardless, after total expenses ($160,104.59) are deducted, the net Fee and Expense Amount ($5,839,895.41) constitutes a multiple of **1.93** on Plaintiffs' Counsel's conservatively calculated total lodestar of $3,019,990.25, which is well within the range deemed reasonable by courts in this and other Circuits, confirming the agreed Fee and Expense Amount would not confer an unreasonable windfall.

**D.     The Proposed Service Awards to Each Plaintiff Are Reasonable**

83.     In recognition of Plaintiffs' essential role in securing the Settlement's substantial benefits for Apple and its shareholders, we respectfully request that the Court approve a nominal service award of $5,000 for each, to be paid from the Fee and Expense Amount.  Stip., ¶23.  Defendants do not oppose this request.  The proposed awards are well within the range generally approved by courts, and, because they will be paid from the Fee and Expense Amount, they will not reduce the value or increase the costs of the benefits secured for the Company.

84.     Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:     Plaintiffs' Counsel's Combined Lodestar Task Chart;

Exhibit 2:     Order After Hearing on November 30, 2020 and Judgment, *In re Alphabet Inc. Shareholder Deriv. Litig.*, Lead Case No. 19CV341522 (Cal. Super. Ct., Santa Clara Cnty. Nov. 30, 2020);

Exhibit 3:     Order Concerning Motion for Award of Attorneys' Fees and Expenses, *In re Alphabet Inc. Shareholder Deriv. Litig.*, Lead Case No. 19CV341522 (Cal. Super. Ct., Santa Clara Cnty. Feb 5, 2021);

Exhibit 4:     Telephonic Hearing and Rulings of the Court on Plaintiff's Motion for Approval of Fees and Expenses, *Irving Firemen's Relief and Retirement Fund v. Page*, C.A. No. 2019-0355-SG (Del. Ch. Dec. 23, 2020);

Exhibit 5:     Stipulation of Settlement, *In re Google Inc. S'holder Derivative Litig.*, No. 4:11cv-04248-PJH (N.D. Cal. Aug. 7, 2014);

Exhibit 6:     Order Approving Derivative Settlement and Order of Dismissal with Prejudice, *In re Google Inc. S'holder Derivative Litig.*, No. 4:11cv-04248-PJH (N.D. Cal. Jan. 21, 2015);

Exhibit 7:     Order and Final Judgment, *In re Motorola, Inc., Derivative Litig.*, No. 07CH23297 (Ill. Cir. Ct.-Cook Cty. Nov. 29, 2012);

| | | |
|---|---|---|
| Exhibit 8: | Stipulation and Agreement of Settlement, *Wolfson v. Spiegel*, Case No. BC720152 (Cal. Super. Ct.–Los Angeles Cnty. Aug. 12, 2020); |
| Exhibit 9: | Final Order and Judgment, *Wolfson v. Spiegel*, Case No. BC720152 (Cal. Super. Ct.–Los Angeles Cnty. Jan. 12, 2021); |
| Exhibit 10: | Stipulation of Settlement, *In re: Lifelock, Inc. Derivative Litig.*, No. CV2015-054087 (Ariz. Super. Ct.-Maricopa Cnty. June 30, 2016); |
| Exhibit 11: | Order Approving Shareholder Derivative Settlement, *In re: Lifelock, Inc. Derivative Litig.*, No. CV2015-054087 (Ariz. Super. Ct.-Maricopa Cnty. Sept. 8, 2016); |
| Exhibit 12: | Stipulation of Settlement, *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-00058586-CU-BT-NC (Cal. Super. Ct.-San Diego Cnty. Apr. 15, 2014); |
| Exhibit 13: | Order and Final Judgment, *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-00058586-CU-BT-NC. (Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014); |
| Exhibit 14: | *McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000); |
| Exhibit 15: | Reporter's Transcript of Proceedings, *In re Google Inc. S'holder Derivative Litig.*, Case No. 4:11-cv-04248-PJH (N.D. Cal. Jan. 21, 2015); |
| Exhibit 16: | Transcript of Final Approval Hearing, *In re comScore S'holder Derivative Litig.*, CA No. 1:16-cv-09855-JGK (S.D.N.Y. June 7, 2018); and |
| Exhibit 17: | Order and Final Judgment, *In re Altria Group, Inc. Derivative Litig.*, No. 3:20-cv-00772-DJN (E.D. Va. Feb. 20, 2023). |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 25, 2024

*/s/ Craig W. Smith*

CRAIG W. SMITH

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 25, 2024

*/s/ David C. Katz*

DAVID C. KATZ

# EXHIBIT 1

*In re Apple Inc. Stockholder Derivative Litigation* , Lead Case No. 4:19-cv-05153-YGR

**Firm Name:**              **ALL FIRMS CONSOLIDATED**
**Reporting Period:**        5/17/2019    *through*    4/30/2024

**Categories:**

(1)  Pre-suit fact investigation & legal analysis, client consultations re potential derivative action

(2)  Draft, revise and file initial complaints

(3)  Negotiations re consolidation and leadership; Research & analysis, draft briefs and declarations in support of contested lead plaintiff motion

(4)  Case management and coordination; consultations with Federal and State Plaintiffs' Counsel

(5)  Track & analyze developments in ongoing related litigation and regulatory matters

(6)  Research & analysis, draft books and records demand and other document requests

(7)  Research & analysis, draft consolidated amended complaint

(8)  Search, vet, and consult with industry and corporate governance experts

(9)  Research & analysis re damages and disgorgement estimates, prepare and evaluate preliminary models and associated graphics

(10)  Research & analysis re oversight breakdown and remedial measures; Prepare and submit settlement demand

(11)  Update legal & factual analysis, evaluate insurance; prepare and submit mediation statement

(12)  Evaluate defendants' mediation statement, research & analysis iso responses to core legal and factual arguments, prepare graphics and outlines for mediation

(13)  Attend mediation (including travel)

(14)  Post-mediation settlement negotiations, information exchanges, evaluate proposals and draft counters

(15)  Negotiate and draft settlement documentation

(16)  Prepare preliminary settlement approval brief and declarations

(17)  Prepare for, travel to, and attend hearing on Motion for Preliminary Approval; Negotiate, draft, and submit Amended Stipulation of Settlement for Preliminary Approval

(18)  Client communications

| TOTAL LODESTAR | | | | | | | | | | | | | | | | | | | | |
| FIRMS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Total Hours | Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Robbins LLP** | 98.75 | 158.3 | 355.8 | 165 | 146.5 | 44.5 | 80.75 | 70 | 68.75 | 104.3 | 70.75 | 37.5 | 43.5 | 107.75 | 94 | 130.8 | 35.25 | 14.5 | 1826.5 | $ 1,303,066.25 |
| **Weiss Law** | 52.9 | 94.1 | 69.7 | 68.3 | 60.4 | 33.2 | 10.6 | 22.8 | 12.3 | 43 | 95.8 | 16.4 | 39.5 | 73.5 | 130.9 | 51.2 | 28 | 22.3 | 924.9 | $ 916,272.00 |
| **Glancy Prongay & Murray LLP** | 6.9 | 39.8 | 5.3 | 88.5 | 20.7 | 14.3 | 14.5 | 54.4 | 2 | 38.4 | 35.3 | 19 | 50.5 | 78.5 | 42.6 | 59.2 | 3.2 | 5.2 | 578.3 | $ 498,675.00 |
| **Herman Jones LLP** | 7 | 30.3 | 19.5 | 120.1 | 34.6 | 24.3 | 6.7 | 0 | 0 | 0.5 | 36.6 | 1 | 18.2 | 0 | 39.1 | 3.3 | 0 | 4.8 | 346 | $ 301,977.00 |
| **TOTALS** | **165.6** | **322.5** | **450.3** | **441.9** | **262.2** | **116.3** | **112.6** | **147.2** | **83.05** | **186.2** | **238.5** | **73.9** | **151.7** | **259.75** | **306.6** | **244.5** | **66.45** | **46.8** | **3675.7** | **$ 3,019,990.25** |

EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/30/2020 4:03 PM
Reviewed By: R. Walker
Case #19CV341522
Envelope: 5379455**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| IN RE ALPHABET INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No.: 19CV341522<br><br>**ORDER AFTER HEARING ON NOVEMBER 30, 2020 AND JUDGMENT**<br><br>**(1) Motion for Final Approval of Derivative Settlement**<br>**(2) Motion for Award of Attorneys' Fees and Expenses** |

The above-entitled matter came on regularly for hearing on Monday, November 30, 2020 at 1:30 p.m. in Department 1 (Complex Civil Litigation), the Honorable Brian C. Walsh presiding. A tentative ruling was issued prior to the hearing, which no party challenged. The appearances are as stated in the record. Having reviewed and considered the written submissions of all parties and being fully advised, the Court adopts the tentative ruling and enters judgment as follows:

These consolidated shareholder derivative actions arise from allegations that officers and directors of Alphabet, Inc., the parent company of Google LLC, breached their fiduciary duties and committed other misconduct in connection with multi-million-dollar severance

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

1 awards to male executives accused of assaulting female employees, amid a broader culture of

2 discrimination against women at the company.  The plaintiffs also allege claims arising from a

3 data breach impacting the Google+ service.

4     The parties reached a settlement, which the Court preliminarily approved in an order

5 filed on October 22, 2020.  The factual and procedural background of the action and the

6 Court's initial analysis of the settlement are set forth in that order and are not repeated here.

7     Before the Court are plaintiffs' motions for final approval of the settlement and for

8 approval of their attorney fees and costs.  Plaintiffs' motions are unopposed, but two Google

9 shareholders filed written objections to the settlement.

10

11 I.  Legal Standard for Approving a Derivative Settlement

12     "A court reviewing a settlement agreement considers whether the proposed settlement

13 is fair and reasonable in light of all relevant factors.  [Citations.]  A court reviews the

14 settlement of a derivative suit as a means of protecting the interests of those who are not

15 directly represented in the settlement negotiations." (*Robbins v. Alibrandi* (2005) 127

16 Cal.App.4th 438, 445.)  "The duty of a court reviewing a settlement of a class action provides a

17 useful analogy because the court in such cases seeks to protect the members of the class who,

18 like the corporation and non-named shareholders in a derivative suit, may have no independent

19 representation and little control over the action." (*Id.* at p. 449, fn. 2.)  Thus, in evaluating the

20 fairness of this derivative settlement, the Court's analysis is guided by relevant legal authorities

21 regarding the approval of class action settlements.

22     Generally, "questions whether a settlement was fair and reasonable, whether notice to

23 the class was adequate, … and whether the attorney fee award was proper are matters

24 addressed to the trial court's broad discretion." (*Wershba v. Apple Computer, Inc.* (2001) 91

25 Cal.App.4th 224, 234-235, citing *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794,

26 disapproved of on another ground in *Hernandez v. Restoration Hardware, Inc.* (2018) 4

27 Cal.5th 260.)

28         In determining whether a class settlement is fair, adequate and reasonable, the
        trial court should consider relevant factors, such as the strength of plaintiffs' case,

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

2

> the risk, expense, complexity and likely duration of further litigation, ... the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement.

(*Wershba v. Apple Computer, Inc., supra*, 91 Cal.App.4th at pp. 244-245, internal citations and quotations omitted.)

The list of factors is not exclusive and the court is free to engage in a balancing and weighing of factors depending on the circumstances of each case. (*Wershba v. Apple Computer, Inc., supra*, 91 Cal.App.4th at p. 245.) The court must examine the "proposed settlement agreement to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." (*Ibid.*, quoting *Dunk v. Ford Motor Co., supra*, 48 Cal.App.4th at p. 1801, internal quotation marks omitted.)

> The burden is on the proponent of the settlement to show that it is fair and reasonable. However "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small."

(*Wershba v. Apple Computer, Inc., supra*, 91 Cal.App.4th at p. 245, citing *Dunk v. Ford Motor Co., supra*, 48 Cal.App.4th at p. 1802.)

The presumption does not permit the Court to "give rubber-stamp approval" to a settlement; in all cases, it must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished," based on a sufficiently developed factual record. (*Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 130.)

II. Terms of the Settlement and Notice to Shareholders

The settlement provides for the adoption, within 12 months of its effective date, of certain "Agreed-To Measures" summarized in the Court's October 22nd order granting

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

3

1 | preliminary approval, which shall remain in place for at least five years.  Key measures include
2 | Alphabet's agreements to extend its waiver of mandatory arbitration to harassment,
3 | discrimination, and retaliation disputes involving Other Bets (Alphabet's subsidiaries other
4 | than Google); to formalize and augment the duties of the Leadership Development and
5 | Compensation Committee ("LDCC") related to claims of sexual harassment, discrimination,
6 | and retaliation, as well as compensation decisions for "Senior Executives" found to have
7 | engaged in serious misconduct involving sexual harassment, sexual misconduct, or retaliation;
8 | to formalize and augment the duties of the Audit and Compliance Committee ("AC
9 | Committee") and Google employees that will report to the AC regarding compliance, including
10 | the creation of a "rapid response" team responsible for certain cases involving "Senior
11 | Executives" and/or the most serious allegations; to create an Employee Disciplinary
12 | Committee to review the relevant investigative team's disciplinary recommendations for
13 | certain cases and a Corrective Action Committee to make final disciplinary determinations in
14 | certain cases; to commit to continuing its current practice of not providing severance to any
15 | employee, including a "Senior Executive," terminated for sexual harassment, sexual
16 | misconduct, or retaliation while formalizing and revising related protocols; to commit to
17 | continue disallowing any employee, including a "Senior Executive," investigated or sued for
18 | such misconduct to modify their 10b5-1 plan while Google's investigation is ongoing or results
19 | in a recommendation of termination; and to formally include Google values as performance
20 | expectations and provide compensation-based incentives for positive behavior, while also
21 | communicating that misconduct is considered in pay, promotions, and severance decisions.

22 |      The Stipulation further provides that Alphabet shall establish and maintain a Diversity,
23 | Equity, and Inclusion Advisory Council (the "DEI Advisory Council") for at least five years
24 | from the effective date of the settlement.  The DEI Advisory Council will be responsible for
25 | overseeing the creation, implementation, and ongoing operation of the Agreed-To Measures.  It
26 | will have three internal members, in addition to Alphabet's CEO Sundar Pichai for the first
27 | year, as well as a minimum of three external members with expertise in diversity, inclusion,
28 | equity and/or sexual harassment.  The external members will be Judge Nancy Gertner (Ret.),

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

4

Grace Speights, and Fred Alvarez, who were jointly selected by Alphabet and plaintiffs' co-lead counsel.  The DEI Advisory Council will meet at least once per quarter and external members are free to meet without other members.  Representatives of the council will participate in at least one annual meeting with the LDCC, and the council will provide written quarterly reports to the CEO and LDCC for three years, which may thereafter be made annual.

Finally, Alphabet shall cause to be spent a total of $310 million over the course of up to 10 years on the following workplace initiative and programs (the "Workplace Initiative"): (1) Expanding the pool of technologists, especially those who are diverse, historically underrepresented, and/or disadvantaged, including by increasing educational and career opportunities through investments in computer science programs to build computer science talent; (2) Hiring, progression, and retention of historically underrepresented talent at Alphabet and in particular at Google; (3) Fostering respectful, equitable, and inclusive workplace cultures; and (4) Helping historically underrepresented groups and individuals succeed with their businesses and in the digital economy and tech industry, including by supporting conferences and events and increasing access to digital tools and opportunities.  The Chief Diversity Officer will be responsible for tracking the spending of this funding, and will report annually to the LDCC and the DEI Advisory Council.

In exchange for the measures described above, the individual defendants, Alphabet, and their Related Persons will obtain a release of all claims

> that Alphabet, the Settling Stockholders derivatively on behalf of Alphabet, or any Alphabet stockholder derivatively on behalf of Alphabet (i) asserted in any of the complaints filed in the Litigations or in the Demands in the Settled Matters, or (ii) could have asserted in any court, tribunal, forum, or proceeding, arising out of, relating to, or based upon the facts, allegations, events, disclosures, nondisclosures, occurrences, representations, statements, matters, transactions, conduct, actions, failures to act, omissions, or circumstances that were alleged or referred to in any of the complaints filed in the Litigations or in the Demands in the Settled Matters; provided, however, that the Released Stockholder Claims shall not include (i) any claims asserted in the pending stockholder and consumer class actions captioned *In re Alphabet, Inc. Securities Litigation*, Lead Case No. 4:18-CV-6245-JSW (N.D. Cal.), and *In re Google Plus Profile Litig.*, Case No. 5:18-CV-6164-EJD (N.D. Cal.), (ii) any claims relating to the enforcement of the Settlement or this Stipulation, or (iii) any claims that arise out of or are based upon any conduct of the Released Defendant Persons after the Effective Date.

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

5

Defendants have agreed not to oppose an award of fees and expenses of up to $29 million. Notice of the settlement has now been provided to shareholders in the manner directed at preliminary approval. The notice and stipulation of settlement were posted online and will remain available through final approval. The notice was filed by Alphabet in a Form 8-K with the SEC on October 23, 2020. The summary notice was published in the weekly national edition of *Investor's Business Daily* on October 26, 2020. The notices provided that Alphabet shareholders would have until November 16, 2020 to submit a written objection to the settlement or proposed fee and expense award to plaintiffs' counsel. Only two shareholders have filed objections, which are addressed below.

III.  Fairness of the Settlement

At preliminary approval, the Court found that the proposed settlement is fair and reasonable to Alphabet shareholders considering the benefits it provides in relation to the risks of continued litigation. After discussing the merits of plaintiffs' claims and their associated risks, the Court concluded:

> … [T]he settlement of this California Action is fair and reasonable for purposes of preliminary approval.  While some of the allegations underlying plaintiffs' complaints are scandalous, their path to wresting control of this action from the Board and, in particular, the [Special Litigation Committee ("SLC")], is difficult and uncertain.  The merits are hotly disputed, and continuing to battle them out in public may well do the company more harm than good given the nature of the claims and the uncertain recovery at issue.  The settlement provides significant value to Alphabet in the form of meaningful governance reforms and financial commitments addressed to the issues giving rise to these actions.  Ultimately, the Court believes that preventing further incidents like those described by plaintiffs will be more valuable to the company and its shareholders than any likely financial recovery in this action, and it appears that the reforms negotiated by the parties are well-designed to accomplish this.

The Court's preliminary conclusions are further supported by declarations from two individuals with relevant expertise: Professor Suzanne B. Goldberg of Columbia Law School and Professor Daniel J. Morrissey of Gonzaga University School of Law.  Professor Goldberg has deep experience in law and policy related to workplace sexual harassment and other forms of employment discrimination and was retained by plaintiffs' co-lead counsel in this matter on

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

6

1  January 6, 2020, as settlement efforts began.  She declares that she has consulted with

2  plaintiffs' co-lead counsel on all aspects of the development of the settlement agreement since

3  she was retained, and explains her belief that the various aspects of the settlement will "reform

4  systems that permitted sexual harassment, discrimination and retaliation and enabled rewards

5  for those who were credibly accused of sexual misconduct in the past," discussing how key

6  aspects of the settlement will further this goal.  She describes the qualifications of the three

7  independent members of the DEI Advisory Council, which are considerable, and explains how

8  the structure and duties of the Council and the access it will have will allow it to ensure that

9  Alphabet does not regress in its efforts regarding workplace equity and continues to adopt

10  state-of-the-art policies and plans to prevent and respond to harassment, discrimination, and

11  retaliation throughout its workforce.

12      Professor Morrissey has expertise in securities litigation, including derivative suits like

13  this one, and concludes that the corporate governance reforms achieved by the settlement are

14  extremely valuable to Alphabet and its shareholders, likely in excess of $100 million.  He

15  explains how the various reforms provided by the settlement will reduce the risk that sexual

16  misconduct by a senior officer will go unaddressed in the future, which is particularly

17  important given the importance of Google's employees to the company's long-term value and

18  the prior negative impact on stockholder value arising from credible allegations of sexual

19  misconduct at Alphabet that was allowed to fester.  While acknowledging that it is impossible

20  to state precisely the dollar value of the benefits conferred on Alphabet by the settlement, he

21  "confidently" and persuasively concludes that they will be very substantial over the long term.

22      The first objection to the settlement is by a John Doe shareholder, who is represented

23  by attorney Chris Baker in unrelated litigation against Alphabet.[1]  Doe raises various criticisms

---

[1] Plaintiffs object to the Court's consideration of Doe's objection and contend that it is not supported by admissible
evidence.  Because the objection ultimately does not impact the Court's ruling, it need not rule on plaintiffs'
objections to it.  (See, e.g., Code Civ. Proc., § 437c, subd. (q) [in summary judgment context, "the court need rule
only on those objections to evidence that it deems material to its disposition of the motion.  Objections to evidence
that are not ruled on for purposes of the motion shall be preserved for appellate review."].)  Plaintiffs' request for
judicial notice of the fact that Mr. Baker represents plaintiffs in several Private Attorneys General Act actions
against Alphabet and/or Google (Ex. 1 to plaintiffs' November 19th, 2020 request) is GRANTED.  (Evid. Code,
§ 452, subds. (c) and (h).)

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

7

of the settlement, including that it does not require the individual defendants to return their

challenged severance payments or stock sales and that it does not provide adequate value to

Alphabet. However, a settlement is by definition a compromise and need not achieve the

maximum recovery that might be possible to constitute a fair result. It has long been held that

"the realization of substantial, if nonpecuniary, benefits by the corporation" supports a

nonmonetary settlement of a derivative action. (*Fletcher v. A. J. Industries, Inc.* (1968) 266

Cal.App.2d 313, 324–325; see also *Cziraki v. Thunder Cats, Inc.* (2003) 111 Cal.App.4th 552,

558.) Such benefits are provided by the settlement here. While Doe points to two settlements

of derivative actions related to sexual harassment that did achieve substantial monetary

recoveries, different circumstances were present in those cases.[2] Doe argues that many of the

commitments and reforms encompassed by the settlement already were or would have been

adopted by Alphabet even without this lawsuit. However, the Court finds that the key

governance reforms summarized above, including the creation of the DEI Advisory Council,

are attributable to the settlement. While Doe criticizes two of the external DEI Advisory

Council members for having represented Google in the past or for being a member of a law

firm that currently represents Google, he does not establish that either of these well-qualified

individuals has a conflict of interest.[3] Doe contends that Google already spends millions on

diversity efforts, but its formal commitment to the Workplace Initiative at a time of great

economic uncertainty is meaningful. Finally, Doe raises criticisms of Alphabet's

confidentiality policies and employment nondisclosure agreements, but those policies and

---

[2] For example, the plaintiffs in *In re Wynn Resorts, Ltd. Derivative Litigation* had successfully opposed a motion to dismiss based on demand futility, and regulators had imposed substantial fines due to the conduct at issue. *City of Monroe Employees' Retirement System v. Murdoch et al.* settled before derivative litigation was even filed, after a lawsuit by a high-profile television host prompted many other suits alleging sexual misconduct, racial discrimination, and retaliation and led to the public disclosure of many prior settlements.

[3] As explained by Professor Goldberg, the DEI Advisory Council is designed to be an extension of the LDCC, and the LDCC's engagement with the Council is crucial. Consequently, it is important that the Council's members were jointly agreed to by all parties to promote collegiality and collaboration with the LDCC.

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

8

agreements are not at issue in these derivative actions, and claims arising from them are not released by the settlement.[4]

On November 23, 2020, a second objection to the settlement was filed by DeWayne Cassel, who is also represented by Mr. Baker in unrelated litigation against Alphabet. The Court has read and considered this objection, which raises many of the same arguments as Doe's objection. Cassel's objection does not change the Court's conclusion that the settlement achieves valuable benefits for Alphabet and its shareholders and warrants approval.

Having considered the briefing and evidence submitted at preliminary and final approval, including Doe's and Cassel's objections, and in light of its own experience with this action and other derivative litigation, the Court finds the settlement is fair and reasonable for purposes of final approval.

IV.  Attorney Fees and Costs

Plaintiffs seek a combined fee and cost award of $29 million, which is a substantial sum, but which represents less than a third of the at least $100 million in long-term value that Professor Morrissey estimates the settlement will provide to Alphabet. Under the circumstances,

> the court considers whether the litigation has conferred a substantial benefit on the corporation, i.e., a benefit that is actual and concrete and not conceptual or doctrinal. [Citations.] The benefit need not be pecuniary [citation], but it must be " 'something more than technical in its consequence and ... one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the

---

[4] Doe also contends that notice of the settlement was inadequate because it states that Alphabet stockholders who held stock as of 2014 may object, but Alphabet was not formed until 2015, and the notice requires that shareholders who submit a written objection satisfy "onerous and intrusive requirements that serve no legitimate purpose (including the disclosure of objector addresses and phone numbers)." While the notice might have been improved in these respects, it also clearly stated that "[a]ny current Alphabet stockholder may also appear and object at the Settlement Hearing ... with or without having submitted a written objection." The Court has considered Doe's objection although he has not even disclosed his name, and Alphabet has not objected: indeed, Alphabet assured the objector that "should any current Alphabet shareholders who did not continuously hold stock during the period covered by the litigation, file an objection, Alphabet will not object to consideration of their objection by the Court." The notice ordered at preliminary approval was adequate, and there is no indication that any Alphabet shareholder who desired to be heard with regard to the settlement has not been heard. Plaintiffs' request for judicial notice of similar notices issued in connection with other derivative settlements (Exs. 2–8 to plaintiffs' November 19th, 2020 request) is GRANTED, although the mere issuance of these notices does not provide authority for the proposition that any particular aspect of the notices was adequate.

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

9

rights and interests of the corporation or affect[s] the enjoyment or protection of an essential right to the stockholder's interest.' " (*Mills v. Electric Auto–Lite* (1970) 396 U.S. 375, 396, 90 S.Ct. 616, 24 L.Ed.2d 593, quoting *Bosch v. Meeker Cooperative Light and Power Ass'n* (1960) 257 Minn. 362, 101 N.W.2d 423, 427.)

For the reasons already discussed, the Court finds that the settlement before it provides substantial benefits to Alphabet shareholders, justifying an award of fees and costs to plaintiffs' counsel.

"[A] court awarding fees under the 'substantial benefit doctrine' begins by establishing a 'lodestar' amount." (*Robbins v. Alibrandi, supra,* 127 Cal.App.4th at p. 453.) The lodestar figure is "based on the careful compilation of the time spent and reasonable hourly compensation of each attorney involved in the presentation of the case." (*Id.* at p. 448.) "The court then has the power and the duty to enhance, or to reduce, the lodestar through the use of multipliers, by taking into consideration factors such as the novelty and complexity of the issues, the skill and expertise of counsel, the extent that the litigation precluded other employment and the contingent nature (or risk) of nonrecovery." (*Ibid.*)

Although [a] negotiated fee need not be perfectly consistent with the fees the court would award under the "substantial benefit doctrine," it must be in the same range. A negotiated fee that clearly is out of that range is not a fair and reasonable settlement of the attorneys' claim for fees.

(*Robbins v. Alibrandi, supra,* 127 Cal.App.4th at p. 451.)

Here, plaintiffs' counsel's collective reported lodestar, as of October 24, 2020, was $8,906,457, representing 12,698.61 hours spent on the matter billed at each firm's regular hourly rates. The declarations supporting this lodestar amount summarize the time billed by counsel at a very high level, broken down only by timekeeper and not by task or even category of task. Given the nature of the matter before the Court and the number of attorneys whose time is included in the lodestar, this is inadequate. (See *In re Vitamin Cases* (2003) 110 Cal.App.4th 1041 [discussing concerns with duplication of efforts in parallel class actions litigated by many different law firms].)

Plaintiffs' counsel bears "the burden of proving the reasonable number of hours they devoted to the litigation, whether through declarations or redacted or unredacted timesheets or

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*    10

billing records," and the Court may not " 'rubberstamp [their] request for attorney fees, but must determine the number of hours *reasonably* expended.' " (*Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1325, quoting *Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 271, italics original.)  A trial court is well within its discretion to request additional information where, as here, declarations supporting a fee request report the total number of hours spent by each lawyer on the case, but fail to "indicate[] how much time a specific lawyer spent on the tasks in a category, let alone on discrete projects." (*Id.* at p. 1325; see also *Robbins v. Alibrandi, supra,* 127 Cal.App.4th at p. 453 [noting "questionable" billing including an entry by lead counsel "for 884.74 hours of 'factual investigation' at a rate of $565 per hour"].)[5]

The Court will continue the hearing on plaintiffs' motion for approval of their fees and costs so that their counsel can file supplemental declarations providing the necessary detail to enable a lodestar evaluation.  Specifically, plaintiffs' counsel shall provide their raw billing records, along with summaries breaking down the time billed not only by timekeeper, but also (for each timekeeper) by project or by task category, providing enough detail for the Court to independently evaluate whether time was duplicated, excessive, or otherwise inappropriate.

## V.   Order and Judgment

In accordance with the above, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

Plaintiffs' motion for final approval of the parties' settlement is GRANTED.

Judgment shall be entered through the filing of this order and judgment.  (Code Civ. Proc., § 668.5.)  Plaintiffs shall take from their complaint only the relief set forth in the settlement agreement and this order and judgment.  Without affecting the finality of this judgment in any way, this Court retains continuing and exclusive jurisdiction over: (a) the

---

[5] While Hon. Layn Phillips (Ret), who mediated the parties' fee dispute, submits a declaration stating that he believes the requested fee award is "fair and reasonable in light of the substantial benefits conferred upon Alphabet and its shareholders, and is consistent with fee provisions in similar complex, large shareholder derivative actions," he does not indicate that he reviewed counsel's billing records as part of his evaluation.

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

11

settling parties and all current Alphabet stockholders for purposes of the administration, interpretation, implementation, and enforcement of the settlement; (b) plaintiffs' motion for an award of attorney fees and expenses and any application for service awards for co-lead plaintiffs herein; and (c) all other matters relating to this California Action.

Plaintiffs' motion for an award of attorney fees and expenses is CONTINUED to **February 4, 2021** at 1:30 p.m. in Department 1. By **January 12, 2021**, plaintiffs' counsel shall file the supplemental materials described above in support of their requested fee award. A separate order shall be entered regarding this motion. Such order shall in no way affect or delay the finality of this judgment and shall not affect or delay the effective date of the settlement.

IT IS SO ORDERED.

Dated: **Nov. 30, 2020**

Honorable Brian C. Walsh
Judge of the Superior Court

*In re Alphabet Inc. Shareholder Derivative Litigation,*
*Superior Court of California, County of Santa Clara, Lead Case No. 19CV341522*
*Order After Hearing on November 30, 2020 and Judgment*
*[Motion for Final Approval of Derivative Settlement; Motion for Award of Attorneys' Fees and Expenses]*

12

# EXHIBIT 3

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 2/5/2021 8:22 AM
Reviewed By: R. Walker
Case #19CV341522
Envelope: 5786171

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

IN RE ALPHABET INC. SHAREHOLDER
DERIVATIVE LITIGATION

Lead Case No.: 19CV341522

**ORDER CONCERNING MOTION
FOR AWARD OF ATTORNEYS'
FEES AND EXPENSES**

These consolidated shareholder derivative actions arise from allegations that officers and directors of Alphabet, Inc., the parent company of Google LLC, breached their fiduciary duties and committed other misconduct in connection with multi-million-dollar severance awards to male executives accused of assaulting female employees, amid a broader culture of discrimination against women at the company.  The plaintiffs also allege claims arising from a data breach impacting the Google+ service.

The parties reached a settlement ("Settlement") that the Court (Judge Walsh) preliminarily approved on October 22, 2020.  Judge Walsh then granted final approval to the Settlement on November 30.  The factual and procedural background of the action and the Court's analysis of the Settlement are set forth in those orders and are not repeated here.

The Court continued the hearing on Plaintiffs' motion for approval of their fees and costs, directing their counsel to file supplemental declarations providing the necessary detail to enable

1

a lodestar evaluation.  That supplemental information has now been provided, and the motion for attorney fees and costs has again come on for hearing.  The Court (Judge Kulkarni) issued a tentative ruling on February 3, 2021, and no party contested the ruling.  The Court now issues its final order and GRANTS Plaintiffs' motion.

## I.    LEGAL STANDARD

The Settlement previously approved by the Court is non-monetary, although there is significant evidence in the record that the Settlement will provide at least $100 million in long-term value to Alphabet.  (See 11/30/21 Final Approval Order, at p. 7.).  Under the circumstances,

> the court considers whether the litigation has conferred a substantial benefit on the corporation, i.e., a benefit that is actual and concrete and not conceptual or doctrinal.  [Citations.]  The benefit need not be pecuniary [citation], but it must be " 'something more than technical in its consequence and ... one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect[s] the enjoyment or protection of an essential right to the stockholder's interest.' " (*Mills v. Electric Auto–Lite* (1970) 396 U.S. 375, 396, 90 S.Ct. 616, 24 L.Ed.2d 593, quoting *Bosch v. Meeker Cooperative Light and Power Ass'n* (1960) 257 Minn. 362, 101 N.W.2d 423, 427.)

(*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 448 (*Robbins*).)  The Court previously found that the Settlement provides substantial benefits to Alphabet shareholders, justifying an award of fees and costs to plaintiffs' counsel.

"[A] court awarding fees under the 'substantial benefit doctrine' begins by establishing a 'lodestar' amount."  (*Robbins, supra,* 127 Cal.App.4th at p. 453.)  The lodestar figure is "based on the careful compilation of the time spent and reasonable hourly compensation of each attorney involved in the presentation of the case."  (*Id.* at p. 448.)  "The court then has the power and the duty to enhance, or to reduce, the lodestar through the use of multipliers, by taking into consideration factors such as the novelty and complexity of the issues, the skill and expertise of counsel, the extent that the litigation precluded other employment and the contingent nature (or

risk) of nonrecovery." (*Ibid.*)  "[I]n cases in which the value of the class recovery can be monetized with a reasonable degree of certainty and it is not otherwise inappropriate, a trial court has discretion to [apply] a positive or negative multiplier … to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation," which may involve evaluating the lodestar as a percentage of the benefit.  (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 49–52 (*Lealao*).)[1]

As *Robbins* states, "[a]lthough [a] negotiated fee need not be perfectly consistent with the fees the court would award under the "substantial benefit doctrine," it must be in the same range. A negotiated fee that clearly is out of that range is not a fair and reasonable settlement of the attorneys' claim for fees." (*Robbins*, *supra,* 127 Cal.App.4th at p. 451.)

## II.    ANALYSIS

Plaintiffs' counsel in this matter consist of 20 law firms representing the plaintiffs in this California Action and the related Federal Actions discussed in the Court's prior orders, as well as counsel for other shareholders who made litigation demands associated with the conduct at issue here.[2]  Counsel submit that their combined lodestar is $9,784,626.25, reflecting 13,907.01 hours

---

[1] Plaintiffs suggest that the Court could evaluate the fees requested here purely as a percentage of a "constructive" common fund, but this approach is unsupported.  (See *Lealao, supra*, 82 Cal.App.4th 19, 37–39 [agreeing with respondent "that pure percentage fees have been rejected by the California Supreme Court … in cases such as this in which there is not a conventional common fund"]; see also *Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 503 ["We do not address here whether or how the use of a percentage method may be applied when there is no conventional common fund … but only a "'constructive common fund'" created by the defendant's agreement to pay claims made by class members …, or when a settlement agreement establishes a fund but provides that portions not distributed in claims revert to the defendant …, making the fund's value to the class depend on how many claims are made and allowed."].)

[2] Co-Lead Counsel for the plaintiffs in this action are Bottini & Bottini, Inc. and Cohen Milstein Sellers & Toll LLC.  Berman Tabacco, Renne Public Law Group, and WeissLaw LLP serve with those firms on the Executive Committee.  Kessler Topaz Meltzer & Check, LLP and Prickett, Jones & Elliott, P.A. are counsel for Plaintiff Sjunde AP-Fonden, which has maintained its own complaint on a demand refusal theory.  Knox Ricksen LLP and Cotchett, Pitre & McCarthy, LLP are counsel for the plaintiffs in *O'Neil v. Page et al*. (Super. Ct. Santa Clara County, Case No. 20CV365249) and *Morgus v. Page, et al.,* (Super. Ct. Santa Clara County, Case No. 20CV363643), which were consolidated into the lead action herein after the Court appointed lead counsel.  The Brown Law Firm, Gainey McKenna & Egleston, P.C., Robbins LLP, and The

billed at each firm's regular hourly rates, which range between $375–795 for associates and $720–1,135 for partners.  Their $29,000,000 combined fee and cost request results in a multiplier of 2.9, considering the $28,641,686.01 in fees remaining after deducting counsel's expenses (addressed below).

Having reviewed the detailed billing records and summaries provided by counsel, the Court finds that their lodestar is reasonable.  Due to the importance of the issues raised by this case, a number of shareholders became involved.  While they and their counsel ultimately worked together on a global settlement, they each spent significant time investigating and preparing their claims in the early stages of the litigation.  This was warranted under the circumstances and contributed to the very substantial benefits achieved by the Settlement.  The rates billed by their counsel are in line with the market considering their experience, practice area, and expertise.

The multiplier requested by counsel, while significant, is likewise reasonable given the contingent nature of the action and the substantial risk of non-recovery; the novelty and complexity of the issues; and the excellent result achieved for shareholders.  Notably, counsel and the Court are aware of only one derivative action in the United States where allegations regarding sexual misconduct and board complicity in concealing that misconduct overcame a challenge to demand futility.  The risk counsel took on in devoting the substantial time and resources necessary to pursue this action was high.  And the long-term value to shareholders achieved by the Settlement, as discussed in the Court's prior orders and the expert declarations and other materials submitted by the parties, is substantial and likely exceeds any monetary recovery that might have ultimately been achieved here.

Rosen Law Firm, P.A. are counsel for the plaintiffs in the Federal Actions.  Bernstein Litowitz Berger & Grossmann LLP, Bragar Eagel & Squire, P.C., Grabar Law Office, Johnson Fistel, LLP, McKay Law, LLC, Rigrodsky & Long, P.A., and The Weiser Law Firm, P.C. represent shareholders who made books and records and/or litigation demands on Alphabet's board and participated in settlement discussions, but never filed derivative actions.

1    Overall, while the Court might make some deductions to counsel's lodestar if it were

2  directly awarding fees under the substantial benefit doctrine, the negotiated fee is in the same

3  range as the Court would award.  Finally, counsel's combined fee and cost request includes

4  $358,313.99 in expenses, which appear reasonable based on the summaries provided in

5  November 2020.

6  **III.    CONCLUSION**

7    For the foregoing reasons, the Court GRANTS Plaintiffs' motion for attorney fees and

8  expenses.

9    **IT IS SO ORDERED.**

10

11  Date:      February 5, 2021

12                                                  _____
                                                    The Honorable Sunil R. Kulkarni
13                                                  Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# EXHIBIT 4

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IRVING FIREMEN'S RELIEF AND RETIREMENT   :
FUND, Derivatively on Behalf of          :
ALPHABET, INC.,                          :
                                         :
                    Plaintiff,           :
                                         :
           v                             : C. A. No.
                                         : 2019-0355-SG
LAWRENCE E. PAGE, SERGEY BRIN, ERIC E.   :
SCHMIDT, SUNDAR PICHAI, DIANE B.         :
GREENE, L. JOHN DOERR, K. RAM SHRIRAM,   :
ANN MATHER, ALAN R. MULALLY, ROGER W.    :
FERGUSON, JR., JOHN L. HENNESSY,         :
SHIRLEY M. TILGHMAN, DAVID C.            :
DRUMMOND, RUTH M. PORAT, ANDREW E.       :
RUBIN, AMIT SINGHAL, and LASZLO BOCK,    :
                                         :
                    Defendants,          :
                                         :
           and                           :
                                         :
ALPHABET, INC., a Delaware corporation,  :
                                         :
                    Nominal Defendant.   :

                    - - -
              Chancery Court Chambers
              Court of Chancery Courthouse
              34 The Circle
              Georgetown, Delaware
              Wednesday, December 23, 2020
              10:04 a.m.
                    - - -

BEFORE: HON. SAM GLASSCOCK III, Vice Chancellor

                    - - -

   TELEPHONIC HEARING AND RULINGS OF THE COURT ON
PLAINTIFF'S MOTION FOR APPROVAL OF FEES AND EXPENSES
----------------------------------------------------------
              CHANCERY COURT REPORTERS
             New Castle County Courthouse
       500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                    (302) 255-0524

2

```
 1   APPEARANCES:

 2         BLAKE A. BENNETT, ESQ.
           Cooch and Taylor, P.A.
 3                -and-
           DEBORAH CLARK-WEINTRAUB, ESQ.
 4         GEOFFREY JOHNSON, ESQ.
           JING-LI YU, ESQ.
 5         of the New York Bar
           Scott+Scott LLP
 6           for Plaintiff

 7

 8         LORI A. WILL, ESQ.
           JESSICA A. HARTWELL, ESQ.
 9         NORA CRAWFORD, ESQ.
           Wilson Sonsini Goodrich & Rosati, P.C.
10                -and-
           BORIS FELDMAN, ESQ.
11         of the California Bar
             for Defendants Lawrence E. Page, Sergey Brin,
12           Eric E. Schmidt, Sundar Pichai, Diane B.
             Greene, L. John Doerr, K. Ram Shriram, Ann
13           Mather, Alan R. Mulally, Roger W. Ferguson
             Jr., John L. Hennessy, Shirley M. Tilghman,
14           David C. Drummond, Ruth M. Porat, Laszlo
             Bock, and Nominal Defendant Alphabet, Inc.

15

16                         -  -  -

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1        THE COURT:  Good morning, Counsel.

2   This is Sam Glasscock.  Who do I have on the line,

3   please?

4        MR. BENNETT:  Good morning,

5   Your Honor.  This is Blake Bennett from Cooch & Taylor

6   on behalf of the plaintiff, Irving Firemen's Relief

7   and Retirement Fund.  With me on the line are my

8   co-counsel from the law firm of Scott+Scott, Deborah

9   Clark-Weintraub, Geoffrey Johnson, and Jing-Li Yu.

10  Ms. Clark-Weintraub is admitted pro hac vice, and with

11  Your Honor's permission will speak on behalf of the

12  plaintiffs today.  Thank you, Your Honor.

13       THE COURT:  Okay.  I'll be happy to

14  hear from Ms. Clark-Weintraub.

15       MS. WILL:  Good morning, Your Honor.

16  It's Lori Will from Wilson Sonsini Goodrich & Rosati

17  on behalf of the Alphabet defendants.  I have with me

18  today my colleagues, Jessica Hartwell and

19  Nora Crawford, and also my former colleague

20  Boris Feldman, who is now at the Freshfields law firm.

21       THE COURT:  Welcome.  And who will be

22  presenting, to the limited extent you need to present,

23  Ms. Will?

24       MS. WILL:  I will be, Your Honor.

4

1    Thank you.

2                    THE COURT:  Good.  And who else?  No

3    one.  Is that everyone?  I'm sorry.

4                    Counsel, thank you for making time for

5    me.  Mr. Bennett, have you received any stockholder

6    objections to the fee petition that you've presented?

7                    MR. BENNETT:  Your Honor, we have not

8    received any objections.

9                    THE COURT:  All right.  Because of

10   certain limitations on our staff here today, I am

11   going to go call the matter in the well of the

12   courthouse and ensure that no one is lurking about who

13   wishes to speak.  And if you will bear with me for 30

14   seconds, I'll be back and then I'll make a record.

15                    (Briefly off the record.)

16                    THE COURT:  Counsel, are you still

17   with me?

18                    MS. WILL:  Yes, Your Honor.

19                    MR. BENNETT:  Yes, Your Honor.

20                    THE COURT:  I've called the matter in

21   the courtroom and in the well of the courthouse.  No

22   one has appeared to object.

23                    Ms. Clark-Weintraub, I'm happy to hear

24   your presentation.

5

1          MS. CLARK-WEINTRAUB:  Thank you,

2    Your Honor.  Good morning.

3          THE COURT:  Good morning.

4          MS. CLARK-WEINTRAUB:  As detailed in

5    our papers, plaintiff's counsel in this action played

6    a significant role in fashioning and negotiating what

7    we believe is truly an historic settlement of these

8    claims.  As Your Honor is aware, that settlement was

9    approved by Judge Walsh on November 30th.

10          And in his opinion approving the

11    settlement, Judge Walsh found that the settlement

12    provides significant value to Alphabet and its

13    stockholders in the form of meaningful corporate

14    governance reforms and financial commitments that are

15    addressed to the issue that gave rise to the various

16    actions and that he also found that the reforms were

17    well-designed to prevent further incidents like the

18    incidents that underlie all of these actions in the

19    future.

20          The settlement was supported by a

21    declaration from Professor Suzanne Goldberg, who is an

22    expert in law and policy related to workplace sexual

23    harassment issues, who had been retained by the

24    settling stockholders to advise them in connection

6

1  with the settlement.  And Professor Goldberg

2  characterized these reforms as a best-in-class

3  approach that far exceeds other settlements of its

4  kind.

5              And as we've summarized in our papers,

6  Your Honor, the settlement requires Alphabet to make

7  an historic $310 million funding commitment over up to

8  ten years to the company's diversity inclusion --

9  diversity and inclusion initiatives and efforts.  And

10  this funding is designated and earmarked to support a

11  set of workplace initiatives that are focused on --

12  that will be focused on hiring, progression, and

13  retention of historically underrepresented talent at

14  Alphabet, and in particular at Google, and also aimed

15  toward fostering a respectful, equitable, and

16  inclusive workplace culture, expanding the pool of

17  technologists -- particularly from underrepresented

18  groups, historically -- and also helping historically

19  underrepresented groups and individuals succeed with

20  their businesses in the digital economy and tech

21  industry by supporting conferences and events and

22  increasing access to digital tools and opportunities.

23              So that aspect of the settlement,

24  Your Honor, we respectfully submit, is quite unique

7

1    and is a major accomplishment in the litigation.

2                    In addition, the settlement requires

3    Alphabet to implement substantial corporate governance

4    reforms and workplace enhancements intended to prevent

5    and address sexual harassment, sexual misconduct and

6    retaliation, and promote a workplace culture that's

7    free of this kind of misconduct.  And in this regard,

8    Alphabet has agreed to do many things, including

9    several things at the board level.

10                    And just to give a couple of examples,

11   Alphabet has agreed to limit Google's use of

12   confidentiality restrictions when settling sexual

13   harassment and retaliation claims, which we think was

14   a very important concession.  Alphabet has agreed to

15   end the use of mandatory arbitration for harassment,

16   discrimination, and retaliation disputes for all --

17   for its other subsidiaries.

18                    Alphabet has also agreed to enhance

19   the sexual harassment and retaliation training

20   programs of both Google and its other subsidiaries and

21   importantly, given the allegations in this case, it's

22   agreed to revise the company's severance guidelines to

23   provide that Google will not provide severance to any

24   employee, including a senior executive, who is subject

8

1   to a pending investigation for sexual harassment,

2   sexual misconduct, or retaliation.

3              And, again, at the board level, the

4   settlement provides that -- or mandates that there

5   will be sexual harassment and fiduciary duty training

6   for the board every other year.  And it also promotes

7   the board's oversight of Google employee sexual

8   harassment training.

9              Alphabet has agreed to amend the

10  charter of its leadership development and compensation

11  committee to make explicit the committee's mandate to

12  oversee management's efforts to promote a workplace

13  culture that's free of discrimination, harassment, and

14  retaliation.

15             It's also agreed that the LDCC

16  committee will report annually to the board with

17  respect to these kinds of issues, as well as any

18  compensation decisions that have been made with

19  respect to senior executives found to have engaged in

20  this kind of misconduct.

21             And also, in order to address the

22  additional allegations with respect to data privacy

23  that were set forth in the complaint of this case,

24  Alphabet has agreed to rename its audit committee the

9

1    audit and compliance committee and amend its charter

2    to explicitly reflect that the committee has oversight

3    responsibilities for legal and regulatory compliance,

4    including data privacy.

5                    And, finally, Your Honor, the

6    settlement requires Alphabet to create and maintain a

7    new diversity, equity, and inclusion advisory council,

8    composed of both internal and external

9    representatives, for at least five years that will be

10   responsible for overseeing the creation and

11   implementation of the corporate governance reforms and

12   workplace enhancements I've just described.

13                   So in sum, Your Honor, as

14   Professor Goldberg stated in her declaration in

15   support of the settlement, this settlement creates the

16   framework for Alphabet to reform its systems and

17   become a workplace free from systemic sexual

18   harassment, sexual misconduct, and other forms of

19   discrimination and retaliation, a goal that is of

20   paramount importance, we believe, to the company and

21   its stockholders, as has been repeatedly demonstrated

22   by events of the last several years.  Addressing these

23   issues removes a significant threat to the company's

24   ability to hire and retain top talent, which Alphabet

10

1   has acknowledged is critical to its continued growth

2   and long-term profitability.

3                    We really believe, Your Honor, as

4   we've stated in our papers, that this settlement is a

5   game-changer with respect to these issues, and we are

6   proud of our participation in helping to achieve these

7   very important reforms.

8                    What's before Your Honor, of course,

9   this morning is plaintiff's counsel's request for a

10  fee and expense award in connection with their work in

11  this case.  And in light of the substantial benefits

12  conferred by the settlement, plaintiff's counsel here

13  is seeking a fee and expense award of $11.33 million.

14                   As set forth in the stipulation,

15  defendants agree that the settlement confers

16  substantial benefits on Alphabet and its stockholders

17  and that plaintiff's counsel is entitled to a

18  reasonable award of attorneys' fees and expenses for

19  their role in creating these benefits.  And after an

20  arm's-length mediation under the auspices of former

21  U.S. District Court Judge Layn Phillips, a very

22  respected mediator, Alphabet has agreed not to oppose

23  an award of fees to plaintiff's counsel here of up to

24  this amount.

11

1             As Mr. Bennett noted, there have been

2    no objections to the fee request here.  And

3    notwithstanding that there's an agreed fee, obviously

4    Your Honor has to make the quest to make its own

5    determination with respect to the reasonableness of

6    the fee request.  And we believe that the request is

7    merited under all of the circumstances here.

8             The primary consideration in

9    determining the reasonableness of a fee request is, of

10   course, the benefit achieved through the litigation.

11   And, as I've just described, the settlement obtained

12   here confers substantial, longstanding, and

13   unprecedented benefits for Alphabet and its

14   stockholders.

15             As we've stated in the papers,

16   Your Honor, we respectfully submit that a conservative

17   estimate of the value of these benefits is

18   $310 million, which is the guaranty funding portion of

19   the settlement for the workplace initiatives.  Using

20   this --

21             THE COURT:  I'm sorry, I didn't mean

22   to interrupt you, Ms. Clark-Weintraub.

23             MS. CLARK-WEINTRAUB:  That's okay.

24             THE COURT:  But I don't understand how

12

 1   you calculate the 310 million as the benefit.  That's

 2   not money that is being paid into the company.  That

 3   is money being paid by the company.  It's an internal

 4   devotion of company funds to certain uses, which

 5   obviously prevents them from being used for other

 6   uses.

 7                 Isn't the 310 million amount wholly

 8   irrelevant?  It's got to be the net benefit; right?

 9   I'm not belittling the result you've achieved.  I just

10   don't see how the 310 million being spent by the

11   company is the equivalent of an award of $310 million

12   to the company, which is typically how we use an

13   amount like that to set a fee under the *Sugarland*

14   factors.

15                 MS. CLARK-WEINTRAUB:  We agree,

16   Your Honor, that this is a corporate benefit

17   settlement.  But unlike the usual corporate benefit

18   settlement, the value that's been conferred here by

19   the settlement, we believe, is more readily

20   quantifiable for a couple of reasons.  One is the

21   amount of money that's being set aside for the

22   workplace initiatives, which is a dedicated amount of

23   money that has been earmarked in order to put those

24   initiatives in place.  And --

13

1          THE COURT:  Right.  That's a cost,

2    though.  That's a cost to the company of $310 million.

3    They're taking $310 million in resources and devoting

4    it to implementing this settlement.  And it may very

5    well be a huge net benefit to the corporation to do

6    that.  But, once again, I don't see how that helps me

7    in any way.

8          MS. CLARK-WEINTRAUB:  Well,

9    Your Honor, that was just one guidepost that we -- or

10   guide to the value or way of quantifying the value of

11   the settlement that we pointed to in our papers.

12   We've also cited a study by professors at Stanford

13   Business School who studied announcements made between

14   2014 and 2018 of improved workforce diversity at

15   technology companies and found that these

16   announcements were correlated to a positive impact on

17   the companies' stock price.

18          And specifically what the study found

19   was that a 1 percent increase in workforce diversity

20   at the tech company studied was accompanied by a

21   .01 percent increase in the market cap of those

22   companies.  So if you use the results of that study as

23   a benchmark and apply it to Alphabet in this case, the

24   market cap of Alphabet is approximately

14

1    $1.19 trillion.

2                     And if the workplace initiatives and

3    corporate governance reforms achieved here in the

4    settlement lead to a modest increase in workforce

5    diversity at Google, say between 5 percent or

6    10 percent, the potential -- the study indicates a

7    potential for an increase of between 590 million and

8    1.19 billion in Alphabet's market cap.

9                     So using those valuations, Your Honor,

10   which we think are a way, a very persuasive way or

11   reasonable way to look at the result here, the

12   requested fee is just 1 to 2 percent of the value

13   conferred by the settlement.  So you don't even have

14   to use the $310 million figure.  You can use the

15   study, the Stanford study, to weigh the value of the

16   corporate reforms and workplace initiatives in this

17   case.

18                     THE COURT:  What is the lodestar

19   amount?  I know it's in your brief, but remind me, if

20   you would.

21                     MS. CLARK-WEINTRAUB:  Yes, the

22   lodestar amount is just over $2.8 million.  And the

23   implied hourly rate, based upon the requested fee, is

24   just over $4,000 an hour.  The multiplier is 3.9.  All

15

1   of those are well within the Court's precedents and we

2   believe are appropriate here, given the significant

3   role played by counsel in obtaining the settlement in

4   this case.  We've described in some detail in the

5   papers all of the activities, both litigation

6   activities -- there was litigation activity in this

7   Court before Your Honor, as well as our participation

8   in fashioning and negotiating settlement in the case.

9              THE COURT:  All right.  What has

10  Judge Walsh done with the fee request in the

11  California action?

12             MS. CLARK-WEINTRAUB:  Judge Walsh

13  adjourned the hearing on the fee request to a date in

14  February.  He requested -- there are multiple counsel

15  involved in that case.  I think it's between 15 and 17

16  different firms.  And he requested that they submit

17  more information with respect to the activities that

18  were engaged in by the various counsel to support

19  their lodestar figures.

20             We've included in our papers not only

21  our hours and hourly rates and lodestar information,

22  basic lodestar information, but also we've categorized

23  our time based upon various types of our own work done

24  in the case, between litigation work, settlement work,

16

1   et cetera.

2              THE COURT:  All right.  Anything else

3   you want to tell me, Ms. Clark-Weintraub?

4              MS. CLARK-WEINTRAUB:  I think I've

5   covered everything, Your Honor.

6              THE COURT:  All right.  Ms. Will,

7   anything you want to tell me?

8              MS. WILL:  Your Honor, we've agreed

9   not to oppose a fee and expense award for counsel in

10  this action of up to 11.33 million.  And I have

11  nothing further to add unless Your Honor has any

12  questions for me.

13             THE COURT:  No, I don't.  Thank you.

14             Counsel, I had determined, before we

15  began this, that I would wait on Judge Walsh's

16  decision.  But from what you've told me,

17  Ms. Clark-Weintraub, what Judge Walsh is doing is

18  trying to understand the actions of counsel, which

19  were spread among a number of attorneys, and use their

20  lodestars in order to craft an appropriate fee award.

21  Is that your understanding, Ms. Clark-Weintraub?  Did

22  I characterize that correctly, as you understand it?

23             MS. CLARK-WEINTRAUB:  My understanding

24  is that the judge wanted additional support for the

17

1   lodestar information that had been submitted in order

2   to weigh whether or not there had been things like

3   duplication of effort, et cetera.

4                    THE COURT:  Yes, thank you.  That was

5   my understanding from what you've said.  That's

6   obviously not a consideration here.  So I have all the

7   information I'm ever going to have, and I think I

8   might as well address this.

9                    Let me start off by saying, I find

10  this a difficult matter to assess a fee for.  For the

11  reasons I've stated, I don't think the $310 million

12  set-aside of company funds to promote both the

13  laudable diversity ends achieved in this settlement is

14  at all a measure of the benefit.  It's a cost to the

15  company.  It may very well be a wonderful investment,

16  and I suspect it will be, but it doesn't represent a

17  tangible benefit flowing to the company.  It's a cost

18  from the company.

19                    I appreciate the study that you have

20  cited, but it seems to me awfully speculative and the

21  kind of thing that will have differing results; that

22  is, the added benefit, the marginal benefit of

23  increasing diversity, I think is something difficult

24  to calculate based on a set of data from a particular

18

1   time and place and apply it to another.

2                So really what I've got is simply a

3   therapeutic benefit case.  It is clear to me that

4   there are a number of societal implications, positive

5   societal implications, of this settlement.  Those are

6   really externalities that are typically not taken into

7   account in setting attorneys' fees.

8                The fact that Google or Alphabet will

9   now be an example and a beacon to others will

10  encourage success of diversity, entrepreneurs outside

11  the company, those kinds of things.  This may all be a

12  wonderful thing, and I'm sure that they are, but

13  they're really externalities to the benefit to the

14  company.  So how am I to determine what is an

15  appropriate fee for this settlement?  Several things

16  are very important to me here.

17               First of all, under the *Sugarland*

18  factors, there has been a benefit.  It's clear to me

19  that this will benefit the company; that the way the

20  company was being run before will be very

21  significantly improved.  That is a corporate benefit

22  that warrants a fee and a fee large enough to be a

23  wholesome incentive to such litigation in the future.

24               And I'm not going to go through all

19

1   the *Sugarland* factors, but looking at the other

2   applicable *Sugarland* factors, I turn to the lodestar

3   amount.  The fee award in connection with the

4   settlement requested is between three and four times

5   the lodestar amount.  That is not usually considered

6   to be an unwholesome amount, particularly in light of

7   the quality of the litigants on both sides, the

8   novelty of what was being litigated, and the fact --

9   which is perhaps the most salient here -- that this

10  was on a purely contingent fee basis.  So looking at

11  that, the $11.33 million requested is within the range

12  of what this Court has found to be reasonable based on

13  the lodestar amount.

14          There are two other very significant

15  things here that help me in this decision.  One is

16  that this was a settlement that was independent of the

17  fee award negotiations.  And those fee award

18  negotiations and settlement were aided by

19  Judge Phillips in what I'm sure was a hard-fought

20  mediation.

21          Second is that this is a significant

22  fee award.  Notice of it has been given.  No

23  stockholder has come forward to object to it.

24          So given all of those things, I think

1   there is this arbitrariness to any fee award that I

2   would approve.  But given that fiduciaries for the

3   company, with the assistance of an able mediator, have

4   reached an amount independent of the settlement for a

5   fee of $11.33 million, and given the stockholders have

6   had an opportunity to come forward and have not

7   objected, and given that this is a contingent

8   litigation and the lodestar indicates that the amount

9   requested is not out of line with previous decisions,

10  does not create unwholesome incentives, for all of

11  those reasons, I am going to approve the requested

12  $11.33 million fee.

13                  Was that clear enough,

14  Ms. Clark-Weintraub?

15                  MS. CLARK-WEINTRAUB:  Yes, Your Honor.

16  Thank you.

17                  THE COURT:  Ms. Will, was that clear

18  enough?

19                  Is there anything else we can do here

20  this morning before I wish you a happy holiday and a

21  Merry Christmas and sign the order?  Mr. Bennett --

22                  MS. CLARK-WEINTRAUB:  Nothing from

23  plaintiffs.

24                  THE COURT:  All right.  Ms. Will,

21

1    anything?

2                    MS. WILL:  Nothing from defendants.

3    Thank you, Your Honor.

4                    THE COURT:  Mr. Bennett, anything from

5    your point of view?

6                    MR. BENNETT:  No, Your Honor.  I

7    believe we submitted an order on -- with our

8    December 1st filing.  It's formatted as a stipulation

9    and proposed order.

10                   THE COURT:  I have it.  It leaves a

11   blank for the fee request, and I will fill it in as

12   11.33 million.

13                   MR. BENNETT:  Great.  Thank you,

14   Your Honor.

15                   THE COURT:  Thank you.  And I

16   appreciate your help, Ms. Clark-Weintraub.  It was

17   very helpful to speak to you because, as I said, I had

18   come in here expecting to reserve because, as I say,

19   it is always difficult with a therapeutic benefit, and

20   while this is a very significant therapeutic benefit,

21   it is not one of the type that I am used to dealing

22   with that involve shareholder rights or the like.

23                   And like all judges, when I see

24   something new, I tend to shrink away in horror.  So I

22

1    really appreciate your help.  And I congratulate the

2    plaintiffs on their participation in a litigation that

3    I think, whatever the direct benefits to the

4    corporation, ought to be a model.  And I do appreciate

5    very much your help here today in doing my small part

6    of that.

7              Thank you, all.

8              MS. CLARK-WEINTRAUB:  Thank you,

9    Your Honor.  Thank you, Your Honor.

10             THE COURT:  Appreciate your time.

11             MS. WILL:  Thank you, Your Honor.

12   Happy holidays.

13             MS. CLARK-WEINTRAUB:  Thank you,

14   Your Honor.  Merry Christmas.  Thank you.  Bye.

15        (Proceedings concluded at 10:32 a.m.)

16                  - - -

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

23

1                          CERTIFICATE

2

3                    I, DOUGLAS J. ZWEIZIG, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, do hereby certify the foregoing

7    pages numbered 3 through 22, contain a true and

8    correct transcription of the proceedings as

9    stenographically reported by me at the hearing before

10   the Vice Chancellor of the State of Delaware, on the

11   date therein indicated.

12                        IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 5th day of January,

14   2021.

15

16

17

18                        /s/ Douglas J. Zweizig
                          -----------------------------
19                          Douglas J. Zweizig
                            Official Court Reporter
20                       Registered Diplomate Reporter
                          Certified Realtime Reporter
21

22

23

24

EXHIBIT 5

1

2 ROBBINS GELLER RUDMAN
    & DOWD LLP
3 SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
    One Montgomery Street, Suite 1800
4 San Francisco, CA  94104
    Telephone:  415/288-4545
5 415/288-4534 (fax)
    shawnw@rgrdlaw.com
6 – and –
    BENNY C. GOODMAN III (211302)
7 ERIK W. LUEDEKE (249211)
    655 West Broadway, Suite 1900
8 San Diego, CA  92101-3301
    Telephone:  619/231-1058
9 619/231-7423 (fax)
    bennyg@rgrdlaw.com
10 eluedeke@rgrdlaw.com

11 Counsel for Plaintiffs Patricia H. McKenna,
    Avrohom Gallis and James Clem

12

                    ABRAHAM, FRUCHTER
                      & TWERSKY, LLP
                    JEFFREY S. ABRAHAM
                    MITCHELL M.Z. TWERSKY
                    One Penn Plaza, Suite 2805
                    New York, NY  10119
                    Telephone:  212/279-5050
                    212/279-3655 (fax)
                    – and –
                    IAN D. BERG
                    TAKEO A. KELLAR
                    12526 High Bluff Drive, Suite 300
                    San Diego, CA  92130
                    Telephone:  858/792-3448
                    858/792-3449 (fax)

                    Counsel for Plaintiff City of Orlando Police
                    Pension Fund

13 [Additional counsel appear on signature page.]

                 UNITED STATES DISTRICT COURT

14

15             NORTHERN DISTRICT OF CALIFORNIA

                      OAKLAND DIVISION

16

17 In re GOOGLE INC. SHAREHOLDER       )   Master File No. CV-11-04248-PJH
    DERIVATIVE LITIGATION               )
    _____    )
18                                      )
    This Document Relates To:           )
19                                      )
        ALL ACTIONS.                    )
    _____    )   Case No. CV-13-02038-PJH
20 CITY OF ORLANDO POLICE PENSION      )
    FUND by Its Trustees, derivatively  )   STIPULATION OF SETTLEMENT
21 on behalf of GOOGLE INC.,            )
                                        )
22              Plaintiffs,             )
                                        )
23        vs.                           )
                                        )
    LAWRENCE E. PAGE, et al.,           )
24                                      )
                Defendants.             )
25                                      )
          and                           )
26 GOOGLE INC., a Delaware corporation, )
                                        )
27              Nominal Defendant.      )
    _____    )

28

945787_8

1     This Stipulation of Settlement, dated August 7, 2014 ("Stipulation" or "Settlement"), is made

2  and entered into by and among the following parties, and by and through their respective counsel:

3  (i) Plaintiffs Patricia H. McKenna, Avrohom Gallis, and James Clem, in the action captioned *In re*

4  *Google Inc. Shareholder Derivative Litigation*, No. CV-11-04248-PJH (the "Demand Futility

5  Action") and the City of Orlando Police Pension Fund, in the action captioned *City of Orlando*

6  *Police Pension Fund v. Page, et al.*, Case No. CV-13-02038-PJH (the "Demand Refused Action")

7  (together, the "Actions") (on behalf of themselves and derivatively on behalf of Google Inc.)

8  ("Google" or the "Company"); (ii) Defendants Larry Page, Sergey Brin, Eric E. Schmidt, L. John

9  Doerr, John L. Hennessy, Ann Mather, Paul S. Otellini, K. Ram Shriram, and Shirley M. Tilghman

10  (together, "Settling Defendants"); and (iii) Nominal Party Google (together, the "Settling Parties").

11  The Stipulation is intended by the Settling Parties to fully, finally and forever resolve, discharge and

12  settle the Released Claims (as defined below in ¶1.15) upon Court approval and subject to the terms

13  and conditions hereof.

14  **I.    INTRODUCTION**

15         **A.    Overview of the Actions and Procedural History**

16         The Actions allege that Google allowed foreign online pharmacies to place advertisements

17  that violated federal laws on Google's advertising platform.  The Actions further assert that Google's

18  alleged violation of federal law regarding the foreign online pharmacy ads caused the Company to

19  enter into a Non-Prosecution Agreement (NPA) with the U.S. Department of Justice whereby

20  Google allegedly admitted to wrongful conduct related to the placement by foreign online

21  pharmacies of advertisements on Google's advertising platform.  As a result of these alleged

22  advertising practices at Google, Plaintiffs in the Demand Futility Action and the Demand Refused

23  Action allege that the Settling Defendants breached their fiduciary duty of loyalty and/or duty of care

24  owed to Google and its stockholders.  The Settling Defendants have denied and continue to deny

25  each and every one of the claims and contentions alleged by the Plaintiffs in the Actions.

26

27

28

1.   **Commencement and Consolidation of the Demand Futility Action**

The first derivative action addressing the foreign pharmacy ads generated on Google's advertising platform was filed on August 29, 2011, in the United States District Court for the Northern District of California (the "Court").  Thereafter, two additional actions were filed in the Court containing similar allegations.  All three actions alleged, among other things, that a pre-suit demand upon the Google Board of Directors (the "Google Board") was futile and excused as a matter of law.  On September 19, 2011, the Court issued an order consolidating these derivative actions.

2.   **The Motion to Dismiss the Consolidated Complaint**

On October 24, 2011, plaintiffs Patricia H. McKenna, Avrohom Gallis and James Clem (together, "Demand Futility Plaintiffs") filed a Consolidated Shareholder Derivative Complaint ("Consolidated Complaint").  In the Consolidated Complaint, the Demand Futility Plaintiffs asserted claims on behalf of Google against defendants Larry Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Paul S. Otellini, K. Ram Shriram, Shirley M. Tilghman, Nikesh Arora, and Patrick Pichette (together, the "Individual Defendants") for breach of fiduciary duty, abuse of control, corporate waste, and unjust enrichment.

On December 14, 2011, the Individual Defendants and Nominal Party Google filed a Motion to Dismiss the Consolidated Complaint.  In the Motion to Dismiss, the Individual Defendants and Google argued, among other things, that the Consolidated Complaint failed to adequately plead that a pre-suit demand upon the Google Board was futile.  They further argued that the Consolidated Complaint failed to state any actionable claim for relief under the applicable laws.

On February 14, 2012, the Demand Futility Plaintiffs filed an Opposition to the Motion to Dismiss the Consolidated Complaint.  In their opposition, the Demand Futility Plaintiffs argued, among other things, that the Consolidated Complaint pleaded, with particularity, facts sufficient to excuse a pre-suit demand upon the Google Board.  The Demand Futility Plaintiffs further argued that the facts alleged in the Consolidated Complaint stated actionable claims for relief against the Individual Defendants.

1    On May 8, 2012, after hearing oral argument, the Court issued an order granting the Motion

2    to Dismiss the Consolidated Complaint.  The Court also granted the Demand Futility Plaintiffs leave

3    to file an amended complaint.

4    **3.    The Motion to Dismiss the Amended Consolidated Complaint**

5    On June 8, 2012, the Demand Futility Plaintiffs filed an Amended Consolidated Shareholder

6    Derivative Complaint (the "Amended Consolidated Complaint").  The Amended Consolidated

7    Complaint included, among other things, additional facts alleging why a pre-suit demand upon the

8    Google Board was futile and, therefore, excused.  The Amended Consolidated Complaint did not

9    name Nikesh Arora or Patrick Pichette as defendants, but asserted claims on behalf of Google

10   against defendants Larry Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Paul

11   S. Otellini, K. Ram Shriram, and Shirley M. Tilghman (together, the "Demand Futility Defendants")

12   for breach of fiduciary duty and other claims.

13   On July 6, 2012, the Demand Futility Defendants and Google filed a Motion to Dismiss the

14   Amended Consolidated Complaint.  In their dismissal motion, the Demand Futility Defendants and

15   Google argued that, despite the additional facts, the Amended Consolidated Complaint failed to

16   adequately allege that a pre-suit demand upon the Google Board was excused.  The Demand Futility

17   Defendants and Google further argued that, even if a pre-suit demand was futile, the Amended

18   Consolidated Complaint still must be dismissed for failure to state any actionable claim for relief.

19   On August 10, 2012, the Demand Futility Plaintiffs filed an Opposition to the Motion to

20   Dismiss the Amended Consolidated Complaint.  In their opposition, the Demand Futility Plaintiffs

21   argued, among other things, that the Motion to Dismiss the Amended Consolidated Complaint

22   should be denied because the Amended Consolidated Complaint set forth facts sufficient to excuse a

23   pre-suit demand upon the Google Board.  The Demand Futility Plaintiffs also articulated why the

24   Amended Consolidated Complaint stated actionable claims for breach of fiduciary duty and other

25   relief.

26   On July 3, 2013, the Court heard oral argument on the Motion to Dismiss the Amended

27   Consolidated Complaint.  On September 26, 2013, the Court issued an order granting the Motion to

28   Dismiss the Amended Consolidated Complaint with leave to amend.

1

### 4.   The Motion to Dismiss the Second Amended Complaint

2        On November 1, 2013, the Demand Futility Plaintiffs filed a Second Amended Consolidated

3 Shareholder Derivative Complaint ("Second Amended Complaint").   The Second Amended

4 Complaint included additional facts concerning the reasons why a pre-suit demand upon the Google

5 Board was futile.   The Second Amended Complaint also asserted claims for relief against the

6 Demand Futility Defendants for, among other things, breach of fiduciary duty.

7        On December 6, 2013, the Demand Futility Defendants and Google filed a Motion to

8 Dismiss the Second Amended Complaint.   In their Motion to Dismiss the Second Amended

9 Complaint, the Demand Futility Defendants and Google once again argued that the Demand Futility

10 Action must be dismissed because the Demand Futility Plaintiffs had not made a pre-suit demand

11 upon the Google Board.   The Demand Futility Defendants and Google further argued that the

12 Second Amended Complaint was defective because it failed to allege facts that stated any actionable

13 claim for relief.

14        On January 16, 2014, the Demand Futility Plaintiffs filed an Opposition to the Motion to

15 Dismiss the Second Amended Complaint.   In their opposition, the Demand Futility Plaintiffs argued

16 that the particularized facts contained in the Second Amended Complaint excused a pre-suit demand

17 upon the Google Board, and stated actionable claims for relief for breach of fiduciary duty, unjust

18 enrichment, and corporate waste.

19        On March 5, 2014, the Court heard oral argument on the Motion to Dismiss the Second

20 Amended Complaint.   At the conclusion of the hearing, the Court took the Motion to Dismiss the

21 Second Amended Complaint under submission.

22        Following the March 5, 2014 hearing, the parties agreed to stay the proceedings to permit the

23 parties to participate in private mediation.   The parties submitted stipulations staying the proceedings

24 on March 11, 2014, April 25, 2014, July 21, 2014, and July 30, 2014.   Pursuant to the Court's Orders

25 of March 12, 2014, April 29, 2014, July 23, 2014, and July 31, 2014, the proceedings are currently

26 stayed until August 8, 2014.

27

28

### 5.   The City of Orlando Police Pension Fund Makes a Demand on Google's Board

On January 13, 2012, the City of Orlando Police Pension Fund ("Demand Refused Plaintiff" or "Orlando Pension Fund") by its attorneys Abraham, Fruchter & Twersky, LLP ("AF&T" or "Demand Refused Counsel"), served a written demand for action ("Demand") upon the Google Board. In the Demand, the Demand Refused Plaintiff demanded, among other things, that the Google Board investigate and bring legal action against defendants Larry Page, Sergey Brin, Eric E. Schmidt and the other executives, accountable for permitting foreign online pharmacies to place advertisements that violated federal laws on Google's advertising platform, which allegedly resulted in, *inter alia*, the Company entering into the NPA.

### 6.   Formation of the Independent Special Committee and Rejection of the Demand

On April 11, 2012, in response to the Demand, the Google Board established an independent Special Committee to conduct an investigation and consider the facts and circumstances of the allegations contained in the Demand. The Google Board determined that Directors Diane B. Greene and Ann Mather were capable of competently and impartially considering the Demand and designated them as the members of the Special Committee.

Between approximately May 2012 and December 2012, the Special Committee and its retained counsel conducted an investigation into the matters set forth in the Demand. On January 28, 2013, after considering the findings and conclusions of the investigation, counsel for the Special Committee notified Orlando Pension Fund of the Google Board's decision to refuse the Demand, and not to pursue any of the claims alleged in the Demand.

### 7.   The Motion to Dismiss the Demand Refused Complaint

On May 2, 2013, the Orlando Pension Fund commenced an action in the United States District Court for the Northern District of California with the filing of a shareholder derivative complaint alleging, among other things, that Google's Board has improperly and unreasonably refused the Demand (the "Demand Refused Complaint"). In the Demand Refused Complaint, the Orlando Pension Fund asserted claims on behalf of Google against Larry Page, Sergey Brin, Eric E.

1  Schmidt, L. John Doerr, John L. Hennessy, Ann Mather, Paul S. Otellini, K. Ram Shriram and

2  Shirley M. Tilghman (together, the "Demand Refused Defendants") for breach of fiduciary duty in

3  connection with Google's acceptance of advertisements by foreign online pharmacies that did not

4  comply with certain federal laws.

5       On May 22, 2013, Google and the Demand Refused Defendants filed a Motion to Dismiss

6  the Demand Refused Complaint.  On June 21, 2013, the Demand Refused Plaintiff filed an

7  Opposition to the Motion to Dismiss the Demand Refused Complaint.  A hearing on the motion was

8  conducted on July 24, 2013.

9       On September 26, 2013, the Court issued an Order denying the Demand Refused Defendants'

10 Motion to Dismiss the Demand Refused Complaint.

11              **8.    The Motion for Summary Judgment**

12      On November 1, 2013, Google and the Demand Refused Defendants filed a Motion for

13 Summary Judgment.

14      On December 18, 2013, the Demand Refused Plaintiff filed an Opposition to the Motion for

15 Summary Judgment and, in the alternative, sought a continuance of the Court's ruling on the Motion

16 for Summary Judgment until the Demand Refused Plaintiff had the opportunity to take sufficient

17 discovery needed for opposing the summary judgment motion by filing of an affidavit pursuant to

18 Federal Rule of Civil Procedure 56(d).

19      The Court heard oral argument on the Motion for Summary Judgment and on the Demand

20 Refused Plaintiff's request for a continuance under Federal Rule of Civil Procedure 56(d) on January

21 29, 2014.  Following the hearing, the parties agreed to stay the proceedings to permit the parties to

22 participate in private mediation.  The parties submitted stipulations staying the proceedings on

23 March 11, 2014, April 25, 2014, July 21, 2014, and July 30, 2014.  Pursuant to the Court's Orders of

24 March 12, 2014, April 29, 2014, July 23, 2014, and July 31, 2014, the proceedings are currently

25 stayed until August 8, 2014.

26       **B.    Settlement Negotiations**

27      After the Motion to Dismiss the Second Amended Complaint and the Motion for Summary

28 Judgment in the Demand Refused Action were taken under submission by the Court, beginning in

1   March 2014, representatives of the Settling Parties commenced negotiations regarding possible

2   resolution of the Actions.  Ultimately, the Settling Parties engaged in a formal mediation process

3   before the Honorable Layn R. Phillips, United States District Court Judge (Ret.), which culminated

4   in an all-day, in-person mediation session on May 21, 2014 in New York, New York.  As a result of

5   these arm's-length settlement negotiations, the Settling Parties reached an agreement-in-principle for

6   the resolution of the Actions.

7       **C.      Approval of the Settlement by the Committee of Independent Google
                  Directors**
8

9           On August 4, 2014, a Committee of independent Google directors, in exercising their

10  business judgment, unanimously approved the Settlement and each of its terms, as set forth in the

11  Stipulation, as in the best interest of Google and its stockholders.

12  **II.    CLAIMS OF PLAINTIFFS AND BENEFITS OF SETTLEMENT**

13          Plaintiffs and Plaintiffs' Counsel believe that the claims asserted in the Actions have merit.

14  However, Plaintiffs and Plaintiffs' Counsel recognize and acknowledge the expense and length of

15  continued proceedings necessary to prosecute the Actions against the Settling Defendants through

16  trial and potential appeals.  Plaintiffs and Plaintiffs' Counsel also have taken into account the

17  uncertain outcome and the risk of any litigation, especially in complex actions such as the Actions,

18  as well as the difficulties and delays inherent in such litigation.  Plaintiffs and Plaintiffs' Counsel

19  also are mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in

20  the Actions.  Based on their evaluation, Plaintiffs and Plaintiffs' Counsel have determined that the

21  Settlement set forth in this Stipulation is in the best interests of Google and its stockholders.

22  **III.   THE SETTLING DEFENDANTS' DENIALS OF WRONGDOING AND
            LIABILITY**

23          The Settling Defendants have denied and continue to deny each and every one of the claims

24  and contentions alleged by the Plaintiffs in the Actions.  The Settling Defendants expressly have

25  denied and continue to deny all allegations of wrongdoing or liability against them or any of them

26  arising out of, based upon or related to any of the conduct, statements, acts or omissions alleged, or

27  that could have been alleged, in the Actions.  Without limiting the foregoing, the Settling Defendants

28  have denied and continue to deny, among other things, that they breached their fiduciary duties or

1  any other duty owed to Google or its stockholders, or that Plaintiffs, Google, or its stockholders

2  suffered any damage or were harmed as a result of any conduct alleged in the Actions or otherwise.

3  The Settling Defendants have further asserted and continue to assert that at all relevant times, they

4  acted in good faith and in a manner they reasonably believed to be in the best interests of Google and

5  its stockholders.

6      Nonetheless, the Settling Defendants also have taken into account the expense, uncertainty

7  and risks inherent in any litigation, especially in complex cases like the Actions. Therefore, the

8  Settling Defendants have determined that it is desirable and beneficial that the Actions, and all of the

9  Settling Parties' disputes related thereto, be fully and finally settled in the manner and upon the

10 terms and conditions set forth in this Stipulation.   Pursuant to the terms set forth below, this

11 Stipulation (including all of the Exhibits hereto) shall in no event be construed as or deemed to be

12 evidence of an admission or concession by the Settling Defendants with respect to any claim of fault,

13 liability, wrongdoing, or damage whatsoever.

14 **IV.    TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT**

15     NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the

16 Plaintiffs (for themselves and derivatively on behalf of Google), by and through their respective

17 attorneys of record, the Settling Defendants and Google, by and through their respective attorneys of

18 record, that in exchange for the consideration set forth below, the Actions and Released Claims shall

19 be fully, finally and forever compromised, settled, discharged, relinquished and released, and the

20 Actions shall be dismissed with prejudice as to the Settling Defendants, upon and subject to the

21 terms and conditions of this Stipulation, as follows:

22     **1.    Definitions**

23     As used in this Stipulation the following terms have the meanings specified below:

24     1.1    "Actions" means, collectively, the Demand Futility Action and the Demand Refused

25 Action.

26     1.2    "Court" means the United States District Court for the Northern District of California.

27

28

1.3    "Demand Futility Action" means the consolidated proceeding entitled *In re Google Inc. Shareholder Derivative Litigation*, No. CV-11-04248-PJH, pending in the United States District Court for the Northern District of California.

1.4    "Demand Refused Action" means the action entitled *City of Orlando Police Pension Fund v. Page, et al.*, Case No. CV-13-02038-PJH, pending in the United States District Court for the Northern District of California.

1.5    "Demand Refused Counsel" means the law firm of Abraham, Fruchter & Twersky, LLP.

1.6    "District Court Approval Order" means the Order Approving Derivative Settlement and Order of Dismissal with Prejudice, substantially in the form attached as Exhibit B hereto.

1.7    "Effective Date" means the first date by which all of the events and conditions specified in ¶6.1 of this Stipulation have been met and have occurred.

1.8    "Final" means the time when the Judgment has not been reversed, vacated, or modified in any way and is no longer subject to appellate review, either because of disposition on appeal and conclusion of the appellate process or because of passage, without action, of time for seeking appellate review.  More specifically, it is that situation when: (1) either no appeal has been filed and the time has passed for any notice of appeal to be timely filed in the Actions; or (2) an appeal has been filed and the court(s) of appeal has/have either affirmed the Judgment or dismissed that appeal and the time for any reconsideration or further appellate review has passed and the appellate court mandate(s) has/have issued; or (3) a higher court has granted further appellate review and that court has either affirmed the underlying Judgment or affirmed the court of appeal's decision affirming the Judgment or dismissing the appeal.

1.9    "Google" means Google Inc., including, but not limited to, its predecessors, successors, partners, joint ventures, subsidiaries, affiliates, divisions, and assigns.

1.10   "Judgment" means the judgment to be rendered by the Court in the Actions upon its final approval of the Settlement, substantially in the form attached as Exhibit C hereto.

1.11   "Person" means an individual, corporation, limited liability company, professional corporation, limited liability partnership, partnership, limited partnership, association, joint venture,

1   joint stock company, estate, legal representative, trust, unincorporated association, government or

2   any political subdivision or agency thereof, and any business or legal entity, and each of their

3   spouses, heirs, predecessors, successors, representatives, or assignees.

4       1.12   "Plaintiffs" means collectively Patricia H. McKenna, Avrohom Gallis, James Clem,

5   and the City of Orlando Police Pension Fund.

6       1.13   "Plaintiffs' Counsel" means any counsel that has appeared of record or rendered legal

7   services to any of the Plaintiffs in connection with any of the Actions.

8       1.14   "Related Parties" means (i) as to Google, Google's past or present directors, officers,

9   managers, employees, partners, agents, attorneys, accountants, auditors, banks, insurers, co-insurers,

10   re-insurers, consultants, experts, successors, subsidiaries, divisions, joint ventures, assigns, general

11   or limited partners or partnerships, limited liability companies, any entity in which Google has a

12   controlling interest, and all officers, directors and employees of Google's current and former

13   subsidiaries, and (ii) as to the Settling Defendants, (1) each spouse, immediate family member, heir,

14   executor, estate, administrator, agent, attorney, accountant, auditor, bank, insurer, co-insurer, re-

15   insurer, advisor, consultant, expert, or affiliate of any of them, (2) any trust in respect of which any

16   Settling Defendant, or any spouse or family member thereof serves as a settlor, beneficiary or

17   trustee, and (3) any entity in which a Settling Defendant, or any spouse or immediate family member

18   thereof, holds a controlling interest or for which a Settling Defendant has served as an employee,

19   director, officer, managing director, advisor, general partner, limited partner, or member and any

20   collective investment vehicle which is advised or managed by any of them.

21       1.15   "Released Claims" means all claims, demands, rights, liabilities and claims for relief

22   of every nature and description whatsoever, known or unknown (as set forth in ¶1.23), that have

23   been, or could have been, asserted in the Actions by Plaintiffs, Google, or any Google stockholder

24   derivatively on behalf of Google against the Settling Defendants, based on the Settling Defendants'

25   acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events,

26   matters, occurrences, acts, disclosures, statements, omissions or failures to act related to Google's

27   hosting of ads placed by foreign online pharmacies that violated certain federal laws through and

28   including the date of execution of this Stipulation.

1.16   "Released Persons" means the Settling Defendants, Google and their respective Related Parties.

1.17   "Settlement" means the terms and conditions contained in this Agreement.

1.18   "Settling Defendants" means Larry Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Ann Mather, Paul S. Otellini, K. Ram Shriram and Shirley M. Tilghman.

1.19   "Settling Parties" means, collectively, each of the Plaintiffs, the Settling Defendants and Google.

1.20   "Special Committee" means the independent Special Committee established by Google consisting of Google Directors Diane B. Greene (who was not named as a defendant in the Actions) and Ann Mather (who was only named as a defendant in the Demand Refused Action after Google refused the Demand).

1.21   "State Actions" refers to the following purported derivative matters filed in the California and Delaware state courts alleging claims similar or identical to those made in the Actions: *DeKalb County Pension Fund v. Google Inc.*, 7694-VCP (Del. Ch. July 12, 2012); *Szmerkes v. Page, et al.*, 6981-VCP (Del. Ch. Oct. 26, 2011); *Louisiana Municipal Police Employees Ret. Sys. v. Page, et al.*, 7041-VCP (Del. Ch. Nov. 14, 2011); *Pompano Beach Police & Firefighters' Ret. Sys. v. Page, et al.*, 7064-VCP (Del. Ch. Nov. 23, 2011); *Miron v. Brin et al.*, 11-CV-208338 (Santa Clara Super. Ct. Aug. 31, 2011); *Clark v. Page, et al.*, 11-CV-209070 (Santa Clara Super. Ct. Sept. 13, 2011); and *Liss v. Page, et al.*, 11-CV-211139 (Santa Clara Super. Ct. Oct. 14, 2011).

1.22   "Stipulation" means this Agreement.

1.23   "Unknown Claims" means any Released Claims which Plaintiffs, Google or a Google stockholder does not know or suspect to exist in his, her or its favor at the time of the release of the Released Persons, including claims which, if known by him, her or it, might have affected his, her or its settlement with, and release of the Released Persons, or might have affected his, her or its decision not to object to this Settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs, Google, and its stockholders shall be deemed to have, and by operation of the Judgment shall have, expressly waived, the provisions, rights and benefits of California Civil Code §1542, which provides:

1    **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
     THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR
2    HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF
     KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS
3    OR HER SETTLEMENT WITH THE DEBTOR.**

4    Further, with respect to any and all claims released pursuant to ¶¶4.1-4.3 below, the Settling Parties

5    stipulate and agree that, upon the Effective Date, each of the Released Persons also shall expressly

6    waive, and by operation of the Judgment shall have expressly waived any and all provisions, rights

7    and benefits conferred by any law of any jurisdiction or any state or territory of the United States, or

8    principle of common law, which is similar, comparable or equivalent to California Civil Code

9    §1542. Plaintiffs, Google and each Google stockholder may hereafter discover facts in addition or

10   different from those which he, she or it now knows or believes to be true with respect to the subject

11   matter of the Released Claims, known or unknown, suspected or unsuspected, contingent or non-

12   contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon

13   any theory of law or equity now existing or coming into existence in the future, including, but not

14   limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty,

15   law or rule, without regard to the subsequent discovery or existence of such different or additional

16   facts. The Settling Parties acknowledge, and the Google stockholders shall be deemed by operation

17   of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and

18   is a key element of the Settlement of which this release is a part.

19      **2.      Consideration**

20      2.1      In connection with the Settlement of the Actions, the Google Board, following review

21   and recommendation by its Special Committee, shall adopt and maintain the corporate governance

22   measures and funding requirements specified herein within one hundred twenty (120) days after

23   judicial approval of the proposed Settlement by the Court. The corporate governance reforms and

24   funding commitments shall remain in effect for not fewer than five (5) years from that date and shall

25   not be altered without a Court order. Google acknowledges and agrees that the corporate

26   governance reforms and funding commitments set forth in ¶¶2.2-2.6 below confer substantial

27   benefits upon Google and its shareholders. Google also acknowledges that the commencement,

prosecution, and settlement of the Actions was a material and substantial factor in the Company's decision to adopt, implement, and maintain the corporate governance reforms and funding commitments set forth in ¶¶2.2-2.5 below.

2.2   User Safety Initiative

(a)   As a material part of the Settlement, Google shall create the User Safety Initiative.  This program will focus on frustrating and disrupting the operations of rogue pharmacies online.

(b)   The mission statement and charter for the User Safety Initiative shall be as follows:

The User Safety Initiative ("USI") aims to disrupt the operations of rogue pharmacies online.  By proactively leveraging Google's expertise in policy enforcement, and working closely with industry, non-profits, NGOs, regulators, and law enforcement, USI's objective is to increasingly and more holistically make it difficult for rogue online pharmacies who abuse Google's systems to operate.

Initial Steps:

To promote USI's mission, Google will focus on the following areas over the next year:

- Building relationships with entities globally who can take meaningful steps to frustrate business operations of rogue online pharmacy networks and expand the reach of drug abuse prevention messaging organizations.

- Continuing to make proactive referrals to trusted partners and law enforcement entities best positioned to take meaningful action aimed at frustrating the operations of largest rogue online pharmacy networks.

- Improving visibility of relevant and reliable educational content regarding prescription drug abuse prevention and intervention, and assist trusted

organizations operating in these areas (e.g., Drugfree.org) with marketing efforts.

- Educating partners on best practices for collaborating with industry and law enforcement so as to more holistically frustrate the business operations of rogue online pharmacy networks.

- Regularly testing policy enforcement systems to identify and remedy potential ways rogue online pharmacies might seek to evade those systems.

Reporting:

Per the "Corporate Governance Provisions" Agreement, the USI's progress in these areas will be reported on to the Audit Committee in July 2015.

USI Team:

Individuals from the Legal Department, the Product Quality Operations Team, and the Risk Team.

Preliminary Action Items:

- Fund and help disseminate drug abuse prevention messaging campaigns online.

- Develop better working relationship with payment processors in order to collectively take action against the most egregious rogue pharmacy networks.

- Work closely with law enforcement and/or regulatory agencies on legal action against most egregious rogue pharmacy networks.

- Work with legitimate pharmacies on optimization practices to counter against the marketing efforts of rogue pharmacy networks online.

- Hire expert in enforcement actions against unlicensed pharmacies as consultant.

1         (c)      At least once annually after adoption of the User Safety Initiative, Google's

2 General Counsel shall report to the Audit Committee of the Google Board on the USI's activities,

3 successes, and challenges, and further recommend to the Google Board (or an appropriate

4 Committee of the Google Board) any changes in the USI. To the extent such changes are

5 substantial, Google shall seek Court approval pursuant to ¶2.1 above after meeting and conferring

6 with Plaintiffs' Counsel.

7         (d)      Should the Board (or an appropriate Committee of the Board) modify the User

8 Safety Initiative, it will ensure that the amount of funding dedicated to the User Safety Initiative will

9 continue to be dedicated to frustrating the operations of actors engaging in illegal and dangerous

10 activities online – including, but not limited to, actors who place ads in violation of U.S. law and/or

11 Google's content policies and prohibitions regarding dangerous and illegal activity.

12      2.3    <u>On-Line Advertising and Compliance</u>

13         (a)      The Audit Committee shall cause Google to continue to implement and

14 maintain, and enforce, to the extent feasible, written policies and procedures designed to ensure

15 compliance with federal and state laws and regulations. These policies and procedures shall include,

16 but need not be limited to, those set forth below.

17         (b)      Google shall retain LegitScript to complement Google's sweeps and searches

18 of advertisements running through AdWords as required under Google's "Unapproved

19 Pharmaceuticals and Supplements" policy. Google may replace LegitScript with another provider or

20 mechanism of at least equal quality with the prior approval of the Audit Committee.

21         (c)      Google shall use the Verified Internet Pharmacy Practices Sites ("VIPPS")

22 program to screen out internet pharmacy ads that do not comply with federal and/or state law or with

23 Google's relevant advertising policies. Google may replace VIPPS with another provider or

24 mechanism of at least equal quality with the prior approval of the Audit Committee.

25         (d)      Google shall use, and as appropriate improve upon, automated systems,

26 including those that review the web pages that consumers visit when clicking on a link in an

27 advertisement, and shall timely disable those ads that violate Google's advertising policies.

28

1     (e)     Google shall disable URLs (including URLs not active on AdWords) from

2   being linked to ads in AdWords or similar Google advertising programs when notified that they are

3   subject to action by governmental agencies, including without limitation, the FDA and Drug

4   Enforcement Agency and/or violate Google's advertising policies.

5     (f)     Google shall refer to appropriate regulators or law enforcement agencies those

6   persons or entities that engage in significant and systematic attempts to evade Google's advertising

7   policies or electronic screening mechanisms against rogue online pharmacies.

8     (g)     Google shall maintain its position as a board member of the Center for Safe

9   Internet Pharmacies ("CSIP"), so long as CSIP's primary focus continues to be effective ways in

10   which industry can combat abuses of their systems with respect to online pharmacies.

11     (h)     The Audit Committee shall (i) require management to conduct internal audits

12   on Google's on-line advertising compliance with regulatory and/or legal requirements; or (ii)

13   commission external review by counsel or other professionals of Google's policies for on-line

14   advertising-related compliance with relevant regulations and/or laws at least once every 24 months.

15   Either shall be provided to the Audit Committee in writing.

16     (i)     Google's General Counsel or senior compliance official shall report to

17   the Audit Committee semi-annually on the Company's compliance with, and enforcement of, its

18   advertising policies and initiatives.

19     (ii)     Google's General Counsel or senior compliance official shall report to

20   the Audit Committee semi-annually discussing any material updates to the advertising compliance

21   program that were or will be adopted to prevent evasion of Google's advertising policy by online

22   pharmacy advertisers.

23   2.4     Criminal Activity Reporting

24   Google's General Counsel shall be responsible for reviewing every situation in which a

25   Google employee is convicted of a felony under U.S. federal or state criminal statutes in connection

26   with his employment by Google and for reporting to the Board (or an appropriate committee of the

27   Board) with respect to that violation.  Presumptively, any employee convicted of a felony under a

28   U.S. federal or state criminal statute in connection with his employment by Google shall be

1   terminated for cause and receive no severance payments in connection with the termination.  If the

2   General Counsel determines that such termination is not warranted, he shall so recommend to the

3   Board (or an appropriate committee of the Board), which will act upon his recommendation in its

4   discretion.

5          2.5     Funding Commitment

6          In order to provide appropriate funding for Google's On-Line Advertising Product, Quality

7   Operations and Ethics Compliance, Google hereby commits to budget and spend at least $50 million

8   per year on its Product Quality Operations, Policy Enforcement, and User Safety Initiative

9   collectively, during each of the five years in which this Agreement shall be in effect, for a total of at

10  least $250 million.  This funding will be deployed through the direction of existing resources, as well

11  as through the allocation or acquisition of additional resources or assets, towards fulfilling the

12  objectives and obligations set forth herein and will be specifically targeted at frustrating the efforts

13  of parties engaging in illegal and dangerous activities online that pose a threat to users of Google

14  services, including ads that violate U.S. law or Google's content policies and prohibitions regarding

15  dangerous and illegal activities.

16         2.6     Application of Google's Policies to Acquired Companies

17         Within twelve months following the acquisition of digital advertising companies, Google will

18  review their advertising-related compliance and regulatory policies to ensure consistency with

19  Google's existing policies and the corporate governance measures set out in ¶¶2.2-2.5 above.

20    **3.    Settlement Procedures**

21         3.1     After execution of this Stipulation, Plaintiffs shall submit the Stipulation together

22  with its Exhibits to the Court and shall move for entry of an order substantially in the form of

23  Exhibit A hereto (the "Preliminary Approval Order"), requesting, among other things, the

24  preliminary approval of the Settlement set forth in the Stipulation, and approval for the filing and

25  publication of the Settlement Notice, substantially in the forms attached hereto as Exhibits A-1

26  ("Long-Form Notice") and A-2 ("Short-Form Notice"; the Long-Form Notice and Short-Form

27  Notice collectively, the "Settlement Notice"), which shall include the general terms of the Settlement

28  set forth in the Stipulation and the date of the Settlement Hearing as described below.

3.2     Within ten (10) business days following the Court's entry of the Preliminary Approval Order, Google shall cause the Stipulation and Long-Form Notice to be filed with the SEC along with an SEC Form 8-K or other appropriate filing, and publish the Short-Form Notice one time in *Investor's Business Daily*. The SEC filing will be accessible via a link on the "Investor Relations" page of http://www.google.com, the address of which shall be contained in the Settlement Notice.

3.3     Plaintiffs will also request that sixty (60) days after the Settlement Notice is given, the Court hold a joint hearing in the Actions (the "Settlement Hearing") to consider and determine whether the District Court Approval Order and the Judgment, substantially in the forms of Exhibits B and C hereto, should be entered: (a) approving the terms of the Settlement as fair, reasonable and adequate; and (b) dismissing with prejudice the Actions against the Settling Defendants.

3.4     Pending the Effective Date, all proceedings and discovery in the Actions shall be stayed except as otherwise provided herein, and the Settling Parties shall not file or prosecute any other actions or proceedings relating to the Settlement. To the extent necessary, the Settling Parties will take all reasonable steps to maintain the stay of proceedings in the State Actions as well.

**4.     Releases**

4.1     Upon the Effective Date, as defined in ¶1.7, Google, current Google stockholders and the Plaintiffs (acting on their own behalf and derivatively on behalf of Google) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged and dismissed with prejudice the Released Claims against the Released Persons and any and all causes of action or claims (including Unknown Claims) that have or could have been asserted in the Actions by Plaintiffs, Google or any Google stockholder derivatively on behalf of Google, or Google against the Settling Defendants or the Released Persons, based on the Settling Defendants' acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions or failures to act related to Google's acceptance of advertisements by foreign online pharmacies that violated certain federal laws through and including the date of execution of this Stipulation. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

4.2     Upon the Effective Date, as defined in ¶1.7, Plaintiffs (acting on their own behalf and derivatively on behalf of Google and its stockholders), Google and any Person acting on behalf of Google, shall be forever barred and enjoined from commencing, instituting or prosecuting any of the Released Claims against any of the Released Persons or any action or other proceeding against any of the Released Persons arising out of, relating to, or in connection with the Released Claims, the Actions, or the filing, prosecution, defense, settlement, or resolution of the Actions.  Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

4.3     Upon the Effective Date, as defined in ¶1.7, each of the Released Persons and the Related Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged each and all of the Plaintiffs and Plaintiffs' Counsel and all current Google stockholders (solely in their capacity as Google stockholders) from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Actions or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

**5.     Plaintiffs' Counsel's Separately Negotiated Attorneys' Fees and Expenses**

5.1     After negotiating the principal terms of the Settlement, Plaintiffs' Counsel and Google, acting by and through its counsel, with the assistance of the Honorable Layn R. Phillips, United States District Judge (Ret.), separately negotiated the attorneys' fees and expenses the Company would pay to Plaintiffs' Counsel.  In light of the substantial benefits conferred by Plaintiffs' Counsel's efforts, Google, acting by and through its Committee of independent directors, has agreed to pay $9,900,000, subject to Court approval (the "Fee and Expense Amount").

5.2     Within twenty (20) calendar days following the Court's issuance of the District Court Approval Order, notwithstanding the existence of any timely filed objections to the Settlement, or potential for appeal therefrom, Google shall make one payment of the Fee and Expense Amount to an account jointly controlled by Robbins Geller Rudman & Dowd LLP and Abraham, Fruchter &

Twersky, LLP, as receiving agents for Plaintiffs' Counsel. If, as a result of any further order of the Court or as a result of any appeal, remand, or successful collateral attack, the Effective Date does not occur or if the Fee and Expense Amount is not approved or is modified or overturned, in whole or in part, then Plaintiffs' Counsel shall be responsible for repayment to Google of the amount received by them. Neither Google nor any other Released Persons shall have any obligations with respect to Plaintiffs' Counsel's fees and/or expenses beyond the Fee and Expense Amount.

6.   **Conditions of Settlement; Effect of Disapproval, Cancellation or Termination**

6.1   The Effective Date shall be conditioned on the occurrence of all of the following events:

(a)   the Committee of independent Google directors has approved the Settlement and each of its terms, including the separately negotiated Fee and Expense Amount;

(b)   the Court has entered the District Court Approval Order and Judgment, substantially in the forms of Exhibits B and C attached hereto; and

(c)   the Judgment has become Final.

6.2   If any of the conditions specified in ¶6.1 are not met, then the Stipulation of Settlement shall be canceled and terminated subject to the provisions of this ¶6.2, unless counsel for the Settling Parties mutually agree in writing to proceed with an alternative or modified Stipulation and submit it for Court approval. If for any reason the Effective Date does not occur, or if this Stipulation is terminated, or is cancelled, or otherwise fails to become effective for any reason:

(a)   The Settling Parties, Released Persons and Related Parties shall be restored to their respective positions that existed immediately prior to the date of execution of this Stipulation;

(b)   All negotiations, proceedings, documents prepared and statements made in connection with this Stipulation shall be without prejudice to the Settling Parties, shall not be deemed or construed to be an admission by a Settling Party of any act, matter, or proposition and shall not be used in any manner for any purpose (other than to enforce the terms remaining in effect) in any subsequent proceeding in the Actions or in any other action or proceeding; and

(c)     The terms and provisions of the Stipulation, with the exception of the provisions of ¶5.2 and ¶6.2 shall have no further force and effect with respect to the Settling Parties and shall not be used in the Actions or in any other proceeding for any purpose, and any judgment or orders entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*.

6.3     No order of the Court or modification or reversal on appeal of any order of the Court concerning the amount of attorneys' fees, costs, expenses and interest awarded by the Court to Plaintiffs' Counsel shall constitute grounds for cancellation or termination of the Stipulation, affect the enforceability of the Stipulation, or delay or preclude the Judgment from becoming Final.

**7.     Miscellaneous Provisions**

7.1     The Settling Parties (a) acknowledge that it is their intent to consummate the terms and conditions of this Stipulation; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation.

7.2     The Settling Parties intend this Settlement to be a final and complete resolution of all disputes between Plaintiffs and Google and its stockholders, on the one hand, and the Released Persons, on the other hand, arising out of, based upon or related to the Released Claims.  The Settlement compromises claims that are contested and shall not be deemed an admission by any Settling Party or Released Person as to the merits of any claim, allegation or defense.  The District Court Approval Order shall contain a finding that during the course of the litigation, the parties and their respective counsel at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure and all other similar laws, including California Code of Civil Procedure §128.7.  The Settling Parties further agree that the Released Claims are being settled voluntarily after consultation with competent legal counsel and an experienced mediator.

7.3     Pending the Effective Date, the Settling Parties agree not to initiate any proceedings concerning the Released Claims other than those incident to the settlement itself; provided, however, that Google and the Settling Defendants may seek to prevent or stay any other action or claims brought seeking to assert any Released Claims.

1    7.4    Neither the Stipulation nor the Settlement, including any Exhibits attached hereto, nor

2    any act performed or document executed pursuant to or in furtherance of the Stipulation or the

3    Settlement: (a) is or may be deemed to be or may be offered, attempted to be offered or used in any

4    way as a concession, admission or evidence of the validity of any Released Claims, or of any fault,

5    wrongdoing or liability of the Released Persons or Google; or (b) is or may be deemed to be or may

6    be used as a presumption, admission or evidence of, any liability, fault or omission of any of the

7    Released Persons or Google in any civil, criminal, administrative, or other proceeding in any court,

8    administrative agency, tribunal or other forum.  Neither this Stipulation nor the Settlement shall be

9    admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and

10    except that the Released Persons may file or use the Stipulation, the District Court Approval Order

11    and/or the Judgment in any action that may be brought against them in order to support a defense or

12    counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release,

13    good faith settlement, standing, judgment bar or reduction or any other theory of claim preclusion or

14    issue preclusion or similar defense or counterclaim.

15    7.5    All agreements made and orders entered during the course of the Actions relating to

16    the confidentiality of information or sealing of documents shall survive this Stipulation and the

17    Judgment.

18    7.6    All Exhibits to this Stipulation are material and integral parts hereof and are fully

19    incorporated herein by this reference.

20    7.7    This Stipulation may be amended or modified only by a written instrument signed by

21    or on behalf of all Settling Parties or their respective successors-in-interest.

22    7.8    This Stipulation and the Exhibits attached hereto constitute the entire agreement

23    among the Settling Parties and no representations, warranties or inducements have been made to any

24    Settling Party concerning the Stipulation and/or any of its Exhibits, other than the representations,

25    warranties and covenants contained and memorialized in such documents.   The Stipulation

26    supersedes and replaces any prior or contemporaneous writing, statement or understanding

27    pertaining to the Actions and no parole or other evidence may be offered to explain, construe,

28    contradict or clarify its terms, the intent of the Settling Parties or their counsel, or the circumstances

under which the Stipulation was made or executed.  It is understood by the Settling Parties that, except for matters expressly represented herein, the facts or law with respect to which this Stipulation is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of facts or law turning out to be different, and agrees that this Stipulation shall be in all respects effective and not subject to termination by reason of any such different facts or law.

7.9    Except as otherwise expressly provided herein, all parties, including all Settling Defendants, their counsel, Google and its counsel, and Plaintiffs and Plaintiffs' Counsel, shall bear their own fees, costs, and expenses.

7.10    Counsel for the Settling Parties are expressly authorized by their respective clients to take all appropriate actions required or permitted to be taken pursuant to the Stipulation to effectuate its terms and conditions.

7.11    Plaintiffs represent and warrant they have not assigned or transferred, or attempted to assign or transfer, to any Person any Released Claim or any portion thereof or interest therein.

7.12    Each counsel or other Person executing this Stipulation or any of its Exhibits on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

7.13    Any failure by any party to this Stipulation to insist upon the strict performance by any other party of any of the provisions of the Stipulation shall not be deemed a waiver of any of the provisions, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of the Stipulation to be performed by such other party.

7.14    The Stipulation and Exhibits may be executed in one or more counterparts.  A faxed or pdf signature shall be deemed an original signature for purposes of this Stipulation.  All executed counterparts including facsimile and/or pdf counterparts shall be deemed to be one and the same instrument.  A complete set of counterparts, either originally executed or copies thereof, shall be filed with the Federal Court.

1    7.15    This Stipulation shall be binding upon, and inure to the benefit of, the Settling Parties

2    and the Released Persons and their respective successors, assigns, heirs, spouses, marital

3    communities, executors, administrators, trustees in bankruptcy and legal representatives.

4    7.16    Without affecting the finality of the Judgment entered in accordance with this

5    Stipulation, the Court shall retain jurisdiction with respect to implementation and enforcement of the

6    terms of the Stipulation, the District Court Approval Order, and the Judgment, and the Settling

7    Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the

8    Settlement embodied in the Stipulation, the District Court Approval Order, and the Judgment and for

9    matters arising out of, concerning or relating thereto.

10   7.17    This Stipulation and the Exhibits hereto shall be considered to have been negotiated,

11   executed and delivered, and to be wholly performed, in the State of California, and the rights and

12   obligations of the Settling Parties to the Stipulation shall be construed and enforced in accordance

13   with, and governed by, the internal substantive laws of the State of California without giving effect

14   to California's choice-of-law principles.

15   IN WITNESS WHEREOF, the Settling Parties have caused the Stipulation to be executed, by

16   themselves and/or by their duly authorized attorneys, dated August 7, 2014.

17
                                      ROBBINS GELLER RUDMAN
18                                        & DOWD LLP
                                      BENNY C. GOODMAN III
19                                    ERIK W. LUEDEKE

20

21                                    _____
                                      BENNY C. GOODMAN III
22
                                      655 West Broadway, Suite 1900
23                                    San Diego, CA  92101-3301
                                      Telephone:  619/231-1058
24                                    619/231-7423 (fax)

25                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
26                                    SHAWN A. WILLIAMS
                                      Post Montgomery Center
27                                    One Montgomery Street, Suite 1800
                                      San Francisco, CA  94104
28                                    Telephone:  415/288-4545
                                      415/288-4534 (fax)

1    POMERANTZ LLP
2    MARC I. GROSS
     JEREMY A. LIEBERMAN
3    600 Third Avenue
     New York, NY 10016
4    Telephone: 212/661-1100
     212/661-8665 (fax)
5
     ROBBINS ARROYO LLP
6    BRIAN J. ROBBINS
     FELIPE J. ARROYO
7    SHANE P. SANDERS
     GINA STASSI
8    600 B Street, Suite 1900
     San Diego, CA 92101
9    Telephone: 619/525-3990
     619/525-3991 (fax)
10
     LAW OFFICE OF ALFRED G.
11       YATES, JR., P.C.
     GERALD L. RUTLEDGE
12   519 Allegheny Building
     429 Forbes Avenue
13   Pittsburgh, PA 15219
     Telephone: 412/391-5164
14   412/471-1033 (fax)

15   Counsel for Plaintiffs Patricia H. McKenna,
     Avrohom Gallis and James Clem
16

17   ABRAHAM, FRUCHTER,
         & TWERSKY, LLP
18   JEFFREY S. ABRAHAM
     MITCHELL M.Z. TWERSKY
19   PHILIP T. TAYLOR

20

21                        _____
                                 JEFFREY S. ABRAHAM
22

23   One Penn Plaza, Suite 2805
     New York, NY 10119
24   Telephone: 212/279-5050
     212/279-3655 (fax)
25

26

27

28

945787_8    STIPULATION OF SETTLEMENT - CV-11-04248-PJH AND CV-13-02038-PJH          - 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ABRAHAM, FRUCHTER,
  & TWERSKY, LLP
IAN D. BERG
TAKEO A. KELLAR
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Tel: (858) 792-3448
Fax: (858) 792-3449
Iberg@aftlaw.com
tkellar@aftlaw.com

Counsel for Plaintiff City of Orlando Police
Pension Fund

WILSON SONSINI GOODRICH &
  ROSATI, P.C.
BORIS FELDMAN
ELIZABETH C. PETERSON

_Boris Feldman / ECP_
                    BORIS FELDMAN

650 Page Mill Road
Palo Alto, CA  94304
Telephone:  650/493-9300
650/493-6811 (fax)

Attorneys for Defendants Larry Page, Sergey
Brin, Eric E. Schmidt, L. John Doerr, John L.
Hennessy, Paul S. Otellini, K. Ram Shriram,
Shirley M. Tilghman, Ann Mather, and Nominal
Defendant Google Inc.

1
CERTIFICATE OF SERVICE

2      I hereby certify that on August 7, 2014, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on August 7, 2014.

9                              s/ Benny C. Goodman III
                              BENNY C. GOODMAN III
10
                              ROBBINS GELLER RUDMAN
11                                  & DOWD LLP
                              655 West Broadway, Suite 1900
12                              San Diego, CA 92101-8498
                              Telephone: 619/231-1058
13                              619/231-7423 (fax)

14                              E-mail:BennyG@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:11-cv-04248-PJH In re Google Inc. Shareholder Derivative Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Felipe Javier Arroyo**
  farroyo@robbinsarroyo.com,notice@robbinsarroyo.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Marshall Pierce Dees**
  mdees@holzerlaw.com

- **Travis E. Downs , III**
  travisd@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Boris Feldman**
  bbahns@wsgr.com

- **Michael I. Fistel , Jr**
  michaelf@johnsonandweaver.com

- **Benny Copeline Goodman , III**
  bennyg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Darren T. Kaplan**
  dkaplan@chitwoodlaw.com

- **Peter John Koenig**
  peter@whk-law.com,serena@whk-law.com,beau@whk-law.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Erik William Luedeke**
  eluedeke@rgrdlaw.com

- **Elizabeth Catherine Peterson**
  epeterson@wsgr.com,vshreve@wsgr.com,sstrain@wsgr.com,cfoung@wsgr.com,bbahns@wsgr.com,dgavril@wsgr.com,dwalters@wsgr.com

- **Anthony David Phillips**
  aphillips@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Brian J. Robbins**
  notice@robbinsarroyo.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Shane Palmesano Sanders**
  ssanders@robbinsarroyo.com,notice@robbinsarroyo.com

- **Bryson Scott Santaguida**
  bsantaguida@wsgr.com

- **Gideon A. Schor**
  gschor@wsgr.com,ageritano@wsgr.com

- **Gina Stassi**
  gstassi@robbinsarroyo.com,notice@robbinsarroyo.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Diane Marie Walters**
  dwalters@wsgr.com,vshreve@wsgr.com

- **Tamar A Weinrib**
  taweinrib@pomlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Marc           L Gross
Pomerantz Haudek Block Grossman & Gross LLP
100 Park Avenue
26th Floor
New York, NY 10017

R.             James Hogdson
Pomerantz Haudek Block Grossman & Gross LLP
100 Park Avenue
16th Floor
New York, NY 10017

Fei-Lu         Qian
Pomerantz Haudek Grossman & Gross LLP
100 Park Avenue
16th Floor
New York, NY 10017
```

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| In re GOOGLE INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) | Master File No. CV-11-04248-PJH |
| ———————————————— | ) ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |
| ———————————————— | ) | |
| CITY OF ORLANDO POLICE PENSION FUND by Its Trustees, derivatively on behalf of GOOGLE INC., | ) ) ) ) | Case No. CV-13-02038-PJH |
| Plaintiffs, | ) ) | [~~PROPOSED~~] ORDER APPROVING |
| vs. | ) ) | DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL WITH PREJUDICE |
| LAWRENCE E. PAGE, et al., | ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| GOOGLE INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) ) | |

998141_1

1         This matter came before the Court for hearing pursuant to the Order of this Court, dated

2    November 6, 2014 ("Order"), on Plaintiffs' motion for approval of the settlement ("Settlement") set

3    forth in the Stipulation of Settlement, dated August 7, 2014 (the "Stipulation").  Due and adequate

4    notice having been given of the Settlement as required in said Order, and the Court having

5    considered all papers filed and proceedings had herein, and otherwise being fully informed in the

6    premises and good cause appearing therefor, IT IS HEREBY ORDERED, ADJUDGED AND

7    DECREED that:

8         1.     This District Court Approval Order incorporates by reference the definitions in the

9    Stipulation, and all capitalized terms used herein shall have the same meanings as set forth in the

10   Stipulation (in addition to those capitalized terms defined herein).

11        2.     This Court has jurisdiction over the subject matter of the Actions, including all

12   matters necessary to effectuate the Settlement, and over all parties to the Actions, including, but not

13   limited to, the Plaintiffs, Google Inc. ("Google"), the current Google stockholders, and the Settling

14   Defendants.

15        3.     The Court finds that the notice provided to Google stockholders was the best notice

16   practicable under the circumstances of these proceedings and of the matters set forth therein,

17   including the Settlement set forth in the Stipulation, to all Persons entitled to such notice.  The notice

18   fully satisfied the requirements of Federal Rule of Civil Procedure 23.1 and the requirements of due

19   process.

20        4.     The Actions and all claims contained therein, as well as all of the Released Claims,

21   are dismissed with prejudice.  As among Plaintiffs, the Settling Defendants and Google, the parties

22   are to bear their own costs, except as otherwise provided in the Stipulation.

23        5.     The Court finds that the terms of the Stipulation and Settlement are fair, reasonable

24   and adequate as to each of the Settling Parties, and hereby finally approves the Stipulation and

25   Settlement in all respects, and orders the Settling Parties to perform its terms to the extent the

26   Settling Parties have not already done so.

27

28

[PROPOSED] ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL
WITH PREJUDICE - CV-11-04248-PJH AND CV-13-02038-PJH                    - 1 -

1    6.    Upon the Effective Date, Google, current Google stockholders and the Plaintiffs

2  (acting on their own behalf and derivatively on behalf of Google) shall be deemed to have, and by

3  operation of this District Court Approval Order and the Judgment shall have, fully, finally, and

4  forever released, relinquished and discharged and dismissed with prejudice the Released Claims

5  against the Released Persons and any and all causes of action or claims (including Unknown Claims)

6  that have or could have been asserted in the Actions by Plaintiffs, Google or any Google stockholder

7  derivatively on behalf of Google, or Google against the Settling Defendants or the Released Persons,

8  based on the Settling Defendants' acts and/or omissions in connection with, arising out of, or relating

9  to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions or

10  failures to act related to Google's acceptance of advertisements by foreign online pharmacies that

11  violated certain federal laws through and including the date of execution of the Stipulation.  Nothing

12  herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the

13  Stipulation.

14    7.    Upon the Effective Date, Plaintiffs (acting on their own behalf and derivatively on

15  behalf of Google and its stockholders), Google and any Person acting on behalf of Google, shall be

16  forever barred and enjoined from commencing, instituting or prosecuting any of the Released Claims

17  against any of the Released Persons or any action or other proceeding against any of the Released

18  Persons arising out of, relating to, or in connection with the Released Claims, the Actions, or the

19  filing, prosecution, defense, settlement, or resolution of the Actions.  Nothing herein shall in any

20  way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

21    8.    Upon the Effective Date, each of the Released Persons and the Related Parties shall

22  be deemed to have, and by operation of this District Court Approval Order and the Judgment shall

23  have, fully, finally, and forever released, relinquished and discharged each and all of the Plaintiffs

24  and Plaintiffs' Counsel and all current Google stockholders (solely in their capacity as Google

25  stockholders) from all claims (including Unknown Claims) arising out of, relating to, or in

26  connection with the institution, prosecution, assertion, settlement or resolution of the Actions or the

27

28

1  Released Claims.  Nothing herein shall in any way impair or restrict the rights of any Settling Party

2  to enforce the terms of the Stipulation.

3        9.    The Court hereby approves the Fee and Expense Amount in accordance with the

4  Stipulation and finds that such fee is fair and reasonable.

5        10.   Neither the Stipulation nor the Settlement, including the Exhibits attached thereto, nor

6  any act performed or document executed pursuant to or in furtherance of the Stipulation or the

7  Settlement: (a) is or may be deemed to be or may be offered, attempt to be offered or used in any

8  way as a concession, admission, or evidence of the validity of any Released Claims or any fault,

9  wrongdoing or liability of the Released Persons or Google; or (b) is or may be deemed to be or may

10  be used as a presumption, admission, or evidence of any liability, fault or omission of any of the

11  Released Persons or Google in any civil, criminal or administrative or other proceeding in any court,

12  administrative agency, tribunal or other forum.  Neither the Stipulation nor the Settlement, nor any

13  act performed or document executed pursuant to or in furtherance of the Stipulation or the

14  Settlement, shall be admissible in any proceeding for any purpose, except to enforce the terms of the

15  Settlement and Stipulation, and except that the Released Persons may file or use the Stipulation,  the

16  District Court Approval Order and/or the Judgment in any action that may be brought against them

17  in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel,

18  full faith and credit, release, standing, judgment bar or reduction or any other theory of claim

19  preclusion or issue preclusion or similar defense or counterclaim.

20        11.   During the course of the Actions, the parties and their respective counsel at all times

21  complied with the requirements of Federal Rule of Civil Procedure 11, any applicable California law

22  and all other similar laws.

23        12.   Without affecting the finality of this District Court Approval Order and the Judgment

24  in any way, this Court hereby retains continuing jurisdiction over the Actions and the parties to the

25  Stipulation to enter any further orders as may be necessary to effectuate, implement and enforce the

26  Stipulation and the Settlement provided for therein and the provisions of this District Court Approval

27  Order.

28

[PROPOSED] ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL
WITH PREJUDICE - CV-11-04248-PJH AND CV-13-02038-PJH       - 3 -

1    13.    This District Court Approval Order and the Judgment is a final and appealable

2  resolution in the Actions as to all claims and the Court directs immediate entry of the Judgment

3  forthwith by the Clerk in accordance with Rule 58, Federal Rules of Civil Procedure, dismissing the

4  Actions with prejudice.

5        IT IS SO ORDERED.

6

7  DATED: ___1/21/15___

8                                          _____
                                           THE HONORABLE PHYLLIS J. HAMILTON
                                           UNITED STATES DISTRICT JUDGE

9  Submitted by:

10

11  ROBBINS GELLER RUDMAN
      & DOWD LLP
    BENNY C. GOODMAN III
12  ERIK W. LUEDEKE

13

14  _____
           BENNY C. GOODMAN III

15  655 West Broadway, Suite 1900
16  San Diego, CA  92101-3301
    Telephone:  619/231-1058
17  619/231-7423 (fax)

18  ROBBINS GELLER RUDMAN
      & DOWD LLP
19  SHAWN A. WILLIAMS
    Post Montgomery Center
20  One Montgomery Street, Suite 1800
    San Francisco, CA  94104
21  Telephone:  415/288-4545
    415/288-4534 (fax)

22  POMERANTZ LLP
23  MARC I. GROSS
    JEREMY A. LIEBERMAN
24  600 Third Avenue
    New York, NY  10016
25  Telephone:  212/661-1100
    212/661-8665 (fax)

26

27

28

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Counsel for Plaintiffs Patricia H. McKenna,
Avrohom Gallis and James Clem

ABRAHAM FRUCHTER,
  & TWERSKY, LLP
JEFFREY S. ABRAHAM
MITCHELL M.Z. TWERSKY
ATARA HIRSCH
PHILIP T. TAYLOR


_____
        JEFFREY S. ABRAHAM

One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

IAN D. BERG
TAKEO A. KELLAR
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Tel: (858) 792-3448
Fax: (858) 792-3449

Counsel for Plaintiff City of Orlando Police
Pension Fund

945888_3      [PROPOSED] ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL
WITH PREJUDICE - CV-11-04248-PJH AND CV-13-02038-PJH                          - 5 -

1  WILSON SONSINI GOODRICH &
      ROSATI, P.C.
2  BORIS FELDMAN
   ELIZABETH C. PETERSON
3

4

5                  BORIS FELDMAN

6  650 Page Mill Road
   Palo Alto, CA  94304
7  Telephone:  650/493-9300
   650/493-6811 (fax)
8

9  Attorneys for Defendants Larry Page,
   Sergey Brin, Eric E. Schmidt, L. John
10 Doerr, John L. Hennessy, Paul S. Otellini,
   K. Ram Shriram, Shirley M. Tilghman, Ann
11 Mather, and Nominal Defendant Google
   Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

945888_3   [PROPOSED] ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL
           WITH PREJUDICE - CV-11-04248-PJH AND CV-13-02038-PJH                          - 6 -

# EXHIBIT 7

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| IN RE MOTOROLA, INC. DERIVATIVE LITIGATION ) ) ) ) | Lead Case No. 07CH23297<br><br>(Derivative Action) |
| This Document Relates To:<br><br>ALL ACTIONS. ) ) ) ) ) ) ) ) | |

## [PROPOSED] ORDER AND FINAL JUDGMENT

This matter came before the Court for hearing on November 29, 2012, to consider approval of the proposed settlement ("Settlement") set forth in the Stipulation of Settlement dated September 12, 2012, and the exhibits thereto (the "Stipulation"). The Court has reviewed and considered all documents, evidence, objections (if any), and arguments presented in support of or against the Settlement. Good cause appearing therefore, the Court enters this Judgment.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.    Unless otherwise stated herein, all capitalized terms contained in this Judgment shall have the same meaning and effect as stated in the Stipulation.

2.    This Court has jurisdiction over the subject matter of the Action and over the Settling Parties to the Action.

3.    This Court hereby approves the Settlement set forth in the Stipulation and finds that the Settlement is, in all respects, fair, reasonable, and adequate to each of the Settling Parties, Motorola Solutions, Inc., formerly known as Motorola, Inc. ("Motorola"), and Motorola shareholders, and hereby directs the Settling Parties to perform the terms of the Settlement as set forth in the Stipulation.

4.    This Court hereby dismisses the Action with prejudice and without costs to Defendants, except as otherwise provided below.

5.    Upon the Effective Date, the Plaintiffs (both individually and derivatively on behalf of Motorola), any other Motorola shareholder on behalf of Motorola, and Plaintiffs' Counsel shall be deemed to have fully, finally, and forever released, relinquished, and discharged the Released Claims (including Unknown Claims) against the Released Persons and any and all claims arising out of, relating to, or in connection with the defense, settlement, or resolution of

the Action against the Released Persons. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

6.    Upon the Effective Date hereof, the Releasing Parties are barred and enjoined from commencing, prosecuting, instigating, or in any way participating in the commencement or prosecution of any action asserting any Released Claims against any of the Released Persons as set forth in and in accordance with the terms of the Stipulation. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

7.    Upon the Effective Date, each of the Defendants shall be deemed to have fully, finally, and forever released, relinquished, and discharged Plaintiffs and Plaintiffs' Counsel from all claims (including Unknown Claims), arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Action or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

8.    The Court finds that the Notice of Pendency and Proposed Settlement of Derivative Action was given in accordance with the Preliminary Approval and Scheduling Order entered on September 18, 2012, and that such Notice was reasonable, constituted the most practicable notice under the circumstances to Current Motorola Shareholders, and complied with the requirements of Illinois law and due process.

9.    The Court hereby approves the Fee and Expense Amount of $9,500,000 and directs payment to Plaintiffs' Counsel of the Fee and Expense Amount in accordance with the terms of the Stipulation.

10. The Court hereby approves the Incentive Awards of $5,000 for each of the Plaintiffs, to be paid from Plaintiffs' Counsels' Fee and Expense Amount in recognition of Plaintiffs' participation and effort in the prosecution of the Action.

11. During the course of the litigation of the Action, all Settling Parties and their counsel acted in good faith and complied with Illinois Supreme Court Rule 137 and any similar rule or statue.

12. Neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement, is or may be deemed to be or may be used as: (a) an admission of, or evidence of, the validity of any Released Claim or any wrongdoing or liability of the Defendants, or the Court's jurisdiction over the Released Persons for purpose of the Released Claims or for any other purpose; (b) an admission or concession by Plaintiffs or any Motorola shareholder of any infirmity in the claims asserted in the Complaint; or (c) an admission of, or evidence of, any fault or omission of any of the Released Persons in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. The Released Persons may file the Stipulation and/or this Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, equitable estoppel, judicial estoppel, release, good-faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of this Settlement; and (b) all Settling Parties and the Settling Parties' counsel hereto for the sole purpose of construing, enforcing, and administering the Stipulation and this Judgment.

14. There is no reason for delay in the entry of this Judgment and immediate entry by the Clerk of the Court is expressly directed by the Court.

Dated: _____, 2012

THE HONORABLE FRANKLIN U. VALDERRAMA
CIRCUIT COURT JUDGE

ENTERED
Assoc. Judge Franklin Ulysse Valderrama-1968

NOV 29 2012

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Edward T. Joyce
Rowena T. Parma
The Law Offices of
Edward T. Joyce & Assoc. P.C.
135 S. LaSalle St.
#2200
Chicago, IL 60603
Atty. I.D. 47922

809184

- 4 -

EXHIBIT 8

1   JOEL E. ELKINS, State Bar No. 256020
    Email: jelkins@weisslawllp.com
2   **WEISSLAW LLP**
3   9107 Wilshire Blvd., Suite 450
    Beverly Hills, CA 90210
4   Telephone:  (310) 208-2800
    Facsimile:   (310) 209-2348
5
    *Counsel for Plaintiff Barbara Wolfson*
6
7   [Additional Counsel on signature page.]

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10  | BARBARA WOLFSON, Derivatively on Behalf of SNAP INC., | Case No. BC720152 |
11  | Plaintiff, | |
12  | v. | **STIPULATION AND AGREEMENT OF SETTLEMENT** |
13  | EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, JOANNA COLES, A.G. LAFLEY, MITCHELL LASKY, STANLEY MERESMAN, SCOTT D. MILLER, CHRISTOPHER YOUNG, ANDREW VOLLERO, and IMRAN KHAN, | Judge:          Honorable Elihu M. Berle Department:    6 |
16  | Defendants, | |
    | and | |
17  | SNAP INC., a Delaware Corporation, | |
18  | Nominal Defendant. | |

19  | JUSTIN POKORNEY, Derivatively for the Benefit of and on Behalf of Nominal Defendant SNAP INC., | Case No. 18STCV09365 |
20  | Plaintiff, | |
21  | v. | |
22  | EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, JOANNA COLES, A.G. LAFLEY, STANLEY MERESMAN, SCOTT D. MILLER, CHRISTOPHER YOUNG, ANDREW VOLLERO, and IMRAN KHAN, | Judge:          Honorable Elihu M. Berle Department:    6 |
25  | Defendants, | |
    | and | |
26  | SNAP INC., a Delaware Corporation, | |
27  | Nominal Defendant | |

28  [Caption continued on following page.]

DAVID SHABBOUEI and ZALMON UVAYDOV, Derivatively on Behalf of SNAP INC.,

        Plaintiffs,

    v.

EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, STANLEY MERESMAN, A. G. LAFLEY, SCOTT D. MILLER, CHRISTOPHER YOUNG, JOANNA COLES, ANDREW VOLLERO, IMRAN KHAN, MITCHELL LASKY, and DOES 1-25, Inclusive,

        Defendants,

and

SNAP INC., a Delaware Corporation,

        Nominal Defendant.

Case No. 19STCV08413

Judge:        Honorable Elihu M. Berle
Department:   6

This Stipulation of Settlement (the "Stipulation" or the "Settlement") is made and entered into by and among Plaintiffs Barbara Wolfson, Justin Pokorney, Amelie Tseng, David Shabbouei, and Zalmon Uvaydov and stockholder Charles Blackburn (together, "Plaintiffs"), on behalf of themselves and derivatively on behalf of Snap Inc. ("Snap" or the "Company"); Plaintiffs' counsel WeissLaw LLP, Robbins LLP, Gainey Mckenna & Egleston, Wolf Haldenstein Adler Freeman & Herz LLP, and Promisloff Law, P.C.; individual defendants Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, Christopher Young, Poppy Thorpe, Andrew Vollero, and Imran Khan (the "Individual Defendants"); nominal defendant Snap Inc. (together with the Individual Defendants, the "Defendants," and together with Plaintiffs, the "Settling Parties"); and counsel for the Defendants, Wilson Sonsini Goodrich & Rosati PC. The Stipulation is intended by the Settling Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined below in Section IV, ¶1.13) upon Court approval and subject to the terms and conditions hereof.

## I.   BACKGROUND

Snap is a Delaware corporation that offers a mobile-phone camera application called Snapchat. Among other capabilities, it allows users to interact with friends by sending pictures, videos, and messages called "Snaps," as well as by composing narratives of their Snaps via a feature called "Stories." The Company was founded in 2011 by Evan Spiegel and Robert Murphy, who serve as Snap's Chief Executive Officer and Chief Technology Officer, respectively, and as members of the Board of Directors (the "Board"). The Company went public in an initial public offering ("IPO") on March 2, 2017.

### A.   The Derivative Actions

On September 5, 2018, Plaintiff Wolfson filed the first in a series of several substantively similar stockholder derivative actions. The action, captioned *Wolfson v. Spiegel*, No. BC720152 ("*Wolfson*"), was filed in the Superior Court of California for Los Angeles County ("Superior Court") against certain Snap officers and members of Snap's Board of Directors (the "Board"), including Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, Christopher Young, Andrew Vollero, Imran Khan,

and the Company as the nominal defendant. The *Wolfson* complaint alleges that the named individual defendants breached their fiduciary duties to Snap by approving or permitting alleged misconduct, or failing to exercise oversight and prevent alleged misconduct, with respect to the definition, calculation, and description of certain key performance indicators ("KPIs") published in Snap's IPO Registration Statement and public disclosures in the months following the IPO. Among other allegations, Wolfson contends that Snap's fiduciaries: (a) failed to disclose a whistleblower lawsuit brought against Snap by former employee Anthony Pompliano ("Pompliano"), which alleged that the Company disseminated misleading KPI data and lacked the internal controls necessary to ensure their accuracy; (b) omitted that Snap's deficient internal controls and corporate governance practices led Snap to publish inconsistently defined and calculated KPIs and to disseminate inaccurate and incomplete information regarding the Company's financial condition and business prospects; (c) omitted material information regarding the competitive threat that the August 2016 release of Instagram Stories, a feature similar to Snap's Stories feature, posed and its anticipated impact on Snap's KPIs; (d) falsely represented that Snap did not use "growth hacking" techniques designed to increase reported user engagement with its platform, leading to a series of federal and state securities class actions (the "Securities Class Actions") that the Company was forced to defend and to subsequently resolve at significant expense; and (e) omitted from the Registration Statement filed in connection with Snap's IPO and public disclosures in the months following the IPO material facts regarding the stock-based compensation paid to the Company's executives.

On October 3, 2018, Promisloff Law, P.C., on behalf of Snap stockholder Charles Blackburn, made a litigation demand on Snap's Board based on substantially similar facts ("Blackburn Demand"). The demand requested that the Board investigate and, if warranted, pursue claims in litigation for breach of fiduciary duty against certain Snap officers and directors, including Michael Lynton, Evan Spiegel, Imran Khan, Robert Murphy, Andrew Vollero, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, and Christopher Young.

On November 1, 2018, Plaintiffs Justin Pokorney and Amelie Tseng filed a stockholder derivative action captioned, *Pokorney and Tseng v. Spiegel*, No. 2018-0778-SG ("*Tseng*"), in the

Court of Chancery of the State of Delaware ("Court of Chancery") against Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, Christopher Young, Poppy Thorpe, and Snap as the nominal defendant, arising from the same nexus of facts alleged in *Wolfson*. On December 21, 2018, Pokorney voluntarily dismissed his claims, but Tseng remained a plaintiff. On January 18, 2019, the parties in the *Tseng* action submitted a stipulation and proposed order staying the action pending resolution of the related consolidated federal securities class action captioned, *In re Snap Inc. Securities Litigation*, No. 2:17-cv-03679-SVW-AGR (the "Federal Securities Class Action") and the stockholder derivative actions then pending in the California Superior Court. The parties in the *Tseng* action have provided the Court of Chancery with periodic updates.

On the same day he dismissed his Delaware case, Pokorney filed a substantially similar stockholder derivative suit in California Superior Court, captioned *Pokorney v. Spiegel*, No. 18STCV09365, against Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Stanley Meresman, Scott D. Miller, Christopher Young, Andrew Vollero, Imran Khan, and Snap as the nominal defendant ("*Pokorney*"). The same counsel that represented Pokorney in the Court of Chancery represents him in this suit.

Another stockholder derivative action based on substantially similar facts, *Shabbouei v. Spiegel*, No. 19STCV08413, was filed on March 12, 2019 in California Superior Court against Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, Christopher Young, Andrew Vollero, Imran Khan, several Does, and Snap as the nominal defendant ("*Shabbouei*").

Each of the Settling Defendants described above denies each and every one of the claims and contentions alleged as to him or her by Plaintiffs in the above-described stockholder derivative actions and litigation demand.

### B. Plaintiffs' Pre- and Post-Filing Investigations

Pursuant to 8 Del. C. § 220, Pokorney and Tseng made a demand to inspect Snap's books and records on September 26, 2017. Snap produced certain corporate records in response to their demand on August 22, 2018.

On December 6, 2018, David Shabbouei and Zalmon Uvaydov made a demand to inspect relevant Snap books and records pursuant to 8 Del. C. § 220. Snap subsequently agreed to produce the records made available to Pokorney and Tseng, and additional records totaling more than 2,000 pages, including materials reflecting the information provided to, and the deliberations of, the Board, the Audit Committee, and the Pricing Committee, regarding user growth, "growth hacking," and the whistleblower action filed by Pompliano, as well as documents bearing on the independence of Snap's directors. Information gleaned from these documents was incorporated into the complaint in *Shabbouei*.

In late December 2018, the parties in *Wolfson* agreed that, under the protection of the settlement privilege provided by California Evidence Code Section 1152 and other analogous provisions, Snap would provide Plaintiff Wolfson's counsel with documents produced in the related Federal Securities Class Action. The parties in *Pokorney* and *Shabbouei* subsequently entered into similar agreements. Pursuant to these agreements, Snap produced 313,135 documents consisting of about 1.5 million pages.

In March 2019, Plaintiff Wolfson's counsel interviewed several Snap employees and executives, including Snap's Director of Data, Senior Director of Growth, Associate General Counsel, and Deputy General Counsel and Chief Compliance Officer, and evaluated the documents and interviews with the assistance of an expert consultant familiar with marketing analytics and data analysis. These interviews concerned Snap's methodology for calculating Daily Active Users ("DAUs"), an important KPI, the effect of Instagram Stories on Snapchat's growth, Snap's disclosure policies and procedures, executive compensation practices, internal litigation review and disclosure process, and how those processes and procedures might be strengthened.

In addition, after the complaint in *Shabbouei* was filed, counsel for the Shabbouei Plaintiffs conducted significant additional research and analysis into the underlying facts and remediation. Counsel assessed Snap's user metrics and disclosure controls using the discovery materials generated in the related Federal Securities Class Action, and reviewed the substantial business and academic literature concerning the special problems posed by non-financial metrics and social media user engagement metrics, including, *inter alia*: (i) the governance and disclosure practices

-6-
STIPULATION AND AGREEMENT OF SETTLEMENT
CASE NOS. BC720152, 18STCV09365, 19STCV08413

of several leading social media companies, as well as criticisms of those practices; (ii) technical publications and manuals detailing user engagement metrics definitions, calculation methods, challenges in interpreting social media user data and developing analytics, and analytics validation issues; (iii) sources of best practices in the development, validation, and disclosure and explanation of user metrics, and various business and marketing journals that address mobile application metrics; and (iv) materials published by organizations that evaluate non-financial metrics.

### C.    Settlement Negotiations

As the Settling Parties have informed the Court at the status conference held on May 9, 2019, and in joint stipulations submitted to the Court (the most recent of which was submitted January 24, 2020), the Settling Parties have been actively engaged in continued productive discussions aimed at potential resolution of the derivative actions.  These discussions culminated in a series of mediation sessions overseen by the Honorable Howard B. Wiener, former Associate Justice of the California Court of Appeal for the Fourth Appellate District, and former Judge of the Superior Court for San Bernardino County.

The first mediation session with Justice Wiener was held on April 1, 2019.  In advance of that mediation, Plaintiff Wolfson sent a settlement demand.  The proposed relief included a comprehensive set of corporate governance and internal controls reforms developed with the assistance of a consultant broadly recognized as a leading expert in the field of social media technology, strategy, and marketing analytics.  The parties submitted extensive mediation statements in advance of the April 1, 2019, mediation session.  Negotiations continued following the mediation.

On August 7, 2019, plaintiffs in *Shabbouei* sent Defendants a detailed settlement demand, including comprehensive and detailed corporate governance, internal controls, and oversight proposals.  Over the following seven weeks, counsel exchanged multiple drafts and information regarding the demand, and participated in a number of telephonic conferences, during which counsel reviewed in detail the facts regarding Snap's metrics development, validation, calculation, and internal controls systems; Pompliano's whistleblower claims; and Snap's DAU figures.

On September 26, 2019, the parties to all of the pending Derivative Actions participated in another in-person mediation session with Justice Wiener, at which the parties reached agreement in principle on the substantive terms of a settlement, including the corporate governance reforms enumerated in Exhibit A to this Stipulation (the "Corporate Governance Reforms").

Following their agreement on the substantive consideration for the settlement, the parties engaged in a process led by Justice Weiner to arrive at an agreement for a fair and reasonable fee and expense amount to be paid to Plaintiffs' Counsel commensurate with the benefits secured through the proposed settlement (the "Fee and Expense Amount"). Justice Wiener determined the Fee and Expense Amount, subject to this Court's approval.

Subsequently, the proposed settlement was presented to a committee of the Snap Board of Directors to which Snap's Board delegated authority to consider the Settlement (the "Committee"). Assisted by independent counsel with substantial experience in Delaware corporate law, the Committee determined that the Corporate Governance Reforms confer a substantial benefit on the Company, and approved the Settlement as fair, reasonable, and adequate, and in Snap and its stockholders' best interests.

Subject to approval of the Court, the Settling Parties agree that the Derivative Actions and the Released Claims shall be resolved as set forth herein.

## II.    PLAINTIFFS' CLAIMS AND THE BENEFITS OF SETTLEMENT

Plaintiffs and Plaintiffs' Counsel believe that the claims asserted in their actions have merit, and Plaintiffs' entry into this Stipulation and Settlement is not intended to be, and shall not be construed as, an admission or concession concerning the relative strength or merit of the claims alleged. Plaintiffs and Plaintiffs' Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Derivative Actions against the Settling Defendants through motion practice, trial, and potential appeals. Plaintiffs and Plaintiffs' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Actions, as well as the difficulties and delays inherent in such litigation. Plaintiffs and Plaintiffs' Counsel are also mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in the Derivative Actions.

Plaintiffs' Counsel have conducted extensive investigation and analysis during the development, prosecution, mediation, and settlement of the Derivative Actions which included, among other things: (i) the review and analysis of over 300,000 documents, consisting of approximately 1.5 million pages, of internal documents regarding the facts and circumstances at issue in the Derivative Actions; (ii) thousands of pages of Board- and Board-committee-level documents secured through inspection demands made pursuant to Section 220 of the Delaware General Corporation law; (iii) the review and analysis of relevant publicly available information regarding the facts and circumstances at issue in the Derivative Actions, including, but not limited to, Snap's filings with the Securities Exchange Commission (the "SEC"), its policies, conduct codes, corporate governance practices and procedures, and charters of the committees of its Board, as well as media reports, conferences with financial analysts and information regarding the definition, calculation, and reporting of KPIs by social media companies such as Snap; (iv) retained and consulted with Christopher S. Penn ("Penn"), a noted expert in the field of digital marketing and marketing technology, regarding the KPI issues in the Derivative Actions; (v) in-person interviews of key Snap executives regarding the matters at issue in this litigation, and remediation efforts; (vi) meetings with Defendants' counsel, including outside counsel representing the Company in the Pompliano civil whistleblower action; (vii) marshalling the facts gathered through a targeted investigation, together with their expert, to identify the key issues that Plaintiffs believe require remediation and the best means to achieve the remediation of those issues; and (viii) numerous discussions among the Settling Parties regarding the strengths and weaknesses of the claims and defenses in the Derivative Actions during the course of multiple mediation sessions.

Based on Plaintiffs' Counsel's thorough review and analysis of the relevant facts, allegations, defenses, and controlling legal principles, Plaintiffs' Counsel believe that the Settlement set forth in this Stipulation is fair, reasonable, and adequate, and confers substantial benefits upon Snap. Based upon Plaintiffs' Counsel's evaluation, Plaintiffs have determined that the Settlement is in the best interests of Snap and has agreed to settle the Derivative Actions upon the terms and subject to the conditions set forth herein.

1  **III.    DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY**

2        Each of the Settling Defendants denies each and every one of the claims and contentions

3  alleged by Plaintiffs as to him or her.  The Settling Defendants expressly deny all allegations of

4  wrongdoing or liability against them, arising out of, based upon, or related to any of the conduct,

5  statements, acts, or omissions alleged, or that could have been alleged, in the Derivative Actions.

6  Without limiting the foregoing, each of the Settling Defendants denies, among other things, that

7  they or any other current or former Snap directors or officers breached their fiduciary duties or any

8  other duty owed to Snap, or that Plaintiffs, Snap, or Snap's stockholders suffered any damage or

9  were harmed as a result of any conduct by him or her alleged in the Derivative Actions or

10  otherwise.  Each of the Settling Defendants has further asserted and continues to assert that at all

11  relevant times, he or she acted in good faith and in a manner he or she reasonably believed to be

12  in the best interests of Snap and its stockholders.

13        Nonetheless, taking into account the expense and uncertainty in continued litigation, the

14  benefits to Snap resulting from the Settlement, the Mediator's recommendation, and risks inherent

15  in any litigation, especially in complex cases like the Derivative Actions, the Settling Defendants

16  have determined that it is desirable and in the best interests of Snap that the Derivative Actions,

17  and all of the Settling Parties' disputes related thereto, be fully and finally settled in the manner

18  and upon the terms and conditions set forth in this Stipulation.

19        Pursuant to the terms set forth below, this Stipulation, including all of the commitments

20  and undertakings agreed to by the Settling Defendants, and all attached Exhibits hereto, shall in

21  no event be construed as, or deemed to be evidence of, an admission or concession by the Settling

22  Defendants with respect to any claim of fault, liability, wrongdoing, or damage whatsoever.

23  **IV.    TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT**

24        NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among

25  Plaintiffs (for themselves and derivatively on behalf of Snap), by and through Plaintiffs' Counsel,

26  and the Settling Defendants and Snap, by and through their attorneys of record, that in exchange

27  for the consideration set forth below, the Derivative Actions and Released Claims shall be fully,

28  finally, and forever compromised, settled, discharged, relinquished, and released, and the

Derivative Actions shall be dismissed with prejudice as to the Settling Defendants, upon and subject to the terms and conditions of this Stipulation, as follows:

**1. Definitions**

As used in this Stipulation, the following terms have the meanings specified below:

1.1 "Actions" or "Derivative Actions" means the stockholder derivative actions filed by: Plaintiff Barbara Wolfson on September 8, 2018, and captioned *Wolfson v. Spiegel*, No. BC720152, pending before the Superior Court; Plaintiff Justin Pokorney on December 21, 2018, and captioned *Pokorney v. Spiegel*, No. 18STCV09365, pending before the Superior Court; Plaintiffs David Shabbouei and Zalmon Uvaydov on March 12, 2019, and captioned *Shabbouei v. Spiegel*, No. 19STCV08413, pending before the Superior Court; Plaintiffs Justin Pokorney and Amelie Tseng on November 1, 2018, and captioned *Pokorney and Tseng v. Snap Inc.*, No. 2018-0778-SG, pending before the Court of Chancery. "Actions" or "Derivative Actions" also includes the Demand made by Charles Blackburn on October 3, 2018.

1.2 "Court" or "Superior Court" means the Superior Court of the State of California in and for the County of Los Angeles.

1.3 "Court Approval Order" means the Final Judgment and Order Approving Derivative Settlement, substantially in the form attached as Exhibit E hereto.

1.4 "Current Snap Stockholder" means any person or entity that has held Snap common stock as of the date of the execution of this Stipulation and continues to hold their Snap common stock through the date of the Final Hearing.

1.5 "Effective Date" means the first date by which all of the events and conditions specified in Section IV, ¶6.1 of this Stipulation have been met and have occurred.

1.6 "Final" means the time when the Judgment has not been reversed, vacated, or modified in any way and is no longer subject to appellate review, either because of disposition on appeal and conclusion of the appellate process or because of passage, without action, of time for seeking appellate review. More specifically, it is that situation when: (1) either no appeal has been filed and the time has passed for any notice of appeal to be timely filed in the Actions; or (2) an appeal has been filed and the court(s) of appeal has/have either affirmed the Judgment or

dismissed that appeal and the time for any reconsideration or further appellate review has passed and the appellate court mandate(s) has/have issued; or (3) a higher court has granted further appellate review and that court has either affirmed the underlying Judgment or affirmed the court of appeal's decision affirming the Judgment or dismissing the appeal.

1.7    "Judgment" means the judgment to be rendered by the Court in those Actions pending before the Court upon its final approval of the Settlement, substantially in the form attached as Exhibit E hereto.

1.8    "Plaintiffs" means plaintiffs Barbara Wolfson, Justin Pokorney, Amelie Tseng, David Shabbouei, Zalmon Uvaydov, and Charles Blackburn.

1.9    "Plaintiffs' Counsel" means any counsel that has appeared of record or rendered legal services to any of the Plaintiffs in connection with any of the Actions.

1.10    "Snap" or the "Company" means Snap Inc., including, but not limited to, its predecessors, successors, partners, joint ventures, subsidiaries, affiliates, divisions, and assigns.

1.11    "Person" means an individual, corporation, limited liability company, professional corporation, limited liability partnership, partnership, limited partnership, association, joint venture, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and each of their spouses, heirs, predecessors, successors, representatives, or assignees.

1.12    "Related Parties" means (i) as to Snap, Snap's past or present directors, officers, employees, partners, agents, attorneys, accountants, auditors, consultants, successors, subsidiaries, divisions, joint ventures, assigns, any entity in which Snap has a controlling interest, and all officers, directors, and employees of Snap's current and former subsidiaries; except that "Related Parties" shall not include Snap's insurance carriers, and (ii) as to the Settling Defendants, (1) each spouse, immediate family member, heir, executor, estate, administrator, agent, attorney, accountant, auditor, advisor, consultant, or affiliate of any of them, (2) any trust in respect of which any Settling Defendant, or any spouse or family member thereof serves as a settlor, beneficiary, or trustee, and (3) any entity in which a Settling Defendant, or any spouse or immediate family member thereof, holds a controlling interest or for which a Settling Defendant has served as an

employee, director, officer, managing director, advisor, general partner, limited partner, or member and any collective investment vehicle that is advised or managed by any of them.

1.13 "Released Claims" means all claims, demands, rights, liabilities, and claims for relief of every nature and description whatsoever, whether known claims or Unknown Claims (as set forth in Section IV, ¶1.18), that have been, or could have been, asserted in the Derivative Actions by Plaintiffs, Snap, or any Current Snap Stockholder derivatively on behalf of Snap against the Settling Defendants and Released Persons, based on the Settling Defendants' and/or the Released Persons' acts and/or omissions in connection with, arising out of, or relating to, any of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or failures to act that were alleged in the Derivative Actions. "Released Claims" shall not include (a) any claims by or on behalf of Snap against any of the carriers for its directors and officers insurance policies, (b) the right to enforce this Stipulation or the Settlement, including the award of fees and expenses referenced herein in Section IV, ¶5, and (c) any of the claims asserted in the Securities Class Actions: the federal class action, captioned *In re Snap Inc. Securities Litigation*, No. 2:17-cv-03679-SVW-AGR (the "Federal Securities Class Action"), and the two state class actions, *Hsieh v. Snap Inc.*, No. BC669394, and *Iuso v. Snap Inc.,* No. 17CIV03710 (the "State Class Actions").

1.14 "Released Persons" means the Settling Defendants, Snap, and their respective Related Parties.

1.15 "Settlement" means the terms and conditions contained in this Stipulation, including the Fee and Expense Amount.

1.16 "Settling Defendants" means the Individual Defendants Evan Spiegel, Robert Murphy, Michael Lynton, Joanna Coles, A.G. Lafley, Mitchell Lasky, Stanley Meresman, Scott D. Miller, Christopher Young, Poppy Thorpe, Andrew Vollero, and Imran Khan.

1.17 "Settling Parties" means, collectively, Plaintiffs, the Settling Defendants, and Snap.

1.18 "Stipulation" means this Stipulation of Settlement.

-13-

1.19 "Unknown Claims" means claims that Plaintiffs, Snap, or a Current Snap Stockholder does not know or suspect to exist at the time of the release of the Released Persons, that have been, or could have been, asserted in the Derivative Actions by Snap, Plaintiffs, or any Current Snap Stockholder derivatively on behalf of Snap against the Settling Defendants and Released Persons, including claims that, if known by him, her, or it, might have affected his, her, or its settlement with, and release of, the Released Persons, or might have affected his, her, or its decision not to object to this Settlement. With respect to any and all Released Claims, including with respect to any and all claims released pursuant to Section IV, ¶¶ 4.1-4.3, below, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs, Snap, and all Current Snap Stockholders shall be deemed to have, and by operation of the Judgment shall have, expressly waived any objection to the release of such claims. Plaintiffs, Snap, and each Current Snap Stockholder may hereafter discover facts in addition to or different from those that he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but they stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs, Snap, and each Current Snap Stockholder shall expressly waive and by operation of the Judgment, shall have, fully, finally, and forever settled and released, any and all of the Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts, that have been, or could have been, asserted in the Derivative Actions by Snap, Plaintiffs, or any Current Snap Stockholder derivatively on behalf of Snap against the Settling Defendants and Released Persons. **The Settling Parties acknowledge, and the Current Snap Stockholders shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of the Settlement of which this release is a part.**

2. **Terms of the Settlement**

Plaintiffs and Snap have agreed that the Company shall implement within ninety (90) days of final settlement approval, and maintain for a minimum period of three (3) years thereafter, the Corporate Governance Reforms detailed in Exhibit A. To the extent any of the Corporate Governance Reforms conflicts with any applicable law or rule of any relevant governmental body, self-regulatory organization, or national securities exchange, the Company will comply with such law or rule notwithstanding the provisions of the Stipulation of Settlement or any orders implementing the Settlement. In the event the Board makes such a determination, the Board shall (a) state the basis for its determination in a formal resolution; and (b) adopt modified or substitute measures designed to accomplish the same or similar purpose(s). Copies of any pertinent Board resolutions shall be provided to Plaintiffs' Counsel upon request.

Exhibit A is part of and subject to all provisions in the Stipulation of Settlement, including the Company's statement therein that it believes that it had in place at all relevant times reasonable controls regarding user metrics and other matters relevant to the Derivative Actions.

**3.      Procedure for Implementing the Settlement**

3.1      After execution of this Stipulation, Plaintiffs shall submit the Stipulation together with its Exhibits to the Court and shall move for entry of an order substantially in the form of Exhibit D hereto (the "Preliminary Approval Order"), requesting, among other things, the preliminary approval of the Settlement set forth in the Stipulation, and approval for the filing and publication of the Settlement Notice, substantially in the forms attached hereto as Exhibits B ("Long-Form Notice") and C ("Postcard Notice"; the Long-Form Notice and Postcard Notice collectively, the "Settlement Notice"), which shall include the general terms of the Settlement set forth in the Stipulation, the procedure for objecting to any terms of the Settlement, and the date of the Settlement Hearing as described below.

3.2      In accordance with the terms of the Preliminary Approval Order to be entered by the Court, within ten (10) business days following the Court's entry of the Preliminary Approval Order, Snap shall cause to be mailed, and/or emailed, the Postcard Notice to those Current Snap Stockholders as may be identified through reasonable effort. Within ten (10) business days of the entry of the Preliminary Approval Order, Snap shall also cause the Long-

Form Notice and Stipulation of Settlement to be posted on a dedicated website, www.SnapDerivativeSettlement.com. Within fourteen (14) days and again within twenty-one (21) days following the Court's entry of the Preliminary Approval Order, Plaintiffs' Counsel will publish the contents of the Postcard Notice in two separate electronic wire press releases. Within fourteen (14) days of the entry of the Preliminary Approval Order, Plaintiffs' Counsel will also post the Long-Form Notice, together with the Stipulation, on each of their respective firm websites.

3.3     At least thirty (30) days prior to the Final Hearing, Snap's Counsel will file a declaration with the Court attesting to the timely posting of the Long-Form Notice in accordance with the terms of the Preliminary Approval Order. Also at least thirty (30) days prior to the Final Hearing, Plaintiffs' Counsel will file a declaration with the Court attesting to the timely posting of Long-Form Notice in accordance with the terms of the Preliminary Approval Order.

3.4     The Defendants will use JND Legal Administration (the "Notice Administrator") to disseminate the Postcard Notice. On December 2, 2020, the Notice Administrator will file a report with the Court attesting to the timely mailing of the Postcard Notice in accordance with the terms of the Preliminary Approval Order as well as other relevant details regarding the mailing.

3.5     Other than Plaintiffs' publication of the contents of the Postcard Notice in two separate electronic wire press releases and the posting of the Long-Form Notice on Plaintiffs' Counsel's respective firm websites, Defendants shall bear all costs of providing Notice in the manner ordered by the Court.

3.6     Within fourteen (14) days following the Court's entry of the Preliminary Approval Order, Plaintiff Amelie Tseng and her counsel shall cause the *Tseng* Action, pending in the Delaware Court of Chancery, to be dismissed with prejudice.

3.7     Plaintiffs will also request that forty-five (45) days after the Settlement Notice is given—or at such other time as is convenient to the Court—the Court hold a joint hearing in the Actions (the "Settlement Hearing") to consider and determine whether the Final Order and Judgment, substantially in the form of Exhibit E hereto, should be entered: (a) approving the terms

of the Settlement as fair, reasonable, and adequate; and (b) dismissing with prejudice the Actions against the Settling Defendants.

3.8    Pending the Effective Date, all proceedings in the Actions shall be stayed except as otherwise provided herein, and the Settling Parties shall not file or prosecute any other actions or proceedings relating to the Settlement.

**4.    Releases**

4.1    Upon the Effective Date, as defined in Section IV, ¶1.5, Snap, Current Snap Stockholders, or any Person acting on behalf of Snap, and Plaintiffs (acting on their own behalves or derivatively on behalf of Snap) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged and dismissed with prejudice the Released Claims against the Released Persons and any and all causes of action or claims (including Unknown Claims) that have or could have been asserted in the Actions by Plaintiffs, Snap, or any Current Snap Stockholder derivatively on behalf of Snap, against the Settling Defendants or the Released Persons, based on the Settling Defendants' or Released Persons' acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or failures to act that were alleged in the Derivative Actions, through and including the date of execution of this Stipulation.  Nothing herein shall in any way impair or restrict the rights of any Settling Party or any other Released Person to enforce the terms of the Stipulation.

4.2    Upon the Effective Date, as defined in Section IV, ¶1.5, Snap, Current Snap Stockholders, or any Person acting on behalf of Snap, and Plaintiffs (acting on their own behalves and derivatively on behalf of Snap and its stockholders) shall be forever barred, estopped, and enjoined from commencing, instituting, or prosecuting any of the Released Claims against any of the Released Persons or any action or other proceeding against any of the Released Persons arising out of, relating to, or in connection with the Released Claims, the Actions, or the filing, prosecution, defense, settlement, or resolution of the Actions.  Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

4.3     Upon the Effective Date, as defined in Section IV, ¶1.5, each of the Released Persons and the Related Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs and Plaintiffs' Counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Actions or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

**5.     Attorneys' Fees and Reimbursement of Expenses**

5.1     After negotiating and agreeing upon the principal terms of the Settlement, Plaintiffs' Counsel and Snap, acting by and through its counsel, with the assistance of the mediator, Justice Wiener, separately negotiated the attorneys' fees and expenses the Company would pay or cause to be paid to Plaintiffs' Counsel. In light of the substantial benefits conferred by Plaintiffs' Counsel's efforts, Snap, acting by and through its Board of Directors, has agreed to pay or cause to be paid $7.5 million, subject to Court approval.

5.2     Within thirty (30) calendar days following the Court's issuance of the Court Approval Order giving final approval to the Settlement or the order awarding the attorneys' fees and expenses, whichever is later, notwithstanding the existence of any timely filed objections to the Settlement, or potential for appeal therefrom, Snap shall pay or cause its insurers directly to pay the Fee and Expense Amount awarded by the Court to an account controlled by Plaintiffs' Counsel, which Plaintiffs and Plaintiffs' Counsel agree shall be allocated among Plaintiffs' Counsel in accordance with Justice Wiener's determination. If, as a result of any further order of the Court or as a result of any appeal, remand, or successful collateral attack, the Effective Date does not occur or if the Fee and Expense Amount is not approved or is modified or overturned, in whole or in part, then Plaintiffs' Counsel shall be responsible for repayment to Snap and/or to Snap's insurers of the Fee and Expense Amount. Neither Snap nor any other Released Persons shall have any obligations with respect to Plaintiffs' Counsel's fees and/or expenses beyond the Fee and Expense Amount.

5.3     Upon receipt of the Fee and Expense Amount, each of Plaintiffs' Counsel shall pay or cause to be paid a Service Award in an amount not to exceed $2,500 to each of the Plaintiffs that they have represented in the Derivative Actions.  The Service Award shall be subject to Court review and approval and paid from (not in addition to) the Fee and Expense Amount, in consideration of the respective Plaintiffs' service in the Derivative Actions.  Neither Snap nor any other Released Persons shall have any obligations with respect to any Service Awards.

**6.     Conditions of Settlement, Effect of Disapproval, Cancellation, or Termination**

6.1     The Effective Date shall be conditioned on the occurrence of all of the following events:

a.     the Snap Board of Directors has approved the Settlement and each of its terms, including the separately negotiated Fee and Expense Amount;

b.     *Tseng* has been dismissed with prejudice and the dismissal has become Final;

c.     the Court has entered the Court Approval Order and Judgment, substantially in the form of Exhibit E attached hereto; and

d.      the Judgment has become Final.

6.2     If any of the conditions specified in Section IV, ¶6.1 are not met, then the Stipulation of Settlement shall be canceled and terminated subject to the provisions of this Section IV, ¶6.2, unless counsel for the Settling Parties mutually agree in writing to proceed with an alternative or modified Stipulation and submit it for Court approval.  If for any reason the Effective Date does not occur, or if this Stipulation is terminated, canceled, or otherwise fails to become effective for any reason:

a.     the Settling Parties, Released Persons, and Related Parties shall be restored to their respective positions that existed immediately prior to the date of execution of this Stipulation;

b.     all negotiations, proceedings, documents prepared, and statements made in connection with this Stipulation shall be without prejudice to the Settling Parties, shall not be deemed or construed to be an admission by a Settling Party of any act, matter, or proposition,

-19-

and shall not be used in any manner for any purpose (other than to enforce the terms remaining in effect) in any subsequent proceeding in the Actions or in any other action or proceeding; and

c.     the terms and provisions of the Stipulation — with the exception of the provisions of Section IV, ¶5.2 and Section IV, ¶6.2 — shall have no further force and effect with respect to the Settling Parties and shall not be used in the Actions or in any other proceeding for any purpose, and any judgment or orders entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*.

6.3     No order of the Court or modification or reversal on appeal of any order of the Court concerning the amount of attorneys' fees, costs, expenses, and interest awarded by the Court to Plaintiffs' Counsel shall constitute grounds for cancellation or termination of the Stipulation, affect the enforceability of the Stipulation, or delay or preclude the Judgment from becoming Final.

**7.     Miscellaneous Provisions**

7.1     The Settling Parties (a) acknowledge that it is their intent to consummate the terms and conditions of the Stipulation; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation.

7.2     The Settling Parties intend this Settlement to be a final and complete resolution of all disputes between Plaintiffs and Snap and all Current Snap Stockholders, on the one hand, and the Released Persons, on the other hand, arising out of, based upon, or related to the Released Claims.  The Settlement compromises claims that are contested and shall not be deemed an admission by any Settling Party or Released Person as to the merits of any claim, allegation, or defense.  The Settling Parties further agree that the Released Claims are being settled voluntarily after consultation with competent legal counsel and an experienced mediator.

7.3     Pending the Effective Date, the Settling Parties agree not to initiate any proceedings concerning the Released Claims other than those incident to the Settlement itself; provided, however, that Snap and the Settling Defendants may seek to prevent or stay any other action or claims brought seeking to assert any Released Claims.

7.4     Neither the Stipulation nor the Settlement, including any Exhibits attached hereto, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement:  (a) is or may be deemed to be or may be offered, attempted to be offered or used in any way as a concession, admission, or evidence of the validity of any Released Claims, or of any fault, wrongdoing, or liability of the Released Persons or Snap; or (b) is or may be deemed to be or may be used as a presumption, admission, or evidence of, any liability, fault, or omission of any of the Released Persons or Snap in any civil, criminal, administrative, or other proceeding in any court, administrative agency, tribunal, or other forum.  Neither this Stipulation nor the Settlement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Released Persons may file or use the Stipulation, the Court Approval Order, and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, full faith and credit, release, good faith settlement, standing, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

7.5     All agreements made and orders entered during the course of the Actions relating to the confidentiality of information or sealing of documents shall survive this Stipulation and the Judgment.

7.6     All Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

7.7     This Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

7.8     This Stipulation and the Exhibits attached hereto constitute the entire agreement among the Settling Parties, and no representations, warranties, or inducements have been made to any Settling Party concerning the Stipulation and/or any of its Exhibits, other than the representations, warranties, and covenants contained and memorialized in such documents. The Stipulation supersedes and replaces any prior or contemporaneous writing, statement, or understanding pertaining to the Actions and no parole or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Settling Parties or their counsel, or the

circumstances under which the Stipulation was made or executed. It is understood by the Settling Parties that, except for matters expressly represented herein, the facts or law with respect to which this Stipulation is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of facts or law turning out to be different, and agrees that this Stipulation shall be in all respects effective and not subject to termination by reason of any such different facts or law.

7.9　　Except as otherwise expressly provided herein, all parties, including all Settling Defendants, their counsel, Snap and its counsel, and Plaintiffs, and Plaintiffs' Counsel shall bear their own fees, costs, and expenses.

7.10　　Counsel for the Settling Parties are expressly authorized by their respective clients to take all appropriate actions required or permitted to be taken pursuant to the Stipulation to effectuate its terms and conditions.

7.11　　Plaintiffs represent and warrant they have not assigned or transferred, or attempted to assign or transfer, to any Person any Released Claim or any portion thereof or interest therein.

7.12　　Each counsel or other Person executing this Stipulation or any of its Exhibits on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

7.13　　Any failure by any party to this Stipulation to insist upon the strict performance by any other party of any of the provisions of the Stipulation shall not be deemed a waiver of any of the provisions, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of the Stipulation to be performed by such other party.

7.14　　The Stipulation and Exhibits may be executed in one or more counterparts. A faxed or pdf signature shall be deemed an original signature for purposes of this Stipulation. All executed counterparts including facsimile and/or pdf counterparts shall be deemed to be one and the same instrument. A complete set of counterparts, either originally executed or copies thereof, shall be filed with the Court.

1      7.15    This Stipulation shall be binding upon, and inure to the benefit of, the
Settling Parties and the Released Persons and their respective successors, assigns, heirs, spouses, marital communities, executors, administrators, trustees in bankruptcy, and legal representatives.

      7.16    Without affecting the finality of the Judgment entered in accordance with this Stipulation, the Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, the Court Approval Order, and the Judgment, and the Settling Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in the Stipulation, the Court Approval Order, and the Judgment and for matters arising out of, concerning, or relating thereto. In the event that a dispute arises between or among any of the Settling Parties, Released Persons, and/or Plaintiffs or Plaintiffs' Counsel concerning the subject matter or any term of this Stipulation, the Settling Parties agree that such dispute shall be mediated in good faith before the mediator, Justice Wiener or, if Justice Wiener is not available, another competent mediator to be agreed upon by the Parties. Only after the Settling Parties and the mediator determine that mediation of such dispute has failed shall relief be sought through a proceeding before the Court.

      7.17    This Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the Settling Parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal substantive laws of the State of California without giving effect to California's choice-of-law principles.

IN WITNESS WHEREOF, the Settling Parties have caused the Stipulation to be executed, by themselves and/or by their duly authorized attorneys, dated August 12, 2020.

DATED: ~~August~~ Sept. 27, 2020

WILSON SONSINI GOODRICH & ROSATI, P.C.

_(signature)_

Ignacio E. Salceda
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: isalceda@wsgr.com

*Attorneys for Defendants*

DATED: August __, 2020

_____
EVAN SPIEGEL

DATED: August __, 2020

_____
ROBERT MURPHY

DATED: August __, 2020

_____
MICHAEL LYNTON

DATED: August __, 2020

_____
JOANNA COLES

DATED: August __, 2020

_____
A.G. LAFLEY

DATED: August __, 2020

_____
MITCHELL LASKY

-24-

DATED: August __, 2020

_____
STANLEY MERESMAN

DATED: August __, 2020

_____
SCOTT D. MILLER

DATED: August __, 2020

_____
CHRISTOPHER YOUNG

DATED: August __, 2020

_____
ANDREW VOLLERO

DATED: August __, 2020

_____
IMRAN KHAN

DATED: August __, 2020          WEISSLAW LLP

*John Rubin*
_____
Joseph H. Weiss
David C. Katz
Joshua M. Rubin
1500 Broadway, 16th Fl
New York, NY 10036
Telephone: (212) 682-3025
Email: jweiss@weisslawllp.com
        dkatz@weisslawllp.com
        jrubin@weisslawllp.com

WEISSLAW LLP
Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: (310) 208-2800
Email: jelkins@weisslawllp.com

*Attorneys for Plaintiff Barbara Wolfson*

DATED: August __, 2020          *Barbara Wolfson*
                                Barbara Wolfson (Oct 1, 2020 13:03 EDT)
                                _____
                                BARBARA WOLFSON

-25-

DATED: August ~~__~~, 2020     *(handwritten: October 1)*

**GAINEY McKENNA & EGLESTON**

*/s/ Thomas J. McKenna*

Thomas J. McKenna

THOMAS J. McKENNA
tjmmckenna@gme-law.com
GREGORY M. EGLESTON
gegleston@gme-law.com
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: 212/983-1300

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorneys for Plaintiffs Justin Pokorney and Amelie Tseng*

DATED: August ___, 2020

Justin J Gui[...] Pokorney [Oct 1, 2020 12:36 CDT]

JUSTIN POKORNEY

DATED: August ___, 2020     *(handwritten: Oct 1, 2020)*

AMELIE TSENG

-26-

**STIPULATION AND AGREEMENT OF SETTLEMENT**
CASE NOS. BC720152, 18STCV09365, 19STCV08413

1    DATED: October 1, 2020          ROBBINS LLP

2

3                                    _____
                                     Shane P. Sanders
4
                                     BRIAN J. ROBBINS
5                                    CRAIG W. SMITH
                                     SHANE P. SANDERS
6                                    5040 Shoreham Place
                                     San Diego, CA 92122
7                                    Telephone: (619) 525-3990
                                     Facsimile: (619) 525-3991
8                                    E-mail:  brobbins@robbinsllp.com
                                             csmith@robbinsllp.com
9                                            ssanders@robbinsllp.com

10                                   *Attorneys for Plaintiffs David Shabbouei and*
                                     *Zalmon Uvaydov*
11              10/9/2020
                                     ┌─ DocuSigned by: ─┐
12   DATED: October __, 2020         │ David Shabbouei  │
                                     └─ 4EADE41C63AE4ED ─┘
13                                   DAVID SHABBOUEI

14   DATED: October __, 2020

15                                   _____
                                     ZALMON UVAYDOV
16
     DATED: October __, 2020         PROMISLOFF LAW, P.C.
17

18                                   _____
                                     David M. Promisloff
19
                                     DAVID M. PROMISLOFF
20                                   5 Great Valley Parkway, Suite 210
                                     Malvern, PA 19355
21                                   Telephone: (215) 259-5156
                                     Facsimile: (215) 600-2642
22                                   E-mail:  david@prolawpa.com

23                                   *Attorneys for Charles Blackburn*

24
     DATED: October __, 2020
25                                   _____

26                                   CHARLES BLACKBURN

27

28

STIPULATION AND AGREEMENT OF SETTLEMENT
CASE NOS. BC720152, 18STCV09365, 19STCV08413

DocuSign Envelope ID: 82B3C680-62FD-4D0B-8390-8AECC8BE1E82

1   DATED: October 1, 2020          ROBBINS LLP

2

3                                    _____
                                     Shane P. Sanders
4
                                     BRIAN J. ROBBINS
5                                    CRAIG W. SMITH
                                     SHANE P. SANDERS
6                                    5040 Shoreham Place
                                     San Diego, CA 92122
7                                    Telephone: (619) 525-3990
                                     Facsimile: (619) 525-3991
8                                    E-mail:  brobbins@robbinsllp.com
                                              csmith@robbinsllp.com
9                                             ssanders@robbinsllp.com

10                                   *Attorneys for Plaintiffs David Shabbouei and*
                                     *Zalmon Uvaydov*
11
12  DATED: October __, 2020

13                                   _____
            10/1/2020                DAVID SHABBOUEI

14  DATED: October __, 2020

15                                   _____
                                     ZALMON UVAYDOV
16
    DATED: October __, 2020          PROMISLOFF LAW, P.C.
17

18
                                     _____
19                                   David M. Promisloff

20                                   DAVID M. PROMISLOFF
                                     5 Great Valley Parkway, Suite 210
21                                   Malvern, PA 19355
                                     Telephone: (215) 259-5156
22                                   Facsimile: (215) 600-2642
                                     E-mail:  david@prolawpa.com
23
                                     *Attorneys for Charles Blackburn*
24
    DATED: October __, 2020
25
                                     _____
26                                   CHARLES BLACKBURN

27

28

STIPULATION AND AGREEMENT OF SETTLEMENT
CASE NOS. BC720152, 18STCV09365, 19STCV08413

1    DATED: August __, 2020              ROBBINS LLP

2

3                                        _____
                                         Shane P. Sanders
4
                                         BRIAN J. ROBBINS
5                                        CRAIG W. SMITH
                                         SHANE P. SANDERS
6                                        5040 Shoreham Place
                                         San Diego, CA 92122
7                                        Telephone: (619) 525-3990
                                         Facsimile: (619) 525-3991
8                                        E-mail: brobbins@robbinsllp.com
                                                 csmith@robbinsllp.com
9                                                ssanders@robbinsllp.com

10                                       *Attorneys for Plaintiffs David Shabbouei and
                                         Zalmon Uvaydov*
11

12   DATED: August __, 2020              _____

13                                       DAVID SHABBOUEI

14   DATED: August __, 2020              _____

15                                       ZALMON UVAYDOV

16
     DATED: August __, 2020              PROMISLOFF LAW, P.C.
17

18                                       _____
                                         David M. Promisloff
19
                                         DAVID M. PROMISLOFF
20                                       5 Great Valley Parkway, Suite 210
                                         Malvern, PA 19355
21                                       Telephone: (215) 259-5156
                                         Facsimile: (215) 600-2642
22                                       E-mail: david@prolawpa.com

23                                       *Attorneys for Charles Blackburn*

24              OCTOBER
     DATED: ~~August~~ 1, 2020           _____
25                                       Charles Blackburn

26                                       CHARLES BLACKBURN

27

28

Exhibit A to Stipulation of Settlement

**Exhibit A to Stipulation of Settlement**

Plaintiffs and Snap Inc. (the "Company") have agreed that the Company shall implement within ninety days of final settlement approval, and maintain for a minimum period of three years thereafter, the corporate governance measures detailed below ("Corporate Governance Measures"). The Company acknowledges that the efforts of the plaintiffs in each of *Wolfson v. Spiegel et al.* and *Shabbouei v. Spiegel et al.* were material factors in the Company's decision to implement and maintain these measures, and that the measures confer substantial benefits on the Company and its stockholders. To the extent any of the Corporate Governance Measures conflicts with any applicable law or rule of any relevant governmental body, self-regulatory organization or national securities exchange, the Company will comply with such law or rule notwithstanding the provisions of the Stipulation of Settlement or any orders implementing the Settlement. In the event the Board makes such as determination, the Board shall (a) state the basis for its determination in a formal resolution; and (b) adopt modified or substitute measures designed to accomplish the same or similar purpose(s). Copies of any pertinent Board resolutions shall be provided to Plaintiffs' Counsel upon request.

This Exhibit A is part of and subject to all provisions in the Stipulation of Settlement, including the Company's statement therein that it believes that it had in place at all relevant times reasonable controls regarding user metrics and other matters relevant to Plaintiffs' complaint.

# I. USER METRICS OVERSIGHT AND CONTROLS

## A. Annual Review

1.      The Company, at the request of the Audit Committee of the Company's Board of Directors (the "Board"), shall retain an arms-length, third-party auditor with relevant expertise and experience in non-financial performance indicators (the "Metrics Advisor") to perform annual reviews of policies and procedures used to calculate the Company's Top-Level Metrics to ensure analytical validity, adherence to evolving industry best practices, and appropriate presentation,

explanation, and qualification of such metrics, and to confirm the adequacy of the Company's internal controls (the "Annual Review"). Before relying on the advice of the Metrics Advisor, the Audit Committee shall oversee an appropriate search and vetting process to confirm the Metrics Advisor's lack of bias, qualifications and experience to ensure that the Metrics Advisor's analyses and recommendations may be reasonably relied upon by the Company's management and the Board. "Top Level Metrics" shall mean Daily Active Users ("DAU") and at least two other Snapchat user metrics that the Company regularly reports to investors and characterizes as key signals of business health. The first Annual Review shall be completed in advance of the Company's Form 10-K filing for the first full fiscal year that commences after the Effective Date, provided that, if after searching in good faith the Audit Committee cannot identify a Metrics Advisor with the requisite expertise, experience and lack of bias to review certain of the Top-Level Metrics, the Audit Committee may delay completion of the Annual Review with respect to those Top-Level Metrics for up to one year, but must timely complete the Annual Review with respect to the remaining Top-Level Metrics for which it has identified a Metrics Advisor with the requisite expertise, experience, and lack of bias.

2.    During the Annual Review, the Metrics Advisor shall, in conjunction with the Company's internal auditor, assess the Top-Level Metrics and ensure that the Company has reliable estimates of (i) error rates and ranges of variance; and (ii) to the extent applicable, the impact of duplicate/false accounts, spam, and malicious automation.

3.    The Metrics Advisor shall provide the results of the Annual Review, along with recommendations for improvements in data collection, methodology, and disclosures, if any, to the Company's Disclosure Committee and internal auditor. The Disclosure Committee shall report its decisions with respect to these recommendations to the Audit Committee.

4.      The results of the Annual Review also shall be provided by the Metrics Advisor directly to the Audit Committee.  The Audit Committee shall discuss with the Metrics Advisor (including in executive session if the Audit Committee so chooses) the nature of the Annual Review and the Metrics Advisor's findings and recommendations.

**B.      Internal Audit Validation of Disclosed Metrics**

1.      The Company shall document a control mandating that Snap's internal auditor will continue, at least annually, to review the Company's calculations of Top-Level Metrics, and will report any material issues to the Audit Committee.

2.      Any material errors in previously publicly-reported Top-Level Metrics in the Company's U.S. Securities and Exchange Commission ("SEC")-filed documents found in the course of the reviews described in I.A. and I.B.1 above shall be disclosed by the Company in its next Form 10-Q or Form 10-K filed with the SEC or on a Form 8-K, as appropriate, along with an explanation, if available, of (i) the errors; (ii) their materiality; and (iii) any remedial steps undertaken by the Company in response.

3.      The Company shall document a control mandating that its internal auditor will continue to review, on an annual basis, the error rate and variance, if any, in the Company's Top-Level Metrics, and report its results to the Company's Disclosure Committee and Audit Committee. The Disclosure Committee shall consider whether this error rate and variance are material and should be disclosed in the Company's external reporting, and shall report its conclusions to the Audit Committee.

4.      The Company shall document a control mandating that its internal auditor will continue to review, on an annual basis, the impacts, if any, of duplicate accounts and spam on the Company's Top-Level Metrics, and report its results to the Company's Disclosure Committee and Audit Committee. The Disclosure Committee shall consider whether these impacts are material and

should be disclosed in the Company's external reporting, and shall report its conclusions to the Audit Committee.

5. Drawing upon input received from the Metrics Advisor as part of its Annual Review, the Disclosure Committee shall, at least annually, identify and evaluate significant trends or developments in the Company's user metrics that may have a material impact on the Company's future operational or financial performance. The Disclosure Committee shall prepare a report and present any recommendations with respect to the Company's external reporting obligations to the Audit Committee.

C. **Audit Committee Response to Metrics Reports**

1. In the event the Metrics Advisor disagrees in the Annual Review with management's policies and procedures for calculating Top-Level Metrics, or the adequacy of the accompanying explanations or qualifications, the Disclosure Committee, in conjunction with the Audit Committee, shall evaluate the Metrics Advisor's report and determine (i) the Company's disclosure obligations, if any, and (ii) appropriate remedial actions, if any.

D. **Other Metrics-Related Measures**

1. The Company shall extend the standards of the Information Technology Governance and Controls ("ITGC") framework, as applicable, to elements of user metric data, and shall provide the Audit Committee, at least biennially, an update on the extent of the ITGC implementation.

2. Appropriate management designees and the Disclosure Committee shall review at least annually whether additional or alternative measures of user activity should be tracked and disclosed in order to fairly present, qualify, or contextualize the Company's business and operations. Management shall present the Board or a committee of the Board with recommendations based on this review.

3.     The Company shall discuss at the Disclosure Committee, and annually before the Board or a committee of the Board, the types, and short-term and long-term results, of user growth initiatives that Snap undertakes.  The Disclosure Committee shall evaluate the need for additional disclosures to fairly describe and contextualize the impact of such initiatives on reported Top Level Metrics.

4.     If the Company decides to report a previously unreported user metric in a Form 10-K or Form 10-Q filed with the SEC (or any document incorporated by reference therein), management shall discuss with the Audit Committee at the next available opportunity the metric, its definition, controls in place around it, and the purpose of its proposed disclosure.  Management also shall consult with the Metrics Advisor during the next Annual Review on the metric, the purpose of its disclosure, and whether it is sufficiently important to the Company that the Company should consider elevating it to a Top-Level Metric.  The initial publication of any new user metric in a Form 10-K or Form 10-Q filed with the SEC shall include a complete definition and a description of its potential utility to investors, along with any appropriate qualifications or warnings.

5.     With respect to the Company's existing internal validation of its Top-Level Metrics: The Company shall document processes mandating that it continues to engage in the following types of internal validation and control: (a) secondary indicator event checks; (b) event instrumentation protections; (c) reasonable QA processes, including QA signoff prior to relevant releases; (d) manual and automated QA testing; (e) session invariant checks; and (f) data loss and trend alarms.  The Company's Data Team shall report to the Audit Committee on the extent of that documentation within six months of the Effective Date.  If the documentation is not complete at that time, the Audit Committee shall require management to develop and implement an appropriate remedial and follow-up plan.

6.     The Company shall endeavor to participate in relevant self-regulatory bodies or industrywide meetings that deal with industry user metrics, and will strive to be an industry leader regarding the accurate reporting of user metrics.

## II.     ENHANCED AUDIT AND DISCLOSURE COMMITTEE RESPONSIBILITIES

### A.     Audit Committee

1.     The Disclosure Committee Charter shall continue to provide that the Disclosure Committee will provide periodic reports to the Audit Committee.  A representative of the Disclosure Committee shall participate in meetings with the Audit Committee, and the Audit Committee shall evaluate the representative's reports regarding matters of significance to the Company's public reporting.

2.     The Audit Committee shall meet with the Metrics Advisor and review its Annual Review and other findings, including any findings of disagreement between the Metrics Advisor and management about the materiality of issues regarding user metrics or controls.

3.     In the event the Metrics Advisor identifies significant areas of concern with respect to the Company's policies and procedures for calculating user metrics, their validity and accuracy, or the adequacy of the accompanying explanations or qualifications published with respect thereto, the Audit Committee shall, in conjunction with the Disclosure Committee, evaluate appropriate remedial measures and disclosure obligations with respect to those concerns.

4.     The Audit Committee shall receive and review regular progress reports from appropriate members of Company management as often as the Audit Committee deems warranted under the circumstances that detail the Company's progress in addressing the Metrics Advisor's recommendations. The Audit Committee shall have access to and be able to discuss (including in executive session if the Audit Committee so chooses) with the Metrics Advisor the nature of the review, its findings, and its recommendations.

5.     The Audit Committee Charter and other Company policies will be amended as necessary to ensure that the Audit Committee has access to Company personnel and records to effectively oversee and monitor the Company's efforts to fulfill its disclosure obligations regarding the calculations and public disclosures of the Company's user metrics, other non-financial metrics, and other issues that may have a significant impact on the Company's performance. The Company's policies will provide mechanisms for periodic and ad hoc reporting to the Audit Committee and the Disclosure Committee by the operational units in which such matters may arise.

6.     The Audit Committee shall continue to receive and review the internal auditor's written reports regarding user metrics, as described above, and any material weaknesses identified in its review.

7.     Relevant Company documents shall be amended as necessary to reflect that all Company employees must cooperate with Audit Committee investigations, and that any failure to cooperate shall be grounds for discipline, including, but not limited to, termination, in the sole discretion of the Board.

**B.     Disclosure Committee**

1.     The Disclosure Committee charter shall ensure that at least the following individuals continue to be represented on the Disclosure Committee: corporate controller, the chief legal officer or general counsel (the "CLO") or other legal counsel with responsibility for disclosure matters, the principal risk management officer, the investor relations director, and any other employees who are knowledgeable about the Company's business units and deemed necessary or appropriate by the Company's management.

2.     The Audit Committee may recommend additional members to the Disclosure Committee as it deems appropriate.

3.     The Disclosure Committee may invite other Company personnel, outside auditors, outside counsel, or other outside advisors to attend its meetings, as it deems necessary and appropriate to perform its duties and responsibilities.

4.     The Disclosure Committee charter shall ensure that the following responsibilities continue to be assigned to the Committee:

(a)     Public Disclosure Review

(i)     Evaluating the materiality of information and events relating to or affecting the Company, and determining the timing and appropriate method of disclosure of information deemed material, particularly as it relates to the Company's public disclosures and underlying calculations concerning user metrics and related data provided to the Company's stockholders;

(ii)     Reviewing in advance the Company's quarterly earnings press release and related materials (such as analyst conference call scripts) to determine the adequacy and accuracy of the disclosures included therein; and

(iii)     Reviewing in advance, in conjunction with the Audit Committee, each Form 10-K and Form 10-Q to be filed by the Company with the SEC, to determine the adequacy and accuracy of the disclosures included therein.

(b)     Evaluation of Metrics Disclosures

(i)     Evaluating the Company's public disclosures in each Form 10-Q and Form 10-K and disclosure-related internal controls specifically with respect to user metrics and other non-financial performance metrics, as well as any other potentially material issues with respect to the Company's public disclosures and disclosure-related internal controls;

(ii)     Ensuring that a representative participates in Audit Committee meetings, along with the Metrics Advisor, as appropriate, to discuss (a) the Company's continued

development of reliable estimates of error rates and ranges of variance in the Company's Top-Level Metrics, including, for example, the impact of duplicate accounts and spam; (b) the identification and timely and appropriate disclosure of significant trends or important developments in the Company's user metrics that may have a significant or material impact on the Company's future operational or financial performance, and evaluation of whether such user metrics merit public disclosure and explanation, as required by applicable law; and (c) any other potentially material issues relating to the Company's user metrics.

5.     The Company shall ensure that, before the Company files a Form 10-K or a Form 10-Q with the SEC, the Company's Disclosure Committee members continue to have the opportunity to review and discuss the material disclosures in such reports.

6.     The Company shall ensure that the Disclosure Committee charter continues to require that before each Form 10-K and Form 10-Q filing, a representative of the Disclosure Committee communicates to the Audit Committee the results of the Disclosure Committee discussion regarding material disclosures.

7.     The Company shall ensure that the members of the Disclosure Committee (i) are trained at least biennially on the Company's whistleblower hotline and other means of reporting alleged financial or public reporting misconduct and (ii) are encouraged as part of that training to report any Form 10-K or Form 10-Q disclosures that they believe to be inaccurate.

### III.     WHISTLEBLOWERS

1.     Company management shall ensure that the Company continues to have a Board-adopted formal written policy protecting whistleblowers (the "Whistleblower Policy").

2.     The Company's Whistleblower Policy shall be amended as necessary to ensure that it:

(a)     Encourages interested parties to bring forward ethical and legal violations, and/or a reasonable belief that ethical and legal violations have occurred, to the Audit Committee, the Integrity & Compliance Department, the Company's chief compliance officer ("CCO"), the CLO, or the Company's third-party operated whistleblower hotline, so that action may be taken to investigate and resolve the problem.  These complaints shall be reviewed by the Integrity & Compliance Department, the Legal Department, the Audit Committee, and/or the full Board, as warranted.

(b)     Communicates that Snap is serious about its policies and that whistleblowing is an important tool in achieving its goal of creating multiple ways for its employees to raise concerns.

3.     The Whistleblower Policy must notify employees and directors of the following:

(a)     Employees are subject to criminal penalties, including imprisonment, for retaliation against whistleblowers;

(b)     Whistleblower complaints may be directed to the Integrity & Compliance Department, Legal Department, Audit Committee, CCO, CLO, or the whistleblower hotline, and the complaints will be handled in confidence to the greatest degree possible;

(c)     If a whistleblower brings his or her complaint to an outside regulator or other governmental entity having jurisdiction over the Company, he or she will be protected by the terms of the Whistleblower Policy just as if he or she directed the complaint to the Integrity & Compliance Department, Legal Department, Audit Committee, CCO, CLO, or the whistleblower hotline;

(d)     If an employee is subject to an adverse employment decision as a result of a good faith whistleblower notification, the employee may file a complaint with the United States

Department of Labor within 90 days of the alleged violation (a failure to report such claims within the 90-day window does not foreclose any other available legal remedy); and

(e)     It is both illegal and against Snap's policy to discharge, demote, suspend, threaten, intimidate, harass, or in any manner discriminate against whistleblowers.

4.     The Company shall ensure that its whistleblower online reporting hotline continues to be available internationally, and shall expand phone access to the whistleblower hotline so it is also available internationally.

5.     The Audit Committee shall receive a quarterly report on whistleblower hotline usage trends.

6.     The Audit Committee shall receive a quarterly report on statistics regarding the results of whistleblower complaints (i.e., the percentage that led to investigation, the percentage referred to Human Resources, etc.).

7.     The CCO or other appropriate person shall make timely, pre-investigation reports to either the chair of the Audit Committee or the chair of the Board, as appropriate, of any whistleblower allegations involving alleged Material Risks. "Material Risks," shall mean actions or omissions that, if proven, likely would result in a material loss to the Company arising from a restatement of earnings, regulatory inquiry, or criminal investigation.

8.     The Company shall ensure on an ongoing basis that the relevant teams have effective, updated processes and procedures to triage and assess whistleblower calls.

9.     The Company shall formalize its current process of publicizing internally the various means by which employees can file complaints and reports, through the whistleblower hotline and otherwise.  The Company shall post information regarding its whistleblower hotline on its website and make clear that it is available to assist on matters pertaining to corruption, fraud, or similar

unlawful activities at Snap, and the Company shall provide alternative reporting mechanisms including email addresses.

10.     The chair of the Board shall receive on a timely basis reports on all correspondence addressed to the Board of Directors or the Corporate Secretary from stockholders in their capacity as such.

11.     The Company shall remind employees of whistleblower options and protections in employee communications provided at least twice a year and via the Company's intranet.

12.     The Whistleblower Policy shall be available on the Company's intranet.

## IV.     INVESTIGATIONS & COMPLIANCE

### A.     Investigations

1.     The Company shall ensure on an ongoing basis that the Company has an effective, updated standard procedure for investigations undertaken by the Company's Audit Committee, CLO, or CCO.

2.     The Audit Committee shall undertake periodic reviews of the results of internal investigations involving Material Risks and consider ways in which the Company can improve its processes for handling such investigations.

### B.     Compliance Executives

1.     The Company's CCO shall provide the Audit Committee a quarterly report summarizing material compliance issues identified by the CCO, the status of any remedial measures associated with such compliance issues, and relevant training statistics. As used here, "compliance issues" shall mean risks, gaps, or lapses relating to rules set forth in any companywide policies governing user metrics, financial reporting, bribery, corruption, conflicts of interest, and trade controls (collectively, "Company Compliance Policies").

2.        The Company shall review and, if necessary, update its policies to ensure that at least annually the CCO reviews the Company Compliance Policies and makes recommendations to the Board or a committee of the Board regarding whether any changes should be made to those policies.

3.        The CCO and CLO shall coordinate at least biennially a Board of Directors education seminar regarding (i) relevant compliance standards, procedures, and enforcement activities, including related controls; and (ii) material updates or changes to key laws and regulations under which the Company operates.

4.        The chair of the Board shall be notified promptly if the CCO or CLO is resigning or being terminated from his or her position.

## V.        OTHER GOVERNANCE PROVISIONS

### A.        Share Issuance

1.        The Company shall amend its bylaws so as to require any issuance of voting securities to be authorized by the full Board of Directors, rather than just by a committee of the Board.

### B.        Annual Meeting

1.        The Company shall issue a press release (or file as part of a Form 8-K with the SEC, or both) informing stockholders how they can submit questions for the annual stockholder meeting.

2.        The Company shall stream the audio of the annual stockholder meeting so that stockholders and interested stakeholders may listen to the meeting.

### C.        Board Committees – Compensation & Other Consultants

1.        The Company shall ensure that the charter of the Compensation Committee of the Board continues to specify that the committee has authority to retain its own compensation consultants.  Before relying on the recommendations of such consultants, the Compensation

Committee shall evaluate and determine whether the consultants are unbiased and have appropriate qualifications and experience sufficient to warrant reliance on their recommendations.

2.      The Company shall ensure that the charter of the Audit Committee continues to specify that the committee has the authority to retain its own consultants and counsel.

**D.      Information Security & Privacy**

1.      Management of the Company shall transmit an internal certification to the Board annually certifying that, to the best of their knowledge, the Company is in material compliance with its privacy policies.

2.      The Company shall ensure on an ongoing basis that the Company continues to have an effective, updated process for compliance with the requirements of the EU General Data Protection Regulation ("GDPR"), including a Data Protection Officer.

3.      The Company shall establish a protocol for promptly escalating to the Board or a committee of the Board (a) potential material breaches of Snap's FTC consent decree and (b) material regulatory investigations into Snap's privacy practices.

4.      The Company shall develop standards for the mandatory reporting of material data breaches directly to the Board or a committee of the Board.

5.      At least annually, the Company will organize penetration tests of Snap's network and systems to test that security measures are effective and to evaluate whether anyone, including insiders, could tamper with Snap data.

EXHIBIT 9

ORIGINAL

FILED
Superior Court of California
County of Los Angeles

JAN 12 2021

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Marisela Fregoso

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| BARBARA WOLFSON, Derivatively on Behalf of SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, JOANNA COLES, A.G. LAFLEY, MITCHELL LASKY, STANLEY MERESMAN, SCOTT D. MILLER, CHRISTOPHER YOUNG, ANDREW VOLLERO, and IMRAN KHAN, <br><br> Defendants, <br> and <br> SNAP INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. BC720152 <br><br><br> Judge: Honorable Elihu M. Berle <br> Department: 6 <br><br> **[PROPOSED] FINAL ORDER AND JUDGMENT** <br><br> RECEIVED - CENTRAL <br> FAMILY LAW CLERK'S OFFICE <br><br> JAN 07 2021 |
| JUSTIN POKORNEY, Derivatively for the Benefit of and on Behalf of Nominal Defendant SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, JOANNA COLES, A.G. LAFLEY, STANLEY MERESMAN, SCOTT D. MILLER, CHRISTOPHER YOUNG, ANDREW VOLLERO, and IMRAN KHAN, <br><br> Defendants, <br> and <br> SNAP INC., a Delaware Corporation, <br><br> Nominal Defendant | Case No. 18STCV09365 <br><br><br> Judge: Honorable Elihu M. Berle <br> Department: 6 |

[Caption continued on following page.]

| | |
|---|---|
| DAVID SHABBOUEI and ZALMON UVAYDOV, Derivatively on Behalf of SNAP INC., | Case No. 19STCV08413 |
| Plaintiffs, | |
| v. | Judge: Honorable Elihu M. Berle |
| EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, STANLEY MERESMAN, A. G. LAFLEY, SCOTT D. MILLER, CHRISTOPHER YOUNG, JOANNA COLES, ANDREW VOLLERO, IMRAN KHAN, MITCHELL LASKY, and DOES 1-25, Inclusive, | Department: 6 |
| Defendants, | |
| and | |
| SNAP INC., a Delaware Corporation, | |
| Nominal Defendant. | |

[PROPOSED] FINAL ORDER AND JUDGMENT

This matter came before the Court for hearing on December 16, 2020 pursuant to this Court's Preliminary Approval Order, entered October 2, 2020, on the application of the Parties for final approval of the Settlement set forth in the Stipulation and Agreement of Settlement dated August 12, 2020 (the "Stipulation"). Due and adequate notice having been given to Current Snap Stockholders as required in said Preliminary Approval Order, and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed of the premises and good cause appearing therefor, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

1. This Final Order and Judgment ("Judgment") incorporates by reference the definitions in the Stipulation, and except where otherwise specified herein, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

2. This Court has jurisdiction over the Derivative Actions, the Settlement, and the Parties to the Stipulation.

3. This Court finds that the Settlement set forth in the Stipulation is fair, reasonable, and adequate as to each of the Parties, and hereby finally approves the Settlement in all respects and orders the Parties to perform its terms to the extent the Parties have not already done so.

4. The Derivative Actions, all claims contained therein, and any other Released Claims are hereby ordered as fully, finally, and forever compromised, settled, released, discharged, and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Judgment. The Parties are to bear their own costs, except as otherwise provided in the Stipulation.

1.1 Upon the Effective Date, as defined in Section IV, ¶1.5, Snap, Current Snap Stockholders, or any Person acting on behalf of Snap, and Plaintiffs (acting on their own behalves or derivatively on behalf of Snap) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged and dismissed with prejudice the Released Claims against the Released Persons and any and all causes of action or claims (including Unknown Claims) that have or could have been asserted in the Derivative Actions by Plaintiffs, Snap, or any Current Snap Stockholder derivatively on behalf of Snap, against the Settling Defendants or the Released Persons, based on the Settling Defendants' or

Released Persons' acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or failures to act that were alleged in the Derivative Actions, through and including the date of execution of this Stipulation. Nothing herein shall in any way impair or restrict the rights of any Settling Party or any other Released Person to enforce the terms of the Stipulation.

5. Upon the Effective Date, as defined in Section IV, ¶1.5, Snap, Current Snap Stockholders, or any Person acting on behalf of Snap, and Plaintiffs (acting on their own behalves and derivatively on behalf of Snap and its stockholders) shall be forever barred, estopped, and enjoined from commencing, instituting, or prosecuting any of the Released Claims against any of the Released Persons or any action or other proceeding against any of the Released Persons arising out of, relating to, or in connection with the Released Claims, the Derivative Actions, or the filing, prosecution, defense, settlement, or resolution of the Derivative Actions. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

6. Upon the Effective Date, as defined in Section IV, ¶1.5, each of the Released Persons and the Related Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs and Plaintiffs' Counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Derivative Actions or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

7. The Court finds that the notice of the Settlement to Current Snap Stockholders was made in accordance with the Preliminary Approval Order and provided the best notice practicable under the circumstances to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process.

8. The Court finds that during the course of the Derivative Actions, the Parties and their counsel at all times complied with California Code of Civil Procedure § 128.7.

9.     The Court finds that the separately negotiated and agreed-to Fee and Expense Amount is fair and reasonable, in accordance with the Stipulation, and finally approves the Fee and Expense Amount.

10.     The Court finds that the Service Awards to Plaintiffs are fair and reasonable, in accordance with the Stipulation, and finally approves the Service Awards, to be paid from the Fee and Expense Amount.

11.     This Judgment, the facts and terms of the Stipulation, including any exhibits attached thereto, all proceedings in connection with the Settlement, and any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement:

a)     shall not be offered, received, or used in any way against the Parties as evidence of, or be deemed to be evidence of, a presumption, concession, or admission by any of the Parties with respect to the truth of any fact alleged by Plaintiff or the validity, or lack thereof, of any claim that has been or could have been asserted in the Derivative Action or in any litigation, or the deficiency, infirmity, or validity of any defense that has been or could have been asserted in the Derivative Action or in any litigation, or of any fault, wrongdoing, negligence, or liability of any of the Released Persons;

b)     shall not be offered, received, or used in any way against any of the Released Persons as evidence of, or be deemed to be evidence of, a presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved, issued, or made by any Released Person;

c)     shall not be offered, received, or used in any way against any of the Released Persons as evidence of, or be deemed to be evidence of, a presumption, concession, or admission of any liability, fault, negligence, omission, or wrongdoing, or in any way referred to for any other reason as against the Released Persons, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding in any court, administrative agency, or other tribunal; and

d)     shall not be offered, received, or used in any ways against Plaintiffs as evidence of, or be deemed to be evidence of, a presumption, concession, or admission that any of

1   Plaintiffs' claims are without merit or that Plaintiffs would not have been able to prevail on
2   his claims at trial.

3       12.    This Judgment, the Stipulation, the Settlement, and any act performed or document
4   executed pursuant to or in furtherance thereof, shall not be admissible in any proceeding for any
5   purpose, except to enforce the terms of the Settlement. However, the Released Persons may refer
6   to the Settlement, and file the Stipulation and/or this Judgment, in any action that may be brought
7   against them to effectuate the liability protections granted them thereunder, including, without
8   limitation, to support a defense or claim based on principles of res judicata, collateral estoppel, full
9   faith and credit, release, standing, good faith settlement, judgment bar or reduction, or any other
10  theory of claim preclusion or issue preclusion or similar defense or claim under U.S. federal or
11  state law or foreign law.

12      13.    Without affecting the finality of this Judgment in any way, the Court hereby retains
13  continuing jurisdiction over: (a) implementation of the Settlement; and (b) all Parties for the
14  purpose of construing, enforcing, and administering the Stipulation and this Judgment, including,
15  if necessary, setting aside and vacating this Judgment, on motion of a Party, to the extent consistent
16  with and in accordance with the Stipulation if the Effective Date fails to occur in accordance with
17  the Stipulation.

18      14.    In the event that the Settlement does not become effective in accordance with the
19  terms of the Stipulation, then this Judgment shall be rendered null and void to the extent provided
20  by and in accordance with the Stipulation and shall be vacated, and in such event, all orders entered
21  and releases delivered in connection herewith shall be null and void to the extent provided by and
22  in accordance with the Stipulation, and the provisions of ¶ 6.2 of the Stipulation shall apply.

23      15.    This Judgment is a final judgment and should be entered forthwith by the Clerk
24  dismissing the Derivative Actions with prejudice.

25  IT IS SO ORDERED.

26  DATED: Jan. 12, 2021

27  HONORABLE ELIHU M. BERLE
    SUPERIOR COURT JUDGE

28

-6-

# EXHIBIT 10

| | |
|---|---|
| 1 | SCHNEIDER WALLACE COTTRELL |
| | KONECKY WOTKYNS LLP |
| 2 | Michael C. McKay, SBN 023354 |
| | mmckay@schneiderwallace.com |
| 3 | 8501 North Scottsdale Road, Suite 270 |
| | Scottsdale, Arizona 85253 |
| 4 | Telephone: (480) 428-0145 |
| | Facsimile: (866) 505-8036 |
| 5 | |
| | WEISSLAW LLP |
| 6 | Joseph H. Weiss (*Admitted Pro Hac Vice*) |

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
Michael C. McKay, SBN 023354
mmckay@schneiderwallace.com
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036

WEISSLAW LLP
Joseph H. Weiss (*Admitted Pro Hac Vice*)
jweiss@weisslawllp.com
David C. Katz
dkatz@weisslawllp.com
Joshua M. Rubin (*Admitted Pro Hac Vice*)
jrubin@weisslawllp.com
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Attorneys for Lead Plaintiff Sridhar
Manthangodu

SACKS, RICKETTS & CASE LLP
Cynthia A. Ricketts, SBN 012668
cricketts@srclaw.com
2800 North Central Avenue, Suite 1230
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Boris Feldman (*Admitted Pro Hac Vice*)
boris.feldman@wsgr.com
Elizabeth C. Peterson (*Admitted Pro Hac Vice*)
epeterson@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Attorneys for Defendants Todd Davis, Gary
Briggs, Clarissa Cerda, David Cowan,
Roy A. Guthrie, Srinivasan Krishnan, Albert
A. Pimentel, Chris Power, Thomas Ridge,
Hilary Schneider, Jaynie Miller Studenmund,
and Nominal Defendant LifeLock, Inc.

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| IN RE: LIFELOCK, INC. DERIVATIVE LITIGATION | Case No. CV2015-054087 |
| | (Consol. with CV2016-000595, CV2016-000820, CV2016-050225, & CV2016-003907) |
| | **STIPULATION OF SETTLEMENT** |

1   This Stipulation of Settlement ("Stipulation" or "Settlement") is made and entered into by

2   and among Lead Plaintiff Sridhar Manthangodu, on behalf of himself and derivatively on behalf of

3   LifeLock, Inc. ("LifeLock" or the "Company"), Lead Counsel WeissLaw LLP and Liaison

4   Counsel, Schneider Wallace Cottrell Konnecky Wotkyns LLP, defendants Todd Davis, Gary

5   Briggs, David Cowan, Roy A. Guthrie, Albert A. Pimentel, and Thomas Ridge (together, the

6   "Individual Defendants" or "Settling Defendants"), Nominal Defendant LifeLock (together with

7   Lead Plaintiff and the Settling Defendants, the "Settling Parties"), and counsel for the Individual

8   Defendants and LifeLock, Wilson Sonsini Goodrich & Rosati PC and Sacks, Ricketts & Case

9   LLP. The Stipulation is intended by the Settling Parties to fully, finally, and forever resolve,

10  discharge, and settle the Released Claims (as defined below in Section IV, ¶A.14) upon Court

11  approval and subject to the terms and conditions hereof.

12  **I.    BACKGROUND**

13      **A.    Lead Plaintiff's Action**

14      On September 23, 2015, Lead Plaintiff filed the first in a series of several substantively

15  similar stockholder derivative actions. Lead Plaintiff's action captioned, *Manthangodu v. Davis,*

16  *et al.*, Case No. CV2015-054087, was filed in the Superior Court of Arizona for Maricopa County

17  (the "Arizona Superior Court" or the "Court") against the Individual Defendants and the Company

18  as nominal defendant (the "Manthangodu Action" or the "Action"). Lead Plaintiff alleges that the

19  Individual Defendants breached their fiduciary duties to LifeLock and its stockholders by failing

20  to ensure the Company's compliance, post-2010, with certain FTC regulations. Lead Plaintiff

21  further alleges that LifeLock and its stockholders suffered damages as a result of the Individual

22  Defendants' fiduciary duty breaches because LifeLock faces liability for, and is being forced to

23  expend fees to defend itself in connection with: (i) a whistleblower complaint filed by Michael D.

24  Peters, who served as LifeLock's Chief Information Security Officer in July 2013; (ii) alleged

25  post-2010 FTC violations, including those alleged in the FTC's motion against LifeLock filed on

26  July 21, 2015 (the "FTC Contempt Motion"); and (iii) a securities class action complaint filed by

27  purported LifeLock stockholder Miguel Avila on July 22, 2015, on behalf of a putative class of

28  LifeLock stockholders who purchased LifeLock stock from June 30, 2014 through July 21, 2015

(the "2015 Securities Class Action"), alleging violations of the federal securities laws by LifeLock, former Chief Executive Officer ("CEO") Todd Davis, and LifeLock's Chief Financial Officer ("CFO"), Chris Power. The Manthangodu Action also brings a claim against the Individual Defendants for indemnification.

The Settling Defendants deny each and every one of the claims and contentions alleged by Lead Plaintiff.

**B.     The Other Shareholder Derivative Actions**

Following the filing of the Manthangodu Action, additional substantively similar purported stockholder derivative actions were filed in the Delaware Court of Chancery (the "Delaware Court"), the United States District Court for the District of Arizona (the "Arizona District Court"), and the Arizona Superior Court. These actions are described below.

On October 28, 2015, LifeLock stockholder, Larissa Gassel, filed a purported shareholder derivative action captioned, *Gassel v. Davis et al.*, Case No. 2:15-cv-02173 (D. Ariz.), in the Arizona District Court against Todd Davis, Chris Power, Gary S. Briggs, Albert "Rocky" Pimentel, Jaynie Miller Studenmund, Roy A. Guthrie, and David Cowan as individual defendants and the Company as nominal defendant (the "Gassel Action"). The Gassel Action alleges that the named individual defendants breached their fiduciary duties to LifeLock and its stockholders by misrepresenting the Company's information security controls and compliance, post-2010, with certain FTC regulations. The Gassel Action further claims that LifeLock and its stockholders suffered damages as a result of those alleged breaches of fiduciary duties because LifeLock faces liability for and is being forced to expend fees to defend itself in connection with the alleged post-2010 violations and the allegations in the 2015 Securities Class Action. The Gassel Action also brings claims against the named individual defendants for abuse of control, gross mismanagement, and unjust enrichment. On January 8, 2016, the individual defendants named in the Gassel Action and LifeLock moved to stay proceedings in the Gassel Action in favor of the Manthangodu Action. That motion remains pending.

On November 19, 2015, LifeLock stockholder, Shiva Stein, filed a purported stockholder derivative action captioned, *Stein v. Davis et al.*, C.A. No. 11726-VCL, in the Delaware Court

against Richard Todd Davis, Donald M. Beck, Gary Briggs, Clarissa Cerda, David Cowan, Marvin Davis, James T. Greener, Roy A. Guthrie, Robert Krakauer, Srinivasan Krishnan, Ignacio Martinez, Robert J. Maynard, Jr., Hillel Moerman, Albert "Rocky" Pimentel, Chris Power, Prakash Ramamurthy, George Reyes, Thomas J. Ridge, Nicholas W. Robbins, Schwark Satyavolu, Hilary Schneider, Ty Shay, Jaynie Miller Studenmund, Tammy Valdez, and Gene Yoon as individual defendants and the Company as nominal defendant (the "Stein Action"). The Stein Action alleges that that the named individual defendants violated their fiduciary duties to LifeLock stockholders by failing to prevent LifeLock's allegedly wrongful sales and marketing practices and approving and/or consciously disregarding LifeLock's business plan and by permitting allegedly illegal promotion practices giving rise to the post-2010 alleged FTC regulatory violations. The Stein Action further alleges that the named individual defendants' breaches of their fiduciary duties has caused the Company significant monetary liability and also damaged its corporate image and goodwill and seeks unspecified monetary damages and disgorgement.

On November 25, 2015, LifeLock stockholder, the John L. Munson Revocable Family Trust, filed a purported stockholder derivative action captioned, *Munson v. Davis et al.*, C.A. No. 11750-VCL, in the Delaware Court against the same individual defendants as those named in the Stein Action and the Company as nominal defendant (the "Munson Action"). The Munson Action makes the same allegations and seeks the same relief as in the Stein Action. On March 18, 2016, the plaintiffs in the Stein Action and the Munson Action voluntarily dismissed their actions. On March 23, 2016, the plaintiffs in the Stein Action and the Munson Action jointly filed a purported stockholder derivative complaint captioned, *Stein and Munson v. Davis et al.*, Case No. CV2016-003907, in the Arizona Superior Court against Richard Todd Davis, Gary Briggs, David Cowan, Roy A. Guthrie, Albert "Rocky" Pimentel, and Thomas J. Ridge as individual defendants and the Company as nominal defendant (the "new Stein and Munson Action"). The new Stein and Munson Action makes the same allegations and seeks the same relief as in the original Stein Action and the Munson Action, but drops several of the named individual defendants.

1        On January 22, 2016, LifeLock stockholder, the City of Pontiac General Employees'

2  Retirement System, filed a purported stockholder derivative action captioned, *City of Pontiac v.*

3  *Guthrie et al.*, Case No. CV2016-000820, in the Arizona Superior Court against Roy A. Guthrie,

4  Gary S. Briggs, David A. Cowan, Srinivasan Krishnan, Albert A. Pimentel, Thomas J. Ridge,

5  Todd Davis, and Chris G. Power as individual defendants and the Company as nominal defendant

6  (the "City of Pontiac Action").  The City of Pontiac Action alleges that the named individual

7  defendants breached their fiduciary duties by failing to ensure LifeLock's compliance, post-2010,

8  with certain FTC regulations and that their alleged oversight failure caused LifeLock to issue false

9  and misleading statements about the Company's business and operations in the Company's filings

10  with the U.S. Securities and Exchange Commission ("SEC").  The City of Pontiac Action also

11  brings claims for corporate waste and unjust enrichment.

12        On January 26, 2016, LifeLock stockholder, Liang Jiawei, filed a purported stockholder

13  derivative action captioned, *Jiawei v. Davis et al.*, Case No. CV2016-000595, in the Arizona

14  Superior Court against Todd Davis, Gary S. Briggs, Albert A. "Rocky" Pimentel, Jaynie Miller

15  Studenmund, Roy A Guthrie, Thomas J. Ridge, and David Cowan as individual defendants and

16  the Company as nominal defendant (the "Jiawei Action").  The Jiawei Action similarly alleges

17  that the named individual defendants breached their fiduciary duties by failing to ensure

18  LifeLock's compliance, post-2010, with certain FTC regulations.  The Jiawei Action also brings

19  claims for unjust enrichment, gross mismanagement, and abuse of control.

20        On February 1, 2016, LifeLock stockholder, Russell Sprouse, filed a purported stockholder

21  derivative action captioned, *Sprouse v. Davis et al.*, Case No. CV2016-050225, in the Arizona

22  Superior Court against Todd Davis, Gary S. Briggs, Clarissa Cerda, David Cowan, Roy Guthrie,

23  Chini Krishnan, Albert Pimentel, Christopher Power, Thomas J. Ridge, and Hilary Schneider as

24  individual defendants and the Company as nominal defendant (the "Sprouse Action").  Like the

25  other shareholder derivative actions, the Sprouse Action alleges that the named individual

26  defendants breached their fiduciary duties by failing to ensure LifeLock's compliance, post-2010,

27  with certain FTC regulations.  The Sprouse Action also brings claims for unjust enrichment

28  against certain of the individual defendants.

1    The Settling Defendants as well as all other defendants named in the additional shareholder

2    derivative actions described above deny each and every one of the claims and contentions alleged

3    by plaintiffs therein.

4    **C.    Consolidation of the Shareholder Derivative Actions in the Arizona Superior**
     **Court**
5

6    On December 24, 2015, the Arizona Superior Court entered an Order Appointing Lead

7    Plaintiff and Lead Counsel and Setting Deadlines for Motion to Dismiss. The Court's Order

8    appointed plaintiff Manthangodu as Lead Plaintiff and the law firms of WeissLaw LLP and

9    Schneider Wallace Cottrell Konnecky Wotkyns LLP as Lead Counsel and Liaison Counsel,

10   respectively. The Order further provided that "[u]pon the filing of or transfer to the [Arizona

11   Superior Court] of any other derivative action arising out of the same or substantially the same

12   transactions or events, and the same or substantially the same defendants, the parties to this case

13   shall promptly move to consolidate the new action with this action pursuant to Rule 42(a) of the

14   Arizona Rules of Civil Procedure and Maricopa County Local Rule 3.1(c)(2)."

15   On February 11, 2016, the Court entered a Case Consolidation Order in which it

16   consolidated the Sprouse Action with the first-filed Manthangodu Action.

17   On February 24, 2016, the Court entered an Order Consolidating Actions in which it

18   consolidated the City of Pontiac Action and the Jiawei Action with the first-filed Manthangodu

19   Action and the previously filed Sprouse Action. The consolidated action is captioned *In re:*

20   *LifeLock, Inc. Derivative Litigation*, Case No. CV2015-054087.

21   On April 7, 2016, the Court entered an Order consolidating the new Stein and Munson

22   Action with the previously consolidated Manthangodu Action, Sprouse Action, Jiawei Action, and

23   City of Pontiac Action.

24   **D.    The Mediation**

25   As the Settling Parties have informed the Court at various status conferences, including on

26   November 17, 2015, December 16, 2015, February 10, 2016, March 18, 2016, and April 7, 2016,

27   the Settling Parties have been actively engaged in continued productive discussions aimed at

28   potential resolution of the Manthangodu Action, including at mediation proceedings before the

1  Honorable Stanley G. Feldman, former Chief Justice of the Arizona Supreme Court.  In

2  connection with that mediation, Lead Counsel have interviewed LifeLock's Chief Risk Officer, its

3  Chief Information Security Officer, and counsel who represented LifeLock in the 2015-2016

4  litigation with the FTC.  The Settling Defendants produced more than 120,000 pages of

5  documents to Lead and Liaison Counsel.  In addition, the Settling Parties submitted extensive

6  mediation statements and supplemental mediation statements to the mediator and met for four

7  mediation sessions before Justice Feldman, on February 9, 2016, March 17, 2016, and April 6,

8  2016, in Tucson, Arizona, and May 26, 2016, in Phoenix, Arizona.  As a result of the mediation

9  and these arm's-length settlement negotiations, in which Lead Counsel had the advice of their

10  expert, Navigant Consulting, Inc., the Settling Parties reached an agreement that, subject to

11  approval of the Court, resolves the Manthangodu Action and the Released Claims as further

12  described herein.

13       **E.**    **The LifeLock Board of Directors' Approval of the Settlement**

14       The outside members of LifeLock's Board of Directors (*i.e.*, all directors except Mr. Todd

15  Davis and Ms. Hilary Schneider), in exercising their business judgment, after consultation with

16  their own independent counsel, unanimously approved the Settlement and each of its terms, as set

17  forth in the Stipulation, as in the best interests of LifeLock and its stockholders.

18  **II.**    **LEAD PLAINTIFF'S CLAIMS AND BENEFITS OF SETTLEMENT**

19       Lead Plaintiff and Lead Counsel believe that the claims asserted in the Manthangodu

20  Action have merit.  Lead Plaintiff and Lead Counsel recognize and acknowledge the expense and

21  length of continued proceedings necessary to prosecute the action against the Settling Defendants

22  through motion practice, trial, and potential appeals.  Lead Plaintiff and Lead Counsel also have

23  taken into account the uncertain outcome and the risk of any litigation, especially in complex

24  actions such as the Manthangodu Action, as well as the difficulties and delays inherent in such

25  litigation.  Lead Plaintiff and Lead Counsel also are mindful of the inherent problems of proof of,

26  and possible defenses to, the claims asserted in the Action.  Based on their evaluation, Lead

27

28

1  Plaintiff and Lead Counsel have determined that the Settlement set forth in this Stipulation is in

2  the best interests of LifeLock and its stockholders.

3  **III.     THE SETTLING DEFENDANTS' DENIALS OF WRONGDOING AND
          LIABILITY**

4

5       The Settling Defendants deny each and every one of the claims and contentions alleged by

6  Lead Plaintiff. The Settling Defendants expressly deny all allegations of wrongdoing or liability

7  against them, or any of them, or any other current or former LifeLock directors or officers, arising

8  out of, based upon, or related to any of the conduct, statements, acts, or omissions alleged, or that

9  could have been alleged, in the Manthangodu Action. Without limiting the foregoing, the Settling

10 Defendants deny, among other things, that they or any other current or former LifeLock directors

11 or officers breached their fiduciary duties or any other duty owed to LifeLock or its stockholders,

12 or that Lead Plaintiff, LifeLock, or LifeLock's stockholders suffered any damage or were harmed

13 as a result of any conduct alleged in the Manthangodu Action or otherwise. The Settling

14 Defendants have further asserted and continue to assert that at all relevant times, they and all other

15 current or former LifeLock directors or officers acted in good faith and in a manner they

16 reasonably believed to be in the best interests of LifeLock and its stockholders.

17      Nonetheless, the Settling Defendants also have taken into account the expense, uncertainty,

18 and risks inherent in any litigation, especially in complex cases like the Manthangodu Action.

19 Therefore, the Settling Defendants have determined that it is desirable and beneficial that the

20 Action, and all of the Settling Parties' disputes related thereto, be fully and finally settled in the

21 manner and upon the terms and conditions set forth in this Stipulation. Pursuant to the terms set

22 forth below, this Stipulation, including all of the commitments and undertakings agreed to by the

23 Settling Defendants, and all attached Exhibits hereto, shall in no event be construed as or deemed

24 to be evidence of an admission or concession by the Settling Defendants with respect to any claim

25 of fault, liability, wrongdoing, or damage whatsoever.

26

27

28

**IV. TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT**

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among Lead Plaintiff (for himself and derivatively on behalf of LifeLock), by and through Lead and Liaison Counsel, and the Settling Defendants and LifeLock, by and through their attorneys of record, that in exchange for the consideration set forth below, the Manthangodu Action and Released Claims shall be fully, finally, and forever compromised, settled, discharged, relinquished, and released, and the Manthangodu Action shall be dismissed with prejudice as to the Settling Defendants, upon and subject to the terms and conditions of this Stipulation, as follows:

**A. Definitions**

As used in this Stipulation the following terms have the meanings specified below:

1. "Action" or "Manthangodu Action" means the shareholder derivative action filed by Lead Plaintiff Sridhar Manthangodu on September 23, 2015, and captioned *Manthangodu v. Davis et al.*, Case No. CV2015-054087, pending in the Arizona Superior Court.

2. "Court" or "Arizona Superior Court" means the Superior Court of the State of Arizona in and for the County of Maricopa.

3. "Court Approval Order" means the Order Approving Derivative Settlement and Order of Dismissal with Prejudice, substantially in the form attached as Exhibit B hereto.

4. "Effective Date" means the first date by which all of the events and conditions specified in Section IV, ¶F of this Stipulation have been met and have occurred.

5. "Final" means the time when the Judgment has not been reversed, vacated, or modified in any way and is no longer subject to appellate review, either because of disposition on appeal and conclusion of the appellate process or because of passage, without action, of time for seeking appellate review. More specifically, it is that situation when: (1) either no appeal has been filed and the time has passed for any notice of appeal to be timely filed in the Action; or (2) an appeal has been filed and the court(s) of appeal has/have either affirmed the Judgment or dismissed that appeal and the time for any reconsideration or further appellate review has passed and the appellate court mandate(s) has/have issued; or (3) a higher court has granted further

appellate review and that court has either affirmed the underlying Judgment or affirmed the court of appeal's decision affirming the Judgment or dismissing the appeal.

6. "Governmental Agency" means any local, state, or federal governmental or regulatory authority including, but not limited to, the Federal Trade Commission or any State Attorneys General office.

7. "Judgment" means the judgment to be rendered by the Court in the Action upon its final approval of the Settlement, substantially in the form attached as Exhibit C hereto.

8. "Lead Counsel" means the law firm of WeissLaw LLP.

9. "Liaison Counsel" means the law firm of Schneider Wallace Cottrell Konnecky Wotkyns LLP.

10. "Lead Plaintiff" means plaintiff Sridhar Manthangodu.

11. "LifeLock" or the "Company" means LifeLock, Inc., including, but not limited to, its predecessors, successors, partners, joint ventures, subsidiaries, affiliates, divisions, and assigns.

12. "Person" means an individual, corporation, limited liability company, professional corporation, limited liability partnership, partnership, limited partnership, association, joint venture, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and each of their spouses, heirs, predecessors, successors, representatives, or assignees.

13. "Related Parties" means (i) as to LifeLock, LifeLock's past or present directors, officers, managers, employees, partners, agents, attorneys, accountants, auditors, banks, consultants, experts, successors, subsidiaries, divisions, joint ventures, assigns, general or limited partners or partnerships, limited liability companies, any entity in which LifeLock has a controlling interest, and all officers, directors and employees of LifeLock's current and former subsidiaries; *except that* "Related Parties" shall not include LifeLock's insurance carriers, and (ii) as to the Settling Defendants, (1) each spouse, immediate family member, heir, executor, estate, administrator, agent, attorney, accountant, auditor, bank, insurer, co-insurer, re-insurer, advisor, consultant, expert, or affiliate of any of them, (2) any trust in respect of which any

1 Settling Defendant, or any spouse or family member thereof serves as a settlor, beneficiary, or

2 trustee, and (3) any entity in which a Settling Defendant, or any spouse or immediate family

3 member thereof, holds a controlling interest or for which a Settling Defendant has served as an

4 employee, director, officer, managing director, advisor, general partner, limited partner, or

5 member and any collective investment vehicle which is advised or managed by any of them.

6      14.    "Released Claims" means all claims, demands, rights, liabilities, and claims for

7 relief of every nature and description whatsoever, known or unknown (as set forth in Section IV,

8 ¶A.20), that have been, or could have been, asserted in the Manthangodu Action by Lead

9 Plaintiff, LifeLock, or any LifeLock stockholder derivatively on behalf of LifeLock against the

10 Settling Defendants and Released Persons, based on the Settling Defendants' and/or the

11 Released Persons' acts and/or omissions in connection with, arising out of, or relating to, any of

12 the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or

13 failures to act in connection with or related to: any alleged FTC violations; the FTC Contempt

14 Motion; the Stipulated Order Resolving FTC's Allegations of Contempt and Modifying

15 Stipulated Final Judgment and Order for Permanent Injunction entered by the Arizona District

16 Court on December 22, 2015, and amended on January 4, 2016 (together, the "2016 Amended

17 FTC Order"); any and all actions brought by any Governmental Agency in connection with or in

18 any way related to alleged post-2010 regulatory violations, including those alleged in the FTC

19 Contempt Motion or the 2016 Amended FTC Order; *Ebarle v. LifeLock, Inc.*, No. 3:15-cv-

20 00258-HDG (N.D. Cal.); or any other related acts and/or omissions that could have given rise to

21 similar claims for the period following March 9, 2010 through and including the date of

22 execution of this Stipulation; *except that* "Released Claims" shall not include (a) any claims by

23 or on behalf of LifeLock against any of its directors and officers insurance carriers, (b) the right

24 to enforce this Stipulation or the Settlement, including the award of fees and expenses referenced

25 herein in Section IV, ¶E, and (c) any of the claims asserted in the federal securities law actions

26 captioned, *In re LifeLock, Inc. Securities Litigation*, No. 14-cv-00416-SRB (D. Ariz. 2014);

27 *Gray v. LifeLock, Inc., et al.*, No. 15-16885 (9th Cir. 2016); and *Avila v. LifeLock, Inc., et al.*,

28 Case No. 15-cv-01398-SRB (D. Ariz. 2015).

15. "Released Persons" means the Settling Defendants, LifeLock, and their respective Related Parties. As defined in Section IV, ¶A.13 above, Related Parties includes, but is not limited to, all current and former LifeLock directors and officers, including all those who are named as defendants in the shareholder derivative actions described in Section I, above.

16. "Settlement" means the terms and conditions contained in this Stipulation.

17. "Settling Defendants" means Todd Davis, Gary Briggs, David Cowan, Roy A. Guthrie, Albert A. Pimentel, and Thomas Ridge.

18. "Settling Parties" means, collectively, Lead Plaintiff, the Settling Defendants, and LifeLock.

19. "Stipulation" means this Stipulation of Settlement.

20. "Unknown Claims" means any Released Claims which Lead Plaintiff, LifeLock, or a LifeLock stockholder does not know or suspect to exist in his, her, or its favor at the time of the release of the Released Persons, including claims which, if known by him, her, or it, might have affected his, her, or its settlement with, and release of the Released Persons, or might have affected his, her, or its decision not to object to this Settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Lead Plaintiff, LifeLock, and its stockholders shall be deemed to have, and by operation of the Judgment shall have, expressly waived, the provisions, rights, and benefits of California Civil Code §1542, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Further, with respect to any and all claims released pursuant to Section IV, ¶¶ D.1-D.3, below, the Settling Parties stipulate and agree that, upon the Effective Date, each of the Released Persons also shall expressly waive, and by operation of the Judgment shall have expressly waived any and all provisions, rights, and benefits conferred by any law of any jurisdiction or any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code §1542. Lead Plaintiff, LifeLock, and each LifeLock stockholder may

1 hereafter discover facts in addition or different from those which he, she, or it now knows or

2 believes to be true with respect to the subject matter of the Released Claims, known or unknown,

3 suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden,

4 which now exist, or heretofore have existed upon any theory of law or equity now existing or

5 coming into existence in the future, including, but not limited to, conduct which is negligent,

6 intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the

7 subsequent discovery or existence of such different or additional facts. The Settling Parties

8 acknowledge, and the LifeLock stockholders shall be deemed by operation of the Judgment to

9 have acknowledged, that the foregoing waiver was separately bargained for and is a key element

10 of the Settlement of which this release is a part.

11     **B.    Consideration**

12         In connection with the settlement of the Action, the LifeLock Board of Directors has

13 approved and/or continued certain corporate governance measures, internal controls measures,

14 and funding commitments. To the extent such measures and commitments have not already been

15 implemented, LifeLock shall implement the corporate governance measures, internal controls

16 measures, and funding requirements specified herein within one year following final judicial

17 approval of the proposed settlement by the Court. LifeLock acknowledges and agrees that the

18 corporate governance reforms, internal controls programs, and funding commitments set forth

19 below confer substantial benefits upon LifeLock and its shareholders including, with regard to

20 those measures that LifeLock has already implemented, that such measures will remain in effect

21 for three (3) years under the terms of this Settlement. LifeLock acknowledges that the

22 commencement and prosecution of the Action and negotiations of the Settlement with Lead

23 Counsel were an important factor in facilitating the Company's significant efforts to continue to

24 implement, reinforce, and enhance its corporate governance measures and internal controls

25 programs. Except as otherwise specified, the corporate governance reforms and internal controls

26 programs described below shall remain in effect for three (3) years from the date of adoption.

27         The Settling Parties agree that in the event LifeLock determines that any of the below

28 corporate governance reforms, internal controls programs, and funding commitments conflict

with LifeLock's obligations and requirements under the 2016 Amended FTC Order, LifeLock's obligations and requirements under the 2016 Amended FTC Order shall govern. The Settling Parties further agree that LifeLock as a company—and not the individual employees, officers, and directors that make up LifeLock—is solely responsible for implementing the below corporate governance reforms, internal controls programs, and funding commitments.

LifeLock's Information Security Program

1.    LifeLock engaged a third-party security consultant who has reviewed its Information Security Program ("ISP") and conducted a baseline assessment of the current components of LifeLock's ISP. This baseline assessment measures LifeLock's ISP in order to identify potential improvements to LifeLock's ISP.

2.    LifeLock has had a comprehensive evaluation of its external security practices assessed by the Online Trust Alliance, including its consumer protection, site security, and privacy practices.

3.    LifeLock has reinforced its policies to protect against theft or abuse of credentials provided to all LifeLock employees, including its ISP system administrators. These policies include, but are not limited to, automated processes that require all employees to change their passwords once every 90 days, and policies that ensure the strength of all employee passwords.

4.    LifeLock shall periodically review and revise as needed the job function guidelines applicable to executives with responsibility for the ISP to clarify their roles and responsibilities in the event of a security breach.

Documentation of Information Security Program

5.    LifeLock will continue to maintain and enhance a comprehensive written documentation of its ISP.

6.    LifeLock will continue to review periodically the documentation of its ISP and update and enhance it as may be necessary from time to time and in accordance with industry standards.

Assessment of Vulnerabilities and Implementation of Patches

7.     LifeLock shall assess the status of its ISP and vulnerabilities regularly and ensure that vulnerabilities are addressed as soon as reasonably practicable in a manner consistent with industry practice.

8.     The assessments referenced in paragraph 7 above shall also include an assessment of LifeLock's internal policies and processes related to cyber security.

9.     LifeLock's senior management shall report to the Board of Directors or a designated committee thereof at least annually on the results of the assessments referenced in paragraph 7.

10.     LifeLock shall perform penetration and vulnerability testing and shall present an overview of the testing results on at least an annual basis to the Audit Committee.

Budget for Information Security Program

11.     In order to provide appropriate funding for LifeLock's ISP, LifeLock has budgeted and shall commit to spend at least $4 million on its information security activities in 2016 and shall budget and commit at least $4 million on its information security activities in 2017, unless the Board of Directors determines that such expenditures are not required.

Metrics for Measuring LifeLock's Information Security Program

12.     The Chief Information Security Officer ("CISO") or other person designated by LifeLock's Board of Directors shall develop appropriate metrics for assessing the Company's ISP.

13.     The CISO or other person designated by LifeLock's Board of Directors shall periodically review those metrics with the Board of Directors or a designated committee thereof.

LifeLock's Biennial Assessments of its Information Security Program

14.     LifeLock shall proceed with its efforts to engage a new third-party auditor to conduct the biennial assessments of LifeLock's ISP required by the 2016 Amended FTC Order.

15.     The Audit Committee, together with the Chief Risk Officer ("CRO"), the CISO, and the General Counsel, shall have the authority to oversee the work of this third-party auditor.

LifeLock's Compliance with the FTC Orders

16.     As part of its corporate Compliance Program, LifeLock shall adopt and implement a plan to enhance its monitoring of compliance with the 2016 Amended FTC Order.

17.     LifeLock's General Counsel, in consultation with the Company's CRO and CISO, and/or another person designated by the Board or Audit Committee shall provide assessments of the Company's compliance with the 2016 Amended FTC Order to the Board of Directors or a designated committee thereof at least annually.

18.     LifeLock's Audit Committee or the Chair of the Audit Committee shall hold periodic meetings with the Chief Executive Officer, the General Counsel, and other relevant officers regarding compliance with the 2016 Amended FTC Order.

Review and Approval of the Chief Risk Officer's and Chief Information Security Officer's Compliance and Enterprise Risk Management Programs

19.     LifeLock's General Counsel, directly or through an outside counsel, shall engage a qualified third party consultant who will review the Enterprise Risk Management Program, the roadmaps and associated milestones of LifeLock's ISP, and the LifeLock Compliance Program proposed by LifeLock's CRO and CISO.

20.     The Enterprise Risk Management Program, the roadmaps and associated milestones of LifeLock's ISP, and the Compliance Program proposed by LifeLock's CRO and CISO shall be presented to LifeLock's Board of Directors or designated committee thereof.

21.     LifeLock's General Counsel, CRO, CISO, or other relevant management personnel shall present regular periodic progress updates and recommendations for any continuous improvements to LifeLock's Board of Directors or designated committee thereof on LifeLock's Enterprise Risk Management Program, the roadmaps and associated milestones of LifeLock's ISP, and LifeLock's Compliance Program.

22.     LifeLock's General Counsel, CRO, and CISO shall continue to have regular access to the Audit Committee to seek input on the Enterprise Risk Management Program, the roadmaps and associated milestones of LifeLock's ISP, and LifeLock's Compliance Program.

Whistleblower and Hotline Reports

23.　　LifeLock's General Counsel or Legal Department shall continue to review all whistleblower reports or reports made to LifeLock's Ethics Hotline on the topics listed below and may route those reports to other LifeLock departments as appropriate. Following reasonable review, due diligence, and fact-gathering by LifeLock's General Counsel or members of LifeLock' s Legal Department, whistleblower reports or reports made to LifeLock's Ethics Hotline on the below topics will be presented by the General Counsel to the Audit Committee:

- Allegations of violations by LifeLock or its employees of the marketing, ISP, biennial assessment, compliance monitoring, and recordkeeping requirements of the 2016 Amended FTC Order;

- Allegations of improprieties by LifeLock or its employees in accounting, auditing, financial record keeping, or internal accounting controls;

- Any alleged or potential bribery, improper payment, or other violation of federal or state criminal statutes by any LifeLock employee or LifeLock business partner if the alleged or potential conduct occurred in connection with LifeLock business;

- Any alleged or potential significant violation of law or any provision of LifeLock's Employee Code of Business Conduct and Ethics by any executive officer of LifeLock if the alleged or potential conduct occurred in connection with LifeLock business and could reasonably be expected to have a material adverse impact on LifeLock's financial or business operations; or

- Any alleged or potential significant legal or regulatory violation by LifeLock, its employees, or its business partners if the potential or alleged conduct occurred in connection with LifeLock business and could have a material adverse impact on LifeLock's financials or business operations.

24.　　Allegations of misdemeanor theft, or misdemeanor trespass, or other similar conduct committed by non-executive employees that do not materially impact LifeLock's financials or business operations will be appropriately addressed by LifeLock's Legal Department and/or Human Resources Department, but need not be presented to the Audit Committee unless the General Counsel, in her discretion, determines such report should be made.

LifeLock's Marketing Practices

25.　　LifeLock shall continue to invest resources to manage and enhance its marketing practices, including periodic trainings of LifeLock employees who have responsibility for

1 LifeLock's marketing practices and review of LifeLock's compliance with the 2016 Amended

2 FTC Order and applicable industry standards.

3       26.     LifeLock's General Counsel or another person designated by the General Counsel

4 shall present the results of the review of compliance with the 2016 Amended FTC Order and

5 applicable industry standards to the Board of Directors or a designated committee thereof.

6       27.     LifeLock shall engage a former senior level FTC employee to review LifeLock's

7 current marketing practices and suggest revisions, if any, to LifeLock's marketing practices and

8 compliance with the marketing requirements of the 2016 Amended FTC Order.

9     <u>Executive Compensation</u>

10       28.     Following the end of LifeLock's fiscal 2015, LifeLock's CEO, President, and

11 CFO communicated to LifeLock's Board of Directors and Compensation Committee that they

12 would voluntarily forego a substantial portion of their fiscal 2015 bonuses based on events that

13 occurred during fiscal 2015. The bonuses paid to the CEO, President, and CFO were then

14 further evaluated by the Compensation Committee and were approved by the Board (at the

15 Compensation Committee's recommendation after close consultation with executive

16 management) at 25.5% of each executive's target bonus opportunities.

17       29.     LifeLock shall consider the performance of the ISP as a factor in the evaluation of

18 performance bonuses for LifeLock's senior executives whose job function impacts the ISP, as

19 determined by LifeLock's CEO, and shall assign appropriate weight to the performance of the

20 ISP (against standards and goals set by the Company for the ISP) for such senior executives'

21 evaluations.

22       30.     LifeLock has adopted an incentive compensation clawback policy applicable to

23 LifeLock's executive officers.

24       31.     LifeLock has adopted a stock ownership guidelines policy applicable to

25 LifeLock's Board of Directors and executive officers.

26

27

28

## Continuing Education for Board of Directors

32. Members of LifeLock's Board of Directors shall attend an established continuing education program for directors designated by the Board of Directors at least once every three years.

## Continued Privacy Training and Certification

33. LifeLock shall designate at least one member of LifeLock's Legal Department or other personnel who shall obtain appropriate privacy certification from the International Association of Privacy Professionals or another similar organization, such as Stanford's Software Security Foundation or Stanford's Advanced Security Certification programs. Upon departure of such certified individual from the Company, LifeLock shall take reasonable steps to certify another member of the Legal Department or other appropriate employee in a timely manner.

34. LifeLock shall implement and provide additional appropriate security training courses for its personnel involved in LifeLock's ISP.

## LifeLock's Litigation Against its Directors and Officers Liability Insurance Carriers

35. LifeLock shall continue to pursue its coverage case against ACE American Insurance Company and others with reasonable diligence to a final conclusion or reasonable settlement. Lead Counsel shall, at the request of and upon reasonable notice from LifeLock, make themselves available to assist in litigating the case and shall do so in the manner specified by LifeLock or its counsel.

## C. Settlement Procedures

1. After execution of this Stipulation, Lead Plaintiff shall submit the Stipulation together with its Exhibits to the Court and shall move for entry of an order substantially in the form of Exhibit A hereto (the "Preliminary Approval Order"), requesting, among other things, the preliminary approval of the Settlement set forth in the Stipulation, and approval for the filing and publication of the Settlement Notice, substantially in the forms attached hereto as Exhibits A-1 ("Long-Form Notice") and A-2 ("Short-Form Notice"; the Long-Form Notice and Short-Form Notice collectively, the "Settlement Notice"), which shall include the general terms of the Settlement set forth in the Stipulation and the date of the Settlement Hearing as described below.

2. Within fourteen (14) business days following the Court's entry of the Preliminary Approval Order, LifeLock shall cause the Stipulation and Long-Form Notice to be filed with the SEC along with an SEC Form 8-K or other appropriate filing, and publish the Short-Form Notice one time in *Investor's Business Daily*. The SEC filing will be accessible via a link on the "Investors" page of http://www.lifelock.com, the address of which shall be contained in the Settlement Notice.

3. Lead Plaintiff will also request that forty-five (45) days after the Settlement Notice is given, the Court hold a joint hearing in the Action (the "Settlement Hearing") to consider and determine whether the Court Approval Order and the Judgment, substantially in the form of Exhibits B and C hereto, should be entered: (a) approving the terms of the Settlement as fair, reasonable, and adequate; and (b) dismissing with prejudice the Action against the Settling Defendants.

4. Pending the Effective Date, all proceedings and discovery in the Action shall be stayed except as otherwise provided herein, and the Settling Parties shall not file or prosecute any other actions or proceedings relating to the Settlement. To the extent necessary, the Settling Parties will take all reasonable steps to obtain or maintain a stay of proceedings in the Gassel Action.

**D.    Releases**

1.    Upon the Effective Date, as defined in Section IV, ¶A.4, LifeLock, LifeLock stockholders, or any Person acting on behalf of LifeLock and Lead Plaintiff (acting on his own behalf or derivatively on behalf of LifeLock) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged and dismissed with prejudice the Released Claims against the Released Persons and any and all causes of action or claims (including Unknown Claims) that have or could have been asserted in the Action by Lead Plaintiff, LifeLock, or any LifeLock stockholder derivatively on behalf of LifeLock, or LifeLock against the Settling Defendants or the Released Persons, based on the Settling Defendants' or Released Persons' acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or failures to act related to LifeLock's alleged FTC violations, the FTC Contempt Motion, and the 2016 Amended FTC Order, through and including the date of execution of this Stipulation.  Nothing herein shall in any way impair or restrict the rights of any Settling Party or any other Released Person to enforce the terms of the Stipulation.

2.    Upon the Effective Date, as defined in Section IV, ¶A.4, LifeLock, LifeLock stockholders, or any Person acting on behalf of LifeLock, and Lead Plaintiff (acting on his own behalf and derivatively on behalf of LifeLock and its stockholders) shall be forever barred and enjoined from commencing, instituting, or prosecuting any of the Released Claims against any of the Released Persons or any action or other proceeding against any of the Released Persons arising out of, relating to, or in connection with the Released Claims, the Action, or the filing, prosecution, defense, settlement, or resolution of the Action.  Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

3.    Upon the Effective Date, as defined in Section IV, ¶A.4, each of the Released Persons and the Related Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Lead Plaintiff, Lead Counsel, Liaison Counsel, and all current LifeLock stockholders (solely in their capacity as LifeLock stockholders) from all claims (including Unknown Claims) arising out of, relating to,

or in connection with the institution, prosecution, assertion, settlement, or resolution of the Action or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

**E.    Lead Counsel's Separately Negotiated Attorneys' Fees and Expenses**

1.    After negotiating and agreeing upon the principal terms of the Settlement, Lead Counsel and LifeLock, acting by and through its counsel, with the assistance of the mediator, Justice Feldman, separately negotiated the attorneys' fees and expenses the Company would pay to Lead Counsel. In light of the substantial and material benefits conferred by Lead Counsel's efforts, LifeLock, acting by and through its Board of Directors, has agreed to pay $6 million subject to Court approval (the "Fee and Expense Amount").

2.    Within thirty (30) calendar days following the Court's issuance of the Court Approval Order, notwithstanding the existence of any timely filed objections to the Settlement, or potential for appeal therefrom, LifeLock shall make one payment of the Fee and Expense Amount to an account controlled by WeissLaw LLP. If, as a result of any further order of the Court or as a result of any appeal, remand, or successful collateral attack, the Effective Date does not occur or if the Fee and Expense Amount is not approved or is modified or overturned, in whole or in part, then Lead Counsel shall be responsible for repayment to LifeLock of the amount received by them. Neither LifeLock nor any other Released Persons shall have any obligations with respect to Lead Counsel's fees and/or expenses beyond the Fee and Expense Amount.

**F.    Conditions of Settlement; Effect of Disapproval, Cancellation, or Termination**

1.    The Effective Date shall be conditioned on the occurrence of all of the following events:

a.    the LifeLock Board of Directors has approved the Settlement and each of its terms, including the separately negotiated Fee and Expense Amount;

b.    the Court has entered the Court Approval Order and Judgment, substantially in the form of Exhibits B and C attached hereto; and

1          c.     the Judgment has become Final.

2         2.     If any of the conditions specified in Section IV, ¶F.1 are not met, then the

3    Stipulation of Settlement shall be canceled and terminated subject to the provisions of this

4    Section IV, ¶F.2, unless counsel for the Settling Parties mutually agree in writing to proceed with

5    an alternative or modified Stipulation and submit it for Court approval.  If for any reason the

6    Effective Date does not occur, or if this Stipulation is terminated, cancelled, or otherwise fails to

7    become effective for any reason:

8          a.     the Settling Parties, Released Persons, and Related Parties shall be

9    restored to their respective positions that existed immediately prior to the date of execution of

10   this Stipulation;

11         b.     all negotiations, proceedings, documents prepared, and statements made in

12   connection with this Stipulation shall be without prejudice to the Settling Parties, shall not be

13   deemed or construed to be an admission by a Settling Party of any act, matter, or proposition and

14   shall not be used in any manner for any purpose (other than to enforce the terms remaining in

15   effect) in any subsequent proceeding in the Action or in any other action or proceeding; and

16         c.     the terms and provisions of the Stipulation – with the exception of the

17   provisions of Section IV, ¶E.2 and Section IV, ¶F.2 – shall have no further force and effect with

18   respect to the Settling Parties and shall not be used in the Action or in any other proceeding for

19   any purpose, and any judgment or orders entered by the Court in accordance with the terms of

20   the Stipulation shall be treated as vacated, *nunc pro tunc*.

21        3.     No order of the Court or modification or reversal on appeal of any order of the

22   Court concerning the amount of attorneys' fees, costs, expenses, and interest awarded by the

23   Court to Lead Counsel shall constitute grounds for cancellation or termination of the Stipulation,

24   affect the enforceability of the Stipulation, or delay or preclude the Judgment from becoming

25   Final.

26   **G.**    **Miscellaneous Provisions**

27        1.     The Settling Parties (a) acknowledge that it is their intent to consummate the

28   terms and conditions of this Stipulation; and (b) agree to cooperate to the extent reasonably

1  necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise

2  their best efforts to accomplish the foregoing terms and conditions of the Stipulation.

3        2.      The Settling Parties intend this Settlement to be a final and complete resolution of

4  all disputes between Lead Plaintiff and LifeLock and its stockholders, on the one hand, and the

5  Released Persons, on the other hand, arising out of, based upon or related to the Released

6  Claims.  The Settlement compromises claims that are contested and shall not be deemed an

7  admission by any Settling Party or Released Person as to the merits of any claim, allegation, or

8  defense.  The Court Approval Order shall contain a finding that during the course of the

9  litigation, the parties and their respective counsel at all times complied with the requirements of

10  Rule 11 of the Arizona Rules of Civil Procedure and all other similar laws.  The Settling Parties

11  further agree that the Released Claims are being settled voluntarily after consultation with

12  competent legal counsel and an experienced mediator.

13        3.      Pending the Effective Date, the Settling Parties agree not to initiate any

14  proceedings concerning the Released Claims other than those incident to the Settlement itself;

15  provided, however, that LifeLock and the Settling Defendants may seek to prevent or stay any

16  other action or claims brought seeking to assert any Released Claims.

17        4.      Neither the Stipulation nor the Settlement, including any Exhibits attached hereto,

18  nor any act performed or document executed pursuant to or in furtherance of the Stipulation or

19  the Settlement: (a) is or may be deemed to be or may be offered, attempted to be offered or used

20  in any way as a concession, admission, or evidence of the validity of any Released Claims, or of

21  any fault, wrongdoing, or liability of the Released Persons or LifeLock; or (b) is or may be

22  deemed to be or may be used as a presumption, admission, or evidence of, any liability, fault, or

23  omission of any of the Released Persons or LifeLock in any civil, criminal, administrative, or

24  other proceeding in any court, administrative agency, tribunal, or other forum.  Neither this

25  Stipulation nor the Settlement shall be admissible in any proceeding for any purpose, except to

26  enforce the terms of the Settlement, and except that the Released Persons may file or use the

27  Stipulation, the Court Approval Order and/or the Judgment in any action that may be brought

28  against them in order to support a defense or counterclaim based on principles of *res judicata*,

collateral estoppel, full faith and credit, release, good faith settlement, standing, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

5. All agreements made and orders entered during the course of the Action relating to the confidentiality of information or sealing of documents shall survive this Stipulation and the Judgment.

6. All Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

7. This Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

8. This Stipulation and the Exhibits attached hereto constitute the entire agreement among the Settling Parties and no representations, warranties, or inducements have been made to any Settling Party concerning the Stipulation and/or any of its Exhibits, other than the representations, warranties, and covenants contained and memorialized in such documents. The Stipulation supersedes and replaces any prior or contemporaneous writing, statement, or understanding pertaining to the Action and no parole or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Settling Parties or their counsel, or the circumstances under which the Stipulation was made or executed. It is understood by the Settling Parties that, except for matters expressly represented herein, the facts or law with respect to which this Stipulation is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of facts or law turning out to be different, and agrees that this Stipulation shall be in all respects effective and not subject to termination by reason of any such different facts or law.

9. Except as otherwise expressly provided herein, all parties, including all Settling Defendants, their counsel, LifeLock and its counsel, and Lead Plaintiff, Lead Counsel, and Liaison Counsel shall bear their own fees, costs, and expenses.

1    10.    Counsel for the Settling Parties are expressly authorized by their respective clients

2  to take all appropriate actions required or permitted to be taken pursuant to the Stipulation to

3  effectuate its terms and conditions.

4    11.    Lead Plaintiff represents and warrants he has not assigned or transferred, or

5  attempted to assign or transfer, to any Person any Released Claim or any portion thereof or

6  interest therein.

7    12.    Each counsel or other Person executing this Stipulation or any of its Exhibits on

8  behalf of any party hereto hereby warrants that such Person has the full authority to do so.

9    13.    Any failure by any party to this Stipulation to insist upon the strict performance

10  by any other party of any of the provisions of the Stipulation shall not be deemed a waiver of any

11  of the provisions, and such party, notwithstanding such failure, shall have the right thereafter to

12  insist upon the strict performance of any and all of the provisions of the Stipulation to be

13  performed by such other party.

14    14.    The Stipulation and Exhibits may be executed in one or more counterparts.  A

15  faxed or pdf signature shall be deemed an original signature for purposes of this Stipulation.  All

16  executed counterparts including facsimile and/or pdf counterparts shall be deemed to be one and

17  the same instrument.  A complete set of counterparts, either originally executed or copies

18  thereof, shall be filed with the Court.

19    15.    This Stipulation shall be binding upon, and inure to the benefit of, the Settling

20  Parties and the Released Persons and their respective successors, assigns, heirs, spouses, marital

21  communities, executors, administrators, trustees in bankruptcy, and legal representatives.

22    16.    Without affecting the finality of the Judgment entered in accordance with this

23  Stipulation, the Court shall retain jurisdiction with respect to implementation and enforcement of

24  the terms of the Stipulation, the Court Approval Order, and the Judgment, and the Settling

25  Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing

26  the Settlement embodied in the Stipulation, the Court Approval Order, and the Judgment and for

27  matters arising out of, concerning, or relating thereto.  In the event that a dispute arises between

28  any of the Settling Parties and/or Released Persons concerning compliance with any term of this

Stipulation, the Settling Parties agree that such dispute shall be mediated in good faith before the mediator, Justice Feldman. Only after the Settling Parties and Justice Feldman determine that mediation of such dispute has failed shall relief be sought through a proceeding before the Court.

17. This Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of Arizona, and the rights and obligations of the Settling Parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal substantive laws of the State of Arizona without giving effect to Arizona's choice-of-law principles.

IN WITNESS WHEREOF, the Settling Parties have caused the Stipulation to be executed, by themselves and/or by their duly authorized attorneys, dated June 30, 2016.

WILSON SONSINI GOODRICH &
ROSATI, Professional Corporation

By: _____
         Boris Feldman

SACKS, RICKETTS & CASE LLP
Cynthia A. Ricketts

*Attorneys for Defendants Todd Davis, Gary Briggs, Clarissa Cerda, David Cowan, Roy A. Guthrie, Srinivasan Krishnan, Albert A. Pimentel, Chris Power, Thomas Ridge, Hilary Schneider, Jaynie Miller Studenmund, and Nominal Defendant LifeLock, Inc.*

WEISS LAW LLP

By: _____
         Joseph H. Weiss

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
Michael C. McKay

*Attorneys for Lead Plaintiff Sridhar Manthangodu*

EXHIBIT 11

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
L. Nelson, Deputy
9/8/2016 8:00:00 AM
Filing ID 7704435

1

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP

2
Michael C. McKay, SBN 023354
mmckay@schneiderwallace.com

3
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253

4
Telephone: (480) 428-0145
Facsimile: (866) 505-8036

5

WEISSLAW LLP

6
Joseph H. Weiss (*Admitted Pro Hac Vice*)
jweiss@weisslawllp.com

7
David C. Katz
dkatz@weisslawllp.com

8
Joshua M. Rubin (*Admitted Pro Hac Vice*)
jrubin@weisslawllp.com

9
1500 Broadway, 16th Floor
New York, New York 10036

10
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

11

12
Attorneys for Lead Plaintiff Sridhar
Manthangodu

13

SACKS, RICKETTS & CASE LLP
Cynthia A. Ricketts, SBN 012668
cricketts@srclaw.com
2800 North Central Avenue, Suite 1230
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Boris Feldman (*Admitted Pro Hac Vice*)
boris.feldman@wsgr.com
Elizabeth C. Peterson (*Admitted Pro Hac Vice*)
epeterson@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Attorneys for Defendants Todd Davis, Gary
Briggs, Clarissa Cerda, David Cowan,
Roy A. Guthrie, Srinivasan Krishnan, Albert
A. Pimentel, Chris Power, Thomas Ridge,
Hilary Schneider, Jaynie Miller Studenmund,
and Nominal Defendant LifeLock, Inc.

14
**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15
**IN AND FOR THE COUNTY OF MARICOPA**

16
IN RE: LIFELOCK, INC. DERIVATIVE
LITIGATION

17

18

19

20

Case No. CV2015-054087

(Consolidated with CV2016-000595,
CV2016-000820, CV2016-050225 &
CV2016-003907)

**ORDER APPROVING SHAREHOLDER
DERIVATIVE SETTLEMENT**

21

22

23

24

25

26

27

28

This matter came before the Court for hearing pursuant to the Order of this Court dated July 8, 2016 ("Order"), on the application of the parties for approval of the proposed settlement ("Settlement") set forth in the Stipulation of Settlement dated June 30, 2016, and the Exhibits thereto (the "Stipulation").[1] Due and adequate notice has been given of the Settlement as required in the Order. The Court has reviewed and considered all documents, evidence, and arguments presented in support of or against the Settlement and the Court has been fully advised of the premises for the Settlement. Good cause appearing,

**IT IS HEREBY ORDERED** as follows:

1. Granting Lead Plaintiff's Motion in Support of Final Approval of Settlement filed on August23, 2016.

2. This Order Approving Shareholder Derivative Settlement (the "Court Approval Order") incorporates by reference the definitions in the Stipulation, and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

3. The Court has jurisdiction over the subject matter of the Action, including all matters necessary to effectuate the Settlement, and over all parties to the Action, including but not limited to Lead Plaintiff, LifeLock, Inc. ("LifeLock" or the "Company"), the current LifeLock stockholders, and the Settling Defendants.

4. The Court finds that the Settlement Notice provided to LifeLock stockholders was the best notice practicable under the circumstances of these proceedings and of the matters set forth therein, including the Settlement and Fee and Expense Amount set forth in the Stipulation, to all Persons entitled to such notice. The Settlement Notice fully satisfies the requirements of Arizona Rule of Civil Procedure 23.1 and the requirements of due process.

5. The Court finds that, during the course of the litigation of the Action, the Settling Parties and their respective counsel at all times complied with the requirements of Arizona Rule of Civil Procedure 11 and all other similar rules and laws.

---

[1] The Stipulation is attached as Exhibit 1 to the Unopposed Motion for Preliminary Approval of Shareholder Derivative Settlement and Incorporated Memorandum of Points and Authorities filed on July 1, 2016.

6. The Court finds that the terms of the Stipulation and Settlement are fair, reasonable, and adequate as to each of the Settling Parties, and hereby finally approves the Stipulation and Settlement in all respects, and orders the Settling Parties to perform its terms to the extent the Settling Parties have not already done so.

7. Upon the Effective Date, as defined in the Stipulation, LifeLock, LifeLock stockholders, or any Person acting on behalf of LifeLock, and Lead Plaintiff (acting on his own behalf or derivatively on behalf of LifeLock) shall be deemed to have, and by operation of this Court Approval Order shall have, fully, finally, and forever released, relinquished, and discharged, and shall be forever barred and enjoined from commencing, instituting, or prosecuting, any of the Released Claims against the Released Persons and any and all causes of action or claims (including Unknown Claims) that have or could have been asserted in the Action by Lead Plaintiff, LifeLock, or any LifeLock stockholder derivatively on behalf of LifeLock, or LifeLock against the Settling Defendants or the Released Persons, based on the Settling Defendants' or Released Persons' acts and/or omissions in connection with, arising out of, or relating to, the facts, transactions, events, matters, occurrences, acts, disclosures, statements, omissions, or failures to act related to LifeLock's alleged FTC violations, the FTC Contempt Motion, and the 2016 Amended FTC Order, through and including the date of execution of the Stipulation.

8. Upon the Effective Date, as defined in the Stipulation, LifeLock, LifeLock stockholders, or any Person acting on behalf of LifeLock, and Lead Plaintiff (acting on his own behalf or derivatively on behalf of LifeLock) shall be deemed to have, and by operation of this Court Approval Order shall have, fully, finally, and forever released, relinquished, and discharged, and shall be forever barred and enjoined from commencing, instituting, or prosecuting, any and all claims (including Unknown Claims) arising out of, relating to, or in connection with the defense, settlement, or resolution of the Action against the Released Persons, as defined in the Stipulation.

9. Upon the Effective Date, as defined in the Stipulation, each of the Released Persons and the Related Parties shall be deemed to have, and by operation of this Court Approval Order shall have, fully, finally, and forever released, relinquished, and discharged Lead Plaintiff, Lead Counsel, Liaison Counsel, and all current LifeLock stockholders (solely in their capacity as

LifeLock stockholders) from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Action or the Released Claims.

10. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

11. The Court hereby approves the Fee and Expense Amount in accordance with the Stipulation and finds that such fee is fair and reasonable.

12. Neither the Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be offered, attempted to be offered, or used in any way by the Settling Parties as a presumption, a concession, or an admission of, or evidence of, any fault, wrongdoing or liability of the Settling Parties; or of the validity of any Released Claims; or (b) is intended by the Settling Parties to be offered or received as evidence or used by any other person in any other actions or proceedings, whether civil, criminal, or administrative. The Released Persons may file the Stipulation, this Court Approval Order, and/or the Judgment in any action that has been brought or may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, good faith settlement, standing, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim; and any of the Settling Parties may file the Stipulation and documents executed pursuant and in furtherance thereto in any action to enforce the Settlement.

13. All agreements made and orders entered during the course of the Action relating to the confidentiality of information shall survive this Court Approval Order. All confidential material provided to Lead Plaintiff and/or Lead or Liaison Counsel in the mediation and during settlement negotiations shall be destroyed by Lead Counsel.

14. Without affecting the finality of this Court Approval Order and/or the Judgment in any way, this Court hereby retains continuing jurisdiction with respect to implementation and enforcement of the terms of the Stipulation. This Court further retains continuing jurisdiction over

the dispute between Lead Counsel and counsel for Plaintiff Liang Jiawei as to the amount of fees and expenses counsel for Plaintiff Jiawei should be awarded from the Fee and Expense Amount.

15.     In the event that the Settlement does not become effective in accordance with the terms of the Stipulation, this Court Approval Order and the Judgment shall be vacated, and all Orders entered and releases delivered in connection with the Stipulation and this Court Approval Order shall be null and void, except as otherwise provided for in the Stipulation.

16.     Pursuant to the Settlement, all pending motions in the Action and/or any of the consolidated actions are hereby withdrawn *ab initio*.

17.     A separate judgment will issue.

DATED: _____          _____
                                  THE HONORABLE DAWN M. BERGIN

# eSignature Page 1 of 1

**Grant with New Order**



/S/ Dawn Bergin Date: 9/7/2016

Judicial Officer of Superior Court

**ENDORSEMENT PAGE**

CASE NUMBER: CV2015-054087       SIGNATURE DATE: 9/7/2016

E-FILING ID #: 7704435       FILED DATE: 9/8/2016 8:00:00 AM

CYNTHIA A RICKETTS

ELIZABETH CATHERINE PETERSON

HART L ROBINOVITCH

JAKE D CURTIS

JOSEPH H. WEISS

JOSHUA M. RUBIN

MICHAEL C MCKAY

RACHEL E. FREEMAN

ROBERT B CAREY

STANLEY G FELDMAN

# EXHIBIT 12

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY R. PALMER (246602)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
TRAVIS E. DOWNS III (148274)
ELLEN GUSIKOFF STEWART (144892)
BENNY C. GOODMAN III (211302)
BRIAN O. O'MARA (229737)
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| In re ALPHATEC HOLDINGS, INC. DERIVATIVE SHAREHOLDER LITIGATION | Case No. 37-2010-00058586-CU-BT-NC |
| | (Consolidated with Case No. 37-2010-00062262-CU-BT-NC) |
| This Document Relates To: | STIPULATION OF SETTLEMENT |
| ALL ACTIONS. | Judge: Jacqueline M. Stern<br>Dept: N-27<br>Date Action Filed: August 25, 2010 |

STIPULATION OF SETTLEMENT

920759_1

This Stipulation of Settlement dated March 25, 2014 (the "Stipulation"), is made and entered into by and among the following Settling Parties,[1] each by and through their respective counsel: (i) Plaintiffs Patrick Fero and Ralph Tuckfield (on behalf of themselves and derivatively on behalf of Alphatec Holdings, Inc. ("Alphatec" or the "Company")); (ii) Individual Defendants; (iii) defendant HealthpointCapital LLC ("HealthpointCapital"); and (iv) nominal defendant Alphatec. Together, the Individual Defendants, nominal defendant Alphatec, and HealthpointCapital are referred to as "Defendants." The Stipulation is intended by the Settling Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims, upon and subject to the terms and conditions hereof.

I. INTRODUCTION AND PROCEDURAL OVERVIEW

A. Initiation of the Action

On August 25, 2010 and November 30, 2010 respectively, Plaintiffs Patrick Fero and Ralph Tuckfield filed shareholder derivative complaints in the California Superior Court for the County of San Diego (the "Court"): *Fero v. Kuyper*, Case No. 37-2010-00058586-CU-BT-NC (the "*Fero* Action") and *Tuckfield v. Kuyper*, Case No. 37-2010-00062262-CU-BT-NC (the "*Tuckfield* Action"). Thereafter, on December 22, 2010, the Court consolidated the *Fero* and *Tuckfield* Actions, and designated *In re Alphatec Holdings, Inc. Derivative Shareholder Litigation*, Lead Case No. 37-2010-00058586-CU-BT-NC, as the lead case (the "Action").

The operative Complaint in the Action asserts claims on behalf of Alphatec against Defendants for, among other things, breaching their fiduciary duties of candor, loyalty and good faith owed to Alphatec by acquiring Scient'x, S.A. ("Scient'x") from Alphatec's alleged controlling shareholder, HealthpointCapital. More specifically, the Complaint alleges that, in late 2009, Alphatec announced the acquisition of Scient'x for $120.4 million in stock, despite Scient'x's lack of foreseeable profitability and its offering no significant benefit to Alphatec and/or its ongoing business operations. The Complaint asserts that at the time of the transaction, five of the nine members of the Alphatec Board of Directors ("Board") were affiliated with HealthpointCapital,

---

[1] All capitalized terms not otherwise defined are defined in Section IV.1, *infra*.

STIPULATION OF SETTLEMENT

920759_1

then the owner of Scient'x.  The Complaint further alleges that the Alphatec Board's approval of the Scient'x acquisition was never in doubt, despite its likely adverse material effects on Alphatec.

The Complaint asserts that in order to obtain approval of the Scient'x acquisition from Alphatec shareholders in connection with Alphatec's announcement of the Scient'x acquisition, Defendants made allegedly false and misleading revenue and income projections for the combined company.

According to the Complaint, after closing the Scient'x acquisition, Alphatec encountered severe problems integrating the international operations, personnel and products of Scient'x. Additionally, Alphatec was under significant pricing pressure.  As a result, on August 5, 2010, when Alphatec announced poor quarterly results and severely reduced revenue and income guidance for the post-Scient'x acquisition combined companies, the trading price of Alphatec stock collapsed.

**B.    Discovery and Pretrial Proceedings**

Discovery in the Action commenced in September 2010.  On September 10, 2010, Plaintiff Fero served a First Request for Production of Documents on Alphatec and HealthpointCapital, seeking documents and information relevant to the derivative claims asserted in the Action.  On November 10, 2010, Alphatec and HealthpointCapital served objections to the document requests. Thereafter, the meet and confer process regarding Plaintiffs' discovery ensued.

Ultimately, however, the meet and confer process failed and law and motion practice commenced.  On April 29, 2011, Plaintiffs filed motions to compel the production of documents in response to their First Requests.  In their motions, Plaintiffs argued, among other things, that Alphatec's and HealthpointCapital's objections to discovery lacked merit and only served to delay the prosecution of the Action.  While the motions were pending, on August 4, 2011, Defendants filed a Motion to Stay the Action in favor of a pending federal securities class action filed in the U.S. District Court for the Southern District of California (the "District Court"), entitled *Mallen v. Alphatec Holdings, Inc.*, Case No. 10-cv-1673-BEN(KSC) (the "Securities Action").  On August 15, 2011, Plaintiffs filed an Opposition to the Motion to Stay, arguing, among other things, that a

stay would prejudice the derivative claims asserted in the Action. On August 26, 2011, the Court stayed the Action in favor of the Securities Action. On March 28, 2013, after the Securities Action was dismissed by the District Court, litigation in the Action resumed.

### C.    The Settlement Negotiations

In May 2013, the Settling Parties began to renew efforts to explore resolution of the Action. The Settling Parties' previous settlement negotiations failed to produce a resolution. Towards that end, on May 3, 2013, the Settling Parties jointly requested a stay of proceedings to explore settlement, which the Court granted. The Settling Parties also agreed to schedule an all-day mediation on August 7, 2013, with the Honorable Layn R. Phillips, United States District Judge (Ret.). Judge Phillips is an experienced mediator with extensive experience in handling complex representative actions, including shareholder derivative actions.

Before the mediation with Judge Phillips, the Settling Parties engaged in extensive negotiations regarding a potential settlement. These negotiations included, among other things, lengthy discussions concerning the Defendants' alleged breaches of fiduciary duty and defenses thereto. In addition, before the mediation, the Settling Parties also engaged in extensive briefing regarding the merits of their respective claims and defenses for Judge Phillips.

Although the August 7, 2013 mediation did not produce a resolution, settlement negotiations, under the supervision of Judge Phillips, continued until January 2014. The settlement negotiations were hard-fought, and, at times, contentious. Ultimately, the Settling Parties, with the substantial assistance of Judge Phillips, reached an agreement-in-principle to resolve the Action.

As a result of the Action and the settlement, reflected in this Stipulation (the "Settlement"), Alphatec will institute significant Corporate Governance Reforms designed to enhance and improve its internal controls and systems, as well as the effectiveness and responsiveness of the Alphatec Board. The Settling Parties believe that a settlement at this juncture on the terms and on the conditions set forth in the Stipulation is fair, reasonable, and adequate.

The Alphatec Board has, in its business judgment, approved the Settlement, and each of its terms, as fair, just and adequate, and in the best interest of Alphatec and its shareholders.

STIPULATION OF SETTLEMENT

## II. CLAIMS OF THE PLAINTIFFS AND BENEFITS OF SETTLEMENT

Plaintiffs and their counsel believe that the claims asserted in the Action have merit. However, Plaintiffs and their counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Action against the Defendants through trial and through appeals. Plaintiffs and their counsel have also taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Action, as well as the difficulties and delays inherent in such litigation. Plaintiffs and their counsel are also mindful of the inherent problems of proof and possible defenses to the claims asserted in the Action. Plaintiffs and their counsel believe that the Settlement set forth in the Stipulation confers substantial benefits upon Alphatec and its shareholders. Based on their evaluation, Plaintiffs, their counsel and Alphatec have determined that the Settlement set forth in this Stipulation is in the best interests of Alphatec and its shareholders.

## III. DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

Defendants have denied and continue to deny each and every one of the claims, contentions, and allegations made against them or that could have been made against them in the Action, and expressly deny all charges of wrongdoing or liability against them. Defendants assert that they have satisfied their fiduciary duties at all relevant times, have acted in good faith and in the best interests of Alphatec and its shareholders, have meritorious defenses to Plaintiffs' claims, and that judgment should be entered dismissing all claims against them with prejudice. Defendants also have denied and continue to deny, among other things, the allegations that Plaintiffs, Alphatec or its shareholders have suffered damage, or that Plaintiffs, Alphatec or its shareholders were harmed by the conduct alleged in the Action. Defendants have thus entered into the Stipulation solely to avoid the continuing additional expense, inconvenience, and distraction of this litigation and to avoid the risks inherent in the lawsuit, and without admitting any wrongdoing or liability whatsoever.

**IV. TERMS OF STIPULATION AND SETTLEMENT AGREEMENT**

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among Plaintiffs (for themselves and derivatively on behalf of Alphatec), Defendants and Alphatec, by and through their respective counsel, as follows:

**1.      Definitions**

As used in the Stipulation, the following terms have the meanings specified below:

1.1      "Action" means collectively the consolidated action pending in the Superior Court of California for the County of San Diego entitled *In re Alphatec Holdings, Inc. Derivative Shareholder Litigation*, Lead Case No. 37-2010-00058586-CU-BT-NC (Consolidated with Case No. 37-2010-00062262-CU-BT-NC, pending in the Superior Court of California for the County of San Diego).

1.2      "Alphatec" or the "Company" means nominal defendant Alphatec Holdings, Inc., and its predecessors, successors, subsidiaries, affiliates, divisions, and assigns.

1.3      "Complaints" means the shareholder derivative complaints filed in the Action.

1.4      "Court" means the Superior Court of California for the County of San Diego.

1.5      "Defendants" means the Individual Defendants, HealthpointCapital, and nominal defendant Alphatec.

1.6      "Effective Date" means the first date by which all of the events and conditions specified in ¶6.1 of this Stipulation have been met and have occurred.

1.7      "Final" means when the last of the following with respect to the Judgment (as defined below in ¶1.10) shall have occurred:  (i) either no appeal has been filed and the time has passed for any notice of appeal to be timely filed in the Action; or (ii) an appeal has been filed and the court of appeal has either affirmed the Judgment/dismissal or dismissed that appeal and the time for any reconsideration or further appellate review has passed; or (iii) a higher court has granted further appellate review and that court has either affirmed the underlying Judgment/dismissal or affirmed the court of appeals' decision affirming the Judgment/dismissal or dismissing the appeal.

STIPULATION OF SETTLEMENT

1.8 "HealthpointCapital" means defendant HealthpointCapital LLC and its predecessors, successors, subsidiaries, affiliates, divisions, and assigns.

1.9 "Individual Defendants" means defendants Dirk Kuyper, Peter C. Wulff, Mortimer Berkowitz, III, John H. Foster, R. Ian Molson, Stephen E. O'Neil, Stephen H. Hochschuler, James R. Glynn, Rohit M. Desai, and Siri S. Marshall.

1.10 "Judgment" means the Order and Final Judgment to be rendered by the Court, substantially in the form attached hereto as Exhibit B.

1.11 "Lead Counsel" means Robbins Arroyo LLP and Robbins Geller Rudman & Dowd LLP and their respective successor(s).

1.12 "Person" means an individual, corporation, limited liability corporation, professional corporation, partnership, limited partnership, limited liability partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government, or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assignees.

1.13 "Plaintiffs" means Patrick Fero and Ralph Tuckfield, and their respective agents, employees, representatives, spouses, marital communities, heirs, successors, subrogees, transferees, and assignees.

1.14 "Plaintiffs' Counsel" means any counsel that has appeared of record or rendered legal services to any Plaintiffs in connection with the Action.

1.15 "Related Persons" means (as applicable): (i) Defendants' respective spouses, domestic partners, marital communities, heirs, successors, executors, estates, or administrators; any entity in which a Defendant and/or member(s) of his or her family has or had a controlling interest; any members of Defendants' immediate family; or any trust of which any Defendant is or was the settlor or which is or was for the benefit of any Defendant and/or member(s) of his or her family; (ii) Defendants' present and former attorneys, legal representatives, insurers, and assigns in connection with the Action; (iii) HealthpointCapital Partners, L.P., HealthpointCapital Partners II, L.P., and HCPII Co-Invest Vehicle II, LP, and all of their past or present members, partners, limited

STIPULATION OF SETTLEMENT

partners, general partners, and investment funds; and (iv) all past and present directors, officers, partners, controlling shareholders, joint venturers, related or affiliated entities, advisors, employees, affiliates, predecessors, successors, parents, subsidiaries, divisions, assigns, insurers, and attorneys for Alphatec or HealthpointCapital, their respective counsel, or any entity in which either Alphatec or HealthpointCapital has a controlling interest.

1.16 "Released Claims" shall collectively mean all claims (including "Unknown Claims"), debts, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, asserted or that could have been asserted by Plaintiffs, by any shareholder on behalf of Alphatec, or by Alphatec, against each and every Released Person (including, without limitation, claims for damages, interest, attorneys' fees, expert or consulting fees and any other costs, expenses or liability, negligence, negligent supervision, gross negligence, intentional conduct, indemnification, breach of duty of loyalty or good faith, fraud, misrepresentation, unjust enrichment, constructive trust, breach of fiduciary duty, negligent misrepresentation, unfair competition, insider trading, professional negligence, mismanagement, corporate waste, breach of contract, or violations of any state or federal statutes, rules or regulations) that were alleged in the Action, or that arise from or relate to the matters or occurrences that were alleged in the Action, or that could have been asserted with respect to the matters or occurrences that were alleged in the Action, for conduct through and including the date on which this Stipulation is executed by all signatories, including, but not limited to, any claims by Plaintiffs, Alphatec shareholders or Alphatec related to public disclosures relating to Alphatec's acquisition of Scient'x.

1.17 "Released Persons" means each of the Defendants and their Related Persons and Alphatec.

1.18 "Settling Parties" means, collectively, each of the Defendants, Plaintiffs (on behalf of themselves and derivatively on behalf of Alphatec), and Alphatec and its shareholders.

1.19 "Unknown Claims" means any of the Released Claims which Plaintiffs, Alphatec, or Alphatec shareholders do not know or suspect to exist in his, her or its favor at the time of the

STIPULATION OF SETTLEMENT

release of the Released Persons, including claims which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this Settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, the Plaintiffs, Defendants, and Alphatec shall expressly waive and each of the Alphatec shareholders shall be deemed to have, and by operation of the Judgment shall have, expressly waived, the provisions, rights, and benefits of California Civil Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Upon the Effective Date, Plaintiffs, Defendants, and Alphatec shall expressly waive, and each of the Alphatec shareholders shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any jurisdiction or any state or territory of the United States or any foreign jurisdiction, or principle of common law, which is similar, comparable or equivalent to California Civil Code Section 1542. Plaintiffs, Defendants, Alphatec, and Alphatec shareholders may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date, each Plaintiff, Defendant, and Alphatec shall expressly settle and release, and each Alphatec shareholder shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Settling Parties acknowledge, and the Alphatec shareholders shall be deemed by operation of the

STIPULATION OF SETTLEMENT

Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of the Settlement of which this release is a part.

**2. Corporate Governance Reforms**

2.1     In connection with the settlement of the Action, Alphatec has agreed to adopt the Corporate Governance Reforms set forth below, which Alphatec shall implement and maintain for a period of not less than five (5) years.  Alphatec and Defendants acknowledge and agree that the Action filed by Plaintiffs precipitated and was a material factor in the Corporate Governance Reforms described below.  Alphatec and Defendants acknowledge and agree that the Corporate Governance Reforms confer a substantial benefit to Alphatec as part of the settlement of the Action.

2.2     Within thirty (30) days of the issuance of an Order approving the settlement of the Action, the Alphatec Board shall adopt resolutions and amend committee charters to ensure adherence to the following Corporate Governance Reforms.  Additionally, the Board shall post the Corporate Governance Reforms on Alphatec's website within thirty (30) days of adoption and maintain a current version of such policies on its website.

## CHANGES TO ALPHATEC HOLDINGS, INC. MANAGEMENT

2.3     The following individuals who served as directors of Alphatec during the time periods relevant to the allegations of the Complaint, resigned:  Mortimer Berkowitz resigned from his position as Chairman of the Board but remains a Director; Dirk Kuyper resigned from his position as Director; and Stephen H. Hochschuler resigned from his position as Director.

2.4     The following individuals, who served as senior executives of Alphatec during the time periods relevant to the allegations of the Complaint, resigned:  Dirk Kuyper (CEO) and Peter Wulff (Senior VP of Strategic Initiatives).

## SEPARATE CHAIRMAN AND CEO

2.5     The Board shall adopt a resolution by no later than June 30, 2014, that requires the positions of CEO and Chairman to be held by separate persons beginning no later than June 30, 2015, or if the same person holds those positions, that a Lead Independent Director be appointed.

920759_1

**RELATED PARTY TRANSACTIONS**

2.6     Directors shall be prohibited from participating in any negotiations of transactions between the Company and any entity with which the director has a relationship that gives rise to an actual or apparent conflict of interest.

2.7     All related-party transactions shall be subject to review and oversight by an independent committee of the Alphatec Board.

2.8     The Board or a Committee of the Board shall engage an independent third party to conduct financial due diligence and valuations of all proposed Alphatec mergers, acquisitions, and investment transactions over $10 million.

2.9     All related party transactions of more than $250,000 are to be reviewed by at least two independent directors or the Audit Committee no less than five days before consummation of the proposed related party transaction, or upon agreement if less than five days between agreement and consummation, and the independent directors' approval or disapproval of the proposed related party transaction are to be fully disclosed in the Company's next annual or quarterly report immediately following the approval or disapproval of the proposed related party transaction.

2.10     The adoption of amendments to the Code of Ethics for Senior Financial Officers in 2012, which amendments require that Senior Financial Officers report to the Chairman of the Audit Committee any transaction that reasonably could be expected to give rise to a conflict of interest, and produce, or cause to be produced, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public filings.

**DIRECTORS**

2.11     A majority of the directors on the Board shall be independent as defined by NASDAQ Rule 5605(a)(2), which, in relevant part, is set forth below.

> "Independent Director" means a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. For purposes of this rule, "Family Member" means a person's spouse, parents, children and

STIPULATION OF SETTLEMENT

920759_1

siblings, whether by blood, marriage or adoption, or anyone residing in such person's home.  The following persons shall not be considered independent:

(A) a director who is, or at any time during the past three years was, employed by the Company;

(B) a director who accepted or who has a Family Member who accepted any compensation from the Company in excess of $120,000 during any period of twelve consecutive months within the three years preceding the determination of independence, other than the following:

(i) compensation for board or board committee service;

(ii) compensation paid to a Family Member who is an employee (other than an Executive Officer) of the Company; or

(iii) benefits under a tax-qualified retirement plan, or non-discretionary compensation.

Provided, however, that in addition to the requirements contained in this paragraph (B), audit committee members are also subject to additional, more stringent requirements under Rule 5605(c)(2).

(C) a director who is a Family Member of an individual who is, or at any time during the past three years was, employed by the Company as an Executive Officer;

(D) a director who is, or has a Family Member who is, a partner in, or a controlling Shareholder or an Executive Officer of, any organization to which the Company made, or from which the Company received, payments for property or services in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000, whichever is more, other than the following:

(i) payments arising solely from investments in the Company's securities; or

(ii) payments under non-discretionary charitable contribution matching programs.

(E) a director of the Company who is, or has a Family Member who is, employed as an Executive Officer of another entity where at any time during the past three years any of the Executive Officers of the Company serve on the compensation committee of such other entity; or

(F) a director who is, or has a Family Member who is, a current partner of the Company's outside auditor, or was a partner or employee of the Company's outside auditor who worked on the Company's audit at any time during any of the past three years.

2.12    The Audit, Compensation, and Nominating Committees of the Board shall be comprised entirely of independent directors as defined by NASDAQ Rule 5605(a)(2).

STIPULATION OF SETTLEMENT

920759_1

1       2.13    The independent directors shall certify their independence in writing annually and

2   will notify the Chairman of any change in status.

3       2.14    The independent directors shall meet separately at least twice a year in conjunction

4   with regularly scheduled meetings of the Board.

5       2.15    The Board and all Board committees shall conduct an annual self-evaluation.

6       2.16    The performance of the Chairman shall be evaluated annually by the Board.

7       2.17    All directors shall attend at least three-fourths of Board meetings in any calendar

8   year. Directors who fail to attend three-fourths of Board meetings in any calendar year must

9   disclose in the annual proxy statement the reasons for their inability to attend.

10  **DIRECTOR EDUCATION**

11      2.18    During 2014, the Board shall have an educational session on corporate

12  governance/directors duties which will be led by an outside consultant hired for this purpose. This

13  can be done in conjunction with a regularly scheduled board meeting or in a separate session

14  specially set.

15  **AUDIT COMMITTEE**

16      2.19    The Chairman of the Audit Committee shall meet quarterly with the Company's

17  Director of Internal Audit.

18      2.20    The Audit Committee shall review and discuss earnings press releases, and the

19  Chairman of the Audit Committee shall be required to give final approval of any earnings press

20  releases before they are made public.

21      2.21    The Audit Committee shall review financial information and earnings guidance

22  provided to analysts and credit rating agencies and make a recommendation to management and to

23  the Board.

24      2.22    The Audit Committee shall be directly responsible for the oversight of the registered

25  public accounting firm engaged to prepare or issue an audit report or perform other audit services.

26      2.23    The Audit Committee Report shall state that the Audit Committee has:

27          (a)    reviewed and discussed the audit financial statements with management;

28

STIPULATION OF SETTLEMENT

(b)     discussed the matters that are required to be communicated by Statement on Auditing Standards No. 61, "Communications with Audit Committees" with the external auditor;

(c)     received the written disclosures and the letter from the external auditor on independence matters as required by ISB Standard No. 1, "Independence Discussions and Audit Committees";

(d)     discussed independence issues with the external auditor; and

(e)     recommended to the Board that the audited financial statements be filed with the SEC.

**3.     Procedure for Implementing the Settlement**

3.1     Promptly after execution of this Stipulation, Plaintiffs shall submit the Stipulation and its Exhibits to the Court and shall apply for an order substantially in the form of Exhibit A hereto, requesting the preliminary approval of the Settlement set forth in this Stipulation (the "Preliminary Approval Order"), and approval for the dissemination of the Notice of Proposed Settlement ("Notice") substantially in the form of Exhibit A-1 hereto, which shall include the general terms of the Settlement set forth in this Stipulation, including the general terms of the fees and expenses to be paid to Plaintiffs' Counsel and the date of the Settlement Hearing (as defined below). Within five (5) business days of the issuance of the Preliminary Approval Order, Alphatec shall cause the Stipulation and Notice to be filed with the SEC via a Form 8-K, shall publish the Summary Notice of Proposed Settlement substantially in the form of Exhibit A-2 hereto, for one day in *Investor's Business Daily*, and shall post the Stipulation and Notice on Alphatec's website such that visitors to the "Investors" section of the website will readily find a hyperlink to the Notice. All costs in providing notice will be paid by Alphatec.

3.2     Plaintiffs will request that after the notice is given, the Court hold a hearing (the "Settlement Hearing") and approve the settlement of the Action as set forth herein, including payment of Plaintiffs' Counsel's attorneys' fees and expenses in the amount negotiated by Lead Counsel and Alphatec, with the assistance of the Honorable Layn R. Phillips (Ret.), following negotiation of the Corporate Governance Reforms, and enter the Judgment.

920759_1

**4. Releases**

4.1    Upon the Effective Date, Alphatec, Plaintiffs (acting on their own behalf and derivatively on behalf of Alphatec), and each of Alphatec's shareholders (solely in their capacity as Alphatec shareholders) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged the Released Claims against the Released Persons and any and all claims (including Unknown Claims) arising out of, relating to, or in connection with the defense, settlement or resolution of the Action against the Released Persons, provided that nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of this Stipulation or the Judgment.

4.2    Upon the Effective Date, Alphatec, Plaintiffs (acting on their own behalf and derivatively on behalf of Alphatec), and each of Alphatec's shareholders (solely in their capacity as Alphatec shareholders) will be forever barred and enjoined from commencing, instituting or prosecuting any of the Released Claims or any action or other proceeding against any of the Released Persons based on the Released Claims or any action or proceeding arising out of, related to, or in connection with the settlement or resolution of the Action, provided that nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of this Stipulation or the Judgment.

4.3    Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged each and all of the Plaintiffs, Plaintiffs' Counsel, Alphatec, and all of the Alphatec shareholders (solely in their capacity as Alphatec shareholders) from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Action or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of this Stipulation or the Judgment.

4.4    Nothing in this Stipulation constitutes or reflects a waiver or release of any rights or claims of Defendants and/or Alphatec against their insurers, or their insurers' subsidiaries,

STIPULATION OF SETTLEMENT

predecessors, successors, assigns, affiliates, or representatives, including, but not limited to, any rights or claims by the Defendants and/or Alphatec under any directors' and officers' liability insurance or other applicable insurance coverage maintained by the Company. Nothing in this Stipulation constitutes or reflects a waiver or release of any rights or claims of the Defendants relating in any way to indemnification or advancement of attorneys' fees relating to the Action or the Released Claims, whether under any written indemnification or advancement agreement, or under the Company's charter, by-laws or operating agreement, or under applicable law.

**5. Plaintiffs' Counsel's Attorneys' Fees and Expenses**

5.1    After negotiating the Corporate Governance Reforms, Lead Counsel and Alphatec, with the assistance of Judge Phillips, separately negotiated the attorneys' fees and expenses that the Company would pay to Plaintiffs' Counsel. As a result of these negotiations, and in light of the substantial benefits conferred upon Alphatec by Plaintiffs' Counsel's efforts, the Company has agreed to pay $5,250,000 for Plaintiffs' Counsel's attorneys' fees and expenses, subject to court approval (the "Fees and Expenses").

5.2    Within ten (10) calendar days of issuance of an Order by the Court finally approving the Settlement, notwithstanding the existence of any timely filed objections to the Settlement, or potential for appeal therefrom, Alphatec shall pay the Fees and Expenses to Robbins Arroyo LLP as receiving agent for Plaintiffs' Counsel, subject to Plaintiffs' Counsel's several obligation to make appropriate refunds or repayment of the principal amount received and any accrued interest thereon less taxes within five (5) business days if and when, as a result of any further Order of the Court, appeal, further proceedings or remand, or successful collateral attack, the Settlement is not approved or is overturned on appeal. The Fees and Expenses shall constitute full, complete, and exclusive compensation for Plaintiffs' Counsel's efforts, fees, services, and expenses.

5.3    Defendants and their respective Related Persons shall have no responsibility for, and no liability whatsoever with respect to, the fee allocation among Plaintiffs' Counsel, and any other Person who may assert a claim hereto, of any portion of the Fees and Expenses.

**6.     Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

6.1     The Effective Date is conditioned on the occurrence of all of the following events, and is the first date by which all of the following events and conditions have been met and have occurred:

> (a)     Approval of the Settlement, and each of its terms, by the Alphatec Board;
>
> (b)     Entry by the Court of the Judgment and an order approving the Settlement;
>
> (c)     Payment of the Fees and Expenses; and
>
> (d)     the Judgment has become Final.

6.2     If any of the conditions specified in paragraph 6.1 are not met, then the Stipulation shall be canceled and terminated subject to paragraph 6.3, unless the Settling Parties mutually agree in writing to proceed with the Stipulation.

6.3     If for any reason the Effective Date of the Stipulation does not occur, the Fees and Expenses paid to Plaintiffs' Counsel and any and all interest accrued thereon since payment, shall be returned to Alphatec within five (5) business days of said event.  The return obligation set forth in this paragraph is the several obligation of all Plaintiffs' Counsel who have received a payment in the Action.

**7.     Additional Provisions**

7.1     The Settling Parties (i) acknowledge that it is their intent to consummate this Stipulation and Settlement; and (ii) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and the Settlement and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation and the Settlement.

7.2     The Settling Parties intend this Settlement to be a final and complete resolution of all disputes between Plaintiffs, Defendants and Alphatec with respect to the Action.  The Settlement compromises claims that are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim, allegation or defense.  The Settling Parties further agree that the claims are being settled voluntarily after consultation with competent legal counsel.  The Settling

920759_1

Parties will request that the Judgment contain a finding that during the course of the litigation, the parties and their respective counsel at all times complied with the requirements of California Code of Civil Procedure Section 128.7, and all other similar laws.

7.3    Neither the Stipulation (including any Exhibits attached hereto) nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be, or may be offered, attempted to be offered or used in any way by the Settling Parties as a presumption, a concession or an admission of, or evidence of, any fault, wrongdoing or liability of the Settling Parties or of the validity of any Released Claims; or (b) is intended by the Settling Parties to be offered or received as evidence or used by any other person in any other actions or proceedings, whether civil, criminal or administrative.  The Released Persons may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, standing, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim, and any of the Settling Parties may file the Stipulation and documents executed pursuant and in furtherance thereto in any action to enforce the Settlement.

7.4    The Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

7.5    The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

7.6    This Stipulation and the Exhibits attached hereto constitute the entire agreement among the Settling Parties and no representations, warranties or inducements have been made to any Settling Party concerning the Stipulation or any of its Exhibits other than the representations, warranties, and covenants contained and memorialized in such documents.  Except as otherwise provided herein, each Settling Party shall bear its own costs.

STIPULATION OF SETTLEMENT

920759_1

7.7     Each counsel or other Person executing the Stipulation and/or the Exhibits attached hereto on behalf of any Settling Party hereby warrants that such Person has the full authority to do so.

7.8     The Stipulation may be executed in one or more counterparts. A faxed signature or electronically scanned (in .pdf format) signature shall be deemed an original signature for the purposes of this Stipulation. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of counterparts, either originally executed or copies thereof, shall be filed with the Court.

7.9     The Stipulation and the Settlement shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties and the Released Persons.

7.10    The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation and the Settlement, and the Settling Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Stipulation and the Settlement.

7.11    This Stipulation and the Exhibits attached hereto shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of California without giving effect to that state's choice-of-law principles.

7.12    The Settling Parties hereby represent and warrant that they have not assigned any rights, claims or causes of action that were asserted or could have been asserted in connection with, under or arising out of the Released Claims.

7.13    All agreements made and orders entered during the course of the Action relating to the confidentiality of information shall survive this Stipulation.

7.14    Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of this Stipulation.

920759_1

IN WITNESS WHEREOF, the parties have caused the Stipulation to be executed, by their duly authorized attorneys, dated March 25, 2014.

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. PALMER

_____
KEVIN A. SEELY

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

ROBBINS GELLER RUDMAN
 & DOWD LLP
TRAVIS E. DOWNS III
ELLEN GUSIKOFF STEWART
BENNY C. GOODMAN, III
BRIAN O. O'MARA

_____
ELLEN GUSIKOFF STEWART

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Lead Counsel for Plaintiffs

LATHAM & WATKINS LLP
COLLEEN C. SMITH

_____
COLLEEN C. SMITH

12670 High Bluff Drive
San Diego, CA 92103
Telephone: (858) 523-5400
Facsimile: (858) 523-5450

- 19 -

920759_1

IN WITNESS WHEREOF, the parties have caused the Stipulation to be executed, by their duly authorized attorneys, dated March 25, 2014.

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. PALMER

_____
KEVIN A. SEELY

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III
ELLEN GUSIKOFF STEWART
BENNY C. GOODMAN, III
BRIAN O. O'MARA

_____
ELLEN GUSIKOFF STEWART

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Lead Counsel for Plaintiffs

LATHAM & WATKINS LLP
COLLEEN C. SMITH

_____
COLLEEN C. SMITH

12670 High Bluff Drive
San Diego, CA 92103
Telephone: (858) 523-5400
Facsimile: (858) 523-5450

- 19 -
STIPULATION OF SETTLEMENT

920759_1

LATHAM & WATKINS LLP
PETER A. WALD
505 Montgomery Street, Suite 200
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

LATHAM & WATKINS LLP
MICHELE D. JOHNSON
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290

Counsel for Defendants Dirk Kuyper, Peter C. Wulff, Stephen H. Hochschuler, Rohit M. Desai, and Nominal Defendant Alphatec Holdings, Inc.

WILSON SONSINI GOODRICH & ROSATI
NINA LOCKER
STEVEN GUGGENHEIM
JONI OSTLER

_____

STEVEN GUGGENHEIM 3/27/14

650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Counsel for Defendants HealthpointCapital, LLC, Mortimer Berkowitz, III, John H. Foster, R. Ian Molson, and Stephen E. O'Neil

STIPULATION OF SETTLEMENT

920759_1

SIDLEY AUSTIN LLP
SARA B. BRODY
CAROL LYNN THOMPSON

_Sara Beth Brody_
SARA B. BRODY

555 California Street
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Counsel for Defendants Siri S. Marshall and
James R. Glynn

STIPULATION OF SETTLEMENT

920759_1

# EXHIBIT 13

F I L E D
Clerk of the Superior Court

AUG 18 2014

By: M. GARLAND, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| In re ALPHATEC HOLDINGS, INC. DERIVATIVE SHAREHOLDER LITIGATION | Case No. 37-2010-00058586-CU-BT-NC |
| | (Consolidated with Case No. 37-2010-00062262-CU-BT-NC) |
| This Document Relates To: | [~~PROPOSED~~] ORDER AND FINAL JUDGMENT |
| ALL ACTIONS. | Judge: Jacqueline M. Stern |
| | Dept: N-27 |
| | Date Action Filed: August 25, 2010 |
| | Hearing Date: August 15, 2014 |
| | Hearing Time: 1:30 p.m. |

This matter came before the Court for hearing pursuant to the Order of this Court, dated April 25, 2014 ("Order"), on the motion of the parties for approval of the proposed settlement ("Settlement") set forth in the Stipulation of Settlement dated March 25, 2014, and the Exhibits thereto (the "Stipulation").

The Court has reviewed and considered all documents, evidence, objections (if any), and arguments presented in support of or against the Settlement; the Court being fully advised of the premises and good cause appearing therefore, the Court enters this Judgment.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.     This Judgment incorporates by reference the definitions in the Stipulation, and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

2.     This Court has jurisdiction over the subject matter of the Action, including all matters necessary to effectuate the Settlement, and over all Settling Parties.

3.     The Court finds that the Notice and Summary Notice provided to Alphatec Holdings, Inc. ("Alphatec" or the "Company") shareholders constituted the best notice practicable under the circumstances. The Notice and Summary Notice fully satisfied the requirements of California law and due process.

4.     The Court finds that, during the course of the litigation of the Action, the Settling Parties and their respective counsel at all times complied with the requirements of California Code of Civil Procedure Section 128.7, and all other similar laws.

5.     The Court finds that the terms of the Stipulation and Settlement are fair, reasonable, and adequate as to each of the Settling Parties, and hereby finally approves the Stipulation and Settlement in all respects, and orders the Settling Parties to perform its terms to the extent the Settling Parties have not already done so.

6.     Pursuant to entry of this Judgment, the Action and all claims contained therein against Defendants, as well as all of the Released Claims against each of the Defendants and their Related Persons, are hereby dismissed with prejudice. As among the Plaintiffs, Defendants and Alphatec, the parties are to bear their own costs, except as otherwise provided in the Stipulation.

1        7.      Upon the Effective Date, as defined in the Stipulation, Alphatec, Plaintiffs (acting on

2  their own behalf and derivatively on behalf of Alphatec), and each of Alphatec's shareholders (solely in

3  their capacity as Alphatec shareholders) shall be deemed to have, and by operation of this Judgment

4  shall have, fully, finally, and forever released, relinquished, and discharged the Released Claims against

5  the Released Persons and any and all claims (including Unknown Claims) arising out of, relating to, or

6  in connection with, the defense, settlement or resolution of the Action against the Released Persons,

7  provided that nothing herein shall in any way impair or restrict the rights of any Settling Party to

8  enforce the terms of the Stipulation or this Judgment.

9        8.      Upon the Effective Date, as defined in the Stipulation, Alphatec, Plaintiffs (acting on

10  their own behalf and derivatively on behalf of Alphatec), and each of Alphatec's shareholders (solely in

11  their capacity as Alphatec shareholders) shall be forever barred and enjoined from commencing,

12  instituting or prosecuting any of the Released Claims or any action or other proceeding against any of

13  the Released Persons based on the Released Claims or any action or proceeding arising out of, related

14  to, or in connection with the settlement or resolution of the Action, provided that nothing herein shall in

15  any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation or this

16  Judgment.

17        9.      Upon the Effective Date, as defined in the Stipulation, each of the Released Persons shall

18  be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released,

19  relinquished, and discharged each and all of the Plaintiffs, Plaintiffs' Counsel, Alphatec, and all of the

20  Alphatec shareholders (solely in their capacity as Alphatec shareholders) from all claims (including

21  Unknown Claims) arising out of, relating to, or in connection with, the institution, prosecution,

22  assertion, settlement or resolution of the Action or the Released Claims. Nothing herein shall in any

23  way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation or this

24  Judgment.

25        10.     Nothing herein constitutes or reflects a waiver or release of any rights or claims of

26  Defendants and/or Alphatec against their insurers, or their insurers' subsidiaries, predecessors,

27  successors, assigns, affiliates, or representatives, including, but not limited to, any rights or claims by

28  the Defendants and/or Alphatec under any directors' and officers' liability insurance or other applicable

- 2 -

insurance coverage maintained by the Company. Nothing herein constitutes or reflects a waiver or release of any rights or claims of the Defendants relating in any way to indemnification or advancement of attorneys' fees relating to the Action or the Released Claims, whether under any written indemnification or advancement agreement, or under the Company's charter, by-laws or operating agreement, or under applicable law.

11.     The Court hereby approves the Fees and Expenses in accordance with the Stipulation and finds that such fee is fair and reasonable.

12.     Neither the Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be, or may be offered, attempted to be offered or used in any way by the Settling Parties or any other Person as a presumption, a concession or an admission of, or evidence of, any fault, wrongdoing or liability of the Settling Parties; or of the validity of any Released Claims; or (b) is intended by the Settling Parties to be offered or received as evidence or used by any other person in any other actions or proceedings, whether civil, criminal or administrative. The Released Persons may file the Stipulation and/or this Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, standing, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim, and any of the Settling Parties may file the Stipulation and documents executed pursuant and in furtherance thereto in any action to enforce the Settlement.

13.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction with respect to implementation and enforcement of the terms of the Stipulation.

14.     In the event that the Settlement does not become effective in accordance with the terms of the Stipulation, this Judgment shall be vacated, and all Orders entered and releases delivered in connection with the Stipulation and this Judgment shall be null and void, except as otherwise provided for in the Stipulation.

[PROPOSED] ORDER AND FINAL JUDGMENT

1     15.    This Judgment is a final, appealable judgment and should be entered forthwith by the

2   Clerk.

3          IT IS SO ORDERED.

4

5   DATED: _____AUG 1 8 2014_____          JACQUELINE M. STERN

6                                            THE HONORABLE JACQUELINE M. STERN
                                             JUDGE OF THE SUPERIOR COURT
7

8   Submitted by:

9   ROBBINS ARROYO LLP
    BRIAN J. ROBBINS
10  KEVIN A. SEELY
    ASHLEY R. PALMER
11

12

13          KEVIN A. SEELY

14  600 B Street, Suite 1900
    San Diego, CA 92101
15  Telephone: (619) 525-3990
    Facsimile: (619) 525-3991
16
    ROBBINS GELLER RUDMAN & DOWD LLP
17  TRAVIS E. DOWNS III
    ELLEN GUSIKOFF STEWART
18  BENNY C. GOODMAN III
    BRIAN O. O'MARA
19  655 West Broadway, Suite 1900
    San Diego, CA 92101
20  Telephone: (619) 231-1058
    Facsimile: (619) 231-7423
21
    Lead Counsel for Plaintiffs
22

23

24

25

26

27  972401

28

# EXHIBIT 14



# McKinsey & Company

## Investor Opinion Survey

### June 2000

# McKinsey & Company Investor Opinion Survey on Corporate Governance

Increased shareholder activism in the U.S. and elsewhere stems from the conviction that better corporate governance will deliver higher shareholder returns. Yet repeated attempts by academics to show an irrefutable link between the two have failed, such is the complexity of the relationship.

With this in mind, McKinsey & Company conducted a series of surveys to discover how shareholders perceive and, importantly, value corporate governance in both developed and emerging markets.  Undertaken in co-operation with the World Bank and the *Institutional Investor's* regional institutes, the surveys gathered responses about investment intentions from over 200 institutional investors, who together manage approximately US$3.25 trillion in assets. Forty percent of the respondents were based in the U.S.

## Among the key findings from the surveys detailed in this pamphlet are the following:

- Three-quarters of investors say board practices are at least as important to them as financial performance when they are evaluating companies for investment. In Latin America, almost half the respondents consider board practices to be more important than financial performance.

- Over 80 percent of investors say they would pay more for the shares of a well-governed company than for those of a poorly governed company with comparable financial performance. (For the purpose of the surveys, a well-governed company is defined as having a majority of outside directors on the board with no management ties; holding formal evaluations of directors; and being responsive to investor requests for information on governance issues. In addition, directors hold significant stockholdings in the company, and a large proportion of directors' pay is in the form of stock options.)

- The actual premium investors say they would be willing to pay for a well-governed company differs by country. For example, investors say they would pay 18 percent more for the shares of a well-governed UK company than for the shares of a company with similar financial performance but poorer governance practices. They would be willing to pay a 22 percent premium for a well-governed Italian company, and a 27 percent premium for one in Venezuela or Indonesia.

# Interpreting the results

The fact that so many investors say board governance is as important as financial performance points to the poor quality of financial reporting in many countries. The priority of investors the world over is that their investments grow. Yet in Asia and Latin America, where financial reporting is both limited and often of poor quality, investors prefer not to put their trust in figures alone. They believe their investments will be better protected by well-governed companies that respect shareholder rights. In Europe and the U.S., where accounting standards are higher, the relative importance of corporate governance is lower.

The size of the premium that institutional investors say they are willing to pay for good governance seems to reflect the extent to which they believe there is room for improvement.

For example, the lower premiums for UK and US companies suggest that investors feel these companies have already addressed many fundamental governance issues. They can improve by fine-tuning current practices, and identifying innovative ways to raise governance standards still further.

The premiums in continental Europe suggest that, in addition to improved corporate governance at board level, there is a need for more effective disclosure of information to shareholders concerning governance practices and financial issues.

In Asia and Latin America, still higher premiums reflect the need for more fundamental disclosure of information, and stronger shareholder rights. In Latin America, for instance, local investors say better disclosure is the main concern, while foreign investors see shareholder rights as the priority. For them, the value of more information is undermined if they cannot influence board or management decisions.

# Meeting the Corporate Governance Challenge

Although it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through. Precise measurement apart, the fact that a majority of investors say they already take corporate governance into account when making investment decisions is a powerful argument in favour of corporate governance reform.

Companies and policy makers should take heed. If companies could capture but a small proportion of the governance premium that is apparently available, they would create significant shareholder value. Moreover, those companies that fail to reform will find themselves at a competitive disadvantage when it comes to attracting capital to finance growth. High governance standards will prove essential to attracting and retaining investors in globalized capital markets, while failure to reform is likely to hinder those companies with global ambitions.

Companies should therefore improve their board practices and board and management incentives. The surveys make clear where investors' priorities lie in these areas. In addition, companies should promote better relationships with all their shareholders.

Policy makers wishing to attract more foreign investors should also play their part, as companies alone cannot produce the magnitude of change that is necessary, particularly in emerging markets.  At the regulatory level, the corporate governance framework should encourage governance reforms or, at the very least, not hinder them.

Improved disclosure of information and stronger shareholder rights appear to be the most appropriate target areas for policy makers, who must also take into account what may well be different priorities of both domestic and foreign investors.

However, it would be wrong to conclude from the survey that good corporate governance is a simple issue. An effective board of directors is a combination of the right people, the right structure, and the right procedures. Determining what is appropriate for each individual company is the real challenge. Likewise, policy changes are likely to impact countries differently depending on existing cultural and economic practices. Each company and country needs to consider its own circumstances before deciding the best way to improve corporate governance.

*Paul Coombes*

Paul Coombes
Director, London Office

# Investor Opinion Survey

- Latin America

    – Undertaken March/April 2000 in cooperation with The World Bank Group

    – 90 respondents with an estimated US$1,650b+ assets under management

    – 70% of respondents had invested in Latin America

- Europe/US

    – Undertaken October/November 1999 in cooperation with the *Institutional Investor's* U.S. Institute and European Institute

    – 42 respondents with an estimated US$550b+ assets under management

    – 95% of respondents had invested in Europe and the U.S.

- Asia

    – Undertaken September/October 1999 in cooperation with the *Institutional Investor's* Asia Pacific Institute

    – 84 respondents with an estimated US$1,050b+ assets under management

    – 82% of respondents had invested in Asia

\*   All postal surveys.  Latin America survey also web-based.  Some questions did not appear on all surveys.  Percentages given exclude non-responses

# Respondents' profiles



* For Europe/US and Asia surveys, highest category was US$25b+

# Board practices are important in selecting companies in which to invest . . .



**"In evaluating companies for potential investment, how important are board practices relative to financial issues?"**
%



Governance factors appear to be at least, if not more, important than financial issues in stock selection

# . . . but as seen in Latin America, views differ by origin of investor





"In evaluating companies for potential investment, how important are board practices relative to financial issues?"
%

Local investors in Latin America consider governance more important than financials in stock selection

# Are investors willing to pay more for a company with good board governance practices?

"Suppose you are considering investing in two well-known companies. Both have performed well in the past, but are currently going through difficult times. However, their board governance practices differ."

**Company A – 'Poor' governance**

- Minority of outside directors
- Outside directors have financial ties with management
- Directors own little or no stock
- Directors compensated only with cash
- No formal director evaluation process
- Very unresponsive to investor requests for information on governance issues

**Company B – 'Good' governance**

- Majority of outside directors
- Outside directors are truly independent, no management ties
- Directors have significant stockholdings
- Large proportion of director pay is stock/options
- Formal director evaluation in place
- Very responsive to investor requests for information on governance issues

**Question:**
- Would you be willing to pay more for company B's stock than company A's?
- If yes, what percentage premium do you estimate you would be willing to pay for B's stock?

# A clear majority say yes

%



# The average premium investors would be willing to pay differs by country . . .

Average %



McKinsey Investor Opinion Survey

# . . . and differs between local and foreign investors

Average %



Local investors*
Foreign investors

**Asia**

| | Local investors | Foreign investors |
|---|---|---|
| Japan | 17.0 | 21.8 |
| Taiwan | 15.9 | 23.5 |
| Korea | 18.8 | 28.7 |
| Thailand | 23.1 | 28.0 |
| Malaysia | 22.1 | 26.0 |
| Indonesia | 24.3 | 29.8 |

Average: Local investors (20.2) Foreign investors (26.3)

**Latin America**

| | Local investors | Foreign investors |
|---|---|---|
| Chile | 23.3 | 20.6 |
| Argentina | 24.5 | 22.4 |
| Mexico | 20.8 | 24.2 |
| Brazil | 22.4 | 24.5 |
| Columbia | 30.1 | 16.6 |
| Venezuela | 25.0 | 28.2 |

Average: Local investors (23.0) Foreign investors (23.2)

\*   Defined as those based in the local region

# Investors agree on the important board tasks* . . .

Average response



| | Latin America | Europe/US | Asia |
|---|---|---|---|
| Monitor and evaluate long-term strategy | 4.5 | 4.5 | 4.6 |
| Monitor and evaluate corporate performance | 4.5 | 4.4 | 4.4 |
| Evaluate senior management performance | 4.3 | 4.4 | 4.5 |
| Maintain legal and ethical practices | 4.3 | 4.0 | 4.3 |
| Manage CEO succession | 4.1 | 4.5 | 4.2 |
| Communicate with shareholders | 3.9 | 3.3 | 4.1 |
| Communicate with other stakeholders | 3.7 | 3.1 | 3.9 |
| Determine executive compensation plan | 3.7 | 4.0 | 3.9 |
| Establish independent corporate leadership | 3.6 | 3.4 | 3.9 |
| Evaluate management development processes | 3.6 | n/a | n/a |
| Evaluate performance of the board | 3.5 | 3.3 | 3.9 |

0 Not important — 5 Very important

\* The list of board tasks was predefined. Investors were asked to rank their importance

McKinsey Investor Opinion Survey

# . . . and on how to improve board performance*

A



\*   The list of practices was predefined. Investors were asked to rate their impact on board performance

# Shareholder rights rank as the most important corporate governance issue in Latin America

Question: for Latin America, please rank the following corporate governance issues

%





# But priorities for local and foreign investors differ

%



Local investors*
Foreign investors

**1st priority**



**2nd priority**



* Defined as those based in the local region

# A p p e n d i x

## Investors' willingness to pay a premium for a well-governed company by country

%



| | | | |
|---|---|---|---|
| Abu Dhabi | Detroit | Mexico | San Francisco |
| Amsterdam | Dubai | Miami | Santiago |
| Antwerp | Dublin | Milan | São Paulo |
| Atlanta | Düsseldorf | Minneapolis | Seoul |
| Bangkok | Frankfurt | Monterrey | Shanghai |
| Barcelona | Geneva | Montreal | Silicon Valley |
| Beijing | Gothenburg | Moscow | Singapore |
| Berlin | Hamburg | Mumbai | Stamford |
| Bogota | Helsinki | Munich | Stockholm |
| Boston | Hong Kong | New Jersey | Stuttgart |
| Brussels | Houston | New York | Sydney |
| Budapest | Istanbul | New Zealand | Taipei |
| Buenos Aires | Jakarta | Orange County | Tokyo |
| Caracas | Johannesburg | Osaka | Toronto |
| Charlotte | Kuala Lumpur | Oslo | Vienna |
| Chicago | Lisbon | Pacific Northwest | Warsaw |
| Cleveland | London | Paris | Washington, DC |
| Cologne | Los Angeles | Pittsburgh | Zurich |
| Copenhagen | Madrid | Prague | |
| Dallas | Manila | Rio de Janeiro | |
| Delhi | Melbourne | Rome | |

# McKinsey & Company

No. 1 Jermyn Street
London SW1Y 4UH, UK

Tel. +44 20 7839 8040

www.mckinsey.com

# EXHIBIT 15

PAGES 1 – 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE GOOGLE INC. | ) | NO. C-11-4248 PJH |
| SHAREHOLDER DERIVITIVE | ) | |
| LITIGATION, | ) | |
| _____ | ) | |
| CITY OF ORLANDO POLICE | ) | |
| FUND, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-13-2038 PJH |
| | ) | |
| VS. | ) | WEDNESDAY, JANUARY 21, 2015 |
| | ) | |
| LAWRENCE E. PAGE, ET AL., | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANTS. | ) | FAIRNESS HEARING |
| _____ | ) | |

**BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

| | |
|---|---|
| **FOR PLAINTIFF:** | ROBBINS ARROYO, LLP |
| **(BOTH CASES)** | 600 B STREET, SUITE 1900 |
| | SAN DIEGO, CALIFORNIA 942101 |
| | BY:  FELIPE J. ARROYO, ESQUIRE |
| | |
| | PMERANTZ, LLP |
| | 600 THIRD AVENUE |
| | NEW YORK, NEW YORK 10016 |
| | BY:  MARC I. GROSS, ESQUIRE |

(APPEARANCES CONTINUED)

| | |
|---|---|
| **REPORTED BY:** | DIANE E. SKILLMAN, CSR 4909, RPR, FCRR |
| | OFFICIAL COURT REPORTER |

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    FOR PLAINTIFF:          ROBBINS GELLER RUDMAN & DOWD, LLP
      (C-11-4248 ONLY)        655 WEST BROADWAY, STE. 1900
 2                            SAN DIEGO, CALIFORNIA 92101
                        BY:   TRAVIS E. DOWNS III, ESQUIRE
 3                            BENNY C. GOODMAN, III, ESQUIRE

 4

 5    FOR PLAINTIFF:          ABRAHAM, FRUCHTER & TWERSKY, LLP
      (C-13-2038 ONLY)        12526 HIGH BLUFF DRIVE, STE. 300
 6                            SAN DIEGO, CALIFORNIA 92130
                        BY:   IAN D. BERG, ESQUIRE
 7

 8

 9    FOR DEFENDANTS:         WILSON, SONSINI, GOODRICH & ROSATI
      (BOTH CASES)            650 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA 94304
                        BY:   BORIS FELDMAN, ESQUIRE
11                            ELIZABETH C. PETERSON, ESQUIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | WEDNESDAY, JANUARY 21, 2015                          9:02 A.M. |
| 2 | P R O C E E D I N G S |
| 3 | THE CLERK:  CALLING RELATED CIVIL CASE NUMBERS |
| 4 | 11-4248 IN RE GOOGLE SHAREHOLDER DERIVATIVE LITIGATION AND |
| 5 | 13-2038 CITY OF ORLANDO POLICE PENSION FUND VERSUS PAGE, ET |
| 6 | AL. |
| 7 | COUNSEL, PLEASE STEP FOR THE RECORD AND STATE YOUR |
| 8 | APPEARANCES. |
| 9 | MR. GOODMAN:  GOOD MORNING, YOUR HONOR.  I'M BENNY |
| 10 | GOODMAN WITH ROBBINS GELLER RUDMAN & DOWD ON BEHALF OF |
| 11 | PLAINTIFFS IN THE 11-4248 CASE. |
| 12 | THE COURT:  GOOD MORNING. |
| 13 | MR. BERG:  GOOD MORNING, YOUR HONOR.  IAN BERG OF |
| 14 | ABRAHAM, FRUCHTER & TWERSKY ON BEHALF OF PLAINTIFF CITY OF |
| 15 | ORLANDO POLICE PENSION FUND. |
| 16 | THE COURT:  GOOD MORNING. |
| 17 | MR. ARROYO:  GOOD MORNING, YOUR HONOR.  FELIPE |
| 18 | ARROYO.  AS -- WITH ROBBINS ARROYO.  AS WITH MR. GOODMAN, I'M |
| 19 | HERE ON THE 4:11-CV-04248 MATTER AS WELL. |
| 20 | THE COURT:  THANK YOU. |
| 21 | MR. GROSS:  GOOD MORNING, YOUR HONOR.  MARC GROSS, |
| 22 | POMERANTZ LAW FIRM IN NEW YORK CITY, ON BEHALF OF THE |
| 23 | PLAINTIFFS IN THE DERIVATIVE ACTION. |
| 24 | THE COURT:  ALL RIGHT. |
| 25 | MR. DOWNS:  GOOD MORNING, YOUR HONOR.  TRAVIS DOWNS, |

1    ROBBINS GELLER, ON BEHALF OF PLAINTIFFS.

2              **THE COURT:**  GOOD MORNING.

3              **MS. PETERSON:**  GOOD MORNING, ELIZABETH PETERSON ON

4    BEHALF OF ALL OF THE DEFENDANTS IN BOTH CASES.

5         I WOULD NOTE THAT MY PARTNER, BORIS FELDMAN, JUST TEXTED

6    ME.  HE IS ON HIS WAY.  HE'S JUST PARKING, BUT WILL BE HERE

7    SHORTLY.

8              **THE COURT:**  ALL RIGHT.  GOOD MORNING.

9         ALL RIGHT.  THIS MATTER IS ON FOR HEARING ON THE FINAL

10   APPROVAL REQUEST IN THIS MATTER.  I'VE REVIEWED THE PAPERS.

11        IS THERE ANYTHING YOU WISH TO ADD, COUNSEL, FOR

12   PLAINTIFFS?

13             **MR. GOODMAN:**  THANK YOU, YOUR HONOR.

14        AS YOU KNOW, WE WERE HERE IN NOVEMBER LAST YEAR AND YOUR

15   HONOR GRANTED PRELIMINARY APPROVAL.  UPON GRANTING PRELIMINARY

16   APPROVAL, YOUR HONOR, WE ISSUED NOTICE PURSUANT TO YOUR ORDER,

17   AN 8-K FILED WITH THE SEC, NOTICE ON GOOGLE'S WEBSITE, AND

18   PUBLICATION IN THE *INVESTORS BUSINESS DAILY* OVER A 30-DAY

19   PERIOD, YOUR HONOR.  AND THAT WAS SUBMITTED -- MS. PETERSON

20   HAS A DECLARATION WITH THE COURT THAT HAS ALL THAT INFORMATION

21   IN THERE.  DOCKET NUMBER 110, YOUR HONOR.

22        THE NOTICES SET FORTH THE TERMS OF THE SETTLEMENT, THE

23   USER SAFETY INITIATIVE, THE FUNDING COMMITMENT, AND ALL OF THE

24   CORPORATE CHANGES AT THE COMPANY, YOUR HONOR, INCLUDING THINGS

25   SUCH AS TERMINATION WITHOUT SEVERANCE FOR PEOPLE CONVICTED OF

1    A FELONY, CLOSER OVERSIGHT BY THE AUDIT COMMITTEE OF THE

2    ADVERTISING POLICIES AT GOOGLE.

3        NOW, THE FINANCIAL PRESS, YOUR HONOR, FROM THE VERY

4    BEGINNING TO THE VERY END OF THIS SETTLEMENT PROCESS WE'VE

5    BEEN IN HAS ALSO BEEN REPORTING ON THE ISSUE FROM PRELIMINARY

6    APPROVAL NOTICING THAT -- YOU KNOW, REPORTING THAT THE

7    SETTLEMENT HAD BEEN SUBMITTED TO THE COURT, YOUR HONOR'S

8    PRELIMINARY APPROVAL ORDER.  THEY DIDN'T SPEAK AS SPECIFICALLY

9    AS THE NOTICES DID, BUT THEY SPOKE GENERALLY OF THE TERMS OF

10   THE SETTLEMENT AND ESPECIALLY THE ESI, YOUR HONOR.

11       NOW, ONE OF THE THINGS THAT'S IMPORTANT TO NOTE HERE IS WE

12   HAVE NOT RECEIVED ANY NEGATIVE SHAREHOLDER COMMENTS.  JUDGE

13   FOGEL IN THE *RAMBUS* CASE, YOUR HONOR, EXPLAINED THAT THAT

14   MIGHT BE ONE OF THE IMPORTANT MEASURES HERE WHETHER A

15   SETTLEMENT SHOULD BE APPROVED.

16       AND IT'S ALSO IMPORTANT TO NOTE THAT THERE'S A LOT OF BIG

17   INSTITUTIONAL HOLDERS, YOUR HONOR, HOLDING BILLIONS OF DOLLARS

18   OF GOOGLE STOCK, AND YET WE STILL HAVE NO NEGATIVE COMMENTS

19   FROM SHAREHOLDERS.  SO IT APPEARS THAT SHAREHOLDERS AGREE THAT

20   THE SETTLEMENT IS IN THE BEST INTEREST OF THE COMPANY.

21       AND UNLESS YOUR HONOR HAS FURTHER QUESTIONS, I WOULD

22   RESPECTFULLY REQUEST YOU FULLY APPROVE THE SETTLEMENT.

23            **THE COURT:**  ALL RIGHT.  ANYTHING FROM THE DEFENSE?

24            **MR. FELDMAN:**  YOUR HONOR, I JUST WANTED TO ENTER A

25   BELATED 880 APPEARANCE.  I'M SORRY.  BORIS FELDMAN FOR THE

1    DEFENDANT.

2              **THE COURT:**  GOOD MORNING.  DID YOU WANT TO ADD

3    ANYTHING TO THE PRESENTATION MADE BY PLAINTIFF'S COUNSEL?

4              **MR. FELDMAN:**  NO, YOUR HONOR.  THANK YOU.

5              **THE COURT:**  ALL RIGHT.  AND IS THERE -- WELL, I DO

6    FIND IT REMARKABLE THAT THERE WERE NO OBJECTIONS, COMMENTS,

7    ANYTHING WITH RESPECT TO THE NATURE OF THE SETTLEMENT, AND,

8    INDEED, I AGREE WITH JUDGE FOGEL THAT THAT CERTAINLY SPEAKS

9    LOUDLY IN FAVOR OF A FINDING THAT THE SETTLEMENT IS A

10   REASONABLE ONE.

11       WITH REGARD TO THE REQUEST FOR FEES, DID YOU WISH TO BE

12   HEARD ON THAT AT ALL?  I DO NOTE THAT IT CERTAINLY EXCEEDS

13   WHAT YOU ALL BELIEVE IS THE LODESTAR, CORRECT?

14             **MR. GOODMAN:**  YES, YOUR HONOR.  THE FEES, YOUR HONOR,

15   ARE -- YOUR HONOR HAS AN OBLIGATION UNDER 23.1 TO ADDRESS THE

16   FEE ISSUE, OF COURSE.  AND, YOUR HONOR, I THINK THAT THE FEES

17   HERE ARE THE PROPER FEES.  WE NEGOTIATED THE FEES AFTER WE HAD

18   SUBSTANTIVELY REACHED THE TERMS OF THE SETTLEMENT, AND WITH

19   THE HELP OF JUDGE PHILLIPS, WHO WAS OUR MEDIATOR, WE

20   NEGOTIATED THE SETTLEMENT -- THE ATTORNEY'S FEES AFTER, AS

21   PART OF THE SETTLEMENT.

22       NOW, THE FEES IN THIS ACTION, YOUR HONOR, THEY WERE

23   NEGOTIATED BECAUSE OF THE SUBSTANTIAL BENEFIT THIS SETTLEMENT

24   BRINGS TO GOOGLE.  THIS SETTLEMENT, YOUR HONOR, IS A GAME

25   CHANGER, I THINK.  THE USER-SAFETY INITIATIVE IS GOING TO

```
1   REALLY MAKE A HUGE IMPACT AND IT'S A SCALABLE IMPACT.  IN
2   OTHER WORDS, ALL OF THE PROBLEMS THAT WE HAVE BEEN HERE
3   COMPLAINING ABOUT, THE ADVERTISING PROBLEMS WITH THE ROGUE
4   PHARMACIES, THESE ARE ADDRESSED BY THIS USER-SAFETY INITIATIVE
5   IN A MULTIFACETED WAY.  AND IT DOESN'T -- THESE KIND OF
6   ISSUES, THESE KIND OF POLICIES AND PROCEDURES, THESE CHANGES
7   THAT ARE GOING TO BE ADDRESSING THE ROGUE PHARMACY ISSUES
8   COULD GO TO ANY DANGEROUS PRODUCT THAT'S ADVERTISING WITH
9   GOOGLE.
10      AND WE BELIEVE THAT THE FEES WERE APPROPRIATE BASED ON THE
11  SUBSTANTIAL BENEFIT, YOUR HONOR.  THERE'S A LOT OF ISSUES WE
12  LOOK AT WHEN WE ARE TALKING ABOUT THE SETTLEMENT AND
13  ESPECIALLY THE ATTORNEY'S FEES, YOUR HONOR, AND I WOULD LIKE
14  TO POINT OUT A FEW THAT I THINK ARE IMPORTANT.
15      ONE IS THE FACT THAT THIS IS NOT A CLASS ACTION WHERE
16  THERE'S UNREPRESENTED CLASS MEMBERS.  THIS IS A SHAREHOLDER
17  DERIVATIVE ACTION WHERE THERE'S EXPERIENCED COUNSEL ON BOTH
18  SIDES.  WILSON, SONSINI, YOUR HONOR, AND THEIR LAWYERS ARE
19  FORMIDABLE SHAREHOLDER DERIVATIVE PRACTICE AND THEY HAVE BEEN
20  DOING IT FOR MANY YEARS.  AND ON OUR SIDE, WE'VE GOT DECADES
21  OF EXPERIENCE IN THESE SHAREHOLDER DERIVATIVE ACTIONS.  WE
22  WERE DEALING WITH GOOGLE, YOUR HONOR, A SOPHISTICATED ENTITY
23  THAT UNDERSTANDS WHAT IT WAS DEALING WITH, HAS COUNSEL
24  EXPLAINING TO IT WHAT THIS IMPACT OF THE SETTLEMENT WAS, HOW
25  THE SETTLEMENT BENEFITS THE COMPANY, AND THERE IS AN
```

1    INDEPENDENT SPECIAL COMMITTEE ON THE BOARD OF DIRECTORS, YOUR

2    HONOR, THAT APPROVED THE SETTLEMENT AND USED THEIR BUSINESS

3    JUDGMENT TO DETERMINE THAT THIS SETTLEMENT IS IN THE BEST

4    INTEREST OF THE COMPANY AND PROVIDES A SUBSTANTIAL BENEFIT.

5    AND IN LIGHT OF THAT BENEFIT, THE FEES WERE APPROPRIATE.

6        IT'S NOT LIKE, YOUR HONOR, AS WE WERE NEGOTIATING, WE MADE

7    A DETERMINATION OR WE MADE A NEGOTIATION WITH DEFENDANTS AND

8    SAID, LOOK, WE SPENT "X" AMOUNT OF HOURS AND WE EXPECT "X"

9    AMOUNT OF FEES.  WE TALKED ABOUT THE BENEFIT THAT ALL OF THE

10   SETTLEMENT AS A PACKAGE BROUGHT TOGETHER, AND WE NEGOTIATED

11   FROM THAT PERSPECTIVE, YOUR HONOR.

12       NOW, THE BUSINESS JUDGMENT RULE, I THINK, IS IMPORTANT

13   HERE, JUDGE, BECAUSE THE INDEPENDENT DIRECTORS THERE'S --

14   MS. PETERSON SUBMITTED A DECLARATION WITH TWO RESOLUTIONS.

15       NOW ONE OF THE RESOLUTIONS WAS AUTHORIZING THE FORMATION

16   OF THE INDEPENDENT COMMITTEE AND GIVING THEM THE POWER TO

17   DETERMINE WHETHER THE SETTLEMENT SHOULD BE APPROVED OR NOT.

18   THE OTHER ONE WAS THE RESOLUTION AFTER WE HAD NEGOTIATED THE

19   SETTLEMENT, IT WAS PRESENTED TO THE SPECIAL COMMITTEE, AND

20   THEY WERE ASKED TO APPROVE OR DISPROVE THE SETTLEMENT.

21       AND THE RESOLUTION SAYS -- THERE'S A BUNCH OF WHEREAS

22   CLAUSES TALKING ABOUT THE USER-SAFETY INITIATIVE AND HOW IT'S

23   GOING TO HELP.  BUT AT THE END, IT SAYS:

24           "WHEREAS, THE INDEPENDENT DIRECTORS, THEREFORE,

25           BELIEVE THE USER-SAFETY INITIATIVE WILL SUBSTANTIALLY

1          BENEFIT GOOGLE AND ITS SHAREHOLDERS, PARTICULARLY

2          WITH REGARD TO GOOGLE'S ENDEAVOR TO FRUSTRATE THE

3          EFFORTS OF CERTAIN PARTIES WHO ENGAGE IN ILLEGAL AND

4          DANGEROUS ONLINE ACTIVITIES", THE CORE OF THE CASE.

5     THEN THERE'S A PARAGRAPH THAT SAYS "RESOLVE".  THERE'S TWO

6     RESOLUTIONS.  THE FIRST ONE SAYS -- THE SECOND ONE AUTHORIZE,

7     IT'S NOT RELEVANT HERE, IT AUTHORIZES THE COMPANY TO PROCEED

8     WITH IMPLEMENTING ALL OF THIS SHOULD YOUR HONOR FINALLY

9     APPROVE THE SETTLEMENT.  BUT THE FIRST ONE SAYS:

10          "RESOLVED THAT IN EXERCISING THEIR BUSINESS JUDGMENT,

11          THE INDEPENDENT DIRECTORS APPROVE THE SETTLEMENT AND

12          EACH OF ITS TERMS, INCLUDING THE ATTORNEYS' FEES AND

13          EXPENSES AS MEMORIALIZED IN THE STIPULATION AS BEING

14          IN THE BEST INTEREST OF GOOGLE AND ITS SHAREHOLDERS,

15          AND AUTHORIZE AND DIRECT EACH OF THE OFFICERS OF

16          GOOGLE TO TAKE SUCH ACTIONS AS TO CAUSE THE

17          SETTLEMENT TO RECEIVE FINAL APPROVAL IN THE FEDERAL

18          COURT."

19     NOW, IN OTHER CIRCUMSTANCES, YOUR HONOR, THE BUSINESS

20     JUDGMENT RULE IS GIVEN SOME DEFERENCE IN A SHAREHOLDER

21     DERIVATIVE ACTION.  GIVEN THE FACT THAT THIS SETTLEMENT

22     PROVIDES A SUBSTANTIAL BENEFIT AND WE'VE GOT A LACK OF ANY

23     NEGATIVE SHAREHOLDER COMMENTS, SHAREHOLDERS APPEAR TO AGREE

24     IT'S IN THE BEST INTEREST OF THE COMPANY, AND THAT THE

25     INDEPENDENT COMMITTEE OF THE BOARD OF DIRECTORS HAS RECEIVED

1    ALL OF THE INFORMATION RELATED TO THIS SETTLEMENT ADVISED BY

2    VERY COMPETENT COUNSEL AND AGREED THAT IT IS A SUBSTANTIAL

3    BENEFIT.  THERE IS A BEST INTEREST OF THE COMPANY BEING

4    REPRESENTED HERE, AND THE ATTORNEY'S FEES ARE APPROPRIATE IN

5    LIGHT OF THAT.

6         **THE COURT:**  THE NOTICE INCLUDED NOTICE OF THE

7    NEGOTIATED ATTORNEY'S FEES AS WELL?

8         **MR. GOODMAN:**  YES, JUDGE, IT DID.

9         **THE COURT:**  OKAY.

10        **MR. GOODMAN:**  SO IN LIGHT OF ALL THAT, YOUR HONOR, WE

11   WOULD REQUEST THAT YOUR HONOR FULLY APPROVE THE SETTLEMENT AND

12   EACH OF ITS TERMS -- FINALLY APPROVE THE SETTLEMENT AND EACH

13   OF ITS TERMS.

14        **THE COURT:**  ALL RIGHT.  DO YOU WISH TO BE HEARD AT

15   ALL ON THE ATTORNEY'S FEES PORTION?

16        **MR. FELDMAN:**  NO.  THANK YOU, YOUR HONOR.

17        **THE COURT:**  ALL RIGHT.  MR. BERG?

18        **MR. BERG:**  MAY I BE HEARD ON THE FEE ISSUE?

19        **THE COURT:**  SURE.

20        **MR. BERG:**  YOUR HONOR, I WOULD LIKE TO ADDRESS THE

21   COURT BECAUSE WE ARE TWO CASES SETTLING AS ONE.  I WANT TO

22   JUST AFFIRM MY BELIEF THAT I THINK THE FEE WE ARE REQUESTING

23   IS IN LINE WITH THE BENEFIT CONFERRED AND THERE'S NO WAY THAT

24   ONE CAN LOOK AT THIS FEE AND VIEW IT AS A PAY-OFF TO ATTORNEYS

25   TO GO AWAY TO PREVENT THE COMPANY FROM HAVING TO DO

1    SUBSTANTIVE REFORMS AND MAKE SUBSTANTIAL CHANGES.

2        WE WERE ABLE TO PROGRESS THE -- OUR CASE, AT LEAST, TO

3    A -- TO A FAR POINT OF SUMMARY JUDGMENT AND THEN REALLY PUT

4    THE PARTIES TO A PLACE WHERE THEY HAD TO MAKE HARD DECISIONS

5    LEGALLY, AND I DON'T THINK THERE SHOULD BE A PUNISHMENT FOR

6    BEING AN EFFICIENT AND EFFECTIVE ADVOCATE.

7        THANK YOU.

8        **THE COURT:**  ALL RIGHT.  ALL RIGHT.  IS THERE ANYONE

9    HERE IN THE AUDIENCE WHO WISHES TO BE HEARD WITH RESPECT TO

10   THE FAIRNESS OF THIS SETTLEMENT?

11                        (NO RESPONSE.)

12       ALL RIGHT.  NO ONE IS RAISING THEIR HAND.

13       ANYTHING ELSE?

14       **MR. GOODMAN:**  IF YOU HAVE NO OTHER QUESTIONS, YOUR

15   HONOR, I HAVE NOTHING ELSE FOR YOU.

16       **THE COURT:**  YOU ALL ADDRESSED THE ISSUES THAT I

17   RAISED THE LAST TIME WITH RESPECT TO THE NOTICE AND YOU CURED

18   THOSE PROBLEMS.  THE NOTICE WAS SATISFACTORY, AND THERE BEING

19   NO OBJECTIONS OR RESPONSES FILED BY THE SHAREHOLDERS, I FIND

20   THE SETTLEMENT IS REASONABLE.

21       WITH REGARD TO THE REQUEST FOR FEES, THE COURT'S

22   RESPONSIBILITY IS A LITTLE DIFFERENT THAN IN YOUR TYPICAL

23   CLASS ACTION GIVEN THE DETERMINATION BY THE CORPORATE ENTITY

24   THAT THE AMOUNT IS SATISFACTORY EVEN THOUGH THAT IT EXCEEDS

25   THE LODESTAR BY I THINK THREE TIMES, IT IS ONLY A FRACTION

1    LESS THAN 20 PERCENT OF THE AMOUNT THAT GOOGLE WAS GOING TO BE

2    PAYING TO FUND THE USER-SAFETY INITIATIVE.  SO WHEN YOU LOOK

3    AT IT FROM THAT PERSPECTIVE, IT SEEMS TO ME TO BE REASONABLE

4    AS WELL.

5        THEREFORE, I WILL APPROVE BOTH THE SETTLEMENT AND THE

6    PAYMENT OF FEES THAT HAVE BEEN AGREED TO.

7        ALL RIGHT.  YOU ALL HAVE SUBMITTED A PROPOSED ORDER.  AND

8    I DON'T THINK I HAD ANY DIFFICULTIES WITH THAT, ALTHOUGH I

9    DON'T APPEAR TO HAVE IT IN FRONT OF ME.

10       DO YOU HAVE THE PROPOSED ORDER SO I CAN LOOK AT IT REAL

11   QUICKLY?

12            MR. GOODMAN:  I HAVE A COPY OF IT RIGHT HERE.

13                 (DOCUMENT HANDED TO COURT.)

14            THE COURT:  OKAY.  I THINK IT IS FINE.  I WILL READ

15   IT MORE CAREFULLY BEFORE I SIGN IT, BUT IT LOOKS LIKE IT IS

16   FINE.

17            MR. GOODMAN:  THANK YOU, YOUR HONOR.

18            THE COURT:  ANYTHING ELSE?

19            MR. FELDMAN:  YOUR HONOR, IT HAS BEEN AN HONOR TO

20   LITIGATE THIS CASE BEFORE THE COURT.  THANK YOU.

21            THE COURT:  THANK YOU.  I AM GLAD IT WAS ABLE TO BE

22   RESOLVED SATISFACTORILY TO BOTH SIDES.  IT WAS CERTAINLY AN

23   INTERESTING CASE AND THERE WERE A NUMBER OF INTERESTING ISSUES

24   THAT I WAS ACTUALLY LOOKING FORWARD TO DELVING INTO, BUT YOU

25   ALL HAVE, I THINK, ARRIVED AT A FAIR WAY TO RESOLVE THE CASE.

1        **MR. FELDMAN:**  THANK YOU.

2        **MR. GOODMAN:**  THANK YOU, YOUR HONOR.

3            (PROCEEDINGS CONCLUDED AT 9:15 A.M.)

4

5                    **CERTIFICATE OF REPORTER**

6        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

7    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

8    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

9    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

10

11           _Diane E. Skillman_

12        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

13            SUNDAY, MARCH 1, 2015

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FRESNO COUNTY EMPLOYEES
RETIREMENT ASSOCIATION, et al.,

                 Plaintiffs,

          v.                        16 Civ. 1820 (JGK)
                                    16 Civ. 9855 (JGK)
COMSCORE, INC., et al.,             17 Civ. 1245 (JGK)

                 Defendants.

------------------------------x
AND RELATED CASES                   New York, N.Y.
                                    June 7, 2018
                                    1:30 p.m.

Before:

                    HON. JOHN G. KOELTL

                                    District Judge

                       APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMANN
     Attorneys for Lead Plaintiffs
BY:  JOHN BROWNE
     JESSE JENSEN
     KATE AUFSES

KESSLER TOPAZ MELTZER & CHECK
     Attorneys for Plaintiff William Huff
BY:  SHARAN NIRMUL

JONES DAY
     Attorneys for Defendants comScore, Fradin, Fulgoni,
Henderson, Katz, Korn and Lewis
BY:  ROBERT MICHELETTO
     NIDHI YADAVA
     MICHAEL McCONNELL

SPEARS & IMES
     Attorneys for Defendant Kenneth Tarpey
BY:  JONATHAN FAYER

1

2                          APPEARANCES (Continued)

3   WILLIAMS & CONNOLLY
         Attorneys for Defendant Magid Abraham
4   BY:  JOHN WILLIAMS

5   STEPTOE & JOHNSON
         Attorneys for Defendant Serge Matta
6   BY:  CHRISTOPHER CONTE

7   HOGAN LOVELLS
         Attorneys for Defendant Melvin Wesley III
8   BY:  MICHAEL KELLY

9   WEIL, GOTSHAL & MANGES LLP
         Attorneys for Defendant Gottesman
10  BY:  IRWIN HOWARD WARREN

11  ALSTON & BIRD
         Attorneys for Defendant Fulgoni, Henderson, Korn, Fradin,
12  Katz, Engel, Rosenthal, Livek, Chemerow and Ganek
    BY:  CARA MARIE PETERMAN
13
    CALFEE, HALTER & GRISWOLD
14       Attorneys for Defendant Lewis
    BY:  DAVID THOMAS BULES
15
    ROBBINS GELLER RUDMAN & DOWD LLP (San Diego)
16       Attorneys for Plaintiff Wayne County Employees Retirement
    System
17  BY:  BENNY C. GOODMAN, III
         DAVID AVI ROSENFELD
18       ERIK W. LUEDEKE

19  THE WEISER LAW
         Attorneys for Plaintiff Donatello
20  BY:  BRETT D. STECKER

21

22

23

24

25

1              (Case called)

2              THE DEPUTY CLERK:  All parties please state who you

3    are, first with counsel in the original action and then counsel

4    in the derivative action.

5              MR. BROWNE:  Good afternoon, your Honor.  It's John

6    Browne from Bernstein Litowitz Berger & Grossman on behalf of

7    the lead plaintiffs in the securities class action.

8              THE COURT:  Commonly comScore.

9              MR. BROWNE:  That's right.

10             MR. JENSEN:  Good afternoon, your Honor.  Jesse

11   Jensen, also from Bernstein Litowitz on behalf of the lead

12   plaintiffs in Sommer v. comScore.

13             MS. AUFSES:  Good afternoon, your Honor.  Kate Aufses,

14   also from Bernstein Litowitz Berger & Grossman on behalf of

15   lead plaintiffs.

16             MR. NIRMUL:  Good afternoon, your Honor.  Sharan

17   Nirmul of Kessler Topaz Meltzer & Check for the named

18   plaintiff, William Huff.

19             MR. MICHELETTO:  Good afternoon, your Honor.  Robert

20   Micheletto from Jones Day on behalf of Defendants comScore

21   Fulgoni, Fradin, Henderson, Katz, Korn, and Lewis.

22             Your Honor, I would also like to introduce Carol

23   DiBattiste who is the general counsel of comScore who is in the

24   courtroom in afternoon with us.  Thank you.

25             THE COURT:  Thank you.

1          MS. YADAVA:  Good afternoon, your Honor.  Nidhi Yadava

2     from Jones Day on behalf of the same defendants that

3     Mr. Micheletto represents.

4          MR. McCONNELL:  Your Honor, Michael McConnell, also

5     with Jones Day.  I made an appearance in the derivative action.

6          MR. KELLY:  Good afternoon, your Honor.  Michael Kelly

7     from Hogan Lovells for Defendant Melvin Wesley.

8          MR. FAYER:  Good afternoon, your Honor.  Jonathan

9     Fayer from Spears & Imes for Ken Tarpey in the class action and

10     the derivative action.

11          MR. CONTE:  Good afternoon, your Honor.  Chris Conte

12     from Steptoe & Johnson on behalf of Defendant Matta in both of

13     the actions.

14          MR. WARREN:  Good afternoon, your Honor.  Irwin Warren

15     from Weil, Gotshal for Patricia Gottesman in the derivative

16     action.

17          MS. PETERMAN:  Good afternoon, your Honor.  In the

18     derivative action as well, Cara Peterman from Alston & Bird for

19     the individual Defendants Fulgoni, Henderson, Korn, Fradin,

20     Katz, Engel, Rosenthal, Livek, Chemerow and Ganek.

21          MR. BULES:  Good afternoon, your Honor.  David Bules

22     from Calfee, Halter & Griswold on behalf of Joan Lewis, a

23     defendant in the derivative action.

24          MR. WILLIAMS:  Good afternoon, your Honor.  John

25     Williams from Williams & Connolly for Defendant Magid Abraham

1   in both the securities and the derivative actions.

2           MR. GOODMAN:  Good afternoon, your Honor.  I'm Benny

3   Goodman from Robbins Geller on behalf of the lead plaintiff in

4   the derivative action, the Wayne County Employees Retirement

5   System.  And also Wayne County Defendant Rob Habb (phonetic),

6   a representative in this hearing also, your Honor.

7           MR. ROSENFELD:  Good afternoon, your Honor.  David

8   Rosenfeld, Robbins Geller as well, also on behalf of Wayne

9   County.

10          MR. LUEDEKE:  Good afternoon, your Honor.  Erik

11  Luedeke, Robbins Geller as well, also on behalf of Wayne

12  County.

13          MR. STECKER:  Good afternoon, your Honor.  Brett

14  Stecker from The Weiser Law Firm on behalf of

15  Plaintiff Donatello.

16          THE COURT:  Okay.  I smile because of the number of

17  lawyers where one of the issues is attorney's fees.  There are

18  a lot of lawyers, but the attorneys' fees quests were already

19  in.

20          All right.  Let's take first Sommer v. comScore.

21  There is the request for final approval of the settlement, as

22  well as the plan of allocation and the request for attorneys'

23  fees.

24          I've read the papers.  I'm familiar with the papers.

25  I've already granted preliminary approval.  I'm aware that

1   there are no objections from any of the members of the class

2   and no requests for exclusion.

3        I'm prepared to listen briefly to anything anyone

4   would like to tell me about approval of the settlement or the

5   plan of allocation before I turn to the issue of the attorneys'

6   fees.

7        MR. BROWNE:  Your Honor, John Browne from Bernstein

8   Litowitz Berger & Grossman.

9        I don't really think so, your Honor.  I think the

10  approval of settlement is set out pretty completely in our

11  papers.  The only point I might highlight just very briefly, in

12  addition to the ones your Honor mentioned, is the percentage

13  recovery damages here is fairly high in these cases at

14  24 percent.  We've laid everything else out.

15       Unless your Honor has questions, I won't say anything

16  else.

17       THE COURT:  No.  I don't.  Thank you.

18       I thought the papers fairly laid out, again, the

19  reasons why it is a good and fair settlement, about $27,000,000

20  in cash, about $83,000,000 in stock, which would be somewhere

21  between 24 percent and 60 percent of the possible recovery.

22       It was procedurally fair.  It was substantively fair.

23  It was determined after hard-fought negotiations, mediation by

24  Former Judge Phillips, sophisticated plaintiffs.  The response

25  of the class, with no objections and no requests for exclusion,

1  supports the fairness of the settlement.

2        Plainly, there would have been risks continuing the

3  litigation, risks whether there would eventually have been a

4  recovery.  The motions to dismiss were hard fought.  There were

5  plainly issues to be litigated.

6        The fact that there was a substantial recovery at this

7  stage of the litigation supports the reasonableness of the

8  settlement.  So it was procedurally fair, it was substantively

9  fair.  I have no problem approving the fairness and

10 reasonableness of the settlement, the adequacy of the notice

11 and the adequacy of the plan of allocation.

12       I'll sign the judgment approving the class action

13 settlement, and I'll sign the order approving the plan of

14 allocation.

15       That takes us to the issue of attorneys' fees.  I

16 might as well set out for you what my problem is which you

17 anticipated from my questions last time.

18       On the one hand, there is no question that this was a

19 difficult case with good results which was litigated well by

20 plaintiffs' counsel.

21       We can go through the percentage of the settlement and

22 the Lodestar, but the Lodestar in this case appears to me to be

23 inflated and not to be a true crosscheck on the percentage of

24 the recovery because of the amount of the Lodestar that was

25 devoted to due diligence.

1          You argue appropriately in the papers that here are

2    cases which say that due diligence is appropriate.  Of course

3    due diligence is appropriate, but the question is what is the

4    amount of the due diligence.

5          Here it is an extraordinary percentage of the

6    Lodestar, extraordinary.  And there is no case cited where due

7    diligence has approached the percentage in this case.

8          So there was a settlement.  It was arrived at in

9    principle, and then there was a settlement agreement, and that

10   was one that the settlement was thought to be a good and

11   reasonable settlement blessed by the impartial mediator.

12         And then there is due diligence.  Due diligence is to

13   check the reasonableness of the settlement.  But what could

14   possibly be expected would be the result of the due diligence?

15   That the settlement was not fair and reasonable because more

16   should be gotten or less should be gotten or the stock

17   shouldn't be gotten?

18         Whatever it was, to think that the due diligence would

19   so dwarf all of the work that was so well done in arriving at a

20   fair and reasonable settlement strains credibility.  I put a

21   caution out there when last we met because I saw it coming.  So

22   the papers say we didn't spend as much in due diligence as we

23   could.  We cut it off a month early.

24         So here is a case that was well litigated, and all of

25   the work that had gone into preparing for the case and

1   responding to the motions to dismiss, and then all of this work

2   went into due diligence, confirming that the settlement that

3   you had already worked out was in fact fair and reasonable.

4          What does that do.  Well, it increases the Lodestar.

5   It makes it appear that the multiplier is less than it would

6   have otherwise been had the due diligence been less.  I

7   understand all of that.

8          What I'm left with really is an unease that the

9   Lodestar is a true check.  So I'm driven back towards a

10  substantial percentage of the recovery as to which the

11  plaintiffs have not objected, sophisticated plaintiffs.  And no

12  class member has objected, even though they were warned that

13  the attorneys' fees might be more.  But I still have to arrive

14  at my own conclusion as to what the fair and reasonable amount

15  of the attorneys' fees in the case are.

16         So my bottom line would be to end up giving somewhat

17  less of a percentage of the recovery that was otherwise being

18  sought but a percentage of the recovery which would be

19  commensurate with similar cases, given the results in the case,

20  the skill pursuing it.

21         In fact, I have little question about the specific

22  items that you listed in the proposed order.  It was not an

23  encomium.  It was simply a factual recitation which I'm

24  prepared to sign.  So those are my observations.

25         MR. BROWNE:  Well, thank you for those, your Honor.

1   That's very helpful.

2           If you don't mind, let me just respond with a couple

3   points on that.

4           Do you want me to take the podium?  Can you hear me

5   okay here?

6           THE COURT:  I hear you fine.

7           MR. BROWNE:  Great.

8           I would just, first of all, echo what your Honor said.

9   At the end, the Lodestar is a crosscheck, and contingency fee

10  lawyers should generally -- and it's an important crosscheck,

11  but generally contingency fee lawyers are paid a percentage of

12  the settlement to align their interest with the class, and the

13  best judge of what that percentage should be really is the

14  quality of the result.

15          We think the quality of the result is very good here.

16  I'm not going to say the things that are in our papers about

17  the percentage of the recovery.  We think the class agrees with

18  us that the quality of the result is very good here.

19          We believe up to 80 percent of this class is comprised

20  of institutional investors.  They have general counsel.  They

21  often have legal offices.  They're always advised by outside

22  counsel.  They know how to object to settlements and fee

23  requests when they're out of line.  And they didn't here.  As

24  your Honor noted, we suggested in the notice that we might seek

25  more.  So under the percentage recovery method, we think

1   23 percent, given the result here, is particularly fair.

2           I just want to make a comment on that in connection

3   with something your Honor asked us to do in preliminary

4   approval.  We did it on page 9 of our fee brief.  We gave you a

5   list of what I believe are either all of the securities class

6   actions or all going back for ten years.

7           If you take out the two in the fee brief, one settled

8   for $250,000 and one settled for $400,000.  So really, really

9   small cases with really negative Lodestar multipliers.  But if

10  you take out both the Lodestar multiplier and the percentage --

11  and you get a higher percentage there -- the average recovery

12  that your Honor has given in those cases is a 1.5 Lodestar

13  multiplier, and it is a 23.6 percent fee.

14          So we are below the average of what your Honor has

15  given.  Those cases are all different, and I take that point.

16  Some had due diligence; some were big; some were small.  But it

17  was a data point that your Honor asked us to look at.

18          There is one other point about it which overlaps with

19  the due diligence point which I do want to talk about in a

20  little bit more detail after this.

21          Can I hand up an exhibit?  Is that okay?

22          THE COURT:  Sure.

23          MR. BROWNE:  So, your Honor, what I just handed up is

24  a chart that reflects the same information that was on page 9

25  of our fee brief but takes out the two outlier small settlement

1   cases and adds in our case in the top, in the top line.

2          I understand that there was a lot of due diligence,

3   80 percent.  As said in the papers, 80 percent of the Lodestar

4   is due diligence discovery, and we'll talk about why I believe

5   that was necessary and important here in a second.

6          It also wasn't particularly expensive to the class.

7   When you look at the Lodestar blended hourly rate that we are

8   requesting here in our case -- this is taking all the

9   attorneys, the top-billing attorneys and the bottom-billing

10  attorneys -- the blended hourly rate -- we requested $406 per

11  hour.  It's literally the lowest blended hourly rate that has

12  ever been submitted to your Honor in any securities class

13  action, other than the two.

14         The rates in those other cases have ranged from $416

15  an hour up to $562 an hour.  That means that the Lodestar

16  committed in those cases was calculated off of a much higher

17  blended hourly rate than the Lodestar that we're submitting

18  here.

19         So when you see our 1.4 multiplier, which would be the

20  multiplier in our full fee request, it's not only below the

21  average of what you've given in other cases, it's actually a

22  lower multiplier because the hourly rates that we used to

23  calculate that multiplier is so much smaller than in many other

24  cases.

25         THE COURT:  We could debate that.  The reason that the

1   hourly rate goes down is because so much of it was document

2   review at the end.  To what end.  To what end other than to

3   increase the total number of hours and the total fees so that

4   the multiplier on the Lodestar looks lower than it would have

5   been had all that work not been done.  Right?

6              80 percent on due diligence, as you correctly point

7   out, sort of turns the usual litigation paradigm on its head

8   where all of the witnesses that you interviewed in preparation

9   for the litigation and then all the work that was done on the

10  motions to dismiss and all the work that went into the

11  mediation are all given short shrifts, and you have the tail

12  wagging the dog, 80 percent.

13             MR. BROWNE:  Let me just give you a little perspective

14  on how we approached the due diligence discovery here, why we

15  thought it was necessary, and why we did what we did and why we

16  stand by that it was important.

17             So first --

18             THE COURT:  I don't doubt that due diligence is

19  important.  It's of course common to have due diligence.  It is

20  uncommon to have that kind of percentage.  It would have been

21  more straightforward to have less on due diligence and sought

22  the percentage and made whatever explanations there were for

23  why the Lodestar was lower.

24             Go ahead.  I understand the arguments about why -- I

25  think I've ticked them off already about why you said the due

1    diligence was so important in this case.

2           MR. BROWNE:  So let me say something that might be a

3    little bit outside of the papers.  The way we approached the

4    due diligence in this case is we approached it like it was the

5    litigation, as if on September 15 of last year, rather than

6    having access to documents through the due diligence process,

7    we were actually in discovery with an end goal of taking ten

8    important depositions at the end of February or early March of

9    last year.

10          If that was a litigation schedule that I had in place

11   in a case, I would have done exactly what I did here.  We would

12   have pushed very hard to get the documents.  And as I said in

13   our papers, it was an adversarial process to get the number of

14   documents that we needed.

15          We threatened to terminate the settlement to get

16   documents.  We got them.  We got 178,000 documents in a case

17   that involves complex accounting issues, judgment calls.  And

18   they weren't all straightforward documents.

19          Again, I treated it like a litigation.  If I was in

20   litigation and I was preparing for ten depositions, I would

21   have assembled a team of document-review attorneys who would

22   have reviewed those documents.  That's what we did.  We would

23   have understood them, and we would have prepared for those

24   depositions.  That's exactly what we did.

25          Once we reviewed the documents and understood them and

were prepared for the interviews, the document review attorneys

went away because -- I mean they were released on other cases

because their job was no longer necessary in this case, and we

took the interviews of the witnesses.

A couple reasons why that is particularly important in

this case, or at least I thought so.  Maybe I was wrong, but

when we reached the settlement of this case, we hoped to

receive eventually $83 million worth of comScore stock.

We were faced with a company that was delisted from

NASDAQ.  It wasn't filing financial statements.  There wasn't a

lot of visibility into what was going on.  We knew its cash

position was low, and it was worrying.

In the time from when we reached that settlement in

principle to the time we completed our due diligence discovery,

there were ten material disclosures about the company.

The CFO who we had dealt with at the mediation

resigned.  They fired 10 percent of their employees.  They did

constant updates on the audit committee investigation, and we

felt it was absolutely critical to understand if any of this

new information that was coming out from a company that

otherwise was kind of a black box was making a settlement that

we thought was good on September 10 to September 15, not good,

not fair, not reasonable, either by we failed to really

understand the scope of the fraud, perhaps there were bigger

damages than we understood, there were other misstatements that

1   could be brought into the case, or there were other defendants

2   to target.

3          We had the diligence around that, but then we also had

4   the diligence around the company's financial position.  The

5   stock was trading over the counter at the time -- we're happy

6   to report -- your Honor may not know, but the stock was

7   relisted on NASDAQ on June 1.

8          So since your Honor has signed the class order, the

9   class will receive freely tradeable stock which should have

10  some value.  It's gone up about 20 percent in the last month.

11  So we're happy to report that.

12         We didn't know that was going to be the case at all.

13  We would be standing here in front of your Honor today, and I

14  would be reporting back to my clients, and I would be answering

15  class member calls.  And they would say, how do you know the

16  settlement is good?  A lot has happened since September 15.  I

17  would have said $110,000,000 is good, I guess.  And that's

18  about it.

19         Now I can actually say, we're very comfortable.  We

20  understood the liability, we understood the scope of the fraud,

21  we understood the way the company is operating, and we think

22  the settlement is going to be even better than we hoped it

23  might be in September.

24         But I'm just saying to your Honor that this is the way

25  I would do a litigation.  But there are other cases where I've

1   actually litigated in this district where my time was

2   70 percent staff attorneys.

3          THE COURT:  I'm sorry.  Where your time?

4          MR. BROWNE:  My time was approximately 70 percent

5   staff attorneys.  Here the staff attorney time is about

6   75 percent.  They were the document reviewers.  80 percent was

7   due diligence.  Some of that was me and Jesse and Kate.  A lot

8   of that was the document review team as your Honor pointed out.

9          That's actually the way I've litigated cases in

10  hard-fought, uncertain, risky situations.  I was looking at the

11  case that settled in front of Judge Kaplan, the Bank of New

12  York Securities.  And my staff-attorney time there -- we had

13  something like 45 staff attorneys reviewing documents, and it

14  was like 70 percent.  So that's how I treat a due diligence.

15         THE COURT:  Usually, usually that work goes in prior

16  to the settlement, not in due diligence.  All of the staff

17  attorneys' work, reviewing documents, preparing is done before

18  the parties enter into a settlement which they think is fair

19  and reasonable.  Usually the confirmatory discovery is not as

20  extensive in this case.

21         You're not suggesting that in your other cases the

22  amount of due diligence was 80 percent.

23         MR. BROWNE:  No, I'm not suggesting that.  I was only

24  trying to reinforce the point that we decided to treat the due

25  diligence discovery here like litigation.  We had 178,000

1  documents.  We could either review them or not.  We could

2  review them halfway or not.

3        We decided to do it the full way, and I would have

4  decided to do that in a litigation on that schedule, given the

5  fact that there was so much of a lack of transparency with the

6  company here.  Given the fact that we were getting stocks.

7  These were unusual factors, given the fact that the company

8  wasn't filing financial statements.

9        I wasn't sure what we were going to find in there.  So

10 we did it seriously.  We did it the way we would normally do a

11 litigation.  We kind of felt like that was our duty to the

12 class, and we discharged it that way.  We'll do it that way in

13 the future no matter what you do here.  That's kind of the way

14 we looked at it.

15       When we were finished and when we were confident in

16 it, we stopped.  So those are kind of my points on it,

17 your Honor, to the extent they're of interest to you.

18            THE COURT:  Of course they're of interest.

19            MR. BROWNE:  I could repeat the stuff that we said in

20 our papers, but your Honor has obviously read them.  So I

21 won't, but I'm happy to answer any questions about it that you

22 might have.

23            THE COURT:  I appreciate your explanation.

24       Does anyone else want to be heard on any aspect of the

25 attorneys' fee application?  I realize that there are

1    reasonable and quite modest fees for the individual plaintiffs,

2    and there are the costs which are also reasonable in terms of

3    the case.

4            No one else wants to be heard.

5            Well, with respect to the issue of the percentage of

6    the settlement fund, I believe that the appropriate percentage,

7    the fair and reasonable percentage, should be 20 percent rather

8    than 23 percent.  That is a percentage which is well within the

9    range of other cases, particularly large cases.

10           Taking the Lodestar at face value, which I've

11   explained why I questioned, it would still be a Lodestar

12   multiplier of about 1.22.  Costs, litigation expenses,

13   $296,362.39.

14           The Plaintiff Employees Retirement System of the City

15   of Baton Rouge and the Parish of East Baton Rouge is here by

16   awarded $950.36.  Lead Plaintiff Fresno County Employees

17   Retirement System is hereby awarded $5,019.12.  I will sign the

18   order.

19           I always try to sign the orders with language on the

20   page.  So I signed the penultimate page rather than the page

21   you had left for a signature page.

22           Thank you, all.

23           MR. BROWNE:  Thank you, your Honor, for your attention

24   to the case throughout and to your courtroom staff as well.

25   Thank you.

1              THE COURT:   The derivative settlement.

2              All right.   I've reviewed the papers.   I have a

3    proposed order approving the derivative settlement and order of

4    dismissal with prejudice and a proposed judgment.

5              I'm perfectly prepared to listen to any of the parties

6    with respect to the approval of the derivative settlement.

7    I've already made observations when I preliminarily approved

8    the settlement.   Since that time, no objections have been

9    raised to the settlement.

10             Given the institutional holders of the stock, that is

11   an important endorsement of the settlement.   On its face, the

12   company gets a payment of $10,000,000 in cash plus whatever the

13   value of the corporate reforms are, which is a substantial

14   settlement.

15             The settlement includes the counsel fees.   I'm not

16   being asked specifically to separate out the counsel fees.

17   It's part of the settlement agreement, and the counsel fees in

18   this case were separately recommended by Former Judge Phillips.

19   They were approved by the board, by the disinterested members

20   of the board.

21             I'm not being asked to separate out that portion of

22   the settlement.   If I were asked to do that, the Lodestar

23   multiplier is high.   The consideration is in stock, but the

24   stock appears to be doing well.

25             But in any event, the legal fees were approved by the

1   noninterested members of the board.  They come from the

2   company.  They're being paid in stock.  And unlike,

3   for example, in a class action settlement where usually the

4   reduction in the attorneys' fees go directly to the class

5   because the amount of the class recovery goes up, that is not,

6   of course, the case in this case, in the case of the derivative

7   settlement.

8           So those are some observations.  It is a good

9   settlement.  It was diligently pursued, procedurally and

10  substantively fair.  The reaction by the institutional

11  investors and shareholders underlines the fairness of the

12  settlement.

13          So those are my general observations, and I'm prepared

14  to listen to any of you who would like to say anything.

15          MR. GOODMAN:  Your Honor, Benny Goodman for

16  plaintiffs.

17          Your Honor, I think you've summed up what we think

18  about the settlement too.  Unless you have any questions, I

19  don't think I have more to add, other than to second much of

20  what you've said, your Honor.

21          THE COURT:  Anyone else?

22          Okay.  I've signed the order approving the derivative

23  settlement and the order of dismissal with prejudice.  I've

24  signed the judgment.

25          You all only gave me one proposed judgment and one

1  proposed order approving derivative settlement.  Right?

2           MR. GOODMAN:  Yes, your Honor.  That's the case.

3           THE COURT:  I made one change on your order approving

4  derivative settlement, which was on page 3, paragraph 8, you

5  said:  "Pursuant to Section 3(a)(10)," but you didn't say "of

6  the Securities Act."  So I added "of the Securities Act" in the

7  second sentence and the last sentence of paragraph 8.

8           MR. GOODMAN:  I see that, your Honor.  Thank you.

9           THE COURT:  Well, I will see that these get entered.

10 Thank you, all.

11          MR. GOODMAN:  Thank you, your Honor.  I appreciate

12 your time.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

IN RE ALTRIA GROUP, INC. DERIVATIVE
LITIGATION

Lead Case No. 3:20cv772 (DJN)

## ORDER AND FINAL JUDGMENT

WHEREAS, shareholder derivative litigation is pending in this Court entitled *In re Altria Group, Inc. Deriv. Litig.*, Lead Case No. 3:20-cv-00772 (DJN) (the "Federal Action");

WHEREAS, shareholder derivative litigation entitled *In re Altria Group, Inc. Deriv. Litig.*, Case No. CL20-7051 (the "Consolidated State Action"), *Cohen v. Willard*, Case No. CL20-7051, *Braunstein v. Gifford*, Case No. CL21-3490, *Lopez v. Casteen*, Case No. CL21-4137, *Dalton v. Surgner*, Case No. CL21-5548, and *McCollum v. Gifford*, Case No. CL21-5732 is pending in the Virginia Circuit Court of Henrico County, and *Merritts v. Casteen, et al.*, Case No. CL21-1093 is pending in the Virginia Circuit Court of Albemarle County (collectively the "State Actions") (together with the Federal Action, the "Litigations");

WHEREAS, Altria Group, Inc. ("Altria" or the "Company") shareholders, including Eric Gilbert ("Gilbert"), Thomas Sandys ("Sandys"), David Hamilton ("Hamilton"), Maria Cecilia Lorca ("Lorca") (collectively with Gilbert, Sandys, and Hamilton, the "Federal Plaintiffs"), Lawrence B. and Minda W. Cohen (the "Cohens"), Edward Ashi Braunstein ("Braunstein"), Jerry E. Dalton ("Dalton"), Portia McCollum ("McCollum"), Richard Merritts ("Merritts") (collectively with the Cohens, Braunstein, Dalton, McCollum, and Eugene Lopez, the "State Plaintiffs," and, collectively with the Federal Plaintiffs, the "Plaintiffs"), John Pietrobon ("Pietrobon"), Linwood W. Jones ("Jones"), Margaret A. Randolph ("Randolph"), the Margaret

A. Randolph Revocable Trust U/A 03/06/97 (the "Randolph Trust"), James Rizzolo ("Rizzolo"), and Jonathan Raul ("Raul"), have made shareholder litigation and books-and-records demands on behalf of or against Altria (the "Demands," and together with the Litigations, the "Actions");

WHEREAS, (1) the Plaintiffs; (2) Altria and all current and former Altria officers, directors, and employees named in any of the Actions, including Dinyar S. Devitre ("Devitre"); Debra J. Kelly-Ennis ("Kelly-Ennis"); W. Leo Kiely III ("Kiely"); Kathryn B. McQuade ("McQuade"); George Muñoz ("Muñoz"); John T. Casteen III ("Casteen"); Mark E. Newman ("Newman"); Nabil Y. Sakkab ("Sakkab"); Virginia E. Shanks ("Shanks"); Ellen R. Strahlman ("Strahlman"); the estate of Thomas F. Farrell II ("Farrell"); William F. Gifford, Jr. ("Gifford"); Howard A. Willard III ("Willard"); Kevin C. Crosthwaite, Jr. ("Crosthwaite"); W. Hildebrandt Surgner, Jr. ("Surgner"); Jody L. Begley ("Begley"); and Ivan S. Feldman ("Feldman") (collectively, the "Altria Defendants"); and (3) Juul Labs, Inc. ("JLI"), and all current and former JLI officers, directors, employees, and investors named in any of the Actions, including: Adam Bowen ("Bowen"); James Monsees ("Monsees"); Kevin Burns ("Burns"); Riaz Valani ("Valani"); Nicholas J. Pritzker ("Pritzker"); and Hoyoung Huh ("Huh") (the "JLI Defendants," and together with the Altria Defendants, the "Defendants") (together with the Plaintiffs, the "Parties") have entered into the Amended Stipulation and Agreement of Settlement (the "Stipulation") dated October 18, 2022, as amended by the Amendment to the Amended Stipulation and Agreement of Settlement ("Amendment") dated February 13, 2023 (together with the Stipulation, the "Amended Stipulation"), which sets forth the terms and conditions of the proposed settlement (the "Settlement"), that provides for a complete dismissal with prejudice of the Litigations, withdrawal of the Demands, and the release of the Released Claims on the terms and conditions set forth therein, subject to the approval of this Court;

WHEREAS, by Order dated October 26, 2022, ("Preliminary Approval Order"), this Court: (i) preliminarily approved the Settlement; (ii) ordered that notice of the proposed Settlement be provided to Current Altria Shareholders; (iii) provided any Person who owned Altria stock as of October 18, 2022, and continued to hold such Altria common stock as of the date of the Settlement Hearing with the opportunity to object to the proposed Settlement and/or Federal Co-Lead Plaintiffs' Counsel's application for a Fee and Expense Award and Service Awards; and (iv) scheduled a hearing regarding final approval of the Settlement ("Settlement Hearing");

WHEREAS, on December 30, 2022, an objection to the Settlement was filed by four Altria shareholders (the "Objectors");

WHEREAS, on January 20, 2023, after full briefing, the Court held the Settlement Hearing to consider, among other things, whether Judgment should be entered: (i) finally approving the terms of the Settlement as fair, reasonable, and adequate; (ii) dismissing with prejudice the Federal Action against Defendants pursuant to the terms of the Stipulation; and (iii) ruling upon Federal Co-Lead Plaintiffs' Counsel's application for a Fee and Expense Award and Service Awards;

WHEREAS, by Order dated January 23, 2023, the Court denied two of the Objectors' three objections to the Settlement, sustained a third, and continued the Settlement Hearing until February 16, 2023;

WHEREAS, on February 10, 2023, counsel for the Objectors informed the Parties that certain agreed revisions would resolve their objection to the settlement;

WHEREAS, on February 13, 2023, the Parties executed the Amendment;

WHEREAS, on February 16, 2023, the Court held the Settlement Hearing;

Reasonable and adequate notice having been given to Current Altria Shareholders as required in the Preliminary Approval Order, and the Court having considered all of the papers filed and proceedings had in this matter and otherwise being fully informed and good cause appearing therefor, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.      This Judgment incorporates by reference the definitions in the Amended Stipulation and, unless otherwise defined in this Judgment, all capitalized terms used in this Judgment shall have the same meaning as set forth in the Amended Stipulation.

2.      The Court has jurisdiction over the subject matter of the Actions, including all matters necessary to effectuate the Settlement, and over all Parties.

3.      The Court finds that: (a) the publication of the Summary Notice in the Wall Street Journal, the filing of the Stipulation and Notice with the SEC on Form 8-K, and the publication of the Stipulation and Notice on the "Investor Relations" page of Altria's corporate website were implemented in accordance with the Preliminary Approval Order and (b) the method of providing notice of the Settlement and the Settlement Hearing set forth in the Preliminary Approval Order: (i) constitutes notice that is reasonably calculated, under the circumstances, to apprise Current Altria Shareholders of the pendency of the Actions, of the effect of the proposed Settlement (including the releases to be provided thereunder), of their right to object to the Settlement and/or Federal Co-Lead Plaintiffs' Counsel's application for a Fee and Expense Award and Service Awards, and of their right to appear at the Settlement Hearing; (ii) constitutes due, adequate, and sufficient notice to all Persons entitled to receive notice of the proposed Settlement; and (iii) fully satisfies the requirements of Rule 23.1(c) of the Federal Rules of Civil Procedure and the requirements of due process.

4.     The Court finds that the Settlement set forth in the Amended Stipulation is fair, reasonable, and adequate as to each of the Parties, and hereby finally approves the Settlement in all respects, finds that the Settlement set forth in the Amended Stipulation provides substantial benefits to the Plaintiffs, to Altria and to Current Altria Shareholders, and orders the Parties to perform its terms to the extent the Parties have not already done so.

5.     The Federal Action, all claims contained therein, and the Released Claims, are hereby ordered compromised, settled, released, discharged, and dismissed on the merits and with prejudice by virtue of the proceedings in the Federal Action and this Judgment.  The Parties are each to bear their own costs, except as otherwise provided in the Amended Stipulation and in connection with any Fee and Expense Award and Service Awards approved by the Court.

6.     The terms of the Amended Stipulation and of this Judgment shall be forever binding on the Parties and all Current Altria Shareholders, as well as their respective successors and assigns.  Any Current Altria Shareholder who has not timely submitted any actual or potential objection to the Settlement in the manner provided in the Notice is deemed to have waived the right to object to any aspect of the proposed Settlement and the Fee and Expense Award and Service Awards (including any right of appeal or collateral attack); is forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Judgment to be entered approving the Settlement, or the Fee and Expense Award and Service Awards; and is deemed to have waived and forever barred and foreclosed from being heard, in this or any other proceeding with respect to any matters concerning the Settlement or the Fee and Expense Award and Service Awards.

7.     The Court orders that the releases set forth in the Amended Stipulation shall be effective as of the Effective Date. Accordingly, the Court orders that:

5

a.      Upon the Effective Date, Plaintiffs and each and every other Altria shareholder, in their capacities as such, derivatively on behalf of Altria, and on behalf of themselves and their respective agents, spouses, heirs, executors, administrators, personal representatives, predecessors, successors, transferors, transferees, representatives, and assigns, in their capacities as such ("Shareholder Releasors"), and Altria directly, shall be deemed to have, and by operation of law and Final Order and Judgment shall have, completely, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, discharged, and dismissed with prejudice the Released Plaintiffs' Altria Claims against the Altria Releasees.

b.      Upon the Effective Date, Shareholder Releasors and Altria directly shall be deemed to have, and by operation of law and Final Order and Judgment shall have, completely, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, discharged, and dismissed with prejudice the Released Plaintiffs' JLI Claims against the JLI Releasees.

c.      Upon the Effective Date, the Released Defendants shall be deemed to have, and by operation of law and Final Order and Judgment shall have, fully, finally, and forever released, relinquished, and discharged the Released Defendants' Claims against the Released Plaintiffs and shall be forever enjoined from prosecuting the Released Defendants' Claims, excluding claims relating to the enforcement or effectuation of the Settlement or Final Order and Judgment.

d.      "Released Plaintiffs' Altria Claims" means any and all claims, rights, demands, obligations, controversies, debts, disputes, damages, losses, actions, causes of action, issues, liabilities, and charges of any kind or nature whatsoever, whether in law or

equity, including both known claims and Unknown Claims, suspected or unsuspected, accrued or unaccrued, fixed or contingent, liquidated or unliquidated, matured or unmatured, foreseen or unforeseen, whether arising under federal or state statutory or common law, or any other law, rule, or regulation, whether foreign or domestic, against the Altria Releasees, that (i) were asserted in any of the complaints filed in the Actions or in any Demands, or (ii) could have been asserted by Altria directly, by Plaintiffs directly, or by Plaintiffs or any other Altria shareholder derivatively on behalf of Altria in any court, tribunal, forum, or proceeding, arising out of, relating to, based upon, or involving, directly or indirectly, any of the facts, allegations, practices, events, claims, disclosures, non-disclosures, occurrences, representations, statements, matters, transactions, conduct, actions, failures to act, omissions, or circumstances that were alleged or referred to in any of the complaints filed in the Actions or in any Demands, including, without limitation, any such claims based in whole or in part on any allegations relating to Altria's investment in JLI or made in any of the following actions or proceedings: (1) *Klein, et al. v. Altria Group, Inc., et al.*, Case No. 3:20-cv-00075-DJN (E.D. Va.), (2) *In the Matter of Altria Group, Inc.*, Docket No. 9393 (F.T.C.), (3) *In re: Juul Labs, Inc., Marketing, Sales Practice, and Products Liability Litigation*, Case No. 3:19-md-02913-WHO (N.D. Cal.), or (4) any government investigations, actions, or proceedings referenced in the Actions.

      e.      "Released Plaintiffs' JLI Claims" means any and all claims or demands, whether in law or equity, and whether arising under federal or state statutory or common law, or any other law, rule, or regulation, whether foreign or domestic, against the JLI Releasees, that: (i) were asserted on behalf of Altria in any of the complaints filed in the Actions or in any Demands (except claims for contribution or indemnification as

7

provided in the Amended Stipulation); or (ii) are for aiding, abetting, or otherwise facilitating the alleged breaches of fiduciary duty by the Altria Releasees set forth in any of the complaints filed in the Actions or any Demands.

        f.      "Released Defendants" means: (i) Defendants and Defendants' counsel; (ii) the current and former parents (including general or limited partners), affiliates, subsidiaries, successors, predecessors, assigns, and assignees of each of the Defendants and Defendants' counsel; and (iii) all of the former or current agents, controlling persons, principals, members, managers, managing members, direct or indirect equity holders, employees, officers, directors, trustees, predecessors, successors, attorneys, heirs, insurers, reinsurers, co-insurers, underwriters, accountants, auditors, consultants, other representatives, servants, respective past or present family members, spouses, agents, fiduciaries, corporations, bankers, estates, and advisors of each person and/or entity listed in (i) and (ii), in their capacities as such, and each of their current and former officers, directors, employees, parents, affiliates, subsidiaries, successors, predecessors, assigns, and assignees, in their capacities as such.

        g.      "Unknown Claims" means any and all Released Claims that any of the Parties or any Altria shareholder does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, including claims which, if known by him, her, or it, might have affected his, her, or its decision to settle or the terms of his, her, or its settlement with and releases provided to the other Parties, or might have affected his, her, or its decision not to object to this Settlement. With respect to any and all Released Plaintiffs' Altria Claims, the Parties stipulate and agree that, upon the Effective Date, the Parties shall expressly waive, and, with respect to Released Plaintiffs' Altria Claims that

could have been asserted derivatively by an Altria shareholder, all other Altria shareholders by operation of the Court's judgment shall have expressly waived, the provisions, rights, and benefits of California Civil Code § 1542, or any other law of the United States or any state or territory of the United States, or principle of common law that is similar, comparable, or equivalent to Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Parties and each Current Altria Shareholder may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity, but the Parties and each other Current Altria Shareholder derivatively on behalf of the Company shall expressly, fully, finally and forever settle and release, and upon the Effective Date and by operation of the Judgment shall have settled and released, fully, finally, and forever, any and all Released Claims as applicable without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and the Current Altria Shareholders shall be deemed by operation of the Judgment to have acknowledged,

that the foregoing waiver was separately bargained for and is a key element of the Settlement of which this release is a part.

h.      "Released Defendants' Claims" means any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, judgments, defenses, counterclaims, offsets, decrees, matters, issues, and controversies of any kind, nature, or description whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims, which were or which could have been asserted by any of the Defendants in any court, tribunal, forum, or proceeding, whether based on state, local, foreign, federal, statutory, regulatory, common, or other law or rule, and which are based upon, arise out of, relate in any way to, or involve, directly or indirectly, the commencement, prosecution, defense, mediation, or settlement of the Actions, including, but not limited to, discovery produced in the Actions. For the avoidance of doubt, the Released Defendants' Claims shall not include any claims to enforce this Settlement, Final Order and Judgment, or any other document memorializing the Settlement of the Actions and shall not include claims, if any, that any Party may have against its insurer with respect to any payment obligations under this Settlement.

i.      "Released Plaintiffs" means Plaintiffs, Plaintiffs' Counsel, Altria shareholder(s), and any and all of their former or current agents, parents, controlling persons, general or limited partners, members, managers, managing members, direct or indirect equity holders, subsidiaries, affiliates, employees, officers, directors,

predecessors, successors, attorneys, heirs, assigns, insurers, reinsurers, consultants, other representatives, servants, respective past or present family members, spouses, agents, fiduciaries, partners, corporations, direct or indirect affiliates, bankers, estates, and advisors, in their capacities as such.  Notwithstanding anything to the contrary herein, none of Altria or any of Altria's controlled affiliates shall be Released Plaintiffs.

j.      "Released Persons" means, collectively, the Released Defendants and the Released Plaintiffs. "Released Person" means, individually, any of the Released Persons.

8.      All Demands are hereby deemed withdrawn.

9.      Upon the Effective Date, Shareholder Releasors shall be forever enjoined from pursuing or prosecuting against the Altria Releasees or the JLI Releasees any and all Released Plaintiffs' Altria Claims and any and all Released Plaintiffs' JLI Claims, and any other derivative litigation or demands, including books-and-records demands, arising out of or relating to any of the facts, allegations, practices, events, claims, disclosures, non-disclosures, occurrences, representations, statements, matters, transactions, conduct, actions, failures to act, omissions, or circumstances that were alleged or referred to in any of the complaints filed in the Actions or in any Demands.

10.     Neither this Judgment, nor the Amended Stipulation (including any exhibits attached thereto), nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Amended Stipulation or the Settlement: (i) is or may be deemed to be or may be offered, attempted to be offered, or used or referred to in any way by the Parties as a presumption, a concession, an admission, or evidence of any fault, wrongdoing, or liability of any of the Parties or of the validity of any Released Claims; or (ii) is or may be deemed to be or may be used as a presumption, concession, admission, or evidence of any liability, fault, or

omission of any of the Released Persons in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Neither this Judgment, nor the Amended Stipulation, nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Amended Stipulation or the Settlement, shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Released Persons may file the Amended Stipulation and/or this Judgment in any action or proceeding that may be brought against them to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, standing, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11.     The Court hereby awards a Fee, Expense and Service Award in the toal amount of $15,295,614.44. Specifically, the Court hereby awards Attorneys' Fees in the amount of $15,000,000, which amount the Court finds to be fair and reasonable and which shall be paid to Plaintiffs' Counsel in accordance with the terms of the Amended Stipulation.[1] The Court hereby awards expenses in the amount of $220,614.44, which the Court finds to be fair and reasonable. Finally, Plaintiffs are each hereby awarded service awards in the amount of $15,000, which the Court finds to be fair and reasonable. Each such service award shall be a separate obligation of Altria and shall not be deducted or disbursed from the fee award or expense award. The entire amount of the Fee, Expense and Service Award ($15,295,614.44) shall remain in the escrow account until the later of (i) the Effective Date or (ii) the date upon which the Fee, Expense and Service Award has become final and non-appealable.

---

[1]     The Service Awards paid to the named plaintiffs shall not be deducted from the awarded attorneys' fees or expenses, but rather shall constitute a separate obligation of Altria in the amount of $75,000 — $15,000 for each named plaintiff.

12.     Without further approval from the Court, the Parties are hereby authorized to agree to and adopt such amendments or modifications of the Amended Stipulation or any exhibits attached thereto, to effectuate the Settlement that: (i) are not materially inconsistent with this Judgment; and (ii) do not materially limit the rights of Altria or Current Altria Shareholders in connection with the Settlement. Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any provisions of the Settlement.

13.     The Court retains jurisdiction to consider and resolve any disputes that may arise in connection with any amendment or modification (as permitted in the Amended Stipulation) and with respect to the interpretation, implementation, and enforcement of the terms of the Amended Stipulation and implementation and enforcement of the Settlement, including disputes involving the allocation of attorneys' fees.

14.     Pursuant to *Kokkonen v. Guardian Life*, 511 U.S. 375 (1994), the Court will retain jurisdiction with respect to the interpretation, implementation, and enforcement of the terms of the Amended Stipulation, and the Parties and their undersigned counsel submit to the jurisdiction of the Court for purposes of implementing, interpreting, and enforcing the Settlement embodied in the Amended Stipulation.

This Judgment is final and appealable.  Let the Clerk file a copy of this Final Order and Judgment electronically and notify all counsel of record.

It is so ORDERED.

The case is now CLOSED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: February 17, 2023

13